**2024-1194, 2024-1221, 2024-1222, 2024-1223**

# United States Court of Appeals
# for the Federal Circuit

CAO LIGHTING, INC.,

*Appellant,*

– v. –

WOLFSPEED, INC., IDEAL INDUSTRIES LIGHTING LLC,
DBA Cree Lighting, LEDVANCE LLC, GENERAL ELECTRIC COMPANY,
CONSUMER LIGHTING (U.S.), LLC, DBA GE Lighting, CURRENT
LIGHTING SOLUTIONS, LLC, OSRAM SYLVANIA, INC.,
FEIT ELECTRIC COMPANY, INC.,

*Cross-Appellants.*

CAO LIGHTING, INC.,

*Appellant,*

– v. –

WOLFSPEED, INC., IDEAL INDUSTRIES LIGHTING LLC,
DBA Cree Lighting,

*Cross-Appellants.*

*Appeals from the United States Patent and Trademark Office,
Patent Trial and Appeal Board in Nos. IPR2022-00847,
IPR2023-0123, IPR2023-00129 and IPR2022-00848*

## BRIEF FOR APPELLANT CAO LIGHTING, INC.

TODD G. VARE
PAUL B. HUNT
JOSHUA P. LARSEN
BARNES & THORNBURG LLP
11 South Meridian Street
Indianapolis, Indiana 46204
(317) 236-1313
todd.vare@btlaw.com
paul.hunt@btlaw.com
joshua.larsen@btlaw.com

RONALD E. CAHILL
HEATHER B. REPICKY
BARNES & THORNBURG LLP
One Marina Park Drive, Suite 1530
Boston, Massachusetts 02210
(617) 316-5310
rcahill@btlaw.com
hrepicky@btlaw.com

*Counsel for Appellants*

MARCH 25, 2024

 COUNSEL PRESS   (800) 4-APPEAL • (328521)

## U.S. Patent No. 6,465,961

### Original Claims 1, 7, and 8

**1.** A semiconductor light source for emitting light to illuminate a space used by humans, the semiconductor light source comprising:

> an enclosure, said enclosure being fabricated from a material substantially transparent to white light,
>
> an interior volume within said enclosure,
>
> a heat sink located in said interior volume,
>
> said heat sink being capable of drawing heat from one or more semiconductor devices,
>
> said heat sink having a plurality of panels on it suitable for mounting semiconductor devices thereon,
>
> said panels on said heat sink being oriented to facilitate emission of light from the semiconductor light source in desired directions around the semiconductor light source,
>
> at least one semiconductor chip being capable of emitting light mounted on one of said panels,
>
> said semiconductor chip being capable of emitting monochromatic light,
>
> said semiconductor chip being selected from the group consisting of light emitting diodes, light emitting diode arrays, laser chips, LED modules, laser modules, and VCSEL chips, and
>
> a coating for converting monochromatic light emitted by said chip to white light.

**7.** A device as recited in claim **1** wherein said chip includes a substrate on which epitaxial layers are grown,

a buffer layer located on said substrate, said buffer layer serving to mitigate differences in material properties between said substrate and other epitaxial layers,

a first cladding layer serving to confine electron movement within the chip, said first cladding layer being adjacent said buffer layer,

an active layer, said active layer emitting light when electrons jump to a valance state,

a second cladding layer, said second cladding layer positioned so that said active layer lies between cladding layers, and

a contact layer on which an electron may be mounted for powering said chip.

**8.** A device as recited in claim **7** further comprising a first and a second reflective layers, each of said first and second reflective layers being located on opposite sides of said active layer, said reflective layers serving to reflect light emitted by said active layer.

## Claims 21, 32, and 36

**21.** The semiconductor light source as recited in claim **8** wherein:

said at least one semiconductor chip is a light emitting diode (LED) chip configured to output light at greater than about 40 milliwatts, and

said LED chip is configured to emit monochromatic light.

**32.** The semiconductor light source as recited in claim **21** wherein:

the semiconductor light source further comprises an AC/DC converter,

said AC/DC converter is configured to convert AC power into DC power that is usable by said LED chip, and

said AC/DC converter is position outside said interior volume.

**36.** The semiconductor light source as recited in claim **21** wherein: said coating is directly applied to a face of said LED chip.

---

## U.S. Patent No. 6,634,770

**Original Claims 1 and 9**

**1.** A semiconductor light source for emitting light to illuminate a space used by humans, the semiconductor light source comprising:

an enclosure, said enclosure being fabricated from a material substantially transparent to white light,

a base to which said enclosure is mounted,

an interior volume within said enclosure,

a secondary heat sink located in said interior volume, said secondary heat sink being capable of drawing heat from one or more semiconductor devices,

said heat sink being capable of drawing heat from one or more semiconductor devices,

said plurality of primary heat sinks mounted on said secondary heat sink, each of said primary heat sinks being smaller than said secondary heat sink,

at least one semiconductor chip being capable of emitting light mounted on one of said panels,

a semiconductor chip capable of emitting light mounted on one of said primary heat sinks, said seminconductor chip being capable of emitting monochromatic light, said semiconductor chip being selected from the group consisting of light emitting diodes, light emitting diode arrays, laser chips, and VCSEL chips,

said chip including a substrate on which epitaxial layers are grown,

a buffer layer located on said substrate, said substrate serving to mitigate differences in material properties between said substrate and other epitaxial layers,

a first cladding layer serving to confine electron movement within the chip, said first cladding layer being adjacent said buffer layer,

an active layer, said active layer emitting light when electrons jump to a valance state,

a second cladding layer, said second cladding layer positioned so that said active layer lies between cladding layers, and

a contact layer on which an electron may be mounted for powering said chip, and

a coating for converting monochromatic light emitted by said chip to white light.

**9.** A device as recited in claim **1** wherein said substrate is electrically conductive.

## Claims 18, 32, and 36

**18.** The semiconductor light source as recited in claim **9** wherein:

said semiconductor chip is a light emitting diode (LED) chip configured to output light at greater than about 40 milliwatts,

said LED chip is surface mounted on said one of said primary heat sinks, and

said LED chip is configured to emit monochromatic visible light.

**32.** The semiconductor light source as recited in claim **18** wherein:

the semiconductor light source further comprises an AC/DC converter,

said AC/DC converter is configured to convert AC power into DC power that is usable by said LED chip, and

said AC/DC converter is position outside said interior volume.

36. The semiconductor light source as recited in claim **18** wherein:

said coating is directly applied to a face of said LED chip.

**FORM 9. Certificate of Interest**                                       Form 9 (p. 1)
                                                                          March 2023

# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

## CERTIFICATE OF INTEREST

**Case Number**  2024-1194, 2024-1221, 2024-1222, 2024-1223

**Short Case Caption**  CAO Lighting, Inc. v. Wolfspeed, Inc. et al.

**Filing Party/Entity**  CAO Lighting, Inc.

---

**Instructions:**

1.  Complete each section of the form and select none or N/A if appropriate.

2.  Please enter only one item per box; attach additional pages as needed, and check the box to indicate such pages are attached.

3.  In answering Sections 2 and 3, be specific as to which represented entities the answers apply; lack of specificity may result in non-compliance.

4.  Please do not duplicate entries within Section 5.

5.  Counsel must file an amended Certificate of Interest within seven days after any information on this form changes.  Fed. Cir. R. 47.4(c).

---

I certify the following information and any attached sheets are accurate and complete to the best of my knowledge.


Date: 03/25/2024                    Signature:  /s/ Ronald E. Cahill

                                    Name:       Ronald E. Cahill

FORM 9. Certificate of Interest

| 1. Represented Entities. Fed. Cir. R. 47.4(a)(1). | 2. Real Party in Interest. Fed. Cir. R. 47.4(a)(2). | 3. Parent Corporations and Stockholders. Fed. Cir. R. 47.4(a)(3). |
|---|---|---|
| Provide the full names of all entities represented by undersigned counsel in this case. | Provide the full names of all real parties in interest for the entities. Do not list the real parties if they are the same as the entities. ☐ None/Not Applicable | Provide the full names of all parent corporations for the entities and all publicly held companies that own 10% or more stock in the entities. ☐ None/Not Applicable |
| CAO Lighting, Inc. | | CAO Group, Inc. |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

☐     Additional pages attached

**4. Legal Representatives.** List all law firms, partners, and associates that (a) appeared for the entities in the originating court or agency or (b) are expected to appear in this court for the entities. Do not include those who have already entered an appearance in this court. Fed. Cir. R. 47.4(a)(4).

☐    None/Not Applicable        ☐    Additional pages attached

| | | |
|---|---|---|
| Adam B. Kauffman<br>Barnes & Thornburg LLP | | |
| Megan M. New<br>Barnes & Thornburg LLP | | |
| Kevin B. Laurence<br>Laurence & Phillips IP Law | | |

**5. Related Cases.** Other than the originating case(s) for this case, are there related or prior cases that meet the criteria under Fed. Cir. R. 47.5(a)?

☑ Yes (file separate notice; see below)   ☐ No   ☐ N/A (amicus/movant)

If yes, concurrently file a separate Notice of Related Case Information that complies with Fed. Cir. R. 47.5(b). **Please do not duplicate information.** This separate Notice must only be filed with the first Certificate of Interest or, subsequently, if information changes during the pendency of the appeal. Fed. Cir. R. 47.5(b).

**6. Organizational Victims and Bankruptcy Cases**. Provide any information required under Fed. R. App. P. 26.1(b) (organizational victims in criminal cases) and 26.1(c) (bankruptcy case debtors and trustees). Fed. Cir. R. 47.4(a)(6).

☑    None/Not Applicable        ☐    Additional pages attached

| | | |
|---|---|---|
| | | |
| | | |

# TABLE OF CONTENTS

CERTIFICATE OF INTEREST ...................................................................i

TABLE OF CONTENTS .......................................................................iv

TABLE OF AUTHORITIES.................................................................vii

STATEMENT OF RELATED CASES .................................................... 1

STATEMENT OF JURISDICTION........................................................ 1

STATEMENT OF THE ISSUES............................................................. 2

STATEMENT OF THE CASE .................................................................5

    A.   Dr. Cao invents and patents a general-purpose light source able to manage heat from high-powered semiconductor chips. ............................................................5

        i.     The '961 and '770 patents issue in 2002 and 2003, respectively................................................................6

        ii.    The challenged patents survive multiple reexaminations with new claims issuing over Begemann. .........................9

    B.   Infringers unearth Krames 2000 to combine with Begemann, but a Delaware jury finds this combination fails to render the '961 patent's new claims obvious. ............. 12

    C.   The new claims of the '961 and '770 patents are subject to inter partes review ("IPR")...................................................... 15

        i.     The Board institutes IPR proceedings based on Cree's proposed combination of Begemann and Krames 2000's LED chip having 170 mW of light output at 1.5 amps.................................................... 15

        ii.    CAO Lighting establishes that a POSITA would never use Krames 2000's LED chip configured to output 170 mW of light in Begemann. ........................... 19

iii.    Cree abandons its proposed combination and engages Dr. Krames to salvage its IPRs. ........................ 22

        a.    Cree concedes that a POSITA would not combine Begemann with the LED chip from Krames 2000 at 170 mW. ..................................... 22

        b.    Cree pivots to a new alleged combination. ........... 23

D.    The Board invalidates, among others, claims 21, 32, and 36 of the '961 patent and claims 18, 32, and 36 of the '770 patent. ................................................................ 23

SUMMARY OF ARGUMENT ................................................................ 27

STANDARD OF REVIEW ..................................................................... 28

ARGUMENT ......................................................................................... 30

I.    The Board's holding that Krames 2000 is proper prior art is unsupported by substantial evidence. ............................................. 30

A.    No evidence exists to show that Krames 2000 was distributed at the January 2000 SPIE Conference. ............. 31

B.    The Board invented its findings regarding the ability of a POSITA to locate Krames 2000 before the critical date. ..... 32

II.    The Board grounded its obviousness holding in an erroneous and untimely claim construction. .................................. 37

A.    The Board misconstrued the limitation requiring a LED chip "configured to" output light at greater than 40 mW. ....................................................................... 39

    i.    The Board's claim construction conflicts with hornbook patent law. ..................................................... 39

    ii.    The Board's construction neglects a POSITA's understanding of basic scientific principles. ................... 44

  iii.   The Board's construction is at odds with every prior application of the challenged claims. ...................46

  B.   The Board's late-breaking claim construction—emerging from Cree's midstream change in theories—violates the APA. ...............................................................................53

III. The Board's motivation to combine finding fails as a matter of fact and law. ..................................................................54

  A.   The Board disregarded undisputed evidence that the LED chips in Krames 2000 are too inefficient. .....................57

    i.   Krames 2000 refutes rather than supports a motivation to combine. ...................................................58

    ii.   The industry agreed that Krames 2000's LED chips were not ready for general purpose lighting. .......62

  B.   To ground its motivation to combine holding, the Board contorted a single sentence from Krames 2000. ...................64

  C.   A hypothetical confected by Dr. Krames through hindsight cannot support the Board's motivation to combine finding. ...............................................................66

  D.   The Board altogether failed to address reasonable expectation of success. .........................................................68

IV. The Board erred as a matter of law in dismissing CAO Lighting's evidence of long-felt but unmet need. ...................69

CONCLUSION ...........................................................................71

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Acceleration Bay, LLC v. Activision Blizzard Inc.*,
908 F.3d 765 (Fed. Cir. 2018) ..............................................29, 33, 34, 37

*Aspex Eyewear, Inc. v. Marchon Eyewear, Inc.*,
672 F.3d 1335 (Fed. Cir. 2012) ...................................................... 44

*Axonics, Inc. v. Medtronic, Inc.*,
75 F.4th 1374 (Fed. Cir. 2023)...................................................... 53

*Blue Calypso, LLC v. Groupon, Inc.*,
815 F.3d 1331 (Fed. Cir. 2016) ..................................................30, 32

*CAO Lighting, Inc. v. General Electric Co.*,
C.A. Nos. 20-681-GBW, 20-690-GBW,
2023 WL 1930354 (D. Del. Jan. 30, 2023)........................ 45, 46, 48, 50

*Consol. Edison Co. of N.Y. v. N.L.R.B.*,
305 U.S. 197 (1938) ................................................................... 29

*In re Cronyn*,
890 F.2d 1158 (Fed. Cir. 1989) ..................................................32, 33

*Dionex Softron GmbH v. Agilent Techs., Inc.*,
56 F.4th 1353 (Fed. Cir. 2023)........................................................ 29

*Dr. Falk Pharma GmbH v. GeneriCo, LLC*,
774 F. App'x 665 (Fed. Cir. 2019)................................................54, 55

*Fantasy Sports Props., Inc. v. Sportsline.com, Inc.*,
287 F.3d 1108 (Fed. Cir. 2002) ...................................................... 42

*Forest Lab'ys, LLC v. Sigmapharm Lab'ys, LLC*,
918 F.3d 928 (Fed. Cir. 2019) ........................................................ 56

*In re Gartside*,
203 F.3d 1305 (Fed. Cir. 2000) ...................................................... 29

*Graham v. John Deere Co.*,
   383 U.S. 1 (1966) ................................................................. 70

*In re Hall*,
   781 F.2d 897 (Fed. Cir. 1986) ............................................. 30

*HTC Corp. v. Cellular Commc'ns Equip., LLC*,
   877 F.3d 1361 (Fed. Cir. 2017) ........................................... 38

*Icon Health & Fitness, Inc. v. Strava, Inc.*,
   849 F.3d 1034 (Fed. Cir. 2017) ........................................... 36

*INVT SPE LLC v. Int'l Trade Comm'n*,
   46 F.4th 1361 (Fed. Cir. 2022)...................................... 42, 43

*K-fee Sys. GmbH v. Nespresso USA, Inc.*,
   89 F.4th 915 (Fed. Cir. 2023)............................................. 40

*KSR Int'l Co. v. Teleflex Inc.*,
   550 U.S. 398 (2007) ........................................................... 56

*Kyocera Wireless Corp. v. Int'l Trade Comm'n*,
   545 F.3d 1340 (Fed. Cir. 2008) ........................................... 30

*Life Techs., Inc. v. Clontech Labs., Inc.*,
   224 F.3d 1320 (Fed. Cir. 2000) ........................................... 70

*Mass. Inst. of Tech. v. AB Fortia*,
   774 F.2d 1104 (Fed. Cir. 1985) ........................................... 31

*Merck Sharp & Dohme B.V. v. Warner Chilcott Co., LLC*,
   711 F. App'x 633 (Fed. Cir. 2017)....................................... 68

*Mintz v. Dietz & Watson, Inc.*,
   679 F.3d 1372 (Fed. Cir. 2012) ........................................... 70

*In re NuVasive, Inc.*,
   841 F.3d 966 (Fed. Cir. 2016) ............................................. 29

*In re Nuvasive, Inc.*,
   842 F.3d 1376 (Fed. Cir. 2016) ........................... 57, 58, 60, 61

*OSI Pharms., LLC v. Apotex Inc.*,
 939 F.3d 1375 (Fed. Cir. 2019) .......................................................... 29

*ParkerVision, Inc. v. Qualcomm Inc.*,
 903 F.3d 1354 (Fed. Cir. 2018) .......................................................... 42

*Pers. Web Techs., LLC v. Apple, Inc.*,
 848 F.3d 987 (Fed Cir. 2017) ...................................................... 28, 69

*Phillips v. AWH Corp.*,
 415 F.3d 1303 (Fed. Cir. 2005) .......................................................... 40

*Qualcomm Inc. v. Intel Corp.*,
 6 F.4th 1256 (Fed. Cir. 2021) ............................................................. 54

*Randall Mfg. v. Rea*,
 733 F.3d 1355 (Fed. Cir. 2013) .......................................................... 29

*Rovalma, S.A. v. Bohler-Edelstahl GmbH & Co. KG*,
 856 F.3d 1019 (Fed. Cir. 2017) .......................................................... 53

*Salesforce.com, Inc. v. WSOU Invs., LLC*,
 IPR2022-00357,
 2022 WL 2718956 (PTAB July 13, 2022) .............................. 34, 35, 36

*Samsung Elecs. Co. Ltd. v. Infobridge Pte. Ltd.*,
 929 F.3d 1363 (Fed. Cir. 2019) .......................................................... 33

*SAS Inst., Inc. v. ComplementSoft, LLC*,
 825 F.3d 1341 (Fed. Cir. 2016) *rev'd on other grounds sub
 nom. SAS Inst., Inc. v. Iancu*, 138 S. Ct. 1348 (2018) ........................ 54

*Smiths Indus. Med. Sys., Inc. v. Vital Signs, Inc.*,
 183 F.3d 1347 (Fed. Cir. 1999) .......................................................... 56

*Warner Chilcott Lab'ys Ireland Ltd. v. Impax Lab'ys, Inc.*,
 C.A. Nos. 2:08-cv-06304, 2:09-cv-02073,
 2:09-cv-01233, 2012 WL 1551709 (D.N.J. Apr. 30, 2012),
 *aff'd sub nom. Warner Chilcott Co., LLC v. Impax Lab'ys,
 Inc.*, 478 F. App'x 672 (Fed. Cir. 2012).............................................. 67

ix

x

**Statutes**

5 U.S.C. § 554 ................................................................................53

35 U.S.C. § 102................................................................*passim*

35 U.S.C. § 103.........................................................28, 29, 70

## STATEMENT OF RELATED CASES

Appellant CAO Lighting, Inc. ("CAO Lighting") states that the following pending cases involve U.S. Patent No. 6,465,961 (the "'961 patent") and/or U.S. Patent No. 6,634,770 (the "'770 patent") and may be affected by these consolidated appeals:

- *CAO Lighting, Inc. v. Feit Electric Company, Inc.*, Case Nos. 2023-1906, 2023-1908 (Fed. Cir.);

- *CAO Lighting, Inc. v. General Electric Company et al.*, C.A. No. 1:20-cv-00681 (D. Del.);

- *CAO Lighting, Inc. v. OSRAM Sylvania, Inc. et al.*, C.A. No. 1:20-cv-00690 (D. Del.); and

- *CAO Lighting, Inc. v. Cree, Inc. et al.*, C.A. No. 1:21-cv-00634 (M.D.N.C.).

## STATEMENT OF JURISDICTION

Pursuant to 28 U.S.C. § 1295(a)(4)(A), this Court has jurisdiction over these appeals from the Patent Trial and Appeal Board (the "Board") of the United States Patent and Trademark Office ("PTO"). On September 28, 2023, the Board entered its Final Written Decisions in IPR2022-00847—to which IPR2023-0123 and IPR2023-0129 were joined—and IPR2022-00848. CAO Lighting filed timely notices of appeal on November 22, 2023. Notices of cross-appeal were timely filed by, among others, Wolfspeed, Inc. and Ideal

1

Industries Lighting, LLC d/b/a Cree Lighting (collectively, "Petitioners" or "Cree") on November 30, 2023. This Court consolidated CAO Lighting's appeals together with the cross-appeals by order dated December 19, 2023.

## STATEMENT OF THE ISSUES

In holding nearly all of the claims of the '961 and '770 patents (collectively, the "challenged patents") invalid as obvious in view of a combination including two references—International Patent Application Publication No. WO 00/17569 to Begemann ("Begemann") and Krames et al., "High-brightness AlGaInN light emitting diodes" ("Krames 2000")—the Board committed both procedural and substantive errors.

Among other things, the Board's fact findings relevant to the status of and disclosures in Krames 2000 are unsupported or directly contradicted by the record evidence. For example, to distinguish the evidence presented here from this Court's (and the Board's own) precedent, the Board was forced to fabricate from whole cloth "facts" regarding the public accessibility of Krames 2000. Moreover, the Board held that a person of ordinary skill in the art ("POSITA") would

2

be motivated to combine Begemann with Krames 2000 because, among other things, the combination would result in an efficient replacement light bulb. But the unrebutted evidence establishes the exact opposite: the proposed combination would result in a bulb less efficient than a traditional lighting source.

In its Final Written Decisions, the Board also unveiled a new claim construction related to the "configured to output light at greater than about 40 milliwatts" limitation in the challenged claims. That construction—i.e., that the claims do not require a chip that is capable of outputting light greater than about 40 mW when placed in the claimed structure—is incorrect as a matter of law. It further is contrary to all previous applications of that limitation, including all analyses and arguments the parties presented to the Board.

The Board further employed the kind of hindsight analysis this Court has repeatedly and forcefully rejected. In both attempting to shore up its unsupported findings with respect to motivation to combine as well in rejecting CAO Lighting's evidence of long-felt but unmet need, the Board allowed hindsight to dominate.

These appeals thus present the issue of whether the Board's

3

errors—individually and collectively—require reversal of its obviousness holdings. Within that issue are four questions:

1.    Did the Board err in holding that Krames 2000 constitutes a "printed publication" under § 102(b) given Cree's failure to show that this research paper was distributed before the critical date or that a POSITA, exercising reasonable diligence, would be able to locate it based on the title, author, or subject matter of the compilation in which it was published?

2.    Whether the Board adopted and applied an erroneous and untimely construction when it revealed for the first time in its Final Written Decisions an interpretation of "configured to" that vitiated from the claims the core of the claimed invention?

3.    Did the Board err in holding that a POSITA would be motivated to combine the LED chip of Krames 2000 in the structure of Begemann where it made clearly erroneous fact findings, disregarded undisputed evidence, and applied hindsight?

4.    Whether the Board impermissibly rejected CAO Lighting's evidence of long-felt but unmet need based on how Dr. Cao made the invention?

4

## STATEMENT OF THE CASE

**A.    Dr. Cao invents and patents a general-purpose light source able to manage heat from high-powered semiconductor chips.**

More than two decades ago, Dr. Densen Cao (through counsel) filed the applications that ultimately issued as the '961 and the '770 patents. Appx1, Appx32.  These patents are directed to solving a problem that the lighting industry struggled with for years: how to replace traditional incandescent, fluorescent, and halogen general-purpose lights (e.g., light bulbs, lamps, and luminaires) with a light source having high-powered semiconductor chips.  *See* Appx18 ('961 patent, 1:6–31), *id.* ('961 patent, 1:46–53), Appx49 ('770 patent, 1:5–31), *id.* ('770 patent, 1:46–53).  Their shared specification describes how, historically, semiconductors were not "successfully and economically used to illuminate physical spaces." Appx18 ('961 patent, 1:20–22), Appx49 ('770 patent, 1:19–21).  Not only did semiconductor chips—such as light emitting diode ("LED") chips— typically lack the necessary high-intensity light to illuminate residential, commercial, and outdoor spaces, but they "took an excessive amount of physical space and created unmanageable amounts of heat."  Appx18 ('961 patent, 1:27–28), Appx49 ('770 patent, 1:27–28); *see also*

5

Appx14362–14372 (describing problems faced in the lighting industry before 2001 as a result of inefficiency, intensity, and heat); Appx14925–14939 (providing overview of problems associated with using white light LEDs for general illumination at the time of the invention).  To solve these issues, the claims of the '961 and '770 patents generally relate to two aspects of a light source: (1) the structure and characteristics of the semiconductor chip(s) used in the light source *and* (2) the structure and overall components of the light source, itself.  *See, e.g.*, Appx22 ('961 patent, claim 1); Appx53 ('770 patent, claim 1).[1]

> ### i.   The '961 and '770 patents issue in 2002 and 2003, respectively.

The PTO issued the challenged patents approximately one year apart.

When the '961 patent issued on October 15, 2002, it included twenty claims.  Appx22–23.  Independent claim 1 of the '961 patent

---

[1] In or about June 2008, Dr. Cao introduced the Dynasty® family of LED lighting products.  *See* Appx14865.  These Dynasty® lamps embodied Dr. Cao's inventions and were heralded for their efficiency.  *Id.*  They were used, for example, to replace the incandescent lamps illuminating the famous Ghirardelli Square sign in San Francisco, California.  *See* Appx14889–14891.

recited:

1. A semiconductor light source for emitting light to illuminate a space used by humans, the semiconductor light source comprising:

an enclosure, said enclosure being fabricated from a material substantially transparent to white light,

an interior volume within said enclosure,

a heat sink located in said interior volume,

said heat sink being capable of drawing heat from one or more semiconductor devices,

said heat sink having a plurality of panels on it suitable for mounting semiconductor devices thereon,

said panels on said heat sink being oriented to facilitate emission of light from the semiconductor light source in desired directions around the semiconductor light source,

at least one semiconductor chip being capable of emitting light mounted on one of said panels,

said semiconductor chip being capable of emitting monochromatic light,

said semiconductor chip being selected from the group consisting of light emitting diodes, light emitting diode arrays, laser chips, LED modules, laser modules, and VCSEL chips, and

a coating for converting monochromatic light emitted by said chip to white light.

Appx22. Many of the elements of claim 1 can be found in Fig. 1 of the



**Fig. 1**

'961 patent (reproduced left)—namely, an enclosure 101 enclosing an interior volume 102, a heat sink 104 with a plurality of panels oriented to facilitate the emission of light in desired directions, and a semiconductor chip 106 mounted on one of said

panels. Appx2; see also Appx18–19 ('961 patent, 2:49–3:52). In this embodiment, the claimed light source takes the form of a traditional light bulb having multiple semiconductor devices, each mounted on a panel of a heat sink. *Id.*

The originally-issued '961 patent also included, among others, dependent claims 7 and 8. These dependent claims added additional detail with respect to the structure of the semiconductor chip recited

in claim 1 (e.g., substrate, buffer, cladding layers, active layer, and reflective layers).  Appx22.

When the '770 patent issued on October 21, 2003, it included seventeen claims that—like the claims of the '961 patent—were directed to the structure of both the light source and the semiconductors to be used therein.  Appx53–54.  For example, claim 1 of the '770 patent recited, among other things, "an enclosure," "a base," and "an interior volume."  Appx53.  The claimed light source also included both "a secondary heat sink" and a "plurality of primary heat sinks" to effectively draw heat from the semiconductor chip having the specific structure recited.  *Id.*  Several of the original dependent claims of the '770 patent added additional elements to the semiconductor of claim 1, including, for example, claim 9, which recited that the substrate is "electrically conductive."  *Id.*

### ii. The challenged patents survive multiple reexaminations with new claims issuing over Begemann.

Ten years after the challenged patents issued, their original claims were subject to both *inter partes* and *ex parte* reexamination

proceedings.[2] *See, e.g.*, Appx6542–6615, Appx7911–8054, Appx9657–9879, Appx16117–16181, Appx16437–16694, Appx17281–17462. In each of these six proceedings, the PTO reexamined the original claims in view of Begemann in combination with at least one other secondary reference. *See, e.g.*, Appx6103–6117; Appx17199–17214.

Begemann describes a lamp, or light bulb, which utilizes LEDs. *See* Appx10232 (Begemann at 1:1–3.) In contrast to the challenged patents, Begemann relies on using a combination of LEDs with different colors—such as red, blue, and green—to create white light. Appx10234 (Begemann at 3:6–9, 3:19–21), Appx10236 (*id.* at 5:17–26) Appx10240 (*id.* at FIG. 2). Moreover, because it makes no disclosure of any LEDs having an output of more than 5 lumens, Begemann does not disclose or contemplate a heat-sinking structure capable of managing the heat generated by high-powered LEDs. *See* Appx10230–10245; *see also* Appx15305–15310.

---

[2] OSRAM Sylvania, Inc. and GE Lighting, Inc. initiated these reexamination proceedings. Both these entities were among several defendants—which also included Feit Electric Company, Inc. ("Feit")—in then-pending litigation involving the challenged patents in the United States District Court for the District of Utah (Case No. 2:11-cv-426-DB). *See* Appx7883–7905.

During the reexamination proceedings, the original claims of the challenged patents were cancelled and new claims were added. *See, e.g.*, Appx14343. In each patent, the first new claim:

- incorporates structure of the light source and semiconductor chip from the original claims;

- limits the claimed semiconductor chip to a "light emitting diode (LED) chip;" and

- requires that the LED chip be "configured to output light at greater than 40 milliwatts."

Appx26–29, Appx63–66. For example, claim 21 of the '961 patent recites:

> **21.**    The semiconductor light source as recited in claim 8 [which depends from claim 7, which depends from claim 1] wherein:
>
> > said at least one semiconductor chip is a light emitting diode (LED) chip configured to output light at greater than about 40 milliwatts, and
>
> > said LED chip is configured to emit monochromatic visible light.

Appx26; *see also* Appx63. Although differences between claim 21 of the '961 patent and claim 18 of the '770 patent exist, these claims cover the fundamental structure of light sources containing heat sink configurations on which high-powered LED chips are mounted to emit

11

visible light. *See* Appx14345.[3] Importantly, these claims overcame rejections based on Begemann; as explained during reexamination of the '961 patent, ". . . it would not have been obvious to have modified Begemann to include one or more LED chips 'configured to *output light at greater than about 40 milliwatts*' because the structure of Begemann is not equipped to handle the increase in heat generation that such a modification would necessarily entail." Appx5916.

**B.   Infringers unearth Krames 2000 to combine with Begemann, but a Delaware jury finds this combination fails to render the '961 patent's new claims obvious.**

In May 2020, CAO Lighting filed two actions in the United States District Court for the District of Delaware for infringement of, among others, claim 21 of the '961 patent. *See* Appx11768, Appx11802. These actions, which were consolidated for pretrial purposes, sought damages for infringement from five defendants, including OSRAM Sylvania, Inc., LEDVANCE, LLC, and General Electric Company (collectively, the "Delaware Defendants"). *See id.*

---

[3] Each of the other new claims in the '961 patent and '770 patent depend from claim 21 and claim 18, respectively.

In defense of CAO Lighting's infringement claims, the Delaware Defendants retained Michael Krames, Ph.D. to opine on the validity of the '961 patent. *See* Appx11851–11876. Dr. Krames, who has extraordinary experience with LEDs, had worked in the Advanced Laboratories at Philips Lumileds/Lumileds Lighting from 1999 through 2009 and is a named inventor on 165 United States patents. Appx11875–11876.

Nearly all of Dr. Krames's prior-art-based invalidity opinions in the district court litigation relied on references previously cited against the challenged patents, including Begemann. *See, e.g.*, Appx11908–11963. Dr. Krames, however, further identified a conference paper that he co-authored related to an experimental LED device. *See* Appx11930–11935. That paper—Krames 2000—was selected for presentation at the proceedings of The International Society for Optical Engineering ("SPIE") in January 2000 in San Jose, California. *See* Appx10706–10724. It discusses using certain LED chips in traffic signals and, maybe, at some future date in a single LED flashlight. *See* Appx10254–10255. Despite earlier litigation involving the Delaware Defendants in the District of Utah and six

13

prior reexaminations, Dr. Krames's use of Krames 2000 was the first time this paper had been cited as prior art vis-à-vis the claims of the '961 or '770 patents.

Dr. Krames asserted that "Krames 2000 [] discloses a semiconductor device configured to output light at greater than 40 milliwatts," citing to the following passage:

> The light output vs. current characteristic for a blue . . . AlGaInN LED mounted in a power package is shown in Fig. 12. A power output of over 170 mW is obtained at a drive current of 1.5 A dC.

Appx11935. Dr. Krames further opined that a POSITA would be motivated to combine Begemann with Krames 2000. Appx12169–12170. He asserted that a POSITA "would have found it obvious to use the high-power LEDs described in Krames 2000 for each of the LEDs of [Begemann's] LED lamp to achieve the highest level of illumination possible while taking advantage of the improved performance of the Krames 2000 LEDs, including improved high temperature operation and improved reliability." Appx12169; *see also* Appx12170–12188.

On February 17, 2023, a jury in the District of Delaware rejected Dr. Krames's invalidity opinions. It returned a verdict finding, among

14

other things, that each of claims 21, 32, and 36 of the '961 patent was not invalid, including not obvious in view of Begemann combined with Krames 2000.  *See* Appx15722–15724.

### C.    The new claims of the '961 and '770 patents are subject to *inter partes* review ("IPR").

#### i.    The Board institutes IPR proceedings based on Cree's proposed combination of Begemann and Krames 2000's LED chip having 170 mW of light output at 1.5 amps.

In addition to the invalidity defenses mounted in the district court litigation by the Delaware Defendants, the '961 and '770 patents were subject to parallel attack at the PTO.  On October 19, 2022—just four months before the jury found the '961 patent not invalid—the Board instituted IPRs of the challenged patents based on obviousness grounds presented by Cree.  Appx430–476, Appx1291–1325.  Here, again, the lamp in Begemann combined with certain high-powered LEDs was alleged to render the claims of the challenged patents obvious.  *See* Appx214–350, Appx1118–1235.  Specifically, Cree argued that all of the claims surviving the earlier reexaminations and requiring a "light emitting diode (LED) chip configured to output light at greater than about 40 milliwatts" were obvious based on a

15

combination of Begemann, Krames 2000, and at least one other reference.  *See* Appx226, Appx1130–1131.

In an effort to meet its threshold burden to show Krames 2000 constitutes proper prior art, Cree submitted a declaration from Rachel J. Watters (the "Watters Declaration").  *See* Appx10701–10728.  Ms. Watters, a librarian at the University of Wisconsin-Madison, states that Krames 2000 was included in *Light-Emitting Diodes: Research, Manufacturing, and Applications IV*, H. Walter Yao, Ian T. Ferguson, E. Fred Schubert, Editors, Proceedings of SPIE Vol. 3938 (2000) (the "Proceedings").  *See* Appx10701–10702.  She further notes that the University's Libraries cataloged the Proceedings in their systems as of June 29, 2000.  Appx10702.

Cree also presented the declaration of Michael S. Lebby, Ph.D., to support the obviousness grounds asserted in its petitions (the "Lebby Declaration").  *See, e.g.*, Appx9987–10148.  In opining that Krames 2000 discloses high-powered LED chips, Dr. Lebby merely lifts from the paper the description of a LED chip having a "power output of over 170 mW."  Appx10071, Appx18084.  The entirety of Dr. Lebby's opinion with regard to the challenged patents' disclosure of a

16

LED chip "configured to output light greater than about 40 milliwatt limitation" is contained in just two sentences:

> Krames teaches that its LED chip achieves "'[a] power output of over 170 mW . . . at a drive current of 1.5 A dc." 170 mW is greater than "about 40 milliwatts."

Appx10071 (citations omitted); *see also* Appx18084 (same). Dr. Lebby provides no opinion regarding using a light output of less than 170 mW or a drive current other than 1.5 amps. *See* Appx9987–10148 (including no discussion of, for example, Fig. 12 from Krames 2000); Appx18007–18145. Nor does he explain how the heat sinks in Begemann could dissipate the heat generated by these LEDs having an output of 170 mW. *Id.* Dr. Lebby summarily concludes that a POSITA "would have had a high expectation of success in taking the high-power LED chips taught by Krames, and mounting those LED chips in the LEDs 4 of Figure 3 of Begemann . . . ." *See* Appx10048.

Based on the grounds presented in Cree's petitions and supported by the Watters and Lebby Declarations, the Board instituted the proceedings from which these present appeals arise

17

(the "Cree IPRs").[4]    Appx430–476, Appx1291–1325.    As to the combination of Begemann and Krames 2000, the Board found:

> Krames teaches a chip that appears suitable for use in Begemann's package . . . On the present record, Petitioner adequately establishes that a person of ordinary skill in the art would have reason to implement Krames's chip design with Begemann with a high expectation of success.

Appx457; Appx1314.  With respect to claim 21 of the '961 patent and claim 18 of the '770 patent specifically, the Board found persuasive the contention that "Krames teaches a LED chip with 170 milliwatts power output (i.e., more than 40 milliwatts)."  Appx462, Appx1317. In its institution decisions, the Board identified no other configuration or capability of the Krames 2000 LED chip.  Appx430–476, Appx1291–1325.

---

[4] The Delaware Defendants and Feit subsequently filed their own IPR petitions for the '961 patent and requested joinder.  *See* Appx2144–2154, Appx2344–2354.  Because these separately-filed petitions relied on the same grounds that the Board instituted the Cree IPR on, the Board granted the petitions and joinder requests.  That grant was made on the condition that the Delaware Defendants and Feit would have a "true understudy role."  *See* Appx2148–2153, Appx2348–2353.

### ii.   CAO Lighting establishes that a POSITA would never use Krames 2000's LED chip configured to output 170 mW of light in Begemann.

In its response to Cree's petitions and the Board's institution decisions, CAO Lighting submitted evidence that, among other things, a POSITA would not be motivated to combine Begemann with the LED chip from Krames 2000. *See* Appx637–642. It showed that the combination proposed would "lead to the LEDs overheating and burning out . . . [or] would cause the insulating coating on the wiring to melt and likely catch fire . . . ." Appx15321.

Specifically, CAO Lighting presented analyses and opinions from Charles R. McCreary, an expert in thermal performance, and Brent York, an expert in thermal management for LED lighting devices. *See* Appx15154–15187, Appx15279–15322. Mr. McCreary analyzed the LED chip identified by Dr. Lebby (i.e., a chip having 170 mW of light output when driven at 1.5 A dc) and concludes that—to produce the same amount of light that would typically be produced by an equivalent 40 W incandescent bulb[5]—between seven and nine LED

---

[5] Mr. York provides evidence that 310 lumens "represents the absolute minimum threshold established by the Federal Government in their definition of a General Service Lamp used for illumination." Appx15309–

chips would be required in the structure of Begemann. Appx15178, Appx15180. These LED chips would produce an expected temperature at the base of the lamp approximately ten times the maximum functional temperature of the wiring. Appx15178–15181. Mr. McCreary also created models of the Begemann structure with Krames 2000-type LED chips. Appx15181–15186. These models demonstrate that Begemann's heat sinks would be incapable of mitigating the extreme amount of heat generated by these LED chips. *Id.*, Appx15317 ("Begemann in no way suggests (or supports even the suggestion) that it could effectively manage the heat that would be generated by using the Krames LEDs.")

Mr. York further details how the "LED industry has established consistent guidelines for maximum LED junction temperatures while also reporting the negative effects of fractionally higher temperature operation." Appx15318. And, even with the most conservative assumptions adopted in Mr. McCreary's modeling, the junction

---

15310. This evidence is consistent with Dr. Krames's trial testimony during which he stated that a 25 W lightbulb would generally have about 180 lumens and a 60 W lightbulb would generally have about 800 lumens. *See* Appx15460.

temperature for the Krames 2000 LED chip would be "hundreds of degrees higher and still well outside any reasonable range of junction temperature for any LED." Appx15320–15321.

CAO Lighting also submitted opinions from James Shealy, Ph.D., professor emeritus at Cornell University, School of Electrical and Computer Engineering. Appx14913–15153. Dr. Shealy has over forty years of experience in the science and engineering of LEDs, has published over 120 articles, and is an inventor on over 17 patents. *See, e.g.*, Appx14915–14919. Dr. Shealy undertook his own analysis of the LED chips outputting 170 mW of optical power from Krames 2000. *See* Appx14971–14974. Dr. Shealy notes that the use of, for example, nine of the Krames 2000-type LED chips would require 56 W of electrical power to replace the output of a 40 W incandescent bulb. Appx14974. It thus "does not make sense to make [the combination of Begemann and Krames 2000], and a person of ordinary skill would never consider this combination to be a success." Appx14974–14975. Dr. Shealy further discusses the issues with efficiency recognized by Krames 2000, itself. Appx14975–14976.

In summary, CAO Lighting set forth evidence that a POSITA would not be motivated to make the only combination relied on in Cree's petitions, Dr. Lebby's Declaration, and the Board's institution decisions. Appx637–642. Among other things, that proposed combination would cause catastrophic heating and be unacceptably inefficient. *See, e.g.*, Appx14971–14976, Appx15313–15322.

### iii. Cree abandons its proposed combination and engages Dr. Krames to salvage its IPRs.

#### a. Cree concedes that a POSITA would not combine Begemann with the LED chip from Krames 2000 at 170 mW.

Rather than contest the opinions from Mr. McCreary, Mr. York, and Dr. Shealy, Cree's reply instead blamed CAO Lighting for using the very LED chip configuration from Krames 2000 on which its petitions and expert relied: a LED chip outputting 170 mW of lights when driven at 1.5 A dc. *See* Appx1553–1559. Indeed, Cree chastised CAO Lighting for focusing on what it deemed an "unreasonable hypothetical." *Id.* Cree also submitted the declaration of Dr. Krames (the "Krames Declaration"), in which he confirms that the combination of Begemann with a LED chip having 170 mW of optical output at 1.5 amps is "quite unreasonable and a POSITA would not

22

have even entertained that in actual product development." Appx10781.

### b.    Cree pivots to a new alleged combination.

Given the failure of its proposed combination, Cree turned to a different combination of elements from Begemann and Krames 2000. Appx735–740. Cree alleged that a POSITA would be motivated to combine Begemann with the Krames 2000 chip driven by 250 milliamps to output light of 45 mW. *See* Appx737–740. Although Dr. Krames asserts in his declaration that "one of skill in the art would consider 250 milliamperes to be a reasonable drive current to use," he points to Figure 12 from Krames 2000 and otherwise cites nothing to support his assertion. *See* Appx10782.

### D.    The Board invalidates, among others, claims 21, 32, and 36 of the '961 patent and claims 18, 32, and 36 of the '770 patent.

On September 28, 2023, the Board issued its Final Written Decisions in the Cree IPRs, invalidating nearly all of the claims in the challenged patents. Appx67–202.[6] Therein, the Board, among other

---

[6] CAO Lighting notes that the "Conclusion" and "Order" sections in the Final Written Decision relating to the '770 patent lists the wrong claims.

things, addressed Krames 2000's status as proper prior art, the scope of the claims, and the motivation to combine Begemann with the experimental LED chip disclosed in Krames 2000.

Relevant to these appeals is the Board's holding that Krames 2000 constitutes a printed publication under 35 U.S.C. § 102(b) and, thus, is proper prior art. *See* Appx88–94.[7] To support this holding, the Board found that a POSITA "would have reasonably located the Krames [2000] article based on the title of the Proceedings." Appx93; *see also* Appx94 ("[T]he Proceeding's title was indexed such that a [POSITA] could find it, and this would have been sufficient to lead a [POSITA] to the Krames [2000] article."). This finding—together with the Board's subsidiary findings regarding a POSITA's knowledge and motivations—allowed the Board to distinguish the present case from the facts presented in its earlier decision in *Salesforce.com, Inc.*

---

*See* Appx200–201. This appears to be the result of an inattentive "copy and paste" from the related '961 patent Final Written Decision.

[7] CAO Lighting herein generally cites to the Final Written Decision in IPR2022-00847, which is identical in all aspects material to these appeals to the Final Written Decision in IPR2022-00848.

24

*v. WSOU Investments, LLC*, IPR2022-00357 (PTAB July 13, 2022), on which CAO Lighting relied.  Appx92–93.

In addition, the Board held that a combination of Begemann and Krames 2000 renders the majority of the claims in the challenged patents obvious.  For example, with respect to claim 21 of the '961 patent, the Board found that "Krames teaches a LED chip with 170 milliwatt power output (i.e., more than 40 milliwatts)."  Appx118–119.

The Board's obviousness conclusions are further premised on several subsidiary holdings and findings relevant to these appeals.  First and foremost, the Board held that—to meet the claim language of the challenged patents—a LED chip need only have the "*capability*" of having optical output of greater than about 40 milliwatts.  *See* Appx106 (emphasis in original).  The Board construed claim 21 of the '961 patent and claim 18 of the '770 patent to exclude any requirement that "a chip [], when placed in the bulb, actually operates at more than about 40 milliwatts."  *Id.*  In other words, any LED chip "capable of" emitting more than about 40 mW of light meets the limitation of the claim regardless of whether it has that capability when included in

25

the claimed structure.[8]

Second, the Board rejected CAO Lighting's arguments regarding the lack of a motivation to combine based on efficiency considerations. Specifically, the Board held that Krames 2000, itself, teaches that the disclosed LED chip has "the best performance in terms of power conversion efficiency" and "excellent reliability performance" when operated at 350 milliamps. Appx108. (quoting Krames 2000). The Board further found persuasive Dr. Krames's proposed combination of Begemann with twelve of the Krames 2000's LED chips driven at 250 milliamps, which would output 136 lumens. *Id.* It concluded that this luminosity "exceeds the light output of many commercial bulbs (while dissipating resulting heat)." *Id.*

Third, the Board rejected out of hand CAO Lighting's evidence of long-felt but unmet need because Dr. Cao testified that he made a

---

[8] The Board also found any prejudice accruing to CAO Lighting as a result of Cree's reliance on the Krames Declaration to be "minimal." *See* Appx81–82. The Board noted that CAO Lighting could have "addressed the general issue of whether a [POSITA] would have reason to combine Begemann's teachings with the Krames reference LED under *any* operating conditions." Appx82 (emphasis in original). It made this finding despite the "procedural concern" raised by the Board at the oral hearing. Appx940–942.

26

prototype of the claimed light source with LEDs he purchased in the market.  Appx97.

## SUMMARY OF ARGUMENT

The Board made significant errors that necessitate reversal of its holdings that the claims of the challenged patents are obviousness in view of a combination of Begemann and Krames 2000.

*First*, although the Board followed the proper analytical framework to assess the public accessibility of Krames 2000, it plugged a gaping evidentiary hole with its own surmise.  Given the dearth of evidence that a POSITA, exercising reasonable diligence, could locate Krames 2000 based on the cataloging and indexing of the Proceedings, the Board's holding that Krames 2000 constitutes prior art under § 102(b) is unsupported by substantial evidence.

*Second*, the Board erroneously construed the limitation requiring "a light emitting diode (LED) configured to output light at greater than about 40 milliwatts."  Its novel construction contravenes core principals of patent law, flouts basic scientific facts, and guts the claimed invention.  Moreover, in adopting a construction without notice to CAO Lighting, the

27

Board breached the notice safeguards provided by Administrative Procedures Act ("APA").

*Third*, the Board defied all evidence and logic in finding that a POSITA would be motivated to combine Begemann and Krames 2000 with a reasonable expectation of success. Without explanation, the Board dismissed undisputed facts in favor of a misinterpreted sentence fragment and hypotheticals based on hindsight. Put simply, the underpinnings of the Board's motivation findings fail as a matter of fact and law.

*Fourth*, in refusing to give any weight to CAO Lighting's evidence of long-felt but unmet need the Board ran afoul of the express language of 35 U.S.C. § 103. And without consideration of the mountain of evidence CAO Lighting presented on the industry's efforts at the time of the invention, hindsight drove the obviousness outcome.

## STANDARD OF REVIEW

This Court reviews the Board's legal determinations de novo and the Board's factual findings underlying those determinations for substantial evidence. *Pers. Web Techs., LLC v. Apple, Inc.*, 848 F.3d 987, 991 (Fed Cir. 2017). Substantial evidence is "such relevant evidence as

a reasonable mind might accept as adequate to support a conclusion." *Consol. Edison Co. of N.Y. v. N.L.R.B.*, 305 U.S. 197, 229 (1938). "The substantial evidence standard asks 'whether a reasonable fact finder could have arrived at the agency's decision,' and 'involves examination of the record as a whole, taking into account evidence that both justifies and detracts from an agency's decision.'" *OSI Pharms., LLC v. Apotex Inc.*, 939 F.3d 1375, 1381–82 (Fed. Cir. 2019) (quoting *In re Gartside*, 203 F.3d 1305, 1312 (Fed. Cir. 2000)).

Whether a reference qualifies as a legal publication under 35 U.S.C. § 102 as well as obviousness under 35 U.S.C. § 103 are questions of law based on underlying factual findings. *Acceleration Bay, LLC v. Activision Blizzard Inc.*, 908 F.3d 765, 772 (Fed. Cir. 2018); *Randall Mfg. v. Rea*, 733 F.3d 1355, 1362 (Fed. Cir. 2013). Similarly, this Court reviews "the Board's claim construction based on intrinsic evidence de novo and any subsidiary factual findings based on extrinsic evidence for substantial evidence." *Dionex Softron GmbH v. Agilent Techs., Inc.*, 56 F.4th 1353, 1358 (Fed. Cir. 2023). The Board's compliance with the APA is reviewed de novo. *In re NuVasive, Inc.*, 841 F.3d 966, 970 (Fed. Cir. 2016).

## ARGUMENT

**I.    The Board's holding that Krames 2000 is proper prior art is unsupported by substantial evidence.**

The Board's legal conclusion that Krames 2000 constitutes a "printed publication" under 35 U.S.C. § 102 rests upon a string of unsupported fact findings regarding the public accessibility of that paper as of June 2000.  "'Public accessibility' has been called the touchstone in determining whether a reference constitutes a 'printed publication' . . . under 35 U.S.C. § 102(b)." *Blue Calypso, LLC v. Groupon, Inc.*, 815 F.3d 1331, 1348 (Fed. Cir. 2016) (quoting *In re Hall*, 781 F.2d 897, 898–99 (Fed. Cir. 1986)).  To be found "publicly accessible," the publication must have been distributed or made available at least to the extent that a POSITA, "exercising reasonable diligence, can locate it." *Id.* (quoting *Kyocera Wireless Corp. v. Int'l Trade Comm'n*, 545 F.3d 1340, 1350 (Fed. Cir. 2008)).  Here, the Board manufactured its finding that a POSITA "would have reasonably located the Krames [2000] article based on the title of the Proceedings." Appx93.

30

### A.   No evidence exists to show that Krames 2000 was distributed at the January 2000 SPIE Conference.

The Board all but concedes the absence of evidence regarding the distribution of Krames 2000 to attendees at the SPIE Conference in January 2000. Although Cree's expert states that the proceedings from that SPIE conference "were distributed to all members of SPIE," as the Board recognized, "Dr. Lebby does not directly state *when* the Proceedings were widely available." Appx90–91. Dr. Lebby does not even state that he, as an attendee of the conference, saw a presentation of Krames 2000 or received a copy of either the Proceedings or Krames 2000, itself. *See* Appx10039–10041. Accordingly, the Board did not, because it could not, find that Krames 2000 had been disseminated to POSITAs prior to the critical date.[9] *Cf. Mass. Inst. of Tech. v. AB Fortia*, 774 F.2d 1104, 1108–09 (Fed. Cir. 1985) (finding paper presented at

---

[9] The Board found "[t]he Proceedings, on their face, indicate that papers from the Proceedings were presented at '26–27 January 2000 San Jose, California." Appx90. The verso page of the Proceedings notes only that "[p]apers were selected by the conference program committee to be presented in oral or poster format . . . ." *See* Appx10708. And Cree presented no testimony that the Krames 2000 paper was actually presented at the January 2000 SPIE Conference. Moreover, that papers were "presented" does not equate to a finding of distribution sufficient to support the conclusion that a reference is a "printed publication."

conference publicly accessible based on evidence that copies were distributed to at least six persons before the critical date).

**B.    The Board invented its findings regarding the ability of a POSITA to locate Krames 2000 before the critical date.**

The fulcrum of the Board's "public accessibility" conclusion is grounded in factual findings related to (i) the University of Wisconsin-Madison Library's cataloging and indexing of the Proceedings and (ii) the ability of a POSITA—"exercising reasonable diligence"—to locate Krames 2000 based on that cataloging and indexing. While the earlier is undisputed, the latter is fictional.

For nearly thirty years, this Court has addressed the public accessibility of a reference stored in a library by inquiring into the sufficiency of the cataloging and indexing of that reference. *Blue Calypso*, 815 F.3d at 1348–49 (summarizing earlier cases addressing the issue). Critically, the mere fact that a reference has been cataloged or indexed does not render it *ipso facto* "publicly accessible." For example, in *In re Cronyn*, 890 F.2d 1158 (Fed. Cir. 1989), the references at issue were indexed on catalog cards (listing the authors and titles of the references). The Court, nonetheless, held that the references "were not accessible to

32

the public because they had not been either cataloged or indexed in a meaningful way." *Id.* at 1161. This emphasis on "*meaningful*" cataloging and indexing reflects the standard that a POSITA must be able to reasonably locate the reference and is an important aspect of the law on public accessibility. *See, e.g., Samsung Elecs. Co. Ltd. v. Infobridge Pte. Ltd.*, 929 F.3d 1363, 13696 (Fed. Cir. 2019) (discussing cases focused on "meaningful" indexing and cataloging); *Acceleration Bay*, 908 F.3d at 772–76 (finding Board did not err in holding report not "publicly accessible" even though it was electronically maintained).

The totality of the evidence relied on by the Board, here, with regard to the meaningful cataloging and indexing of Krames 2000 consists of the Watters Declaration. Ms. Watters notes that the University of Wisconsin-Madison Libraries received and cataloged the Proceedings—which includes Krames 2000—in their systems as of June 29, 2000, which is not disputed. Appx10702. Ms. Watters also provides a copy of the record from the University's system regarding the Proceedings. Appx10726–10728. As shown below, that record demonstrates that what was indexed and searchable in the University catalog is the title, editors, sponsors, publisher, and

33

subject of *the entire Proceedings.  See id.*

Light-emitting diodes : research, manufacturing, and applications IV : 26-27 January, 2000, San Jose, California / H. Walter Yao, Ian T. Ferguson, E. Fred Schubert, chairs/editors ; sponsored by, U.S. Army Research Office, AIXTRON, Inc., SPIE--the International Society for Optical Engineering ; published by SPIE--the International Society for Optical Engineering.

Book By Yao, H. Walter (Bellingham, Washington : SPIE, [2000])
Subject: Light emitting diodes--Congresses. Semiconductors--Congresses.
Series: Proceedings of SPIE--the International Society for Optical Engineering ; v. 3938.
Modification Date: 10/02/2018 12:10:35 CDT
Creation Date: 04/26/2015 12:54:39 CDT

Language: English
ISBN: 0819435554
Record number: (OCoLC)ocm44161150

MMS ID: 9949670213602122

Appx10726.  The record makes no mention of the title, authors, or subject matter of Krames 2000.  *Id.*  And Ms. Watters offers no evidence as to how a POSITA would find Krames 2000 based on the record.  Appx10701–10704.

In circumstances nearly identical to those presented here, the Board previously applied this Court's precedent to determine whether a conference-related paper was "*meaningfully* indexed such that an interested artisan exercising reasonable diligence could have found it." *Salesforce.com, Inc. v. WSOU Invs., LLC*, IPR2022-00357, 2022 WL 2718956, at *3–6 (PTAB July 13, 2022) (quoting *Acceleration Bay*, 908 F.3d at 774).  There, like here, the reference—G.C. Fox et al., "Integration of Hand-Held Devices into Collaborative Environments," *Proceedings of the 2002 International Conference on Internet Computing*, June 24–27, 2002, Las Vegas, Nev. ("Fox")—was included in a compilation of papers associated with an industry conference.  *Id.* at *3.  To establish that Fox

34

was "publically available" and thus qualified as proper prior art, the petitioner proffered a declaration describing and attaching a record from a German library's catalog showing "bibliographic information, subject matter classification, and call numbers" (the "MARC record") *Id.* at *3–4. Although the MARC record showed that the copy of the proceedings had been received, cataloged, and indexed before the critical date, the Board nonetheless found that "the MARC record itself does not evidence meaningful indexing relative to Fox." *Id.* at *6. The Board found:

> In particular, the MARC record is keyed to the titled of the entire conference proceedings, and the only name evident in the record is the editor of the proceedings. In other words, the MARC record neither includes the title of Fox nor lists its authors.

*Id.* (citations omitted). Because it did "not explain how the MARC record provides meaningful indexing such that an ordinary skilled artisan would have located Fox," the Board found that the petitioner had failed to establish a reasonable likelihood that Fox was publically accessible before the critical date. *Id.* Both the Board's analysis and conclusion in *Salesforce* is correct.

In an effort to distinguish the current case from *Salesforce*, the Board here baldly asserts that a POSITA "could have reasonably

35

located the Krames article *based on the title of the Proceedings.*" Appx93 (citing no evidence from the record) (emphasis added).[10]  It builds this assertion on its finding that a POSITA "would have been very interested in a recent publication from a known technical society entitled 'Light-Emitting Diodes: Research, Manufacturing, and Applications IV.'" *Id.*  But this subsidiary finding has no support.  The only evidence cited by the Board is the Krames 2000 reference, itself, and the cover page of the Proceedings.  *Id.* (citing Appx10247 and Appx10706).  Cree offered and the Board cites to *no evidence* that:

- SPIE is a "known technical society;"

- a POSITA would be interested in (i) publications from SPIE conferences or (ii) any and all materials generally related to light-emitting diodes;  or

- would suggest, even if a POSITA were to look for SPIE proceedings or undertake a general search for LEDs, that she would or could locate the Proceedings—and thus Krames 2000—exercising reasonable diligence.

For example, Cree proffered no information regarding the volume of

---

[10] At the oral hearing, Cree's counsel stated, without support, that a POSITA would look for a "bright LED."  Appx1739.  Yet, again, there is nothing in the record to tie "interest" in a "bright LED" to a POSITA's ability to locate Krames 2000 based on the title of the Proceedings. Moreover, "[a]ttorney argument is not evidence."  *Icon Health & Fitness, Inc. v. Strava, Inc.*, 849 F.3d 1034, 1043 (Fed. Cir. 2017).

36

materials that would result if one were to search the University Libraries' catalog for SPIE publications.  The face of the Proceedings, however, indicates that it is volume 3938 in the series and, thus, suggests that the Proceedings would appear in a results list among thousands of other SPIE publications.  *See* Appx10706.  At bottom, the evidence presented by Cree is wholly inadequate to support a finding that a POSITA—exercising reasonable diligence—would locate Krames 2000.  And the Board's own speculation cannot satisfy Cree's burden to prove a reasonable likelihood that Krames 2000 is prior art under 35 U.S.C. § 102(b).  *See Acceleration Bay*, 908 F.3d at 772 (holding that petitioner bears the burden to prove reference is a printed publication).

## II.    **The Board grounded its obviousness holding in an erroneous and untimely claim construction.**

Before issuance of the Final Written Decisions, the meaning of "a light emitting diode (LED) chip configured to output light at greater than about 40 milliwatts" was undisputed.  Each of Cree, CAO Lighting, the litigants in various district court proceedings, and the district court in the District of Delaware all agreed that this limitation requires a LED chip *capable of* emitting 40 milliwatts of light when

operating *within the claimed light structure*—that is, within a LED light bulb, lamp, or luminaire. It was never suggested that a POSITA would believe that a LED chip's sheer ability to output 40 mW of light irrespective of drive current or outside of the claimed light source could satisfy the "configured to" limitation. Such a construction not only improperly divorces the 40 mW limitation from the rest of claims, but is illogical given that an isolated LED chip outputs *no* light.

Although the Board contends that it merely accepted the Delaware court's construction at CAO Lighting's urging, it dramatically broadened the claim scope. *See* Appx86–87, Appx106. As explained below, the Delaware court viewed "capable of" in its construction to mean that the LED chip was capable of its function within the claimed structure of a light source. In its Final Written Decisions, the Board expressly removed this structure, and its attendant constraints, from the claim term. Undoubtedly, the Board engaged in its own claim construction despite its protestations to the contrary. *See, e.g.*, *HTC Corp. v. Cellular Commc'ns Equip., LLC*, 877 F.3d 1361, 1367 (Fed. Cir. 2017) (holding Board's "findings establishing the scope of the patented subject matter may fall

38

within the ambit of claim construction"). And in doing so without notice, the Board violated CAO Lighting's rights under the APA.

## A. The Board misconstrued the limitation requiring a LED chip "configured to" output light at greater than 40 mW.

### i. The Board's claim construction conflicts with hornbook patent law.

In its Final Written Decisions, the Board altogether eliminated the "configured to" requirement expressly recited in the challenged patents. It did so by first concluding that neither claim 21 of the '961 patent nor claim 18 of the '770 patent "require[s] a chip that, when placed in the bulb, actually operates at more than about 40 milliwatts." Appx106. Because Krames 2000 "teaches its LED chip achieves '[a] power output of over 170 mW . . . ,'" it then held that the reference shows the "*capability*" of the LED chip, which is all that is claimed. *Id.* Not only does this holding rely on a capability of the Krames 2000 LED chip that Cree effectively disclaimed, but it violates this Court's standards on how to construe claim limitations and apply functional capability recited in apparatus claims.[11]

---

[11] To be clear, CAO Lighting agrees that Cree was not required to show that the Krames 2000 LED chips were ever operated within a lamp to

The claim language, itself, reveals the Board's error. Both claim 21 of the '961 patent and claim 18 of the '770 patent recite substantial structure for both the overall light source (e.g., bulb, lamp, luminaire) and the LED chip before reciting the LED chip's light output function. *See supra* at 6–11. By construing the later functional capability without consideration of the former claimed context, the Board violated a cardinal rule of claim construction: a claim term must be interpreted in the context of the claim as a whole. *See, e.g.*, *K-fee Sys. GmbH v. Nespresso USA, Inc.*, 89 F.4th 915, 919 (Fed. Cir. 2023) ("We generally give words of a claim their ordinary meaning on the context of the claim and the whole patent document") (quotations and citations omitted); *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312–13 (Fed. Cir. 2005) (requiring that a claim term be read in the context of the particular claim in which the disputed term appears). In admonishing CAO Lighting for focusing on the drive current relied on by Cree in its petitions and the Board in its institution decisions, the

---

produce more than 40 mW of light. Cree, however, was required to establish the capability of those chips to actually output light at more than about 40 mW within the claimed structure.

Board changed the scope of the claims. It held that the LED chip's capacity or capability to output light at greater than about 40 mW can be assessed without consideration of either the drive current or any constraints the claimed structure may impose. In applying the proposed combination to claim 21 of the '961 patent, the Board states only:

> Petitioner contends that Krames teaches a LED chip with 170 milliwatt power output (i.e., more than 40 milliwatts). The preponderance of the evidence supports that Krames teaches or suggests this recitation [in claim 21]. Importantly, this claim language requires a semiconductor chip *capable* of the recited output, and Patent Owner does not persuasively dispute that the Krames chip is *capable* of meeting this recitation.

Appx118–119 (citations omitted); *see also* Appx183 (failing to even state the mW output). In this way, the Board plucked the "configured to" limitation from the overall invention and found it met by the LED chips in Krames 2000 without any reference to the chips' capability when designed into the overall structure claimed.[12]

In addition, the Board's construction and application of the

---

[12] Just as in its institution decisions, in applying the combination of prior art to the claims, the Board cited to no configuration or capability of the Krames 2000 LED chip other than 170 mW. Appx67–137.

41

"configured to" limitations cannot be squared with the law regarding apparatus claims that recite function. To properly analyze such claims, this Court has confirmed that only structure that is reasonably capable of performing the function *when in operation without significant modification* will satisfy the limitation. *See e.g.*, *ParkerVision, Inc. v. Qualcomm Inc.*, 903 F.3d 1354, 1362 (Fed. Cir. 2018) (noting that even claim language reciting capability demands that only an apparatus that is "'reasonably capable' of performing the claimed functions 'without significant alterations' can infringe those claims." (citations omitted)); *Fantasy Sports Props., Inc. v. Sportsline.com, Inc.*, 287 F.3d 1108, 1117–18 (Fed. Cir. 2002) (holding that functional limitation is only met where functional capability is already present in the context of the existing software as opposed to capable if that software were modified).

Although dealing with a different type of technology, the reasoning in *INVT SPE LLC v. Int'l Trade Comm'n*, 46 F.4th 1361 (Fed. Cir. 2022), is instructive. There, the Court found that "proof that an accused product—when put into operation—in fact executes all of the claimed functions at least some of the time or at least once

42

in the claim-required environment"[13] was necessary to show that the accused product met the claim limitations requiring the capability to receive and obtain data. *Id.* at 1377. Without such proof, the Court reasoned that the capability limitation at issue would lack "teeth and meaning." *Id.* Here, too, the Board's analysis renders the "configured to output light at greater than about 40 milliwatts" limitation "without teeth and meaningless" because infringement could be shown without proof that the LED chip actually has the ability to output 40 mW of light within the structure of the claimed light source. Thus, the same must be true in the invalidity context. For all of the reasons this Court previously noted, "what the device *does* (and how it does it) is highly relevant to understanding what the device *is . . . .*" *Id.* at 1377.

In summary, when the Board eradicated the "configured to" language and severed the functional capability of the LED chip from

---

[13] The "claim-required environment" in *INVT* included an unclaimed "base station" that was necessary to the functioning of the claimed "communication apparatus." *Id.* at 1375. The Board's argument here that the claims do not recite "actually running the recited LED at any particular" drive current is thus of no moment. Appx81.

the rest of the elements in the claims, it erred.[14]

### ii. The Board's construction neglects a POSITA's understanding of basic scientific principles.

Not only did the Board stray from fundamental claim construction rules, it failed to account for the elementary scientific fact that a LED chip in isolation is not capable of outputting *any* light. It must be supplied power. *See, e.g.*, Appx14924 (describing how current flows from the anode to the cathode that causes electrons to fall into a lower energy level and release energy in the form of a photon, i.e., light); *see also infra* at 45–46. This fact was central to the analysis of the challenged claims by the district court in the co-pending litigation in the District of Delaware. Indeed, the Delaware court—whose claim construction the Board claims it adopted—

---

[14] The phrase "configured to" often has been construed by this Court to mean—not merely having the capacity to—but "made to" or "designed to." *See, e.g., Aspex Eyewear, Inc. v. Marchon Eyewear, Inc.*, 672 F.3d 1335, 1349 (Fed. Cir. 2012) (collecting cases). Here, the concepts of "made to," "designed to," "configured to," and "capable of" merge given that the LED chip's capabilities with respect to light output are dependent on the relevant circuit in which they are placed. *See infra.* Because a bare LED chip has no light output until a drive current is applied, the recitation of a specific light output demands that the LED chips be driven by a current that renders them capable of achieving that output within the claimed device.

expressly rejected the idea that a disembodied LED chip could be "configured to" or "capable of" producing light output of greater than 40 mW.

In *CAO Lighting, Inc. v. General Electric Co.*, C.A. Nos. 20-681-GBW, 20-690-GBW, 2023 WL 1930354, at *11–12 (D. Del. Jan. 30, 2023), the Delaware court analyzed the evidence and opinions presented on infringement with respect to the "configured to output light at greater than about 40 milliwatts" limitation. There, CAO Lighting tested LED chips that had been removed from accused LED replacement light bulbs. For one product, Dr. Shealy was provided data that showed that the circuit within the light source supplied a drive current of 20 mA to the LED chips under test. *Id.* At that drive current, the LED produced less than 40 mW of optical output. *Id.* Dr. Shealy, however, tested that chip at a range of drive currents and found that it produced at least about 40 mW at drive currents at or above 36 mA. *Id.* After noting that the LED manufacturer recommended operating the chip at a drive current of 150 mA, he opined that the LED was "configured to output light at greater than about 40 milliwatts." *Id.* The court disagreed and excluded this opinion; it limited Dr. Shealy's testimony on infringement to only those

45

products where Dr. Shealy measured or calculated in a reliable manner the drive current supplied by the lightbulb and where the LED chip's optical output based on that drive current met or exceeded 40 mW. *Id.* It was not enough, as the Board states here, that the LED chip on its own was capable of producing 40 mW of optical output. The LED chip had to be *capable of* this output *in the circuit in which it was designed for the accused lightbulb.*

Because the LED chips disclosed in Krames 2000 are dark (i.e., output no light) until they are placed in a circuit, how those chips are powered and their capability to output light greater than about 40 mW within the environment of the claims is critical to the invalidity analysis. And explained below, no one but the Board in its Final Written Decisions has ever suggested otherwise. *See infra* at 46–51.

### iii. The Board's construction is at odds with every prior application of the challenged claims.

That the claims never have been construed in the manner they were here further proves that the Board's reinterpretation of the claims is incorrect.

Notably, neither Cree nor CAO Lighting (nor their respective experts) ever argued that the claims' recitation of "a light emitting

diode (LED) chip configured to output light at greater than about 40 milliwatts" requires only that a LED chip in isolation be "*capable of*" outputting more than 40 mW of light. Even in its petitions, Cree did not merely point to the fact that the LED chip in Krames 2000 could output more than 170 mW of light; it specifically asserted that Krames 2000 "teaches its LED chip achieves "[a] power output of *over 170 mW . . . at a drive current of 1.5 A dc*." Appx267 (emphasis added); Appx1170 (same).

Following (and as a result of) this assertion, the parties devoted the entirety of their briefing and arguments on this claim element to whether or not the Krames 2000 LED chip was, in fact, capable of achieving this output (or any output of light greater than 40 mW) with a drive current that would not destroy the LED chips when placed in the claimed light source. For example, as detailed above, CAO Lighting's experts described how and why a POSITA would understand that the configuration of the Krames 2000 LED chip relied on by Cree could not output more than 40 mW of light within the claimed context because it would generate unmanageable heat. *See, e.g.,* Appx15177–15186 (describing how, in the configuration

47

disclosed by Cree, the "junction temperature of the [Krames 2000] LEDs would also be well in excess of its maximum functional temperature"); Appx15313–15321 (opining that the configuration of the Krames 2000 LED chips Cree relied on would "lead to the LEDs overheating and burning out"); *see also* Appx637–641 (detailing how heat generated from the use of the Krames 2000 LED chip within the structure of Begemann "would destroy the chips"); *supra* at 19–22. Dr. Krames, himself, did not contest this evidence; he agreed that the use of a drive current of 1.5 A dc "is quite unreasonable and a POSITA would not have even entertained that in actual product development." Appx10781. Dr. Krames—on behalf of Cree—opined that, instead, a POSITA would "have used a drive current near [350 mA], or even lower (when thermal concerns arose)." Appx10781. In other words, even Cree understood and explained to the Board in its reply papers that the selection of a drive current is necessary to demonstrate the LED chip's capability to output light at greater than about 40 mW and meet this limitation of the claims. *See id.* ("assuming an appropriate drive current").

The Board ignored all of this evidence regarding a POSITA's

48

understanding and grasped onto the bare phrase "capable of" used by CAO Lighting and the Delaware court. *See* Appx86–87, Appx106. But, again, no one in that litigation ever used the phrase "capable of" to argue that the "configured to" limitation did not require the claimed LED chip to be capable of that output within a circuit in the claimed structure. For example, in presenting his obviousness opinion to a jury in Delaware, Dr. Krames asserted that a POSITA would be motivated to combine the structure disclosed in Begemann with the Krames 2000 LED chip being driven at 700 mA such that it would have an optical output of 100 mW. *See* Appx15463; *see also* Appx15457–15583. In rebuttal, Dr. Shealy explained to the jury why Dr. Krames's proposed combination of Begemann and Krames 2000 is problematic. *See, e.g.*, Appx15501–15502. Dr. Shealy described how—because of the inefficiency of the LEDs in Krames 2000—a POSITA would understand that to output greater than 40 milliwatts of light those LEDs would require a drive current of at least 200 mA, i.e., ten fold the drive current needed for the LEDs actually described

49

in Begemann. *See* Appx15502.[15] Consequently, swapping out the LEDs found in the Begemann light source for those disclosed in Krames 2000 would cause the bulb to "burn out and maybe even worse, do something bad to the lamp, like catch it on fire." *Id.* Dr. Krames never contested this conclusion at trial. Appx15510–15511.

Finally, the intrinsic evidence also reflects a POSITA's understanding that consideration of the drive current needed to achieve a light output of greater than about 40 mW is necessary in analyzing the claims. During the *ex parte* reexamination of the '961 patent, for example, CAO Lighting argued that "it would not have been obvious to have modified Begemann to include one or more LED chips 'configured to output light at greater than about 40 milliwatts.'"

---

[15] Dr. Shealy explained to the jury how the amount of light generated by a LED chip depends on the amount of electrical energy that is put in. *See* Appx10935. For this reason, much of Dr. Shealy's infringement analysis regarding the "configured to output light at greater than about 40 milliwatts" limitation also centered on the selection of an appropriate drive current to test the LED chips within the accused products. *See, e.g.*, Appx10939–10941 (describing determination of appropriate drive current to measure optical output); Appx10956 (same); Appx10944–10945 (acknowledging that optical output for purposes of claim 21 is dependent on the determination of the appropriate drive current).

Appx5916. It did not argue that such chips did not exist in the prior art; rather, it asserted that "the structure of Begemann is not equipped to handle the increase in heat generation that such a modification would necessarily entail." Appx5916. In other words, here, again, the emphasis was on a POSITA's knowledge that the drive current required to power LED chips to output greater than 40mW of light would render those chips incapable of operating within the claimed structure of the light source. CAO Lighting's counsel went so far as to clarify and remind the PTO examiner that "it is each claim as a whole, rather than any particular element, that makes each of the claims allowable." Appx2663.

The Board's conclusion that its construction of the scope of claims 21 of the '961 patent and claim 18 of the '770 patent is consistent with or reflective of any prior or proposed construction of these claims is thus plainly incorrect.

\* \* \*

The claims of the challenged patents are expressly directed to striking the previously-unachieved balance of managing the heat generated from LEDs having high-light intensity in the form of a

51

general purpose light source. *See supra* at 5–9.  By interpreting the claims to delete the requirement that the LED chip be configured to output greater than about 40 mW of light within the claimed environment, the Board committed reversible error.  The phrase "a light emitting diode (LED) chip configured to output light at greater than about 40 milliwatts" means exactly what the parties here (as well as all others interpreting the claims) have previously found it to mean: a LED chip capable of outputting light at greater than about 40 mW when designed into a circuit within the claimed light source.  Because Cree concedes that the only legally-proper evidence it submitted to the Board (i.e., a configuration of the Krames 2000 LED chip to output 170 mW of light)[16] fails to show that the proposed combination would meet this limitation, the Board's obviousness determination must be reversed.

---

[16] The only configuration proposed by Cree other than the one it relied on in its petitions is found in its reply and the Krames Declaration.  As explained herein, Dr. Krames's configuration of the Krames 2000 LED chip at 250 milliamps to output 45 mW of light is pure hindsight and, thus, legally irrelevant.  *See infra* at 66–68.

**B. The Board's late-breaking claim construction— emerging from Cree's midstream change in theories—violates the APA.**

By adopting a claim construction in its Final Written Decisions never proposed or discussed, the Board denied CAO Lighting the procedural protections afforded to it by the APA. Post-issuance proceedings, such as IPR proceedings, are formal administrative adjudications and, as such, parties to them are entitled to be "timely informed of . . . the matters of fact and law asserted." 5 U.S.C. § 554(b)(3); *see Axonics, Inc. v. Medtronic, Inc.*, 75 F.4th 1374, 1381 (Fed. Cir. 2023) (discussing procedural requirements imposed by the APA in IPR proceedings); *Rovalma, S.A. v. Bohler-Edelstahl GmbH & Co. KG*, 856 F.3d 1019, 1029 (Fed. Cir. 2017) (detailing procedural requirements for the conduct of IPR proceedings under the APA). As described above, the Board altered the scope of claim 21 of the '961 patent and claim 18 of the '770 patent by re-construing the "configured to" limitations in those claims. This new (and erroneous) construction was a direct response to CAO Lighting's evidence and Cree's admission that no POSITA would ever combine the LED chip from Krames 2000 using the configuration identified in both Cree's petitions and the Board's institution decisions,

53

i.e., 170 mW light output at 1.5 A dc. Appx106. Because CAO Lighting could not have known that the meaning of this claim term was a moving target, the Board's new construction improperly deprived CAO Lighting of notice and an opportunity to be heard with respect to both the propriety of that construction and the facts as applied to it. *See Qualcomm Inc. v. Intel Corp.*, 6 F.4th 1256, 1262–63 (Fed. Cir. 2021) (holding the Board violated the APA when it adopted a construction despite there being no dispute over the term's meaning); *SAS Inst., Inc. v. ComplementSoft, LLC*, 825 F.3d 1341, 1351–52 (Fed. Cir. 2016) (holding that, where parties never anticipated the "construction that eventually materialized in the final written decision," Board's adoption of that construction violated APA) *rev'd on other grounds sub nom. SAS Inst., Inc. v. Iancu*, 138 S. Ct. 1348 (2018); *cf. Dr. Falk Pharma GmbH v. GeneriCo, LLC*, 774 F. App'x 665, 673–74 (Fed. Cir. 2019) (finding patent owner had notice of the claim construction adopted as evidenced by arguments made pre- and post-institution).

## III. The Board's motivation to combine finding fails as a matter of fact and law.

In addition to misconstruing the scope of the claims, the Board separately erred in holding that a POSITA "would have had reason to

combine the teachings of Begemann and Krames [2000] with a reasonable expectation of success." Appx109. Quoting the motivation to combine presented by Cree, the Board first cited Begemann for the proposition that "[c]ustomary incandescent lamps can only be replaced by LED lamps which are provided with LEDs having . . . a high luminous flux." *Id.*; *see also* Appx10047–10048. With Begemann failing to disclose an appropriate LED chip, a POSITA would be left to hunt for one. Appx104; *see also* Appx10047 ("Begemann does not disclose a specific LED chip."). The Board further concluded that a POSITA would turn to Krames 2000, which posits that "[b]y increasing the chip size and providing low-thermal-resistance power packages capably of dissipating several Watts, LEDs should be able to compete more favorably with conventional lighting technologies in many applications." Appx105. But in making this fact finding, the Board rejected unchallenged evidence regarding the inefficiencies inherent in the LED chips disclosed in Krames 2000. In addition, it accepted Cree's invitation to pervert the meaning and import of a single statement pulled from Krames 2000 regarding efficiency. The Board then elevated its false finding of fact over the unrebutted evidence. It further clutched onto a hypothetical

proposed by Dr. Krames that is driven by hindsight.

It is axiomatic that a conclusion of obvious cannot simply be based on a combination of known elements. *KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 402 (2007) ("Inventions usually rely upon building blocks long since uncovered, and claimed discoveries almost necessarily will be a combination of what, in some sense, is already known.").

> Instead, the relevant inquiry is whether there is a reason, suggestion, or motivation in the prior art that would lead one of ordinary skill in the art to combine the references, and that would also suggest a reasonable likelihood of success.

*Smiths Indus. Med. Sys., Inc. v. Vital Signs, Inc.*, 183 F.3d 1347, 1356 (Fed. Cir. 1999) (reversing judgment of invalidity based in part on failure to identify the motivation or teaching to combine references and summary conclusion invention was obvious); *see also Forest Lab'ys, LLC v. Sigmapharm Lab'ys, LLC*, 918 F.3d 928, 934 (Fed. Cir. 2019) (applying standard that obviousness requires more than mere showing elements were previously known). Thus, to find claims obvious over a combination of references, the Board must explain why a POSITA would have been motivated to combine the references. In particular:

- "[T]he finding must be supported by a reasoned explanation, conclusory statements alone are insufficient;"

- "[I]t is not adequate to summarize and reject arguments without explaining why the PTAB accepts the prevailing argument;" and

- "[T]he PTAB cannot rely solely on common knowledge or common sense to support its findings."

*In re Nuvasive, Inc.*, 842 F.3d 1376, 1383 (Fed. Cir. 2016) (internal quotations and citations omitted). Here, the Board inexplicably arrived at its holding regarding a POSITA's motivation to combine by (i) rejecting unopposed facts regarding efficiency, (ii) relying on a cherry-picked phrase from Krames 2000, and (iii) citing a hypothetical anchored in hindsight. Consequently, the Board's finding of a motivation to combine Begemann and Krames 2000 with a reasonable expectation of success, and thus its obviousness conclusions, is without a reasoned basis, without substantial evidence, and contrary to well-established law.

## A. The Board disregarded undisputed evidence that the LED chips in Krames 2000 are too inefficient.

Although it recognized that the inefficiency of the Krames 2000 LED chips could be an independent basis for denying Cree's claim that the challenged patents are invalid, Appx985, the Board summarily rejected the evidence presented by CAO Lighting.

### i. Krames 2000 refutes rather than supports a motivation to combine.

The Krames 2000 paper, itself, proves that efficiency issues would preclude a POSITA from placing its LED chips within the structure of Begemann. For example, Krames 2000 admits that the efficiency of the high-flux LEDs required by the Board's motivation to combine—even when powered at a drive current five times less than Dr. Krames opines is required to meet the claims (e.g., 250 mA)—is problematic. It states:

> reduced quantum efficiency at higher current levels (e.g., 50 mA) for AlGaInN poses a challenge for realization of high-flux LEDs with high power conversion efficiency.

Appx10249. Krames 2000 further points out that, for the very chips that Cree and the Board would combine with Begemann, "the quantum efficiency . . . decreases with increasing current density." *Id.* In other words, at the current conditions necessary to meet the light output required by the claims, Krames 2000 concedes that efficiency for the high-flux LED chips disclosed would "present challenges."

Critically, as a result of these challenging efficiency problems the combination of Krames 2000 and Begemann result in a replacement LED lamp that no POSITA would ever want or build. For example, Krames 2000 admits that, "[t]oday, external quantum efficiencies of ~ 21% in the

58

blue . . . spectral [region has] been observed.  In photometric terms, [this]

efficienc[y] correspond[s] to ~ 10 lm/W."  Appx10247.  As shown below in

an annotated view of Figure 1 from Krames 2000, the efficiency—10

lm/W—for the disclosed blue LED chip is *less efficient than an*

*incandescent light bulb* (a tungsten filament bulb on the chart) and *much*

*less efficient than a fluorescent light*:



Fig. 1.  The evolution of commercial LED performance and its comparison to conventional lighting technologies.

Appx10246.  In fact, even a cursory review of this chart shows that

conventional lighting technology continued to be significantly more

efficient compared to the LED technology available.

Moreover, the only evidence presented to the Board regarding a

POSITA's analysis and understanding of the data disclosed in Krames

59

2000 confirms the inefficiencies described by the paper, itself. Using a 40 W incandescent lightbulb as an example, it would require significantly more than 40 W to power a replacement bulb with Krames 2000's LED chips. *See* Appx20596–20600. By one conservative calculation, it would take 56 W to power a LED light bulb using the Krames 2000 chips to replace a 40 W incandescent lightbulb. *Id.* Simply, because the proposed combination would create a result no POSITA would accept, no POSITA would be motivated to make it. None of this analysis was disputed; apart misconstruing a few quotes from the Krames 2000 reference (which are addressed below), Cree's experts were silent on the hurdles presented by the LED chip's inefficiencies.

Cree failed to address the substantial evidence presented to the Board by CAO Lighting because it could not. Krames 2000 not only describes the problematic efficiency issues, but it highlights that these issues were not readily solvable. For example, Krames 2000 states:

- "The *details of the recombination physics* in InGaN-Gan-AlGaN active regions *needs to be better understood* in order to provide a model for the decreased efficiency at high current levels and to provide hope for solving this problem." Appx10249.

- "*[C]ontinued research and development* of these material systems will yield more efficient and higher power LEDs,

resulting in emitters with increased luminous output." Appx10255.

- "At these rates, the *LED will catch up with the conventional light bulb in terms of cost and power in the early part of the 21st century . . . .*" Appx10256.

The Board addressed none of these issues.

Instead, making matters worse, the Board relied on Krames 2000's discussion that by "increasing the chip size . . . LEDs should be able to compete more favorably with conventional lighting technologies." Appx105, Appx170. But a POSITA would know that increasing the size of the LED chip would only exacerbate—not solve—the known efficiency problems described in Krames 2000. Appx20592–20593. For example, the light extraction efficiency is reduced by close to 30% when a 1.0 x 1.0 mm² LED chip as disclosed in Krames 2000 is used in comparison to a 0.35 x 0.35 mm² chip. *Id.* This "light efficiency reduction significantly limits the ability of these chips to be used to light a space used by humans" as recited in the claims. *Id*; *see also* Appx20599–20600 (describing how quantum efficiency LED in 1x1 mm LED chip is approximately 74%, which is about 25% less than the same LED in the form of a 0.35 x 0.35 mm chip). The record contains no contrary evidence.

### ii. The industry agreed that Krames 2000's LED chips were not ready for general purpose lighting.

No one in the industry imagined that LED technology was ready to take on general purpose lighting at the time of Begemann, Krames 2000, or the priority date of CAO Lighting's patents. CAO Lighting's expert Dr. Shealy reviewed a variety of references published between 1994 and 2005 that concluded that LED chips such as those described in Krames 2000 would not be able to replace conventional white lights. *See* Appx20549–20562. Even Dr. Nakamura, Nobel Prize winner and inventor of the blue light LED, concluded that poor efficiency precluded commercial use of blue light LEDs for general purpose lighting. Appx20551–20552. A paper published by the Environmental Protection Agency in 2005 complained that indoor illumination will be the most difficult market for LED lighting to replace and "will probably not happen for another 15–20 years." Appx20560.

In and around the time of the Krames 2000 research paper, LED chips did not replace general purpose white lighting. Instead, the only white light application mentioned by Krames 2000 is a single LED

flashlight. Appx10255.[17]  A Scientific American article, published in 2001, a little more than a year after Dr. Krames purportedly presented his paper, makes this point vividly. *See* Appx20422–20427. That article states "that by the end of the decade LEDs will dominate the red and amber lighting on the exterior of vehicles. Larger and brighter LEDs are making their way into the red of traffic lights."[18] Appx20423. That same article concludes that, even with the enormous incentive of a potential $12 billion worldwide market, "large-scale *replacement of lamps for general-purpose illumination are not expected for a decade or two because of the difficulty in making white LEDs efficient* and cost-competitive." Appx20427 (emphasis added).  Remarkably, the article makes this statement even with the likes of Dr. Craford—the then Chief Technology

---

[17] The Board suggests that the Krames 2000 LED chips could be applied in "many applications." *See, e.g.*, Appx105.  But the applications described in Krames 2000 relate to traffic signals, fiber optics, and a possible single flashlight. Appx10253–10255; *see also* Appx15313. Accordingly, the Board's reference to "many applications" is unclear and does not rescue the Board from its errors with respect to motivation to combine and reasonable expectation of success.

[18] Krames 2000 also cites traffic signals as a key application for its LED chips. Appx10246, Appx10254. The Board, itself, admits that the Krames LED chip may offer unique advantages in "traffic signaling." Appx108.

Officer at LumiLeds who, as Dr. Krames's boss, was presumably familiar with the ongoing research reported in Krames 2000—as an author.

### B.    To ground its motivation to combine holding, the Board contorted a single sentence from Krames 2000.

Rather than reason through the evidence presented by CAO Lighting regarding the inefficiency problems posed by Krames 2000, the Board summarily concluded that the reference teaches that a 350 milliAmp drive current provides "the best performance in terms of power conversion efficiency." Appx108. This statement—citing to Cree's reply brief as well as to the Krames 2000 reference—is false.

The sentence from which this quotation was selected relates to the number of "cells" used within the oversized LED chips of Krames 2000. Appx10252. "Cells" refers to the number of "fingers" provided in the electrode that spreads the drive current across the surface area of the chip. *Id.* Figure 10a of Krames 2000 (shown to the right), shows four ohmic contacts (fingers) extending downward from the top of the figure—meaning that this is a four cell chip. *Id.* The full sentence from which the Board selectively quotes from that, "[e]xperimental optimization for



(a)

the 1x1 mm$^2$ device at 350 mA shows that four cells achieves the best performance in terms of power conversion efficiency." *Id.* As the sentence makes clear, and as Dr. Krames confirmed on cross-examination, this means that, for an otherwise inefficient and oversized Krames chip, a four cell structure is more efficient than a three cell or five cell structure. Appx15646–15648. It provides no support with regard to the overall efficiency of the disclosed LED chips or their performance vis-à-vis other known LED chips or conventional technology.

Only by removing a phrase from Krames 2000 and applying it to mean something that the context of the quotation does not allow could the Board dodge CAO Lighting's evidence of efficiency. In all events, a misconstrued partial quotation is not the substantial evidence required to support the Board's holding with respect to a POSITA's motivation to combine.[19]

---

[19] The Board makes passing reference to certain "potential advantages" of using the Krames 2000 LED chips. Appx109. It, however, does not provide a single "advantage" or cite to any evidence to support the existence of any "potential advantages."

**C.    A hypothetical confected by Dr. Krames through hindsight cannot support the Board's motivation to combine finding.**

The Board's resort to a hypothetical use of the Krames 2000 LED chip likewise fails.  The Board asserted that "Petitioner persuasively argues" that the combination of Begemann and Krames 2000 can exceed "the light output of many commercial bulbs (while dissipating resulting heat)."  Appx108.  For this proposition, the Board cited to an alleged configuration of the Krames 2000 LED chip created for the first time in Cree's reply and the attendant Krames Declaration.  As noted above, Cree pivoted away from the 170 mW configuration and eventually claimed that a POSITA would be motivated to combine Begemann with an alleged LED chip having an optical output of 45 mW driven by 250 milliamps.  *See* Appx10782; *see also supra* at 22–23.  Because this hypothetical is based on impermissible hindsight, it must be rejected as a matter of law.

Neither Krames 2000 nor any other cited reference suggests running the LED chip at a drive current of 250 mA.  Krames 2000 reports results for a drive current of 1.5 A.  Appx10254.  Krames 2000 also discusses results for a drive current of 350 mA.  Appx10254, Appx10252.

66

And, instead of finding a suggestion or motivation in the prior art or in the understanding of a POSITA, Dr. Krames goes to the claim recitations.



Fig. 12. Light output vs. current characteristic of a blue (λ$_p$ ~470 nm), 1x1 mm$^2$ AlGaInN LED in a power package, compared to a conventional AlGaInN LED in a 5 mm lamp package.

He looks to Figure 12 of Krames 2000 (shown blow), and argues that the "chart shows that its LED can be driven at a lower current and still provide the optical *output required by the claims*." Appx10782 (emphasis added). Even more, he argues that "the chart shows that the Krames LED can be driven at around 250 millamperes . . . and would still provide about 45 milliwatts of light, which is greater than the minimum *output recited in the claims*." *Id.* (emphasis added). That is, Dr. Krames uses the claims as a template to craft an obviousness combination by starting with the claimed limit of 40 mW and going to the chart to select a drive current that will meet the claimed limit (plus a reasonable margin of error).

Analyses that start with the claims and work backwards, as here, are "entirely hindsight driven." *Warner Chilcott Lab'ys Ireland Ltd. v. Impax Lab'ys, Inc.*, C.A. Nos. 2:08-cv-06304, 2:09-cv-02073, 2:09-cv-

01233, 2012 WL 1551709, at *57 (D.N.J. Apr. 30, 2012) ("Instead of conducting their analysis from the perspective of a person of ordinary skill in the art at the time the inventions were made, Defendants' experts started with the [subject] Patent . . ."), *aff'd sub nom. Warner Chilcott Co., LLC v. Impax Lab'ys, Inc.*, 478 F. App'x 672 (Fed. Cir. 2012). This Court has reversed obviousness findings where "the only way to arrive at the [claimed device] is by using the [subject] patent as a roadmap" because this kind of analysis "represents an improper reliance on hindsight." *Merck Sharp & Dohme B.V. v. Warner Chilcott Co., LLC*, 711 F. App'x 633, 636–37 (Fed. Cir. 2017) (reversing where claim required specific amounts of steroid compounds to be released from a compartment and, with no suggestion of specific amounts in the art, the district court only found the amounts in the claim itself).

The Board's reliance on Dr. Krames's hindsight analysis provides an additional basis on which this Court must reverse the obviousness holdings.

## D. The Board altogether failed to address reasonable expectation of success.

This Court's case law requires that a motivation to combine references must be accompanied by a reasonable expectation of success.

*See, e.g.*, *Pers. Web Techs.*, 848 F.3d at 993–94. The Board's only analysis of this issue is that, "[w]e determine that Petitioner's evidence, absent rebuttal evidence, is sufficient to establish that a person of ordinary skill in the art would have had a 'high expectation of success' in mounting Krames's chips as LEDs 4 of Figure 3 of Begemann." Appx79–80. In support, the Board cites to the declaration of Cree's expert that asserts that the surfaces of Begemann are flat and big enough to mount a LED. *See* Appx10048. CAO Lighting does not dispute that the surfaces in Begemann are flat or that they are bigger than a LED chip. Instead, CAO Lighting points out that Krames 2000, and the entire industry, understood that the LED chips disclosed are too inefficient to successfully replace conventional lamps as asserted by Cree and the Board. *See supra* at 58–64. Because the Board's Final Written Decisions fail in this regard as well, its obviousness holdings cannot stand.

## IV. The Board erred as a matter of law in dismissing CAO Lighting's evidence of long-felt but unmet need.

Just as in its motivation to combine analysis, the Board fell victim to hindsight when it dismissed CAO Lighting's objective industry evidence of non-obviousness in the form of long-felt but unmet need. Appx95–98. "Obviousness requires a court to walk a tightrope

blindfolded (to avoid hindsight)—an enterprise best pursued with the safety net of objective evidence." *Mintz v. Dietz & Watson, Inc.*, 679 F.3d 1372, 1379 (Fed. Cir. 2012) (reversing obviousness holding for lacking sufficient evidence where the lower court relied on unsubstantiated "common sense" to hold that it would be obvious to try a claim limitation that did not appear in the prior art). The objective indicia "guard against slipping into use of hindsight and to resist the temptation to read into the prior art the teachings of the invention in issue." *Graham v. John Deere Co.*, 383 U.S. 1, 36 (1966) (internal citations and quotations omitted).

Here, the Board failed to engage in the funambulism the law demands. It never even addressed the objective industry evidence of long-felt but unmet need based solely on the testimony of Dr. Cao that he "purchased an off-the-shelf LED as a prototype." Appx97–98. But the Patent Act, itself, dictates that "[p]atentability shall not be negatived by the manner in which the invention was made." 35 U.S.C. § 103; *see also Life Techs., Inc. v. Clontech Labs., Inc.*, 224 F.3d 1320, 1325 (Fed. Cir. 2000) ("[T]he path that leads an inventor to the invention is expressly made irrelevant to patentability by statute."). By impermissibly focusing

70

on irrelevant testimony from the inventor, the Board avoided the substantial evidence establishing that the industry was very sure that Dr. Cao's invention could not be made despite the strong need for it. *Supra* at 62–64. In doing so, the Board removed the important guardrails that would have prevented hindsight from guiding its obviousness analysis.

## CONCLUSION

For at least the reasons discussed above, CAO Lighting requests that this Court reverse or vacate the Final Written Decisions' findings of obviousness with respect to all claims of the '961 patent and '770 patent.

|  | /s/ Ronald E. Cahill |
|---|---|
| TODD. G. VARE | RONALD E. CAHILL |
| PAUL B. HUNT | HEATHER B. REPICKY |
| JOSHUA P. LARSEN | BARNES & THORNBURG LLP |
| BARNES & THORNBURG LLP | One Marina Park Drive, |
| 11 South Meridian Street | Suite 1530 |
| Indianapolis, IN 46204 | Boston, MA 02210 |
| (317) 236-1313 | (617) 316-5310 |
| todd.vare@btlaw.com | rcahill@btlaw.com |
| paul.hunt@btlaw.com | hrepicky@btlaw.com |
| josh.larsen@btlaw.com |  |
|  | *Counsel for Patent Owner Appellant* |

MARCH 25, 2024

# Addendum

| Description | Appx Pgs. |
|---|---|
| U.S. Patent No. 6,465,961 B1 "Semiconductor Light Source Using a Heat Sink with a Plurality of Panels," October 15, 2002 (Cao) | Appx1–23 |
| *Ex Parte* Reexamination Certificate for U.S. Patent No. 6,465,961 issued on September 2, 2014 | Appx24–29 |
| *Inter Partes* Reexamination Certificate for U.S. Patent No. 6,465,961 issued on May 11, 2017 | Appx30–31 |
| U.S. Patent No. 6,634,770 B2 "Light Source Using Semiconductor Devices Mounted on a Heat Sink," October 21, 2003 (Cao) | Appx32–55 |
| *Inter Partes* Reexamination Certificate for U.S. Patent No. 6,634,770 issued on December 3, 2013 | Appx56–57 |
| *Inter Partes* Reexamination Certificate for U.S. Patent No. 6,634,770 issued on December 10, 2013 | Appx58–59 |
| *Ex Parte* Reexamination Certificate for U.S. Patent No. 6,634,770 issued on September 8, 2014 | Appx60–66 |
| Judgment and Final Written Decision from IPR2022-00847 dated September 28, 2023 ['961 patent] | Appx67–137 |
| Judgment and Final Written Decision from IPR2022-00848 dated September 28, 2023 ['770 patent] | Appx138–202 |

US006465961B1

## (12) United States Patent
### Cao

(10) **Patent No.:    US 6,465,961 B1**
(45) **Date of Patent:        Oct. 15, 2002**

(54) **SEMICONDUCTOR LIGHT SOURCE USING A HEAT SINK WITH A PLURALITY OF PANELS**

(75) Inventor: **Densen Cao**, Sandy, UT (US)

(73) Assignee: **Cao Group, Inc.**, Sandy, UT (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

(21) Appl. No.: **09/939,340**

(22) Filed: **Aug. 24, 2001**

(51) **Int. Cl.**[7] ............................................... **B60Q 1/02**
(52) **U.S. Cl.** ........................ **315/58**; 362/83.1; 362/235
(58) **Field of Search** ................... 315/58, 185; 313/512; 362/83.1, 800, 293, 230, 231, 235, 246, 249; 250/339.13

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 4,675,575 A | 6/1987 | Smith et al. ................. | 315/185 |
| 5,160,200 A | 11/1992 | Cheselske ................... | 362/249 |
| 5,721,430 A * | 2/1998 | Wond ..................... | 250/339.13 |
| 5,803,579 A * | 9/1998 | Turnbull et al. ........... | 362/83.1 |
| 5,941,626 A | 8/1999 | Yamuro ...................... | 362/246 |
| 5,947,588 A | 9/1999 | Huang ........................ | 362/235 |
| 5,982,092 A | 11/1999 | Chen .......................... | 313/512 |

* cited by examiner

*Primary Examiner*—Don Wong
*Assistant Examiner*—James Clinger
(74) *Attorney, Agent, or Firm*—Daniel P. McCarthy; Parsons Behle & Latimer

(57) **ABSTRACT**

A semiconductor light source for illuminating a physical space has been invented. In various embodiments of the invention, a semiconductor such as and LED chip, laser chip, LED chip array, laser array, an array of chips, or a VCSEL chip is mounted on a heat sink. The heat sink may have multiple panels for mounting chips in various orientations. The chips may be mounted directly to a primary heat sink which is in turn mounted to a multi-panel secondary heat sink. A TE cooler and air circulation may be provided to enhance heat dissipation. An AC/DC converter may be included in the light source fitting.

**20 Claims, 16 Drawing Sheets**



**Appx1**



**Fig. 1**



**Fig. 2**



**Fig. 3a**



**Fig. 3c**



**Fig. 3b**



**Fig. 3d**



**Fig. 3e**



**Fig. 3g**



**Fig. 3f**



1239

1252a    1252b

| | |
|---|---|
| p+ GaN contact layer | 1251 |
| p - AlGaN cladding layer | 1250 |
| AlN/AlGaN MQW reflective layer | 1249 |
| p - AlGaN cladding layer | 1248 |
| GaInN MQW active layer | 1247 |
| n - AlGaN cladding layer | 1246 |
| AlN/AlGaN MQW reflective layer | 1245 |
| NGaInN-cladding layer | 1244 |
| n - GaN cladding layer | 1243 |
| GaN buffer layer | 1242 |
| SiC - electrically conductive substrate | 1241 |
| Electrode | 1240 |

**Fig. 3h**

Appx8



## Fig. 4a



## Fig. 4b

**U.S. Patent**     **Oct. 15, 2002**     **Sheet 9 of 16**     **US 6,465,961 B1**



**Fig. 4c**



**Fig.4d**



## Fig. 5a



## Fig. 5b



# Fig. 6



**Fig. 7a**



**Fig. 7b**



## Fig. 8a

## Fig. 8b



**Fig. 9**



**Fig. 10**



**Fig. 11**

US 6,465,961 B1

**1**

## SEMICONDUCTOR LIGHT SOURCE USING A HEAT SINK WITH A PLURALITY OF PANELS

### BACKGROUND OF INVENTION

The invention relates to the field of light sources and illumination devices. More particularly, the invention relates to semiconductor light sources and illumination devices useful for providing visible light in order to partially or fully illuminate a space occupied by or viewed by humans, such as residential space, commercial space, outdoor space, the interior or exterior of a vehicle, etc.

In the prior art, light emitting diodes ("LED's") and other semiconductor light sources were traditionally used for panel displays (such as laptop computer screens), signal lighting, and other instrumentation purposes. LED's are desirable because they are a high efficiency light source that uses substantially less energy and creates less heat than typical prior art light sources such as incandescent and halogen lights. Prior art semiconductor light sources have not been successfully and economically used to illuminate physical spaces. Additionally, in the prior art, LED's are typically individually packaged in a module, either with or without a focus dome on the module. Typical prior art LED modules lack high light intensity due to the size of the LED chips used. Further, arranging a sufficient number of prior art LED modules to generate high light intensity, such as use of a stack, lamp or array, took an excessive amount of physical space and created unmanageable amounts of heat. Consequently, in the prior art, LED's and other semiconductor light sources were not suitable for replacing the traditional tungsten light bulbs.

U.S. Pat. No. 5,941,626 discloses a long light emitting apparatus that uses a plurality of LED lamps (modules) connected in series. The LED modules are spaced apart and appear to be intended for decorative use, such as on street lamp poles and on Christmas trees.

U.S. Pat. No. 5,160,200 discloses a wedge-base LED bulb housing. The patent depicts a plurality of separate LED modules electrically connected to a wedge base.

U.S. Pat. No. 4,675,575 discloses light-emitting diode assemblies such as a mono-color or bi-color light string system. Each LED is in an envelope with light conducting optical spheres for light transmission and dispersion. The LED string system appears adapted for decorative use, such as for lighting Christmas trees.

A distinct need is felt in the prior art for a semiconductor light source for use in illuminating a space with single color light in the visible range and which can efficiently dissipate the heat that they produce. Presently, that application is served by incandescent and fluorescent lights which have high energy consumption, high heat generation, and short useful life compared to the invented semiconductor light sources.

### SUMMARY OF INVENTION

It is an object of some embodiments of the invention to provide a semiconductor light source capable of illuminating a space with visible light. Thes and other objects of various embodiments of the invention will become apparent to persons of ordinary skill in the art upon reading the specification, viewing the appended drawings, and reading the claims.

### BRIEF DESCRIPTION OF DRAWINGS

FIG. 1 depicts a semiconductor light source of one embodiment of the invention using a high power chip or array arrangement.

**2**

FIG. 2 depicts a semiconductor light source of one embodiment of the invention using high power surface mount LED chip modules or lamps.

FIG. 3a depicts an LED with an insulating substrate.

FIG. 3b depicts a detailed view of an LED structure on a sapphire substrate.

FIG. 3c depicts an LED with a conducting substrate.

FIG. 3d depicts a detailed view of an LED structure on a sapphire substrate.

FIG. 3e depicts a VCSEL chip on an insulating substrate.

FIG. 3f depicts a detailed view of a VCSEL chip on a insulative substrate.

FIG. 3g depicts a VCSEL chip on a conductive substrate.

FIG. 3h depicts a detailed view of a VCSEL chip in a conductive substrate.

FIG. 4a depicts a top view of an LED array on a single chip with an insulating substrate.

FIG. 4b depicts a top view of an LED array on a single chip with a conductive substrate.

FIG. 4c depicts a top view of a VCSEL array on a single chip with an insulating substrate.

FIG. 4d depicts a top view of a VCSEL array on a single chip with a conductive substrate.

FIG. 5a depicts a semiconductor chip of the invention that emits single color light using a conversion layer.

FIG. 5b depicts a semiconductor chip of the invention that emits single color light using a phosphor coating.

FIG. 6 depicts a cross sectional view of a heat sink of the invention using a fan and TE cooler to circulate air and remove heat.

FIG. 7a depicts a single chip or single array chip package.

FIG. 7b depicts a multiple chip package.

FIG. 8a depicts a chip package with phosphor covering on the semiconductor.

FIG. 8b depicts a chip package with a uniform phosphor coating.

FIG. 9 depicts a high power LED package.

FIG. 10 depicts an LED or laser light source located in a light enclosure having a phosphor coating.

FIG. 11 depicts a power supply module with fitting for a light source of the invention.

### DETAILED DESCRIPTION

Referring to FIG. 1, one embodiment of the invention is depicted. In this embodiment of the invention, a semiconductor light source 100 is depicted. The light source 100 includes a traditional bulb-shaped enclosure 101. The enclosure 101 may be of any desired shape, including spherical, cylindrical, elliptical, domed, square, n-sided where n is an integer, or otherwise. The enclosure may be made from any desired light transparent or translucent materials, including glass, plastic, polycarbonate, and other light transparent materials.

The enclosure 101 has an exterior surface 101a and an interior surface 101b. The exterior surface 101a may be smooth and glossy, matte, or another finish or texture. The exterior surface 101a may be coated or painted with desired materials. The interior surface 101b may optionally include an appropriate coating, such as a luminous powder coating. Examples of luminous powder coating that may be used in the invention include YAG: Ce or other phosphor powders or coatings. For example, if the light source uses blue LED's

US 6,465,961 B1

3

to generate light, but it is desired to illuminate a room with white light, the interior surface 101b maybe covered with a phosphor coating to convert blue light into white light. Any wavelength-modifying coating such as phosphor or another coating may be used. In some preferred embodiments of the invention, it is intended to convert light emitted by a semiconductor chip in the wavelength range of about 200 to about 700 nm. to white light.

The enclosure 101 encloses an interior volume 102 which may be a vacuum, or may contain a gas such as ordinary air, an inert gas such as argon or nitrogen, or any other desired gas. In some embodiments of the invention, a gas will be included within the interior volume 102 for the purpose of avoiding oxidation of the heat sink and the semiconductor.

The enclosure 101 may be mounted to a support 105. The support 105 may be a separate component or may be integral with the base 103. The base 103 may be configured as a fitting or connector for use in a desired light socket, such as a traditional light socket. In such case, the base 103 would also include electrodes 103a and 103b for making electrical connection with a power source.

Located within the interior volume 102 is at least one heat sink 104. The heat sink 104 may be of any desired shape, depending on the application. As depicted, the heat sink 104 has a generally flat or planar top 104a, and a plurality of generally flat or planar panels or compartment 104b, 104c, 104d, 104e, 104f, 104g, 104h, 104i, etc. each of which may host a single or an array of semiconductor devices capable of producing light. The heat sink 104 may be shaped otherwise, with curved or rounded sides.

If the heat sink 104 may be mounted on a support 105, the support 105 may be designed in order to place the heat sink in the most desirable position within the interior volume 102 so that semiconductors located on the heat sink may emit light that will be transmitted in a diffuse or focused pattern through the enclosure 101.

Mounted on the heat sink 104 are at least one semiconductor device 106. The semiconductor device(s) 106 may be arranged in this embodiment of the invention to transmit light in all directions except through the base 103, or in a manner to direct light in a specific direction. The semiconductor devices may be any semiconductor devices capable of emitting light, such as LED's, LED arrays, VCSEL's, VCSEL arrays, photon recycling devices that cause a monochromatic chip to emit white light, and others.

The semiconductor devices 106 are electrically connected to each other via electrical connections 107. Lead wires 108a and 108b are used to provide the semiconductor devices 106 with electrical power. As desired, the heat sink may serve as a positive or negative electrical connection for the semiconductor devices.

The heat sink 104 may be any material capable of conducting heat away from the semiconductor devices. Examples of suitable materials include copper, aluminum, silicon carbide, boron nitride and others known to have a high coeffecient of thermal conductivity.

In order to provide suitable electrical power to the semiconductor devices, an AC/DC converter (not shown in this fixture) is utilized. This will permit the invented semiconductor light source to be powered by 110 V. or 220 V. AC power found in homes and businesses throughout the world. The AC/DC converter may be located in the base 103 or in another location.

In alternative embodiments of the invention, each semiconductor device may have its own individual heat sink, or two or more semiconductor devices may be located on the

4

same heat sink. In some embodiments of the invention, the base may also serve as a heat sink, eliminating the need for a separate heat ink and thereby reducing cost.

Referring to FIG. 2, a semiconductor device 2220 in enclosure 2201 can be arranged to accommodate high power surface LED's. "High power"LED's means that the light output from each LED module is greater than 40 milliwatts. "Surface mount"LED's are LED's mounted directly on a heat sink, or other surface, in contrast with traditional LED lamps which have ordinary electrical leads for wiring and must be separately held in place. High power surface mount LED's are described in detail later in this document.

When high power LED's are used, all the components are the same as in FIG. 1 except that a high power LED 2206 is used. It can be seen that the LED's 2206 are electrically connected with electrical connectors 2207 and are located on a heat sink 2204. The heat sink 2204 has a plurality of heat sink faces 2210, 2211 and 2212 which are each generally planar and are arranged in angular orientation with each other in order to cause light from the LED's to be dispersed around a space to be illuminated. The heat sink faces can be oriented with respect to each other at any desired angle, but 45 degree angles are depicted in the figure so that face 2210 is perpendicular to face 2212. A standard base 2203 is provided.

Any of the semiconductor light sources described below and others may be used in embodiments of the invention.

FIG. 3a depicts an LED chip with an insulating substrate 201. The substrate 202 may be an appropriate material on which a semiconductor may be grown, such as sapphire, gallium arsenide, silicon carbide, gallium phosphorous, gallium nitride and others. The substrate 202 will also in this embodiment be electrically insulative. The semiconductor material 203 will emit light in all directions as indicated by arrows 204a, 204b, 204c and 204d. Positive 205a and negative 205b electrodes are provided for powering the chip.

FIG. 3b depicts an example of epitaxial layer configuration for the LED of FIG. 3a. A light emitting diode on an electrically insulative substrate 1200 is depicted. The LED includes an electrically insulative substrate such as sapphire 1201. The substrate serves as a carrier, pad or platform on which to grow the chip's epitaxial layers. The first layer placed on the substrate 1201 is a buffer layer 1202, in this case a GaN buffer layer. Use of a buffer layer reduces defects in the chip which would otherwise arise due to differences in material properties between the epitaxial layers and the substrate. Then a conductive layer 1203 is provided, such as n-GaN. This layer acts as a connector for a negative electrode. Then a cladding layer 1204, such as n-AlGaN, is provided. Cladding layers serve to confine the electrons as they jump from a conduction band to valance and give up energy that converts to light. An active layer 1205 p-lnGaN is then provided where electrons jump from a conduction band to valance and emit energy which converts to light. On the active layer 1205, another cladding layer 1206, such as p-AlGaN is provided that also serves to confine electrons. A contact layer 1207 such as p+-GaN is provided that is doped for Ohmic contact. The contact layer 1207 has a positive electrode 1208 mounted on it, in this case an electrode that has a mount side on the contact layer 1207 that is Ni and an electrode face that is Au. A similar negative electrode is provide on a shelf of the first cladding layer 1203.

FIG. 3c depicts an LED with a conducting substrate 210. The substrate 211 must be an electrically conductive material on which a semiconductor ship may be grown, such as gallium arsenide, silicon carbide, gallium phosphorous, gal-

US 6,465,961 B1

**5**

lium nitride and others. A portion of the substrate **212** will serve as an electrode for powering the chip, in this case a negative electrode. The semiconductor material **213** will emit light in all directions as indicated by arrows **214***a*, **214***b*, **214***c* and **214***d*. A positive electrode **215** is provided, and the base **240** of the substrate **211** acts as a negative electrode. The base **240** is made of any conductive metal such as Au, Au/Ce, An/Zn and others.

FIG. **3***d* depicts epitaxial layer configuration for the LED of FIG. **3***c*. A light emitting diode grown on an electrically conductive substrate **1210** is depicted. The LED includes an electrically conductive substrate such as SiC **1212**. The substrate serves as a carrier, pad or platform on which to grow the chip's epitaxial layers, and as a negative electrode in the chip. The first layer placed on the substrate **1212** is a buffer layer **1213**, in this case a GaN buffer layer. Next, a cladding layer **1214** is provided, such as n-GaN. An active layer **1215** p-lnGaN is provided where energy is converted to light. On the active layer **1215**, another cladding layer **1216**, such as p-AlGaN is provided. A contact layer **1217** such as p+-GaN that has a positive electrode **1218** mounted on it. A negative electrode **1211** is provided at the base of the chip.

FIG. **3***e* depicts a VCSEL chip on an insulating substrate **220**. The substrate **221** has a volume of semiconductor material **222** on it. Positive electrodes **223***a* and **223***b* and negative electrodes **224** are provided for powering the chip, and light is emitted from the chip in directions generally indicated by arrows **225***a* and **225***b*.

FIG. **3***f* depicts epitaxial layer configuration of the VCSEL chip of FIG. **3***e* with an electrically insulative substrate **1220**. The chip **1220** includes a substrate **1221** that has electrically insulative properties such as sapphire. On top of the substrate **1221** there is a buffer layer **1222** such as GaN followed by a cladding layer and contact layer **1223** such as n-GaN. The cladding layer **1223** includes a negative electrode **1232***c*. Next, there is another cladding layer nGaInN **1224**. A reflective layer AlN/AlGaN MQW (multiple quantum wells) **1225** is provided. A cladding layer **1226** n-AlGaN is interposed between the reflective layer **1225** and the active layer **1227** GaInN MQW. The active layer **1227** is followed by another cladding layer p-AlGaN **1228** which is followed by a second reflective layer **1229** AlN/AlGaN MQW. Light emitted from the active layer reflects between the two reflective layers until it reaches an appropriate energy level and then lases, emitting a laser beam of light. The second reflective layer **1229** is followed by a cladding layer p AlGaN **1230** and a contact layer p+-GaN **1231**. The contact layer may be ring-shaped with a window opening **1233** and has one or more positive electrodes **1232***a* and **1232***b* which are contact areas. The negative electrode is created on the n-GaN layer.

FIG. **3***g* depicts a VCSEL chip on a conductive substrate **230**. The substrate **231** has a volume of semiconductor material **232** on it. Positive electrodes **233***a* and **233***b* are provided for powering the chip, and light is emitted from the chip in directions generally indicated by arrows **235***a* and **235***b*. The base **236** of the substrate **231** serves as a negative electrode.

FIG. **3***h* depicts epitaxial layer configuration of a VCSEL chip with an electrically conductive substrate **1239** such as that of FIG. **3***g*. The chip **1239** includes a substrate **1241** that has electrically conductive properties such as SiC. The underside of the substrate **1241** has an electrode **1240**. On top of the substrate **1241** there is a buffer layer **1242** such as GaN followed by a cladding layer **1243** such as n-GaN.

**6**

Next, there is another cladding layer NGaInN **1244**. A reflective layer using AlN/AlGaN MQW (multiple quantum wells) **1245** is then provided. A cladding layer **1246** n-AlGaN is interposed between the first reflective layer **1245** and the active layer **1247** GaInN MQW. The active layer **1247** is followed by another cladding layer p-AlGaN **1248** which is followed by a second reflective layer **1429** AlN/ AlGaN MQW. The second reflective layer **1249** is followed by a cladding layer p AlGaN **1250** and a contact layer p+-GaN **1251**. The contact layer may have one or more positive electrodes **1252***a* and **1252***b* mounted on it.

FIG. **4***a* depicts a top view of an LED array on a single chip with a size a×b on an insulating substrate **301**. Each of sizes a and b is greater than 300 micro meters. Semiconductor materials **302** are located on an electrically insulative substrate (not shown). Positive **303** and negative **304** pads are provided, each in electrical connection with its respective metal strip **305** and **306** arranged in a row and column formation (8 columns shown) to create the array and power the chip. This enables the LED to emit high power light from a single chip.

FIG. **4***b* depicts a top view of an LED array on a single chip with a size a×b on a conductive substrate **310**. Each of sizes a and b is greater than 300 micro meters. Semiconductor materials **312** are located on an electrically conductive substrate (not shown). Positive pad **313** is provided in electrical connection with a metal strip **315** arranged in an array formation to power the chip. The substrate **310** serves as the negative electrode in the embodiment depicted.

FIG. **4***c* depicts a top view of a VCSEL array on a single chip with a size a×b on an insulating substrate **320**. Each of sizes a and b is greater than 300 micro meters. The chip **320** includes an electrically insulative substrate (not shown) on which a semiconductor material **332** is located covered by a panel **333**. The panel **333** may be an appropriate conductive material such as Au/Ce, Au/Zn and others. The panel **333** has a plurality of windows **334** in it to permit light produced by the semiconductor material **332** to be emitted for use. The panel **333** is electrically connected to conductive metal strip **340** and to an electrode pad **335**. A negative electrode pad **336** is also provided in electrical conduction with a metal strip **337** to power the chip.

FIG. **4***d* depicts a top view of a VCSEL array on a single chip with a dimension a×b on a conductive substrate **340**. Each of sizes a and b is greater than 300 micro meters. It includes a conductive substrate (not shown) on which a semiconductor material **341** is located. A conductive panel **342** overlays the semiconductor material **341**. A plurality of windows **343** are provided in the panel **342** to allow light produced by the chip to escape for us. A positive electrode pad **344** is provided which in conjunction with the electrically conductive substrate serving as a negative electrode power the chip. A negative electrode is provided on the bottom of the chip **340**.

FIGS. **5***a* and **5***b* depict a semiconductor chip system that emits white light. In FIG. **5***a*, there is a GaN based semiconductor chip **2000** depicted. It includes a GaN system **5001** built on an insulative sapphire substrate **5002** capable of emitting blue light, the general structure of which is known in the prior art. A light conversion layer **5003** such as AlGaInP (aluminum gallium indium phosphate) adjacent the sapphire layer **5002** opposite the GaN system **5001**. Light emitted from the GaN system will travel through the sapphire layer **5002**, through the AlGaInP **5003** to exit the chip system. Some of the blue light will be absorbed by the AlGaInP to emit yellow light, and some of the blue light will

US 6,465,961 B1

7

be transmitted through the AlGaInP. The combination of blue and yellow light emitted by the chip according to arrows **5004***a*, **5004***b* and **5004***c* will appear as white light to human eyes. Electrodes **5005** and **5006** are provided for electrical connection. Referring to FIG. **5***b*, the chip **2000** is depicted following application of an exterior light conversion coating or layer **5007** such as phosphor. Light which exits through the phosphor such as **5004***a* will be converted in wavelength to white, making a useful light for illuminating physical spaces. A coating or layer to convert monochromatic light to white light may include phosphor powder, YAG/Ce and others. Such a coating or layer may be applied by the methods of brush coating, flow coating and evaporative coating.

FIG. **6** depicts a cross sectional view of a heat sink of the invention **401**. As depicted in this embodiment, a plurality of semiconductor chips or high power LED's **402** capable of emitting light are mounted in a well of the heat sink material **403** (surface mounting). The mounting of the chips or high power LED's may be achieved by use of a heat-conductive adhesive **404**, or by brazing or mechanical fixation. The heat sink material **403** is of sufficient thickness to conduct heat away from the chips **402** and keep the chips cool. Located within the heat sink **403**, a layer or lining of thermal electric material **405** may be installed. Thermal electric ("TE") material experiences a reduction in temperature when voltage is applied to it. By applying a voltage to the TE material **405**, its temperature can be lowered and heat can be drawn from the heat sink material **403** that in turn is drawing heat away from the chips **402**. The TE material may line an air chamber **406**. The air chamber is open at its entrance **406***a* and at its exit **406***b*. A fan **407** may be placed in or near the air chamber **406** in order to cause air **408** to travel in the entrance **406***a*, through the air chamber **406** past the TE material **405** and out of the exit **406***b*, carrying heat with it. Such a system will increase efficiency of heat dissipation from the chips **402**. At the bottom of the heat sink, a fitting or connector may be provided that is threaded **409***a* and has an electrode **409***b* for installation into a traditional light socket.

FIG. **7***a* depicts a single chip or single array chip surface mount package **501**. It includes a semiconductor chip or array **502** capable of emitting light mounted in a well **503** of a heat sink **504**. The well **503** is provided with reflective sides to that light emitted from the sides of the chip or array **502** is reflected out of the well in order to provide useful illumination and to minimize heat buildup. The chip or array **502** may be mounted in the well **503** by use of a heat conductive adhesive **505** or by brazing or mechanical fixation. The heat conductive adhesive may also be used as a reflector to reflect light from the substrate in the direction of arrows **509***a* and **509***b*. Connection blocks **507** and **508** may be mounted on the heat sink **504** in order to facilitate electrical connection of the chip **502**. Light exits the chip as indicated by arrows **509***a*, **509***b* and **509***c*.

FIG. **7***b* depicts a multiple chip package **520**. It includes multiple wells **521***a*, **521***b* and **521***c* on a heat sink **522** in which multiple chips or arrays **523***a*, **523***b* and **523***c* are located. Connection blocks **524***a*, **524***b*, **524***c* and **524***d* are provided with lead wires **525***a*, **525***b*, **525***c*, **525***d* and **525***f* in order to electrically power the chips or arrays.

FIG. **8***a* depicts a chip package with phosphor covering **601**. The package includes a heat sink **602** in which a well is located **603** for receiving a chip or array **604**. Connection blocks **605***a* and **605***b* and lead wires **606***a* and **606***b* may be used to electrically power the chip or array **604**. A thickness of phosphor **607** may be placed over the chip or array **604**

8

in order to convert single wavelength light emitted from the chip or array into multiple wavelength white light useful for illumination of spaces used by humans. FIG. **8***b* depicts another phosphor coated chip package **6000**. It includes a heat sink **6001** on which a light emitting chip **6002** is mounted in a receptacle **6005** on the heat sink. The chip **6002** does not fill the entirety of the receptacle **6005** so a transparent filler **6003** of a material transparent to the wavelength of light emitted by the chip **6002** is provided. Some transparent materials which may be used include epoxy, plastic and others. On the face of the chip **6002** opposite the heat sink **6001** a wavelength conversion coating or layer **6004** is provided to convert the light emitted by the chip to white light. A phosphor coating is preferred.

FIG. **9** depicts a high power surface mount LED package **901** useful in the invention. The LED package **901** includes a heat sink **902** formed from a material which can dissipate heat. A well **904** is formed in the heat sink in order to accept an LED, laser diode or semiconductor chip array **903** therein. The well **904** has walls **905** for reflecting light **906***a* and **906***b* emitted by the chip(s) **903**. An optional phosphor coating **907** is provided over the chip(s) to convert light emitted by the chip(s) to white light. The chip(s) **903** are secured to the heat sink **903** by use of adhesive **908**. The adhesive **908** may be heat conductive to aid in transmission of heat from the chips to the heat sink, and it may have light reflective properties to aid in reflection of light from the chips in the direction of arrows **906***a* and **906***b* in a usable direction. Reflection of light by the well and the adhesive provides more efficient light output than would otherwise be achieved. Connection blocks **909***a* and **909***b* are provided for forming electrical connection with diodes **910***a* and **910***b*. A focus dome, lens, or cover **910** is provided that is transparent to the light being emitted. The focus dome may have the characteristic of serving to focus light being emitted from the chips in order to create a substantially coherent beam of usable light.

FIG. **10** depicts a light source of the invention **1001** having an LED or laser light source **1002** located in an enclosure **1003**. The enclosure may be any appropriate shape. The depicted shape is that of a bulb, but flat, arcuate, rounded or other shapes may be used depending on the application. The enclosure **1003** may be glass, plastic, polycarbonate or any other material that is substantially transparent to the light to be emitted. The enclosure **1003** has an exterior surface **1003***a* and an interior surface **1003***b*. The enclosure serves as a protector of the light source **1002** and it may be designed to diffuse light. The interior surface **1003***b* of the enclosure may have a coating or layer **1004** which serves to alter properties of the light emitted from the light source **1002**. For example, if light from the light source **1002** is single wavelength, then the light-altering coating **1004** may be phosphorous which will turn the monochromatic light into white light. Other coatings may be used as desired to alter the light in other ways.

FIG. **11** depicts a power supply module **701** for a light source of the invention. The power supply module **701** includes a fitting or connector **702** with electrodes **703** and **704** for receiving AC electrical input from a traditional light bulb socket. An AC/DC converter **705** is provided to convert AC power from standard building wiring into DC power usable by the semiconductor chips of the invention. Electrical lead wires **706***a* and **706***b* are provided for electrical connection to the chips to power the light source, and electrical lead wires **707***a* and **707***b* are provided to provide power for the cooling fan TE cooler. The coating may be applied on the interior or exterior of the enclosure, or both.

**Appx21**

US 6,465,961 B1

9

Examples of some heat sink materials which may be used in the invention include copper, aluminum, silicon carbide, boron nitride natural diamond, monocrystalline diamond, polycrystalline diamond, polycrystalline diamond compacts, diamond deposited through chemical vapor deposition and diamond deposited through physical vapor deposition. Any materials with adequate heat conductance can be used.

Examples of heat conductive adhesives which may be used are silver based epoxy, other epoxies, and other adhesives with a heat conductive quality. In order to perform a heat conductive function, it is important that the adhesive possess the following characteristics: (i) strong bonding between the materials being bonded, (ii) adequate heat conductance, (iii) electrically insulative or electrically conductive as desired, and (iv) light reflective as desired. Examples of light reflective adhesives which may be used include silver and aluminum based epoxy.

Examples of substrates on which the semiconductors used in the invention may be grown include Si, GaAs, GaN, lnP, sapphire, SiC, GaSb, lnAs and others. These may be used for both electrically insulative and electrically conductive substrates.

Materials which may be used to used as a thermoelectric cooler in the invention include known semiconductor junction devices.

It will be preferred that the semiconductor light source of the invention will emit light in the wavelength range of 200 to 700 in order to be useful for illumination of a physical space used by humans.

Heat sinks used in this invention can be of a variety of shapes and dimensions, such as those depicted in the drawings or any others which are useful for the structure of the particular light source being constructed.

Any of the foregoing, including combinations thereof, and other semiconductors, materials and components may be used in the invented light sources.

While the present invention has been described and illustrated in conjunction with a number of specific embodiments, those skilled in the art will appreciate that variations and modifications may be made without departing from the principles of the invention as herein illustrated, as described and claimed. The present invention may be embodied in other specific forms without departing from its spirit or essential characteristics. The described embodiments are considered in all respects to be illustrative and not restrictive. The scope of the invention is, therefore, indicated by the appended claims, rather than by the foregoing description. All changes which come within the meaning and range of equivalence of the claims are to be embraced within their scope.

What is claimed is:

1. A semiconductor light source for emitting light to illuminate a space used by humans, the semiconductor light source comprising:

an enclosure, said enclosure being fabricated from a material substantially transparent to white light,

an interior volume within said enclosure,

a heat sink located in said interior volume,

said heat sink being capable of drawing heat from one or more semiconductors devices,

said heat sink having a plurality of panels on it suitable for mounting semiconductor devices thereon,

said panels on said heat sink being oriented to facilitate emission of light from the semiconductor light source in desired directions around the semiconductor light source,

10

at least one semiconductor chip capable of emitting light mounted on one of said panels,

said semiconductor chip being capable of emitting monochromatic light,

said semiconductor chip being selected from the group consisting of light emitting diodes, light emitting diode arrays, laser chips, LED modules, laser modules, and VCSEL chips, and

a coating for converting monochromatic light emitted by said chip to white light.

2. A device as recited in claim 1 wherein said coating is located on the interior of said enclosure.

3. A device as recited in claim 1 wherein said coating is located on said chip.

4. A device as recited in claim 1 further comprising a power module for powering the light source, said power module including a fitting for installation in a traditional light bulb socket and an AC/DC converter for converting AC power from traditional building wiring to DC power usable by a semiconductor devices.

5. A device as recited in claim 1 further comprising a quantity of heat conductive adhesive located between said chip and said heat sink and serving to conduct heat from said chip to said heat sink.

6. A device as recited in claim 1 further comprising a quantity of light reflective adhesive located between said chip and said heat sink.

7. A device as recited in claim 1 wherein said chip includes

a substrate on which epitaxial layers are grown,

a buffer layer located on said substrate, said buffer layer serving to mitigate differences in material properties between said substrate and other epitaxial layers,

a first cladding layer serving to confine electron movement within the chip, said first cladding layer being adjacent said buffer layer,

an active layer, said active layer emitting light when electrons jump to a valance state,

a second cladding layer, said second cladding layer positioned so that said active layer lies between cladding layers, and

a contact layer on which an electron may be mounted for powering said chip.

8. A device as recited in claim 7 further comprising a first and a second reflective layers, each of said first and second reflective layers being located on opposite sides of said active layer, said reflective layers serving to reflect light emitted by said active layer.

9. A device as recited in claim 8 wherein said reflective layers include multiple quantum wells.

10. A semiconductor light source for emitting light to illuminate a space used by humans, the semiconductor light source comprising:

an enclosure, said enclosure being fabricated from a material substantially transparent to white light,

a base to which said enclosure is mounted,

an interior volume within said enclosure,

a secondary heat sink located in said interior volume,

said secondary heat sink being capable of drawing heat from one or more semiconductors devices,

said secondary heat sink having a plurality of panels on it suitable for mounting primary heat sinks thereon,

said panels on said secondary heat sink being oriented to facilitate emission of light from the semiconductor light source in desired directions around the semiconductor light source,

US 6,465,961 B1

11

a plurality of primary heat sinks mounted on said secondary heat sink, each of said primary heat sinks being smaller than said secondary heat sink,

a semiconductor chip capable of emitting light mounted on one of said primary heat sinks, said semiconductor chip being capable of emitting monochromatic light, said semiconductor chip being selected from the group consisting of light emitting diodes, light emitting diode arrays, laser chips, and VCSEL chips,

a coating for converting monochromatic light emitted by said chip to white light.

11. A device as recited in claim 10 wherein said coating is located on the interior of said enclosure.

12. A devices as recited in claim 10 wherein said coating is located on said chip.

13. A device as recited in claim 10 further comprising a power module for powering the light source, said power module including a fitting for installation in a traditional light bulb socket and an AC/DC converter for converting AC power from traditional building wiring to DC power usable by a semiconductor devices.

14. A device as recited in claim 10 wherein at least one of said heat sink includes a material selected from the group consisting of include copper, aluminum, silicon carbide, boron nitride natural diamond, monocrystalline diamond, polycrystalline diamond, polycrystalline diamond compacts, diamond deposited through chemical vapor deposition and diamond deposited through physical vapor deposition.

15. A device as recited in claim 1 further comprising a quantity of heat conductive adhesive located between said chip and said primary heat sink and serving to conduct heat from said chip to said primary heat sink.

16. A device as recited in claim 1 further comprising a quantity of light reflective adhesive located between said chip and said primary heat sink.

17. A semiconductor light source for emitting light to illuminate a space used by humans, the semiconductor light source comprising:

an enclosure, said enclosure being fabricated from a material substantially transparent to white light,

an interior volume within said enclosure,

a heat sink located in said interior volume,

said heat sink being capable of drawing heat from one or more semiconductors devices,

said heat sink having a plurality of panels on it suitable for mounting semiconductor devices thereon,

said panels on said heat sink being oriented to facilitate emission of light from the semiconductor light source in desired directions around the semiconductor light source,

at least one semiconductor chip module capable of emitting light mounted on one of said panels,

said semiconductor chip module including a module heat sink, a semiconductor chip mounted to said module heat sink, and a cover covering said semiconductor chip,

said semiconductor chip module being capable of emitting monochromatic light.

18. A device as recited in claim 17 wherein said chip includes a substrate on which epitaxial layers are grown,

a buffer layer located on said substrate, said buffer layer serving to mitigate differences in material properties between said substrate and other epitaxial layers,

12

a first cladding layer serving to confine electron movement within the chip, said first cladding layer being adjacent said buffer layer,

an active layer, said active layer emitting light when electrons jump to a valance state, and

a second cladding layer, said second cladding layer positioned so that said active layer lies between cladding layers.

19. A device as recited in claim 17 wherein at least one of said heat sinks includes a material selected from the group consisting of include copper, aluminum, silicon carbide, boron nitride, natural diamond, monocrystalline diamond, polycrystalline diamond, polycrystalline diamond compacts, diamond deposited through chemical vapor deposition and diamond deposited through physical vapor deposition.

20. A semiconductor light source for emitting light to illuminate a space used by humans, the semiconductor light source comprising:

an enclosure, said enclosure being fabricated from a material substantially transparent to white light,

an interior volume within said enclosure,

a heat sink located in said interior volume,

said heat sink being capable of drawing heat from one or more semiconductors devices,

said heat sink including a material selected from the group consisting of include copper, aluminum, silicon carbide, boron nitride, natural diamond, monocrystalline diamond, polycrystalline diamond, polycrystalline diamond compacts, diamond deposited through chemical vapor deposition and diamond deposited through physical vapor deposition,

said heat sink having a plurality of panels on it suitable for mounting semiconductor devices thereon,

said panels on said heat sink being oriented to facilitate emission of light from the semiconductor light source in desired directions around the semiconductor light source,

at least one semiconductor chip capable of emitting light mounted on one of said panels,

said semiconductor chip being capable of emitting monochromatic light,

said semiconductor chip being selected from the group consisting of light emitting diodes, light emitting diode arrays, laser chips, LED modules, laser modules, and VCSEL chips,

said chip including

a substrate on which epitaxial layers are grown,

a buffer layer located on said substrate, said buffer layer serving to mitigate differences in material properties between said substrate and other epitaxial layers,

a first cladding layer serving to confine electron movement within the chip, said first cladding layer being adjacent said buffer layer,

an active layer, said active layer emitting light when electrons jump to a valance state,

a second cladding layer, said second cladding layer positioned so that said active layer lies between cladding layers, and

a coating for converting monochromatic light emitted by said chip to white light.

* * * * *



US006465961C1

## (12) EX PARTE REEXAMINATION CERTIFICATE (10279th)

# United States Patent
Cao

(10) **Number:** US 6,465,961 C1

(45) **Certificate Issued:** Sep. 2, 2014

(54) **SEMICONDUCTOR LIGHT SOURCE USING A HEAT SINK WITH A PLURALITY OF PANELS**

(75) Inventor: **Densen Cao**, Sandy, UT (US)

(73) Assignee: **Cao Group, Inc.**, Sandy, UT (US)

**Reexamination Request:**
No. 90/012,957, Aug. 26, 2013

**Reexamination Certificate for:**
Patent No.: **6,465,961**
Issued: **Oct. 15, 2002**
Appl. No.: **09/939,340**
Filed: **Aug. 24, 2001**

(51) **Int. Cl.**
*F21K 99/00* (2010.01)
*H01L 25/075* (2006.01)

(52) **U.S. Cl.**
USPC ................ **315/58**; 257/E25.02; 257/E25.021; 362/235

(58) **Field of Classification Search**
None
See application file for complete search history.

(56) **References Cited**

To view the complete listing of prior art documents cited during the proceeding for Reexamination Control Number 90/012,957, please refer to the USPTO's public Patent Application Information Retrieval (PAIR) system under the Display References tab.

*Primary Examiner* — Erik Kielin

(57) **ABSTRACT**
A semiconductor light source for illuminating a physical space has been invented. In various embodiments of the invention, a semiconductor such as and LED chip, laser chip, LED chip array, laser array, an array of chips, or a VCSEL chip is mounted on a heat sink. The heat sink may have multiple panels for mounting chips in various orientations. The chips may be mounted directly to a primary heat sink which is in turn mounted to a multi-panel secondary heat sink. A TE cooler and air circulation may be provided to enhance heat dissipation. An AC/DC converter may be included in the light source fitting.

At the time of issuance and publication of this certificate, the patent remains subject to pending reexamination control numbers 95/000,680 and 95/002,324 filed Sep. 13, 2012 and Sep. 14, 2012 respectively. The claim content of the patent may be subsequently revised if a reexamination certificate issues from the reexamination proceedings.



AMENDED

Appx24



**Fig. 1**
AMENDED

US 6,465,961 C1

# 1

# EX PARTE
# REEXAMINATION CERTIFICATE
# ISSUED UNDER 35 U.S.C. 307

THE PATENT IS HEREBY AMENDED AS
INDICATED BELOW.

**Matter enclosed in heavy brackets [ ] appeared in the patent, but has been deleted and is no longer a part of the patent; matter printed in italics indicates additions made to the patent.**

THE DRAWING FIGURES HAVE BEEN
CHANGED AS FOLLOWS:

On FIG. 1 Brackets have been added to clarify the portions of the figures denoted by reference characters **103** and **105**. Reference characters **103**, **103a**, and **105** have been repositioned on the figure. Reference characters **120** and **121** have been removed.

AS A RESULT OF REEXAMINATION, IT HAS BEEN DETERMINED THAT:

Claims **8** and **9** are cancelled.

New claims **21-103** are added and determined to be patentable.

Claims **1-7** and **10-20** were not reexamined.

21. The semiconductor light source as recited in claim 8 wherein:
said at least one semiconductor chip is a light emitting diode (LED) chip configured to output light at greater than about 40 milliwatts, and
said LED chip is configured to emit monochromatic visible light.

22. The semiconductor light source as recited in claim 21 wherein:
said LED chip is an LED array chip,
said LED array chip has a length greater than 300 micrometers and a width greater than 300 micrometers, and
said LED array chip includes a pad in electrical connection with a metal strip arranged in an array formation configured to provide power to said active layer.

23. The semiconductor light source as recited in claim 21 wherein:
said heat sink is configured to serve as a negative electrical connection for said LED chip.

24. The semiconductor light source as recited in claim 21 wherein:
said heat sink is configured to serve as a positive electrical connection for said LED chip.

25. The semiconductor light source as recited in claim 21 wherein:
the semiconductor light source further comprises a base to which said enclosure is mounted,
the semiconductor light source further comprises additional LED chips mounted on others of said panels and each configured to output monochromatic visible light at greater than about 40 milliwatts, and
said LED chip and said additional LED chips are each mounted on one of said panels.

# 2

26. The semiconductor light source as recited in claim 25 wherein:
at least two of said panels of said heat sink are shaped differently.

27. The semiconductor light source as recited in claim 25 wherein:
at least two of said panels of said heat sink are sized differently.

28. The semiconductor light source as recited in claim 21 wherein:
the semiconductor light source further comprises a support,
said enclosure is shaped as a dome that defines an opening, and
said dome-shaped enclosure is mounted to said support.

29. The semiconductor light source as recited in claim 28 wherein:
said opening defined in said dome-shaped enclosure is large enough for said heat sink to pass through said opening.

30. The semiconductor light source as recited in claim 28 wherein:
said dome-shaped enclosure includes an exterior surface and an interior surface, and
said exterior surface has a matte-textured finish.

31. The semiconductor light source as recited in claim 28 wherein:
said dome-shaped enclosure includes an exterior surface and an interior surface,
said interior surface is coated with a first material, and
said exterior surface is coated with a second material.

32. The semiconductor light source as recited in claim 21 wherein:
the semiconductor light source further comprises an AC/DC converter,
said AC/DC converter is configured to convert AC power into DC power that is usable by said LED chip, and
said AC/DC converter is positioned outside said interior volume.

33. The semiconductor light source as recited in claim 32 wherein:
the semiconductor light source further comprises a base to which said enclosure is mounted, and
said AC/DC converter is positioned in said base.

34. The semiconductor light source as recited in claim 33 wherein:
the semiconductor light source further comprises a positive lead wire and a negative lead wire configured to provide power from said AC/DC converter to said LED chip, and
said positive lead wire and said negative lead wire run from said AC/DC converter, through an interior of said base, into said interior volume, and over an exterior surface of said heat sink.

35. The semiconductor light source as recited in claim 34 wherein:
the semiconductor light source further comprises a second positive lead wire and a second negative lead wire configured to provide power from said AC/DC converter.

36. The semiconductor light source as recited in claim 21 wherein:
said coating is directly applied to a face of said LED chip.

37. The semiconductor light source as recited in claim 36 wherein:
said coating is not directly applied to any side of said LED chip.

US 6,465,961 C1

3

38. The semiconductor light source as recited in claim 37 wherein:

said coating is also directly applied to a transparent material that is applied to sides of said LED chip.

39. The semiconductor light source as recited in claim 38 wherein:

said coating is positioned in a well in which said LED chip is mounted.

40. The semiconductor light source as recited in claim 21 wherein:

the semiconductor light source further comprises additional LED chips mounted on said one of said panels and each configured to output monochromatic visible light at greater than about 40 milliwatts, and

said LED chip and said additional LED chips are substantially positioned in a single plane.

41. The semiconductor light source as recited in claim 40 wherein:

said enclosure includes a substantially flat side.

42. The semiconductor light source as recited in claim 21 wherein:

said LED chip is surface mounted on a primary heat sink that is mounted on said one of said panels of said heat sink,

the semiconductor light source further comprises additional LED chips surface mounted on said primary heat sink and each configured to output monochromatic visible light at greater than about 40 milliwatts, and

said LED chip and said additional LED chips are all configured to emit a same color of monochromatic visible light.

43. The semiconductor light source as recited in claim 42 wherein:

the semiconductor light source further comprises a lens mounted on said primary heat sink and mounted over said LED chip and said additional LED chips, and

said coating is positioned between said lens and said LED chip and said additional LED chips.

44. The semiconductor light source as recited in claim 43 wherein:

said lens is configured to focus light emitted from said LED chip and from said additional LED chips to create a substantially coherent beam of usable light.

45. The semiconductor light source as recited in claim 43 wherein:

the semiconductor light source further comprises a first connection block and a second connection block both mounted on said primary heat sink and both in electrical connection with said LED chip and said additional LED chips, and

said lens is mounted over said first connection block and over said second connection block.

46. The semiconductor light source as recited in claim 42 wherein: said LED chip and said additional LED chips are all positioned in separate wells formed in said primary heat sink.

47. The semiconductor light source as recited in claim 21 wherein:

the semiconductor light source further comprises an air entrance, and

the semiconductor light source further comprises an air exit.

48. The semiconductor light source as recited in claim 47 wherein:

the semiconductor light source further comprises a base to which said enclosure is mounted, and

said base includes an electrical connector.

4

49. The semiconductor light source as recited in claim 47 wherein:

the semiconductor light source further comprises an air chamber located in said interior volume, and

said air entrance and air exit are configured to allow air to travel through said air chamber.

50. The semiconductor light source as recited in claim 49 wherein:

said air chamber at least partially runs inside said heat sink and directly underneath said LED chip.

51. The semiconductor light source as recited in claim 50 wherein:

said air chamber is at least partially U-shaped.

52. The semiconductor light source as recited in claim 21 wherein:

the semiconductor light source further comprises an electrical connector,

said electrical connector is configured to be received into a light socket,

said electrical connector includes external electrodes configured to make electrical connection with a power source through said light socket,

the semiconductor light source further comprises a support,

said support is configured to be substantially positioned outside said light socket,

said support is substantially positioned outside said interior volume and between said enclosure and said electrical connector, and

said support is in thermal communication with said heat sink that is located in said interior volume of said enclosure.

53. The semiconductor light source as recited in claim 52 wherein:

said electrical connector is a threaded electrical connector, and

said threaded electrical connector is configured to be screwed into said light socket.

54. The semiconductor light source as recited in claim 53 wherein:

said support is integral with said threaded electrical connector.

55. The semiconductor light source as recited in claim 54 wherein:

said support is a separate component from said threaded electrical connector.

56. The semiconductor light source as recited in claim 52 wherein:

the semiconductor light source further comprises an air entrance, and

the semiconductor light source further comprises an air exit.

57. The semiconductor light source as recited in claim 56 wherein:

the semiconductor light source further comprises an air chamber located in said interior volume, and

said air entrance and air exit are configured to allow air to travel through said air chamber.

58. The semiconductor light source as recited in claim 52 wherein:

the semiconductor light source further comprises additional LED chips each configured to output monochromatic visible light at greater than about 40 milliwatts,

the semiconductor light source further comprises an AC/DC converter,

**Appx27**

US 6,465,961 C1

5

said AC/DC converter is configured to convert AC power, that is provided through said light socket, into DC power that is usable by said LED chip and said additional LED chips, and

said AC/DC converter is positioned outside said interior volume.

59. The semiconductor light source as recited in claim 58 wherein:

at least some of said LED chip and said additional LED chips are LED array chips,

each of said LED array chips has a length greater than 300 micrometers and a width greater than 300 micrometers, and

each of said LED array chips includes a pad in electrical connection with a metal strip arranged in an array formation.

60. The semiconductor light source as recited in claim 58 wherein:

said heat sink is configured to serve as a negative electrical connection for said LED chip and for said additional LED chips.

61. The semiconductor light source as recited in claim 58 wherein:

said heat sink is configured to serve as a positive electrical connection for said LED chip and for said additional LED chips.

62. The semiconductor light source as recited in claim 58 wherein:

said additional LED chips are mounted on others of said panels, and

said LED chip and said additional LED chips are each mounted on one of said panels.

63. The semiconductor light source as recited in claim 62 wherein:

at least two of said panels of said heat sink are shaped differently.

64. The semiconductor light source as recited in claim 63 wherein:

at least two of said panels of said heat sink are sized differently.

65. The semiconductor light source as recited in claim 58 wherein:

said enclosure is shaped as a dome that defines an opening, and said dome-shaped enclosure is mounted to said support.

66. The semiconductor light source as recited in claim 63 wherein:

said LED chip and said additional LED chips are substantially positioned in a single plane.

67. The semiconductor light source as recited in claim 65 wherein:

said opening defined in said dome-shaped enclosure is large enough for said heat sink to pass through said opening.

68. The semiconductor light source as recited in claim 65 wherein:

said dome-shaped enclosure includes an exterior surface and an interior surface, and

said exterior surface has a matte-textured finish.

69. The semiconductor light source as recited in claim 65 wherein:

said dome-shaped enclosure includes an exterior surface and an interior surface,

said interior surface is coated with a first material, and

said exterior surface is coated with a second material.

6

70. The semiconductor light source as recited in claim 58 wherein:

said AC/DC converter is positioned in said electrical connector.

71. The semiconductor light source as recited in claim 58 wherein:

the semiconductor light source further comprises a positive lead wire and a negative lead wire configured to provide power from said AC/DC converter to said LED chip and to said additional LED chips, and

said positive lead wire and said negative lead wire run from said AC/DC converter, through an interior of said support, into said interior volume, and over an exterior surface of said heat sink.

72. The semiconductor light source as recited in claim 71 wherein:

the semiconductor light source further comprises a second positive lead wire and a second negative lead wire configured to provide power from said AC/DC converter.

73. The semiconductor light source as recited in claim 58 wherein:

said coating is directly applied to faces of said LED chip and said additional LED chips.

74. The semiconductor light source as recited in claim 73 wherein:

said coating is not directly applied to any side of said LED chip and of said additional LED chips.

75. The semiconductor light source as recited in claim 74 wherein:

said coating is also directly applied to a transparent material that is applied to sides of said LED chip and that is applied to sides of said additional LED chips.

76. The semiconductor light source as recited in claim 58 wherein:

said LED chip and said additional LED chips are substantially positioned in a single plane,

said enclosure includes a substantially flat side, and

the semiconductor light source further comprises lenses positioned between said substantially flat side and said plane.

77. The semiconductor light source as recited in claim 58 wherein:

said LED chip is surface mounted on a primary heat sink that is mounted on said one of said panels of said heat sink,

the semiconductor light source further comprises other LED chips surface mounted on said primary heat sink and each configured to output monochromatic visible light at greater than about 40 milliwatts, and

said LED chip and said other LED chips are all configured to emit a same color of monochromatic visible light.

78. The semiconductor light source as recited in claim 77 wherein:

the semiconductor light source further comprises a lens mounted on said primary heat sink and mounted over said LED chip and said other LED chips, and

said lens is configured to focus light emitted from said LED chip and from said other LED chips to create a substantially coherent beam of usable light.

79. The semiconductor light source as recited in claim 78 wherein:

the semiconductor light source further comprises a first connection block and a second connection block both mounted on said primary heat sink and both in electrical connection with said LED chip and said other LED chips, and

US 6,465,961 C1

7

said lens is mounted over said first connection block and over said second connection block.

80. The semiconductor light source as recited in claim 77 wherein:

said LED chip and said other LED chips are all positioned in separate wells formed in said primary heat sink,

each of said wells defines a planar bottom portion to which said LED chip mounted therein is surface mounted, and

each of said wells further defines reflective side portions that are angled with respect to said planar bottom portion and that are configured to reflect light that is emitted from sides of said LED chip mounted therein.

81. The semiconductor light source as recited in claim 58 wherein:

the semiconductor light source further comprises an air entrance, and

the semiconductor light source further comprises an air exit.

82. The semiconductor light source as recited in claim 81 wherein:

the semiconductor light source further comprises an air chamber located in said interior volume, and

said air entrance and air exit are configured to allow air to travel through said air chamber.

83. The semiconductor light source as recited in claim 82 wherein:

said air chamber at least partially runs inside said heat sink and directly underneath said LED chip.

84. The semiconductor light source as recited in claim 83 wherein:

said air chamber is at least partially U-shaped.

85. The semiconductor light source as recited in claim 58 wherein:

said LED chip and said additional LED chips are substantially positioned in a single plane,

said electrical connector is a threaded electrical connector, and

said threaded electrical connector is configured to be screwed into said light socket.

86. The semiconductor light source as recited in claim 85 wherein:

the semiconductor light source further comprises an air entrance, and

the semiconductor light source further comprises an air exit.

87. The semiconductor light source as recited in claim 86 wherein:

said enclosure includes a substantially flat side, and

the semiconductor light source further comprises lenses positioned between said substantially flat side and said plane.

88. The semiconductor light source as recited in claim 86 wherein:

said enclosure is shaped as a dome that defines an opening, and

said dome-shaped enclosure is mounted to said support.

89. The semiconductor light source as recited in claim 88 wherein:

said opening defined in said dome-shaped enclosure is large enough for said heat sink to pass through said opening.

8

90. The semiconductor light source as recited in claim 58 wherein:

said LED chip is configured to emit said monochromatic visible light from a top of said LED chip and from sides of said LED chip.

91. The semiconductor light source as recited in claim 90 wherein:

said LED chip is further configured to emit said monochromatic visible light from a bottom of said LED chip.

92. The semiconductor light source as recited in claim 58 wherein:

said substrate is electrically conductive, and

said electrically conductive substrate includes silicon (Si) without carbon (C).

93. The semiconductor light source as recited in claim 58 wherein:

said substrate is electrically conductive, and

said electrically conductive substrate includes gallium nitride (GaN).

94. The semiconductor light source as recited in claim 58 wherein:

said substrate is electrically conductive, and

said electrically conductive substrate includes indium phosphorous (InP).

95. The semiconductor light source as recited in claim 58 wherein:

said substrate is electrically conductive, and

said electrically conductive substrate includes gallium antimony (GaSb).

96. The semiconductor light source as recited in claim 58 wherein:

said substrate is electrically conductive, and

said electrically conductive substrate includes indium arsenide (InAs).

97. The semiconductor light source as recited in claim 58 wherein:

said substrate is electrically conductive, and

said LED chip further comprises a conductive base layer underneath said electrically conductive substrate.

98. The semiconductor light source as recited in claim 97 wherein:

said conductive base layer includes gold (Au).

99. The semiconductor light source as recited in claim 97 wherein:

said conductive base layer includes gold/cerium (Au/Ce).

100. The semiconductor light source as recited in claim 58 wherein:

said LED chip is surface mounted to said one of said panels of said heat sink.

101. The semiconductor light source as recited in claim 100 wherein:

said LED chip is surface mounted in a well defined in said one of said panels of said heat sink.

102. The semiconductor light source as recited in claim 101 wherein:

said coating is at least partially positioned in said well.

103. The semiconductor light source as recited in claim 101 wherein:

said well defines a planar bottom portion to which said LED chip is surface mounted, and

said well further defines reflective side portions that are angled with respect to said planar bottom portion and that are configured to reflect light that is emitted from sides of said LED chip.

\* \* \* \* \*

US006465961C2

## (12) INTER PARTES REEXAMINATION CERTIFICATE (1421st)

# United States Patent
### Cao

(10) **Number:** **US 6,465,961 C2**
(45) **Certificate Issued:** **May 11, 2017**

(54) **SEMICONDUCTOR LIGHT SOURCE USING A HEAT SINK WITH A PLURALITY OF PANELS**

(75) Inventor: **Densen Cao**, Sandy, UT (US)

(73) Assignee: **CAO LIGHTING, INC.**, West Jordan, UT (US)

**Reexamination Request:**
No. 95/000,680, Sep. 13, 2012
No. 95/002,324, Sep. 14, 2012

**Reexamination Certificate for:**
| | |
|---|---|
| Patent No.: | **6,465,961** |
| Issued: | **Oct. 15, 2002** |
| Appl. No.: | **09/939,340** |
| Filed: | **Aug. 24, 2001** |

Reexamination Certificate C1 6,465,961 issued Sep. 2, 2014

(51) **Int. Cl.**
| | |
|---|---|
| *H01L 25/075* | (2006.01) |
| *F21V 3/00* | (2015.01) |
| *F21V 29/67* | (2015.01) |
| *F21K 9/232* | (2016.01) |
| *F21V 29/70* | (2015.01) |
| *F21Y 107/40* | (2016.01) |
| *F21Y 115/10* | (2016.01) |
| *F21Y 115/30* | (2016.01) |
| *F21V 29/89* | (2015.01) |
| *F21K 9/64* | (2016.01) |

(52) **U.S. Cl.**
CPC ................ *F21V 3/00* (2013.01); *F21K 9/232* (2016.08); *F21V 29/67* (2015.01); *F21V 29/70* (2015.01); *H01L 25/0756* (2013.01); *F21K 9/64* (2016.08); *F21V 29/677* (2015.01); *F21V 29/89* (2015.01); *F21Y 2107/40* (2016.08); *F21Y 2115/10* (2016.08); *F21Y 2115/30* (2016.08); *H01L 25/0753* (2013.01); *H01L 2224/48091* (2013.01); *H01L 2224/48465* (2013.01); *H01L 2224/73265* (2013.01); *H01L 2924/00* (2013.01); *H01L 2924/00014* (2013.01)

(58) **Field of Classification Search**
None
See application file for complete search history.

(56) **References Cited**

To view the complete listing of prior art documents cited during the proceedings for Reexamination Control Numbers 95/000,680 and 95/002,324, please refer to the USPTO's public Patent Application Information Retrieval (PAIR) system under the Display References tab.

*Primary Examiner* — Albert J Gagliardi

(57) **ABSTRACT**

A semiconductor light source for illuminating a physical space has been invented. In various embodiments of the invention, a semiconductor such as and LED chip, laser chip, LED chip array, laser array, an array of chips, or a VCSEL chip is mounted on a heat sink. The heat sink may have multiple panels for mounting chips in various orientations. The chips may be mounted directly to a primary heat sink which is in turn mounted to a multi-panel secondary heat sink. A TE cooler and air circulation may be provided to enhance heat dissipation. An AC/DC converter may be included in the light source fitting.



**Appx30**

US 6,465,961 C2

## INTER PARTES
## REEXAMINATION CERTIFICATE

THE PATENT IS HEREBY AMENDED AS INDICATED BELOW.

AS A RESULT OF REEXAMINATION, IT HAS BEEN DETERMINED THAT:

Claims **8** and **9** were previously cancelled.

Claims **1-7** and **10-20** are cancelled.

Claims **21-103** were not reexamined.

\* \* \* \* \*

US006634770B2

(12) **United States Patent**
Cao

(10) **Patent No.:** US 6,634,770 B2
(45) **Date of Patent:** *Oct. 21, 2003

(54) **LIGHT SOURCE USING SEMICONDUCTOR DEVICES MOUNTED ON A HEAT SINK**

(76) Inventor: **Densen Cao**, 2851 E. Durban Rd., Sandy, UT (US) 84109

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 112 days.

This patent is subject to a terminal disclaimer.

(21) Appl. No.: **09/938,876**

(22) Filed: **Aug. 24, 2001**

(65) **Prior Publication Data**

US 2003/0039122 A1 Feb. 27, 2003

(51) **Int. Cl.**[7] ............................................... **F21V 29/00**
(52) **U.S. Cl.** ........................ **362/294**; 362/800; 362/545; 362/373; 362/547; 362/230
(58) **Field of Search** ................................. 362/800, 545, 362/294, 373, 547, 230

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | | |
|---|---|---|---|---|
| 4,675,575 A | | 6/1987 | Smith et al. ................. | 315/185 |
| 4,727,289 A | * | 2/1988 | Uchida ......................... | 315/71 |
| 5,160,200 A | | 11/1992 | Cheselske ................... | 362/249 |
| 5,463,280 A | * | 10/1995 | Johnson ...................... | 315/187 |
| 5,575,459 A | * | 11/1996 | Anderson ................... | 362/240 |
| 5,655,830 A | * | 8/1997 | Ruskouski ................... | 362/240 |
| 5,688,042 A | * | 11/1997 | Madadi et al. .............. | 362/240 |
| 5,806,965 A | * | 9/1998 | Deese ......................... | 362/249 |
| 5,890,794 A | * | 4/1999 | Abtahi et al. ............... | 362/294 |
| 5,941,626 A | | 8/1999 | Yamuro ....................... | 362/246 |
| 5,947,588 A | | 9/1999 | Huang ......................... | 362/235 |
| 5,982,092 A | | 11/1999 | Chen .......................... | 313/512 |
| 6,220,722 B1 | * | 4/2001 | Begemann .................. | 362/231 |

OTHER PUBLICATIONS

Bill Schweber, LEDs move from indication to illumination, www.ednmag.com, 75, 76, 78, 80 & 82.*

* cited by examiner

*Primary Examiner*—Sandra O'Shea
*Assistant Examiner*—Jacob Y. Choi
(74) *Attorney, Agent, or Firm*—Parsons Behle & Latimer; Daniel P. McCarthy

(57) **ABSTRACT**

A semiconductor light source for illuminating a physical space has been invented. In various embodiments of the invention, a semiconductor such as and LED chip, laser chip, LED chip array, laser array, an array of chips, or a VCSEL chip is mounted on a heat sink. The heat sink may have multiple panels for mounting chips in various orientations. The chips may be mounted directly to a primary heat sink which is in turn mounted to a multi-panel secondary heat sink. A TE cooler and air circulation may be provided to enhance heat dissipation. An AC/DC converter may be included in the light source fitting.

**17 Claims, 16 Drawing Sheets**







Appx32



**Fig. 1**



**Fig. 2**

**U.S. Patent**    Oct. 21, 2003    Sheet 3 of 16    US 6,634,770 B2



**Fig. 3a**



**Fig. 3c**



**Fig. 3b**



**Fig. 3d**

Appx36



**Fig. 3e**



**Fig. 3g**



**Fig. 3f**



**Fig. 3h**



**Fig. 4a**



**Fig. 4b**



**Fig. 4c**



**Fig. 4d**



**Fig. 5a**



**Fig. 5b**



**Fig. 6**



**Fig. 7a**



**Fig. 7b**



## Fig. 8a



## Fig. 8b



**Fig. 9**



**Fig. 10**



**Fig. 11**

US 6,634,770 B2

1

## LIGHT SOURCE USING SEMICONDUCTOR DEVICES MOUNTED ON A HEAT SINK

### BACKGROUND OF INVENTION

The invention relates to the field of light sources and illumination devices. More particularly, the invention relates to semiconductor light sources and illumination devices useful for providing visible light in order to partially or fully illuminate a space occupied by or viewed by humans, such as residential space, commercial space, outdoor space, the interior or exterior of a vehicle, etc.

In the prior art, light emitting diodes ("LED's") and other semiconductor light sources were traditionally used for panel displays (such as laptop computer screens), signal lighting, and other instrumentation purposes. LED's are desirable because they are a high efficiency light source that uses substantially less energy and creates less heat than typical prior art light sources such as incandescent and halogen lights. Prior art semiconductor light sources have not been successfully and economically used to illuminate physical spaces. Additionally, in the prior art, LED's were typically individually packaged in a module, either with or without a focus dome on the module. Typical prior art LED modules lack high light intensity due to the size of the LED chips used. Further, arranging a sufficient number of prior art LED modules to generate high light intensity, such as use of a stack, lamp or array, took an excessive amount of physical space and created unmanageable amounts of heat. Consequently, in the prior art, LED's and other semiconductor light sources were not suitable for replacing the traditional tungsten light bulbs.

U.S. Pat. No. 5,941,626 discloses a long light emitting apparatus that uses a plurality of LED lamps (modules) connected in series. The LED modules are spaced apart and appear to be intended for decorative use, such as on street lamp poles and on Christmas trees.

U.S. Pat. No. 5,160,200 discloses a wedge-base LED bulb housing. The patent depicts a plurality of separate LED modules electrically connected to a wedge base.

U.S. Pat. No. 4,675,575 discloses light-emitting diode assemblies such as a mono-color or bi-color light string system. Each LED is in an envelope with light conducting optical spheres for light transmission and dispersion. The LED string system appears adapted for decorative use, such as for lighting Christmas trees.

A distinct need is felt in the prior art for a semiconductor light source for use in illuminating a space with single color light in the visible range and which can efficiently dissipate the heat that they produce. Presently, that application is served by incandescent and fluorescent lights which have high energy consumption, high heat generation, and short useful life compared to the invented semiconductor light sources.

### SUMMARY OF INVENTION

It is an object of some embodiments of the invention to provide a semiconductor light source capable of illuminating a space with visible light. Thes and other objects of various embodiments of the invention will become apparent to persons of ordinary skill in the art upon reading the specification, viewing the appended drawings, and reading the claims.

### BRIEF DESCRIPTION OF DRAWINGS

FIG. 1 depicts a semiconductor light source of one embodiment of the invention using a high power chip or array arrangement.

2

FIG. 2 depicts a semiconductor light source of one embodiment of the invention using high power surface mount LED chip modules or lamps.

FIG. 3a depicts an LED with an insulating substrate.

FIG. 3b depicts a detailed view of an LED structure on a sapphire substrate.

FIG. 3c depicts an LED with a conducting substrate.

FIG. 3d depicts a detailed view of an LED structure on a sapphire substrate.

FIG. 3e depicts a VCSEL chip on an insulating substrate.

FIG. 3f depicts a detailed view of a VCSEL chip on a insulative substrate.

FIG. 3g depicts a VCSEL chip on a conductive substrate.

FIG. 3h depicts a detailed view of a VCSEL chip in a conductive substrate.

FIG. 4a depicts a top view of an LED array on a single chip with an insulating substrate.

FIG. 4b depicts a top view of an LED array on a single chip with a conductive substrate.

FIG. 4c depicts a top view of a VCSEL array on a single chip with an insulating substrate.

FIG. 4d depicts a top view of a VCSEL array on a single chip with a conductive substrate.

FIG. 5a depicts a semiconductor chip of the invention that emits single color light using a conversion layer.

FIG. 5b depicts a semiconductor chip of the invention that emits single color light using a phosphor coating.

FIG. 6 depicts a cross sectional view of a heat sink of the invention using a fan and TE cooler to circulate air and remove heat.

FIG. 7a depicts a single chip or single array chip package.

FIG. 7b depicts a multiple chip package.

FIG. 8a depicts a chip package with phosphor covering on the semiconductor.

FIG. 8b depicts a chip package with a uniform phosphor coating.

FIG. 9 depicts a high power LED package.

FIG. 10 depicts an LED or laser light source located in a light enclosure having a phosphor coating.

FIG. 11 depicts a power supply module with fitting for a light source of the invention.

### DETAILED DESCRIPTION

Referring to FIG. 1, one embodiment of the invention is depicted. In this embodiment of the invention, a semiconductor light source 100 is depicted. The light source 100 includes a traditional bulb-shaped enclosure 101. The enclosure 101 may be of any desired shape, including spherical, cylindrical, elliptical, domed, square, n-sided where n is an integer, or otherwise. The enclosure may be made from any desired light transparent or translucent materials, including glass, plastic, polycarbonate, and other light transparent materials.

The enclosure 101 has an exterior surface 101a and an interior surface 101b. The exterior surface 101a may be smooth and glossy, matte, or another finish or texture. The exterior surface 101a may be coated or painted with desired materials. The interior surface 101b may optionally include an appropriate coating, such as a luminous powder coating. Examples of luminous powder coating that may be used in the invention include YAG:Ce or other phosphor powders or coatings. For example, if the light source uses blue LED's to

US 6,634,770 B2

generate light, but it is desired to illuminate a room with white light, the interior surface 101b maybe covered with a phosphor coating to convert blue light into white light. Any wavelength-modifying coating such as phosphor or another coating may be used. In some preferred embodiments of the invention, it is intended to convert light emitted by a semiconductor chip in the wavelength range of about 200 to about 700 nm. to white light.

The enclosure 101 encloses an interior volume 102 which may be a vacuum, or may contain a gas such as ordinary air, an inert gas such as argon or nitrogen, or any other desired gas. In some embodiments of the invention, a gas will be included within the interior volume 102 for the purpose of avoiding oxidation of the heat sink and the semiconductor.

The enclosure 101 may be mounted to a support 105. The support 105 may be a separate component or may be integral with the base 103. The base 103 may be configured as a fitting or connector for use in a desired light socket, such as a traditional light socket. In such case, the base 103 would also include electrodes 103a and 103b for making electrical connection with a power source.

Located within the interior volume 102 is at least one heat sink 104. The heat sink 104 may be of any desired shape, depending on the application. As depicted, the heat sink 104 has a generally flat or planar top 104a, and a plurality of generally flat or planar panels or compartment 104b, 104c, 104d, 104e, 104f, 104g, 104h, 104i, etc. each of which may host a single or an array of semiconductor devices capable of producing light. The heat sink 104 may be shaped otherwise, with curved or rounded sides.

If the heat sink 104 may be mounted on a support 105, the support 105 may be designed in order to place the heat sink in the most desirable position within the interior volume 102 so that semiconductors located on the heat sink may emit light that will be transmitted in a diffuse or focused pattern through the enclosure 101.

Mounted on the heat sink 104 are at least one semiconductor device 106. The semiconductor device(s) 106 may be arranged in this embodiment of the invention to transmit light in all directions except through the base 103, or in a manner to direct light in a specific direction. The semiconductor devices may be any semiconductor devices capable of emitting light, such as LED's, LED arrays, VCSEL's, VCSEL arrays, photon recycling devices that cause a monochromatic chip to emit white light, and others.

The semiconductor devices 106 are electrically connected to each other via electrical connections 107. Lead wires 108a and 108b are used to provide the semiconductor devices 106 with electrical power. As desired, the heat sink may serve as a positive or negative electrical connection for the semiconductor devices.

The heat sink 104 may be any material capable of conducting heat away from the semiconductor devices. Examples of suitable materials include copper, aluminum, silicon carbide, boron nitride and others known to have a high coeffecient of thermal conductivity.

In order to provide suitable electrical power to the semiconductor devices, an AC/DC converter (not shown in this fixture) is utilized. This will permit the invented semiconductor light source to be powered by 110V. or 220V. AC power found in homes and businesses throughout the world. The AC/DC converter may be located in the base 103 or in another location.

In alternative embodiments of the invention, each semiconductor device may have its own individual heat sink, or two or more semiconductor devices may be located on the same heat sink. In some embodiments of the invention, the base may also serve as a heat sink, eliminating the need for a separate heat ink and thereby reducing cost.

Referring to FIG. 2, a semiconductor device 2220 in enclosure 2201 can be arranged to accommodate high power surface LED's. "High power" LED's means that the light output from each LED module is greater than 40 milliwatts. "Surface mount" LED's are LED's mounted directly on a heat sink, or other surface, in contrast with traditional LED lamps which have ordinary electrical leads for wiring and must be separately held in place. High power surface mount LED's are described in detail later in this document.

When high power LED's are used, all the components are the same as in FIG. 1 except that a high power LED 2206 is used. It can be seen that the LED's 2206 are electrically connected with electrical connectors 2207 and are located on a heat sink 2204. The heat sink 2204 has a plurality of heat sink faces 2210, 2211 and 2212 which are each generally planar and are arranged in angular orientation with each other in order to cause light from the LED's to be dispersed around a space to be illuminated. The heat sink faces can be oriented with respect to each other at any desired angle, but 45 degree angles are depicted in the figure so that face 2210 is perpendicular to face 2212. A standard base 2203 is provided.

Any of the semiconductor light sources described below and others may be used in embodiments of the invention.

FIG. 3a depicts an LED chip with an insulating substrate 201. The substrate 202 may be an appropriate material on which a semiconductor may be grown, such as sapphire, gallium arsenide, silicon carbide, gallium phosphorous, gallium nitride and others. The substrate 202 will also in this embodiment be electrically insulative. The semiconductor material 203 will emit light in all directions as indicated by arrows 204a, 204b, 204c and 204d. Positive 205a and negative 205b electrodes are provided for powering the chip.

FIG. 3b depicts an example of epitaxial layer configuration for the LED of FIG. 3a. A light emitting diode on an electrically insulative substrate 1200 is depicted. The LED includes an electrically insulative substrate such as sapphire 1201. The substrate serves as a carrier, pad or platform on which to grow the chip's epitaxial layers. The first layer placed on the substrate 1201 is a buffer layer 1202, in this case a GaN buffer layer. Use of a buffer layer reduces defects in the chip which would otherwise arise due to differences in material properties between the epitaxial layers and the substrate. Then a conductive layer 1203 is provided, such as n-GaN. This layer acts as a connector for a negative electrode. Then a cladding layer 1204, such as n-AlGaN, is provided. Cladding layers serve to confine the electrons as they jump from a conduction band to valance and give up energy that converts to light. An active layer 1205 p-InGaN is then provided where electrons jump from a conduction band to valance and emit energy which converts to light. On the active layer 1205, another cladding layer 1206, such as p-AlGaN is provided that also serves to confine electrons. A contact layer 1207 such as p+-GaN is provided that is doped for Ohmic contact. The contact layer 1207 has a positive electrode 1208 mounted on it, in this case an electrode that has a mount side on the contact layer 1207 that is Ni and an electrode face that is Au. A similar negative electrode is provide on a shelf of the first cladding layer 1203.

FIG. 3c depicts an LED with a conducting substrate 210. The substrate 211 must be an electrically conductive material on which a semiconductor ship may be grown, such as gallium arsenide, silicon carbide, gallium phosphorous, gal-

US 6,634,770 B2

<table>
<tr><td>5</td><td>6</td></tr>
</table>

lium nitride and others. A portion of the substrate 212 will serve as an electrode for powering the chip, in this case a negative electrode. The semiconductor material 213 will emit light in all directions as indicated by arrows 214a, 214b, 214c and 214d. A positive electrode 215 is provided, and the base 240 of the substrate 211 acts as a negative electrode. The base 240 is made of any conductive metal such as Au, Au/Ce, An/Zn and others.

FIG. 3d depicts epitaxial layer configuration for the LED of FIG. 3c. A light emitting diode grown on an electrically conductive substrate 1210 is depicted. The LED includes an electrically conductive substrate such as SiC 1212. The substrate serves as a carrier, pad or platform on which to grow the chip's epitaxial layers, and as a negative electrode in the chip. The first layer placed on the substrate 1212 is a buffer layer 1213, in this case a GaN buffer layer. Next, a cladding layer 1214 is provided, such as n-GaN. An active layer 1215 p-InGaN is provided where energy is converted to light. On the active layer 1215, another cladding layer 1216, such as p-AlGaN is provided. A contact layer 1217 such as p+-GaN that has a positive electrode 1218 mounted on it. A negative electrode 1211 is provided at the base of the chip.

FIG. 3e depicts a VCSEL chip on an insulating substrate 220. The substrate 221 has a volume of semiconductor material 222 on it. Positive electrodes 223a and 223b and negative electrodes 224 are provided for powering the chip, and light is emitted from the chip in directions generally indicated by arrows 225a and 225b.

FIG. 3f depicts epitaxial layer configuration of the VCSEL chip of FIG. 3e with an electrically insulative substrate 1220. The chip 1220 includes a substrate 1221 that has electrically insulative properties such as sapphire. On top of the substrate 1221 there is a buffer layer 1222 such as GaN followed by a cladding layer and contact layer 1223 such as n-GaN. The cladding layer 1223 includes a negative electrode 1232c. Next, there is another cladding layer nGaInN 1224. A reflective layer AlN/AlGaN MQW (multiple quantum wells) 1225 is provided. A cladding layer 1226 n-AlGaN is interposed between the reflective layer 1225 and the active layer 1227 GaInN MQW. The active layer 1227 is followed by another cladding layer p-AlGaN 1228 which is followed by a second reflective layer 1229 AlN/AlGaN MQW. Light emitted from the active layer reflects between the two reflective layers until it reaches an appropriate energy level and then lases, emitting a laser beam of light. The second reflective layer 1229 is followed by a cladding layer p AlGaN 1230 and a contact layer p+-GaN 1231. The contact layer may be ring-shaped with a window opening 1233 and has one or more positive electrodes 1232a and 1232b which are contact areas. The negative electrode is created on the n-GaN layer.

FIG. 3g depicts a VCSEL chip on a conductive substrate 230. The substrate 231 has a volume of semiconductor material 232 on it. Positive electrodes 233a and 233b are provided for powering the chip, and light is emitted from the chip in directions generally indicated by arrows 235a and 235b. The base 236 of the substrate 231 serves as a negative electrode.

FIG. 3h depicts epitaxial layer configuration of a VCSEL chip with an electrically conductive substrate 1239 such as that of FIG. 3g. The chip 1239 includes a substrate 1241 that has electrically conductive properties such as SiC. The underside of the substrate 1241 has an electrode 1240. On top of the substrate 1241 there is a buffer layer 1242 such as GaN followed by a cladding layer 1243 such as n-GaN.

Next, there is another cladding layer NGaInN 1244. A reflective layer using AlN/AlGaN MQW (multiple quantum wells) 1245 is then provided. A cladding layer 1246 n-AlGaN is interposed between the first reflective layer 1245 and the active layer 1247 GaInN MQW. The active layer 1247 is followed by another cladding layer p-AlGaN 1248 which is followed by a second reflective layer 1429 AlN/AlGaN MQW. The second reflective layer 1249 is followed by a cladding layer p AlGaN 1250 and a contact layer p+-GaN 1251. The contact layer may have one or more positive electrodes 1252a and 1252b mounted on it.

FIG. 4a depicts a top view of an LED array on a single chip with a size a×b on an insulating substrate 301. Each of sizes a and b is greater than 300 micro meters. Semiconductor materials 302 are located on an electrically insulative substrate (not shown). Positive 303 and negative 304 pads are provided, each in electrical connection with its respective metal strip 305 and 306 arranged in a row and column formation (8 columns shown) to create the array and power the chip. This enables the LED to emit high power light from a single chip.

FIG. 4b depicts a top view of an LED array on a single chip with a size a×b on a conductive substrate 310. Each of sizes a and b is greater than 300 micro meters. Semiconductor materials 312 are located on an electrically conductive substrate (not shown). Positive pad 313 is provided in electrical connection with a metal strip 315 arranged in an array formation to power the chip. The substrate 310 serves as the negative electrode in the embodiment depicted.

FIG. 4c depicts a top view of a VCSEL array on a single chip with a size a×b on an insulating substrate 320. Each of sizes a and b is greater than 300 micro meters. The chip 320 includes an electrically insulative substrate (not shown) on which a semiconductor material 332 is located covered by a panel 333. The panel 333 may be an appropriate conductive material such as Au/Ce, Au/Zn and others. The panel 333 has a plurality of windows 334 in it to permit light produced by the semiconductor material 332 to be emitted for use. The panel 333 is electrically connected to conductive metal strip 340 and to an electrode pad 335. A negative electrode pad 336 is also provided in electrical conduction with a metal strip 337 to power the chip.

FIG. 4d depicts a top view of a VCSEL array on a single chip with a dimension a×b on a conductive substrate 340. Each of sizes a and b is greater than 300 micro meters. It includes a conductive substrate (not shown) on which a semiconductor material 341 is located. A conductive panel 342 overlays the semiconductor material 341. A plurality of windows 343 are provided in the panel 342 to allow light produced by the chip to escape for us. A positive electrode pad 344 is provided which in conjunction with the electrically conductive substrate serving as a negative electrode power the chip. A negative electrode is provided on the bottom of the chip 340.

FIGS. 5a and 5b depict a semiconductor chip system that emits white light. In FIG. 5a, there is a GaN based semiconductor chip 2000 depicted. It includes a GaN system 5001 built on an insulative sapphire substrate 5002 capable of emitting blue light, the general structure of which is known in the prior art. A light conversion layer 5003 such as AlGaInP (aluminum gallium indium phosphate) adjacent the sapphire layer 5002 opposite the GaN system 5001. Light emitted from the GaN system will travel through the sapphire layer 5002, through the AlGaInP 5003 to exit the chip system. Some of the blue light will be absorbed by the AlGaInP to emit yellow light, and some of the blue light will

US 6,634,770 B2

7 8

be transmitted through the AlGaInP. The combination of blue and yellow light emitted by the chip according to arrows **5004***a*, **5004***b* and **5004***c* will appear as white light to human eyes. Electrodes **5005** and **5006** are provided for electrical connection. Referring to FIG. **5***b*, the chip **2000** is depicted following application of an exterior light conversion coating or layer **5007** such as phosphor. Light which exits through the phosphor such as **5004***a* will be converted in wavelength to white, making a useful light for illuminating physical spaces. A coating or layer to convert monochromatic light to white light may include phosphor powder, YAG/Ce and others. Such a coating or layer may be applied by the methods of brush coating, flow coating and evaporative coating.

FIG. **6** depicts a cross sectional view of a heat sink of the invention **401**. As depicted in this embodiment, a plurality of semiconductor chips or high power LED's **402** capable of emitting light are mounted in a well of the heat sink material **403** (surface mounting). The mounting of the chips or high power LED's may be achieved by use of a heat-conductive adhesive **404**, or by brazing or mechanical fixation. The heat sink material **403** is of sufficient thickness to conduct heat away from the chips **402** and keep the chips cool. Located within the heat sink **403**, a layer or lining of thermal electric material **405** may be installed. Thermal electric ("TE") material experiences a reduction in temperature when voltage is applied to it. By applying a voltage to the TE material **405**, its temperature can be lowered and heat can be drawn from the heat sink material **403** that in turn is drawing heat away from the chips **402**. The TE material may line an air chamber **406**. The air chamber is open at its entrance **406***a* and at its exit **406***b*. A fan **407** may be placed in or near the air chamber **406** in order to cause air **408** to travel in the entrance **406***a*, through the air chamber **406** past the TE material **405** and out of the exit **406***b*, carrying heat with it. Such a system will increase efficiency of heat dissipation from the chips **402**. At the bottom of the heat sink, a fitting or connector may be provided that is threaded **409***a* and has an electrode **409***b* for installation into a traditional light socket.

FIG. **7***a* depicts a single chip or single array chip surface mount package **501**. It includes a semiconductor chip or array **502** capable of emitting light mounted in a well **503** of a heat sink **504**. The well **503** is provided with reflective sides to that light emitted from the sides of the chip or array **502** is reflected out of the well in order to provide useful illumination and to minimize heat buildup. The chip or array **502** may be mounted in the well **503** by use of a heat conductive adhesive **505** or by brazing or mechanical fixation. The heat conductive adhesive may also be used as a reflector to reflect light from the substrate in the direction of arrows **509***a* and **509***b*. Connection blocks **507** and **508** may be mounted on the heat sink **504** in order to facilitate electrical connection of the chip **502**. Light exits the chip as indicated by arrows **509***a*, **509***b* and **509***c*.

FIG. **7***b* depicts a multiple chip package **520**. It includes multiple wells **521***a*, **521***b* and **521***c* on a heat sink **522** in which multiple chips or arrays **523***a*, **523***b* and **523***c* are located. Connection blocks **524***a*, **524***b*, **524***c* and **524***d* are provided with lead wires **525***a*, **525***b*, **525***c*, **525***d* and **525***f* in order to electrically power the chips or arrays.

FIG. **8***a* depicts a chip package with phosphor covering **601**. The package includes a heat sink **602** in which a well is located **603** for receiving a chip or array **604**. Connection blocks **605***a* and **605***b* and lead wires **606***a* and **606***b* may be used to electrically power the chip or array **604**. A thickness of phosphor **607** may be placed over the chip or array **604**

in order to convert single wavelength light emitted from the chip or array into multiple wavelength white light useful for illumination of spaces used by humans. FIG. **8***b* depicts another phosphor coated chip package **6000**. It includes a heat sink **6001** on which a light emitting chip **6002** is mounted in a receptacle **6005** on the heat sink. The chip **6002** does not fill the entirety of the receptacle **6005** so a transparent filler **6003** of a material transparent to the wavelength of light emitted by the chip **6002** is provided. Some transparent materials which may be used include epoxy, plastic and others. On the face of the chip **6002** opposite the heat sink **6001** a wavelength conversion coating or layer **6004** is provided to convert the light emitted by the chip to white light. A phosphor coating is preferred.

FIG. **9** depicts a high power surface mount LED package **901** useful in the invention. The LED package **901** includes a heat sink **902** formed from a material which can dissipate heat. A well **904** is formed in the heat sink in order to accept an LED, laser diode or semiconductor chip array **903** therein. The well **904** has walls **905** for reflecting light **906***a* and **906***b* emitted by the chip(s) **903**. An optional phosphor coating **907** is provided over the chip(s) to convert light emitted by the chip(s) to white light. The chip(s) **903** are secured to the heat sink **903** by use of adhesive **908**. The adhesive **908** may be heat conductive to aid in transmission of heat from the chips to the heat sink, and it may have light reflective properties to aid in reflection of light from the chips in the direction of arrows **906***a* and **906***b* in a usable direction. Reflection of light by the well and the adhesive provides more efficient light output than would otherwise be achieved. Connection blocks **909***a* and **909***b* are provided for forming electrical connection with diodes **910***a* and **910***b*. A focus dome, lens, or cover **910** is provided that is transparent to the light being emitted. The focus dome may have the characteristic of serving to focus light being emitted from the chips in order to create a substantially coherent beam of usable light.

FIG. **10** depicts a light source of the invention **1001** having an LED or laser light source **1002** located in an enclosure **1003**. The enclosure may be any appropriate shape. The depicted shape is that of a bulb, but flat, arcuate, rounded or other shapes may be used depending on the application. The enclosure **1003** may be glass, plastic, polycarbonate or any other material that is substantially transparent to the light to be emitted. The enclosure **1003** has an exterior surface **1003***a* and an interior surface **1003***b*. The enclosure serves as a protector of the light source **1002** and it may be designed to diffuse light. The interior surface **1003***b* of the enclosure may have a coating or layer **1004** which serves to alter properties of the light emitted from the light source **1002**. For example, if light from the light source **1002** is single wavelength, then the light-altering coating **1004** may be phosphorous which will turn the monochromatic light into white light. Other coatings may be used as desired to alter the light in other ways.

FIG. **11** depicts a power supply module **701** for a light source of the invention. The power supply module **701** includes a fitting or connector **702** with electrodes **703** and **704** for receiving AC electrical input from a traditional light bulb socket. An AC/DC converter **705** is provided to convert AC power from standard building wiring into DC power usable by the semiconductor chips of the invention. Electrical lead wires **706***a* and **706***b* are provided for electrical connection to the chips to power the light source, and electrical lead wires **707***a* and **707***b* are provided to provide power for the cooling fan TE cooler. The coating may be applied on the interior or exterior of the enclosure, or both.

US 6,634,770 B2

**9**

Examples of some heat sink materials which may be used in the invention include copper, aluminum, silicon carbide, boron nitride natural diamond, monocrystalline diamond, polycrystalline diamond, polycrystalline diamond compacts, diamond deposited through chemical vapor deposition and diamond deposited through physical vapor deposition. Any materials with adequate heat conductance can be used.

Examples of heat conductive adhesives which may be used are silver based epoxy, other epoxies, and other adhesives with a heat conductive quality. In order to perform a heat conductive function, it is important that the adhesive possess the following characteristics: (i) strong bonding between the materials being bonded, (ii) adequate heat conductance, (iii) electrically insulative or electrically conductive as desired, and (iv) light reflective as desired. Examples of light reflective adhesives which may be used include silver and aluminum based epoxy.

Examples of substrates on which the semiconductors used in the invention may be grown include Si, GaAs, GaN, InP, sapphire, SiC, GaSb, InAs and others. These may be used for both electrically insulative and electrically conductive substrates.

Materials which may be used to used as a thermoelectric cooler in the invention include known semiconductor junction devices.

It will be preferred that the semiconductor light source of the invention will emit light in the wavelength range of 200 to 700 in order to be useful for illumination of a physical space used by humans.

Heat sinks used in this invention can be of a variety of shapes and dimensions, such as those depicted in the drawings or any others which are useful for the structure of the particular light source being constructed.

Any of the foregoing, including combinations thereof, and other semiconductors, materials and components may be used in the invented light sources.

While the present invention has been described and illustrated in conjunction with a number of specific embodiments, those skilled in the art will appreciate that variations and modifications may be made without departing from the principles of the invention as herein illustrated, as described and claimed. The present invention may be embodied in other specific forms without departing from its spirit or essential characteristics. The described embodiments are considered in all respects to be illustrative and not restrictive. The scope of the invention is, therefore, indicated by the appended claims, rather than by the foregoing description. All changes which come within the meaning and range of equivalence of the claims are to be embraced within their scope.

What is claimed is:

1. A semiconductor light source for emitting light to illuminate a space used by humans, the semiconductor light source comprising:

an enclosure, said enclosure being fabricated from a material substantially transparent to white light,

a base to which said enclosure is mounted,

an interior volume within said enclosure,

a secondary heat sink located in said interior volume, said secondary heat sink being capable of drawing heat from one or more semiconductors devices,

a plurality of primary heat sinks mounted on said secondary heat sink, each of said primary heat sinks being smaller than said secondary heat sink,

a semiconductor chip capable of emitting light mounted on one of said primary heat sinks, said semiconductor

**10**

chip being capable of emitting monochromatic light, said semiconductor chip being selected from the group consisting of light emitting diodes, light emitting diode arrays, laser chips, and VCSEL chips,

said chip including a substrate on which epitaxial layers are grown,

a buffer layer located on said substrate, said buffer layer serving to mitigate differences in material properties between said substrate and other epitaxial layers,

a first cladding layer serving to confine electron movement within the chip, said first cladding layer being adjacent said buffer layer,

an active layer, said active layer emitting light when electrons jump to a valance state,

a second cladding layer, said second cladding layer positioned so that said active layer lies between cladding layers, and

a contact layer on which an electron may be mounted for powering said chip, and

a coating for converting monochromatic light emitted by said chip to white light.

2. A device as recited in claim 1 further comprising a power module for powering the light source, said power module including a fitting for installation in a traditional light bulb socket and an AC/DC converter for converting AC power from traditional building wiring to DC power usable by a semiconductor devices.

3. A device as recited in claim 1 wherein at least one of said heat sink includes a material selected from the group consisting of include copper, aluminum, silicon carbide, boron nitride natural diamond, monocrystalline diamond, polycrystalline diamond, polycrystalline diamond compacts, diamond deposited through chemical vapor deposition and diamond deposited through physical vapor deposition.

4. A device as recited in claim 1 further comprising a quantity of heat conductive adhesive located between said chip and said primary heat sink and serving to conduct heat from said chip to said primary heat sink.

5. A device as recited in claim 1 further comprising a quantity of light reflective adhesive located between said chip and said primary heat sink.

6. A device as recited in claim 1 further comprising a first and a second reflective layers, each of said first and second reflective layers being located on opposite sides of said active layer, said reflective layers serving to reflect light emitted by said active layer.

7. A device as recited in claim 6 wherein said reflective layers include multiple quantum wells.

8. A device as recited in claim 1 wherein said substrate is selected from the group consisting of Si, GaAs, GaN, InP, sapphire, SiC, GaSb, InAs.

9. A device as recited in claim 1 wherein said substrate is electrically conductive.

10. A device as recited in claim 1 wherein said substrate is electrically insulative.

11. A device as recited in claim 1 wherein at least one of said epitaxial layers includes a material selected from the group consisting of GaN, AlGaN, AlN, AlGaN, GaInN, and GamiN.

12. A device as recited in claim 1 wherein said coating for converting monochromatic light is a phosphor coating located on said chip.

13. A semiconductor light source for creating white light to illuminate a space used by humans, the semiconductor light source comprising:

an enclosure, said enclosure being fabricated from a material substantially transparent to white light,

US 6,634,770 B2

11

an interior volume within said enclosure,

a heat sink located in said interior volume, said heat sink being capable of drawing heat from one or more semiconductors devices,

a plurality of semiconductor devices located in said interior volume,

said semiconductor devices being capable of emitting light,

at least one of said semiconductor devices including

a substrate on which epitaxial layers are grown,

a buffer layer located on said substrate, said buffer layer serving to mitigate differences in material properties between said substrate and other epitaxial layers,

a first cladding layer serving to confine electron movement within the chip, said first cladding layer being adjacent said buffer layer,

an active layer, said active layer emitting light when electrons jump to a valance state,

a second cladding layer, said second cladding layer positioned so that said active layer lies between cladding layers, and

12

a contact layer on which an electron may be mounted for powering said chip.

14. A device as recited in claim 13 further comprising a coating for converting monochromatic light emitted by at least one of said semiconductor devices to white light.

15. A device as recited in claim 13 further comprising a first and a second reflective layers, each of said first and second reflective layers being located on opposite sides of said active layer, said reflective layers serving to reflect light emitted by said active layer.

16. A device as recited in claim 15 wherein said reflective layers include multiple quantum wells.

17. A device as recited in claim 13 wherein said heat sink includes a material selected from the group consisting of include copper, aluminum, silicon carbide, boron nitride natural diamond, monocrystalline diamond, polycrystalline diamond, polycrystalline diamond compacts, diamond deposited through chemical vapor deposition and diamond deposited through physical vapor deposition.

\* \* \* \* \*

**Appx54**

**Disclaimer**

**6,634,770 B2** — Densen Cao, Sandy, UT (US). LIGHT SOURCE USING SEMICONDUCTOR DEVICES MOUNTED ON A HEAT SINK. Patent dated October 21, 2003. Disclaimer filed September 9, 2013, by the assignee, Cao Group, Inc.

Hereby disclaim complete claims 1-6, 8, 10-15 and 17 of said patent.

*(Official Gazette, October 8, 2013)*

**Appx55**

US006634770C1

## (12) INTER PARTES REEXAMINATION CERTIFICATE (753rd)

# United States Patent

## Cao

(10) **Number:** **US 6,634,770 C1**

(45) **Certificate Issued:** ***Dec. 3, 2013**

(54) **LIGHT SOURCE USING SEMICONDUCTOR DEVICES MOUNTED ON A HEAT SINK**

(75) Inventor: **Densen Cao**, Sandy, UT (US)

(73) Assignee: **Cao Group, Inc.**, Sandy, UT (US)

**Reexamination Request:**
No. 95/000,678, Sep. 13, 2012

**Reexamination Certificate for:**

| | |
|---|---|
| Patent No.: | **6,634,770** |
| Issued: | **Oct. 21, 2003** |
| Appl. No.: | **09/938,876** |
| Filed: | **Aug. 24, 2001** |

( * ) Notice: This patent is subject to a terminal disclaimer.

(51) **Int. Cl.**
*F21K 99/00* (2010.01)
*H01L 25/075* (2006.01)

(52) **U.S. Cl.**
USPC ........... **362/294**; 362/230; 362/373; 362/545; 362/547; 362/800; 257/E25.02

(58) **Field of Classification Search**
None
See application file for complete search history.

(56) **References Cited**

To view the complete listing of prior art documents cited during the proceeding for Reexamination Control Number 95/000,678, please refer to the USPTO's public Patent Application Information Retrieval (PAIR) system under the Display References tab.

*Primary Examiner* — Erik Kielin

(57) **ABSTRACT**

A semiconductor light source for illuminating a physical space has been invented. In various embodiments of the invention, a semiconductor such as and LED chip, laser chip, LED chip array, laser array, an array of chips, or a VCSEL chip is mounted on a heat sink. The heat sink may have multiple panels for mounting chips in various orientations. The chips may be mounted directly to a primary heat sink which is in turn mounted to a multi-panel secondary heat sink. A TE cooler and air circulation may be provided to enhance heat dissipation. An AC/DC converter may be included in the light source fitting.

**At the time of issuance and publication of this certificate, the patent remains subject to pending reexamination control numbers 95/002,242 and 90/012,959 filed Sep. 13, 2012 and Aug. 27, 2013 respectively. The claim content of the patent may be subsequently revised if a reexamination certificate issues from the reexamination proceedings.**



**Appx56**

US 6,634,770 C1

**1**

**INTER PARTES
REEXAMINATION CERTIFICATE
ISSUED UNDER 35 U.S.C. 316**

THE PATENT IS HEREBY AMENDED AS
INDICATED BELOW.

AS A RESULT OF REEXAMINATION, IT HAS BEEN
DETERMINED THAT:

Claims **1-6**, **8**, **10-15** and **17** are now disclaimed.
Claims **7**, **9** and **16** were not reexamined.

\* \* \* \* \*

**2**



US006634770C2

(12) **INTER PARTES REEXAMINATION CERTIFICATE** (762nd)

# United States Patent

Cao

(10) **Number:** **US 6,634,770 C2**

(45) **Certificate Issued:** *Dec. 10, 2013

(54) **LIGHT SOURCE USING SEMICONDUCTOR DEVICES MOUNTED ON A HEAT SINK**

(75) Inventor: **Densen Cao**, Sandy, UT (US)

(73) Assignee: **Cao Group, Inc.**, Sandy, UT (US)

**Reexamination Request:**
No. 95/002,242, Sep. 13, 2012

**Reexamination Certificate for:**

| | |
|---|---|
| Patent No.: | **6,634,770** |
| Issued: | **Oct. 21, 2003** |
| Appl. No.: | **09/938,876** |
| Filed: | **Aug. 24, 2001** |

Reexamination Certificate C1 6,634,770 issued Dec. 3, 2013

( * ) Notice: This patent is subject to a terminal disclaimer.

(51) **Int. Cl.**
*F21K 99/00* (2010.01)
*H01L 25/075* (2006.01)

(52) **U.S. Cl.**
USPC ........... **362/294**; 362/230; 362/373; 362/545; 362/547; 362/800; 257/E25.02

(58) **Field of Classification Search**
None
See application file for complete search history.

(56) **References Cited**

To view the complete listing of prior art documents cited during the proceeding for Reexamination Control Number 95/002,242, please refer to the USPTO's public Patent Application Information Retrieval (PAIR) system under the Display References tab.

*Primary Examiner* — Erik Kielin

(57) **ABSTRACT**

A semiconductor light source for illuminating a physical space has been invented. In various embodiments of the invention, a semiconductor such as and LED chip, laser chip, LED chip array, laser array, an array of chips, or a VCSEL chip is mounted on a heat sink. The heat sink may have multiple panels for mounting chips in various orientations. The chips may be mounted directly to a primary heat sink which is in turn mounted to a multi-panel secondary heat sink. A TE cooler and air circulation may be provided to enhance heat dissipation. An AC/DC converter may be included in the light source fitting.

**At the time of issuance and publication of this certificate, the patent remains subject to pending reexamination control numbers 95/000,678 and 90/012,959 filed Sep. 13, 2012 and Aug. 27, 2013 respectively. The claim content of the patent may be subsequently revised if a reexamination certificate issues from the reexamination proceedings.**



**Appx58**

US 6,634,770 C2

**1**

**INTER PARTES**
**REEXAMINATION CERTIFICATE**
**ISSUED UNDER 35 U.S.C. 316**

THE PATENT IS HEREBY AMENDED AS
INDICATED BELOW.

AS A RESULT OF REEXAMINATION, IT HAS BEEN
DETERMINED THAT:

Claims **1-6**, **8**, **10-15** and **17** are now disclaimed.
Claims **7**, **9** and **16** were not reexamined.

\* \* \* \* \*

**2**



US006634770C3

(12) **EX PARTE REEXAMINATION CERTIFICATE** (10292nd)

# United States Patent

Cao

(10) **Number:** **US 6,634,770 C3**

(45) **Certificate Issued:** *Sep. 8, 2014

(54) **LIGHT SOURCE USING SEMICONDUCTOR DEVICES MOUNTED ON A HEAT SINK**

(75) Inventor: **Densen Cao**, Sandy, UT (US)

(73) Assignee: **Cao Group, Inc.**, Sandy, UT (US)

**Reexamination Request:**
No. 90/012,959, Aug. 27, 2013

**Reexamination Certificate for:**
Patent No.: **6,634,770**
Issued: **Oct. 21, 2003**
Appl. No.: **09/938,876**
Filed: **Aug. 24, 2001**

Reexamination Certificate C1 6,634,770 issued Dec. 3, 2013

Reexamination Certificate C2 6,634,770 issued Dec. 10, 2013

( * ) Notice: This patent is subject to a terminal disclaimer.

(51) **Int. Cl.**
*F21K 99/00* (2010.01)
*H01L 25/075* (2006.01)

(52) **U.S. Cl.**
USPC ........... **362/294**; 362/230; 362/373; 362/545; 362/547; 362/800; 257/E25.02

(58) **Field of Classification Search**
None
See application file for complete search history.

(56) **References Cited**

To view the complete listing of prior art documents cited during the proceeding for Reexamination Control Number 90/012,959, please refer to the USPTO's public Patent Application Information Retrieval (PAIR) system under the Display References tab.

*Primary Examiner* — Erik Kielin

(57) **ABSTRACT**

A semiconductor light source for illuminating a physical space has been invented. In various embodiments of the invention, a semiconductor such as and LED chip, laser chip, LED chip array, laser array, an array of chips, or a VCSEL chip is mounted on a heat sink. The heat sink may have multiple panels for mounting chips in various orientations. The chips may be mounted directly to a primary heat sink which is in turn mounted to a multi-panel secondary heat sink. A TE cooler and air circulation may be provided to enhance heat dissipation. An AC/DC converter may be included in the light source fitting.



AMENDED

**Appx60**



**Fig. 1**

AMENDED

**U.S. Patent**    Sep. 8, 2014    Sheet 2 of 2    US 6,634,770 C3



**Fig. 9**
AMENDED

US 6,634,770 C3

**1**

# EX PARTE REEXAMINATION CERTIFICATE ISSUED UNDER 35 U.S.C. 307

THE PATENT IS HEREBY AMENDED AS INDICATED BELOW.

**Matter enclosed in heavy brackets [ ] appeared in the patent, but has been deleted and is no longer a part of the patent; matter printed in italics indicates additions made to the patent.**

THE DRAWING FIGURES HAVE BEEN CHANGED AS FOLLOWS:

Brackets have been added to clarify the portions of the figure denoted by reference characters **103** and **105**, and reference characters **103**, **105**, and **108**b have been repositioned on the figure.

Reference numeral **910** has been added.

AS A RESULT OF REEXAMINATION, IT HAS BEEN DETERMINED THAT:

Claims **1-6**, **8**, **10-15** and **17** were previously disclaimed.

Claims **7**, **9** and **16** are cancelled.

New claims **18-96** are added and determined to be patentable.

18. The semiconductor light source as recited in claim 9 wherein:
   said semiconductor chip is a light emitting diode (LED) chip configured to output light at greater than about 40 milliwatts,
   said LED chip is surface mounted on said one of said primary heat sinks, and
   said LED chip is configured to emit monochromatic visible light.

19. The semiconductor light source as recited in claim 18 wherein:
   said LED chip further comprises a conductive base layer underneath said electrically conductive substrate.

20. The semiconductor light source as recited in claim 19 wherein:
   said conductive base layer includes gold (Au).

21. The semiconductor light source as recited in claim 19 wherein:
   said conductive base layer includes gold/cerium (Au/Ce).

22. The semiconductor light source as recited in claim 18 wherein:
   said LED chip is an LED array chip,
   said LED array chip has a length greater than 300 micrometers and a width greater than 300 micrometers, and
   said LED array chip includes a pad in electrical connection with a metal strip arranged in an array formation configured to provide power to said active layer.

23. The semiconductor light source as recited in claim 18 wherein:
   said secondary heat sink is configured to serve as a negative electrical connection for said LED chip.

24. The semiconductor light source as recited in claim 18 wherein:
   said secondary heat sink is configured to serve as a positive electrical connection for said LED chip.

**2**

25. The semiconductor light source as recited in claim 18 wherein:
   the semiconductor light source further comprises additional LED chips surface mounted on others of said primary heat sinks and each configured to output monochromatic visible light at greater than about 40 milliwatts, and
   said primary heat sinks are each mounted on one of multiple panels of said secondary heat sink.

26. The semiconductor light source as recited in claim 25 wherein:
   at least two of said panels of said secondary heat sink are shaped differently.

27. The semiconductor light source as recited in claim 25 wherein:
   at least two of said panels of said secondary heat sink are sized differently.

28. The semiconductor light source as recited in claim 18 wherein:
   said enclosure is shaped as a dome that defines an opening.

29. The semiconductor light source as recited in claim 28 wherein:
   said opening defined in said dome-shaped enclosure is large enough for said secondary heat sink to pass through said opening.

30. The semiconductor light source as recited in claim 28 wherein:
   said dome-shaped enclosure includes an exterior surface and an interior surface, and said exterior surface has a matte-textured finish.

31. The semiconductor light source as recited in claim 28 wherein:
   said dome-shaped enclosure includes an exterior surface and an interior surface,
   said interior surface is coated with a first material, and
   said exterior surface is coated with a second material.

32. The semiconductor light source as recited in claim 18 wherein:
   the semiconductor light source further comprises an AC/DC converter,
   said AC/DC converter is configured to convert AC power into DC power that is usable by said LED chip, and
   said AC/DC converter is positioned outside said interior volume.

33. The semiconductor light source as recited in claim 32 wherein:
   said AC/DC converter is positioned in said base.

34. The semiconductor light source as recited in claim 32 wherein:
   the semiconductor light source further comprises a positive lead wire and a negative lead wire configured to provide power from said AC/DC converter to said LED chip, and
   said positive lead wire and said negative lead wire run from said AC/DC converter, through an interior of said base, into said interior volume, and over an exterior surface of said secondary heat sink.

35. The semiconductor light source as recited in claim 34 wherein:
   the semiconductor light source further comprises a second positive lead wire and a second negative lead wire configured to provide power from said AC/DC converter.

36. The semiconductor light source as recited in claim 18 wherein:
   said coating is directly applied to a face of said LED chip.

37. The semiconductor light source as recited in claim 36 wherein:

US 6,634,770 C3

**3**

said coating is not directly applied to any side of said LED chip.

38. The semiconductor light source as recited in claim 37 wherein:

said coating is also directly applied to a transparent material that is applied to sides of said LED chip.

39. The semiconductor light source as recited in claim 38 wherein:

said coating is positioned in a well of said one of said primary heat sinks.

40. The semiconductor light source as recited in claim 18 wherein:

the semiconductor light source further comprises additional LED chips surface mounted on others of said primary heat sinks and each configured to output monochromatic visible light at greater than about 40 milliwatts, and

said LED chip and said additional LED chips are substantially positioned in a single plane.

41. The semiconductor light source as recited in claim 40 wherein:

said enclosure includes a substantially flat side.

42. The semiconductor light source as recited in claim 18 wherein:

the semiconductor light source further comprises additional LED chips surface mounted on said one of said primary heat sinks and each configured to output monochromatic visible light at greater than about 40 milliwatts, and

said LED chip and said additional LED chips are all configured to emit a same color of monochromatic visible light.

43. The semiconductor light source as recited in claim 42 wherein:

the semiconductor light source further comprises a lens mounted on said one of said primary heat sinks and mounted over said LED chip and said additional LED chips, and

said coating is positioned between said lens and said LED chip and said additional LED chips.

44. The semiconductor light source as recited in claim 43 wherein:

said lens is configured to focus light emitted from said LED chip and from said additional LED chips to create a substantially coherent beam of usable light.

45. The semiconductor light source as recited in claim 43 wherein:

the semiconductor light source further comprises a first connection block and a second connection block both mounted on said one of said primary heat sinks and both in electrical connection with said LED chip and said additional LED chips, and

said lens is mounted over said first connection block and over said second connection block.

46. The semiconductor light source as recited in claim 42 wherein:

said LED chip and said additional LED chips are all positioned in separate wells formed in said one of said primary heat sinks.

47. The semiconductor light source as recited in claim 18 wherein:

the semiconductor light source further comprises an air entrance, and

the semiconductor light source further comprises an air exit.

**4**

48. The semiconductor light source as recited in claim 47 wherein:

said base includes an electrical connector.

49. The semiconductor light source as recited in claim 47 wherein:

the semiconductor light source further comprises an air chamber located in said interior volume, and

said air entrance and air exit are configured to allow air to travel through said air chamber.

50. The semiconductor light source as recited in claim 49 wherein:

said air chamber at least partially runs inside said secondary heat sink and directly underneath said LED chip.

51. The semiconductor light source as recited in claim 50 wherein:

said air chamber is at least partially U-shaped.

52. The semiconductor light source as recited in claim 18 wherein:

said base includes an electrical connector and a support,

said electrical connector is configured to be received into a light socket,

said electrical connector includes external electrodes configured to make electrical connection with a power source through said light socket,

said support is configured to be substantially positioned outside said light socket,

said support is substantially positioned outside said interior volume and between said enclosure and said electrical connector, and

said support is in thermal communication with said secondary heat sink that is located in said interior volume of said enclosure.

53. The semiconductor light source as recited in claim 52 wherein:

said electrical connector is a threaded electrical connector, and

said threaded electrical connector is configured to be screwed into said light socket.

54. The semiconductor light source as recited in claim 53 wherein:

said support is integral with said threaded electrical connector.

55. The semiconductor light source as recited in claim 54 wherein:

said support is a separate component from said threaded electrical connector.

56. The semiconductor light source as recited in claim 52 wherein:

the semiconductor light source further comprises an air entrance, and

the semiconductor light source further comprises an air exit.

57. The semiconductor light source as recited in claim 56 wherein:

the semiconductor light source further comprises an air chamber located in said interior volume, and

said air entrance and air exit are configured to allow air to travel through said air chamber.

58. The semiconductor light source as recited in claim 52 wherein:

the semiconductor light source further comprises additional LED chips surface mounted on others of said primary heat sinks and each configured to output monochromatic visible light at greater than about 40 milliwatts,

the semiconductor light source further comprises an AC/DC converter,

**Appx64**

US 6,634,770 C3

5

said AC/DC converter is configured to convert AC power, that is provided through said light socket, into DC power that is usable by said LED chip and said additional LED chips, and

said AC/DC converter is positioned outside said interior volume.

59. The semiconductor light source as recited in claim 58 wherein:

at least some of said LED chip and said additional LED chips are LED array chips,

each of said LED array chips has a length greater than 300 micrometers and a width greater than 300 micrometers, and

each of said LED array chips includes a pad in electrical connection with a metal strip arranged in an array formation.

60. The semiconductor light source as recited in claim 58 wherein:

said secondary heat sink is configured to serve as a negative electrical connection for said LED chip and for said additional LED chips.

61. The semiconductor light source as recited in claim 58 wherein:

said secondary heat sink is configured to serve as a positive electrical connection for said LED chip and for said additional LED chips.

62. The semiconductor light source as recited in claim 58 wherein:

said primary heat sinks are each mounted on one of multiple panels of said secondary heat sink.

63. The semiconductor light source as recited in claim 62 wherein:

at least two of said panels of said secondary heat sink are shaped differently.

64. The semiconductor light source as recited in claim 63 wherein:

at least two of said panels of said secondary heat sink are sized differently.

65. The semiconductor light source as recited in claim 58 wherein:

said enclosure is shaped as a dome that defines an opening, and

said dome-shaped enclosure is mounted to said support.

66. The semiconductor light source as recited in claim 65 wherein:

said LED chip and said additional LED chips are substantially positioned in a single plane.

67. The semiconductor light source as recited in claim 65 wherein:

said opening defined in said dome-shaped enclosure is large enough for said secondary heat sink to pass through said opening.

68. The semiconductor light source as recited in claim 65 wherein:

said dome-shaped enclosure includes an exterior surface and an interior surface, and

said exterior surface has a matte-textured finish.

69. The semiconductor light source as recited in claim 65 wherein:

said dome-shaped enclosure includes an exterior surface and an interior surface,

said interior surface is coated with a first material, and

said exterior surface is coated with a second material.

70. The semiconductor light source as recited in claim 58 wherein:

said AC/DC converter is positioned in said base.

6

71. The semiconductor light source as recited in claim 58 wherein:

the semiconductor light source further comprises a positive lead wire and a negative lead wire configured to provide power from said AC/DC converter to said LED chip and to said additional LED chips, and

said positive lead wire and said negative lead wire run from said AC/DC converter, through an interior of said support, into said interior volume, and over an exterior surface of said secondary heat sink.

72. The semiconductor light source as recited in claim 71 wherein:

the semiconductor light source further comprises a second positive lead wire and a second negative lead wire configured to provide power from said AC/DC converter.

73. The semiconductor light source as recited in claim 58 wherein:

said coating is directly applied to faces of said LED chip and said additional LED chips.

74. The semiconductor light source as recited in claim 73 wherein:

said coating is not directly applied to any side of said LED chip and of said additional LED chips.

75. The semiconductor light source as recited in claim 74 wherein:

said coating is also directly applied to a transparent material that is applied to sides of said LED chip and that is applied to sides of said additional LED chips.

76. The semiconductor light source as recited in claim 58 wherein:

said LED chip and said additional LED chips are substantially positioned in a single plane,

said enclosure includes a substantially flat side, and

the semiconductor light source further comprises lenses positioned between said substantially flat side and said plane.

77. The semiconductor light source as recited in claim 58 wherein:

the semiconductor light source further comprises other LED chips surface mounted on said one of said primary heat sinks and each configured to output monochromatic visible light at greater than about 40 milliwatts, and

said LED chip and said other LED chips are all configured to emit a same color of monochromatic visible light.

78. The semiconductor light source as recited in claim 77 wherein:

the semiconductor light source further comprises a lens mounted on said one of said primary heat sinks and mounted over said LED chip and said other LED chips, and

said lens is configured to focus light emitted from said LED chip and from said other LED chips to create a substantially coherent beam of usable light.

79. The semiconductor light source as recited in claim 78 wherein:

the semiconductor light source further comprises a first connection block and a second connection block both mounted on said one of said primary heat sinks and both in electrical connection with said LED chip and said other LED chips, and

said lens is mounted over said first connection block and over said second connection block.

80. The semiconductor light source as recited in claim 77 wherein:

said LED chip and said other LED chips are all positioned in separate wells formed in said one of said primary heat sinks,

**Appx65**

US 6,634,770 C3

**7**

each of said wells defines a planar bottom portion to which said LED chip mounted therein is surface mounted, and

each of said wells further defines reflective side portions that are angled with respect to said planar bottom portion and that are configured to reflect light that is emitted from sides of said LED chip mounted therein.

81. The semiconductor light source as recited in claim 58 wherein:

the semiconductor light source further comprises an air entrance, and

the semiconductor light source further comprises an air exit.

82. The semiconductor light source as recited in claim 81 wherein:

the semiconductor light source further comprises an air chamber located in said interior volume, and

said air entrance and air exit are configured to allow air to travel through said air chamber.

83. The semiconductor light source as recited in claim 82 wherein:

said air chamber at least partially runs inside said secondary heat sink and directly underneath said LED chip.

84. The semiconductor light source as recited in claim 83 wherein:

said air chamber is at least partially U-shaped.

85. The semiconductor light source as recited in claim 58 wherein:

said LED chip and said additional LED chips are substantially positioned in a single plane,

said electrical connector is a threaded electrical connector, and

said threaded electrical connector is configured to be screwed into said light socket.

86. The semiconductor light source as recited in claim 85 wherein:

the semiconductor light source further comprises an air entrance, and

the semiconductor light source further comprises an air exit.

87. The semiconductor light source as recited in claim 86 wherein:

**8**

said enclosure includes a substantially flat side, and

the semiconductor light source further comprises lenses positioned between said substantially flat side and said plane.

88. The semiconductor light source as recited in claim 86 wherein:

said enclosure is shaped as a dome that defines an opening, and

said dome-shaped enclosure is mounted to said support.

89. The semiconductor light source as recited in claim 88 wherein:

said opening defined in said dome-shaped enclosure is large enough for said secondary heat sink to pass through said opening.

90. The semiconductor light source as recited in claim 58 wherein:

said LED chip is configured to emit said monochromatic visible light from a top of said LED chip and from sides of said LED chip.

91. The semiconductor light source as recited in claim 90 wherein:

said LED chip is further configured to emit said monochromatic visible light from a bottom of said LED chip.

92. The semiconductor light source as recited in claim 58 wherein:

said electrically conductive substrate includes silicon (Si) without carbon (C).

93. The semiconductor light source as recited in claim 58 wherein:

said electrically conductive substrate includes gallium nitride (GaN).

94. The semiconductor light source as recited in claim 58 wherein:

said electrically conductive substrate includes indium phosphorous (InP).

95. The semiconductor light source as recited in claim 58 wherein:

said electrically conductive substrate includes gallium antimony (GaSb).

96. The semiconductor light source as recited in claim 58 wherein:

said electrically conductive substrate includes indium arsenide (InAs).

\* \* \* \* \*

Trials@uspto.gov
571-272-7822

Paper 69
Entered: September 28, 2023

UNITED STATES PATENT AND TRADEMARK OFFICE

_____

BEFORE THE PATENT TRIAL AND APPEAL BOARD

_____

WOLFSPEED, INC., IDEAL INDUSTRIES LIGHTING, LLC D/B/A
CREE LIGHTING, LEDVANCE LLC, GENERAL ELECTRIC
COMPANY, CONSUMER LIGHTING (U.S.), LLC D/B/A GE
LIGHTING, CURRENT LIGHTING SOLUTIONS, LLC, OSRAM
SYLVANIA, INC., AND FEIT ELECTRIC COMPANY, INC.,

Petitioner,

v.

CAO LIGHTING, INC.,
Patent Owner.

_____

IPR2022-00847
Patent 6,465,961 C2

_____

Before GRACE KARAFFA OBERMANN, CHRISTOPHER M. KAISER,
and BRIAN D. RANGE, *Administrative Patent Judges*.

RANGE, *Administrative Patent Judge*.

JUDGMENT
Final Written Decision
Determining Some Challenged Claims Unpatentable
*35 U.S.C. § 318(a)*

**Appx67**

IPR2022-00847
Patent 6,465,961 C2

## I.    INTRODUCTION

Wolfspeed, Inc. and IDEAL Industries Lighting, LLC d/b/a Cree Lighting ("Cree") (collectively, the "Original Petitioners") filed a Petition requesting *inter partes* review of claims 21, 22, 25, 26, 28–30, 32–36, 40–44, 47–49, 52, 53, 56–59, 62, 63, 65–68, 71–73, 77, 78, 81, 82, 85, 86, and 88–91 (the "Challenged Claims") of U.S. Patent No. 6,465,961 C2 (Ex. 1001, "the '961 patent"). Paper 1 ("Pet."). We instituted *inter partes* review of the challenged claims on all asserted grounds. Paper 10 ("Dec."). After institution, Patent Owner filed a Patent Owner Response (Paper 32, "Resp."), Petitioner filed a Reply (Paper 44, "Reply"), and Patent Owner filed a Sur-Reply (Paper 50, "Sur-Reply"). An oral hearing was held on July 18, 2023, and a transcript of the hearing is included in the record (Paper 65, "Tr.").

LEDVANCE LLC ("LEDVANCE"), OSRAM Sylvania, INC. ("OSRAM"), General Electric Company, Consumer Lighting (U.S.), LLC d/b/a GE Lighting ("GE"), and Current Lighting Solutions, LLC ("Current") (collectively, the "IPR2023-00123 Petitioners") also filed a Petition (IPR2023-00123, Paper 3) seeking *inter partes* review of the Challenged Claims of the '961 patent. The IPR2023-00123 Petitioners also filed a motion for joinder to be joined as a petitioner to the present matter. IPR2023-00123, Paper 2. After full briefing, we instituted *inter partes* review for IPR2023-00123 and joined that matter with the present matter. IPR2023-00123, Paper 19. The IPR2023-00123 Petitioners rely on the same grounds and same arguments as the Original Petitioners. *Id.* at 6–7, 9–10.

Feit Electric Company, Inc. ("Feit") also filed a Petition (IPR2023-00129, Paper 1) seeking *inter partes* review of the Challenged Claims of the

2

IPR2022-00847
Patent 6,465,961 C2

'961 patent. Feit also filed a motion for joinder to be joined as a petitioner to the present matter. IPR2023-00129, Paper 3. After full briefing, we instituted *inter partes* review for IPR2023-00129 and joined that matter with the present matter. IPR2023-00129, Paper 14. The IPR2023-00123 Petitioners rely on the same grounds and same arguments as the Original Petitioners. *Id.* at 6–7, 9–10.

In this decision, we collectively refer to the Original Petitioners, the IPR2023-00123 Petitioners, and Feit as "Petitioner." We refer to documents from the present matter. The petitions and relevant documents from IPR2023-00123 and IPR2023-00129 are the same in substance.

We have jurisdiction under 35 U.S.C. § 6. This decision is issued pursuant to 35 U.S.C. § 318(a). For the reasons that follow, we determine that Petitioner has shown, by a preponderance of the evidence, that claims 21, 22, 25, 26, 28–30, 32–36, 40, 42–44, 47–49, 52, 53, 56–59, 62, 63, 65–68, 71–73, 77, 78, 81, 82, 85, 86, and 88–91 of the '961 patent are unpatentable. We determine that Petitioner has not shown, by a preponderance of the evidence, that claim 41 is unpatentable.

## II.   BACKGROUND

### A.   *Related Matters*

The parties indicate that the '961 patent is the subject of the following district court proceedings: *CAO Lighting, Inc. v. Cree, Inc. et al.*,[1] No. 1:21-cv-00634 (M.D.N.C.) ("the parallel district court litigation"), *CAO Lighting,*

---

[1] Petitioner states that "Cree, Inc., a named defendant in the Underlying Litigation, is now Wolfspeed, Inc." Pet. 133 n.3. Petitioner identifies this case as "the district court case" or "Underlying Litigation" that involves the parties. Pet. 19.

IPR2022-00847
Patent 6,465,961 C2

*Inc. v. GE Lighting, Inc.*, No. 1:20-cv-00681 (D. Del.), *CAO Lighting, Inc. v. OSRAM Sylvania Inc. et al.*, No. 1:20-cv-00690 (D. Del.), *CAO Lighting, Inc. v. Feit Electric Company, Inc.*, No. 2:20-cv-04926 (C.D. Cal.), *CAO Lighting, Inc. v. Lights of America, Inc.*, No. 5:20-cv-02367 (C.D. Cal.), *CAO Lighting, Inc. v. Topaz Lighting Corp.*, No. 2-21-cv-08912 (C.D. Cal.), and *CAO Lighting, Inc. v. Signify NV f/k/a Philips Lighting NV et al.*, No. 2-21-cv-08972 (C.D. Cal.). Pet. 133–134; Paper 4, 1–2.

Patent Owner also identifies the following proceedings as related matters: *CAO Group v. GE Lighting et al.*, 2-11-cv-00426 (District of Utah), *CAO Lighting, Inc. v. Light Efficient Design et al.*, 4-16-cv-00482 (originally filed in District of Idaho), 1-17-cv-07359 (transferred to Northern District of Illinois), *inter partes* Reexamination Control No. 95/000,680, and *inter partes* Reexamination Control No. 95/002,324. Paper 4, 1.

We also note IPR2023-00123 and IPR2023-00129 which, as we explain above, have been joined with this matter. We also note that in IPR2023-00213 and IPR2023-00214, Signify North America Corp. challenges the '961 patent.

### B.    The '961 Patent

The '961 patent originally issued with claims 1–20. Ex. 1001, 9:52–12:63. After a first reexamination, claims 8 and 9 were cancelled and new claims 21–103 were added. *Id.* at p. 26, Ex Parte Reexamination Certificate ("EPRC") 1:26–8:62. Claims 1–7 and 10–20 were cancelled by an additional reexamination. *Id.* at p. 31, Inter Partes Reexamination Certificate ("IPRC") 1:10–12.

The '961 patent is titled "Semiconductor Light Source Using a Heat Sink with a Plurality of Panels." *Id.* at code (54). According to the '961

4

**Appx70**

IPR2022-00847
Patent 6,465,961 C2

patent, "[p]rior art semiconductor light sources have not been successfully
and economically used to illuminate physical spaces." *Id.* at 1:20–22. The
'961 patent states that "[t]ypical prior art LED modules lack high light
intensity due to the size of the LED chips used." *Id.* at 1:23–25. In view of
this, the '961 patent states there is a need "in the prior art for a
semiconductor light source for use in illuminating a space with single color
light in the visible range and which can efficiently dissipate the heat that
they produce." *Id.* at 1:46–49.

       We reproduce Figure 1 of the '961 patent below.



**Fig. 1**

Figure 1 shows a semiconductor light source that uses a high power chip or
array arrangement. *Id.* at 1:65–67. Semiconductor light source 100 includes
enclosure 101 having interior volume 102. *Id.* at 2:48–52, 3:9. Enclosure 101

5

IPR2022-00847
Patent 6,465,961 C2

may be mounted to support 105. *Id.* at 3:15. Semiconductor light source 100
further includes base 103, which "may be configured as a fitting or
connector for use in a desired light socket." *Id.* at 3:17–18. Heat sink 104 is
further located within interior volume 102. *Id.* at 3:22–23. The '961 patent
describes heat sink 104 as having "a generally flat or planar top 104a, and a
plurality of generally flat or planar panels or compartment 104b, 104c, 104d,
104e, 104f, 104g, 104h, 104i, etc. each of which may host a single or an
array of semiconductor devices capable of producing light." *Id.* at 3:24–29.
In addition, at least one semiconductor device 106 is mounted on heat sink
104. *Id.* at 3:37–38. The '961 patent describes the use of "high power" LEDs
by stating that "'[h]igh power' LED's means that the light output from each
LED module is greater than 40 milliwatts." *Id.* at 4:6–8.

We reproduce Figure 3d of the '961 patent below.



**Fig. 3d**

Figure 3d illustrates an LED structure on a substrate. *Id.* at 2:9–10. The
structure includes electrically conductive substrate 1212, buffer layer 1213,

6

IPR2022-00847
Patent 6,465,961 C2

cladding layer 1214, active layer 1215 where energy is converted to light,
cladding layer 1216, and contact layer 1217. *Id.* at 5:11–20.

We reproduce Figure 3d of the '961 patent below.



**Fig. 3f**

Figure 3f depicts a VCSEL chip on an insulative substrate. *Id.* at 2:12–13.
VCSEL chip 1220 includes substrate 1221, buffer layer 1222, cladding layer
1223, another cladding layer 1224, reflective layer 1225, cladding layer
1226, active layer 1227, another cladding layer 1228, second reflective layer
1229, cladding layer 1230, and contact layer 1231. *Id.* at 5:31–49. The '961

7

IPR2022-00847
Patent 6,465,961 C2

patent explains that "[l]ight emitted from the active layer reflects between the two reflective layers until it reaches an appropriate energy level and then lases, emitting a laser beam of light." *Id.* at 5:45–48.

### C.    *Illustrative Claims*

Petitioner challenges claims 21, 22, 25, 26, 28–30, 32–36, 40–44, 47–49, 52, 53, 56–59, 62, 63, 65–68, 71–73, 77, 78, 81, 82, 85, 86, and 88–91. Pet. 11. Claim 21 depends from claim 8, which was cancelled via reexamination. Ex. 1001, EPRC 1:32–39. Claim 8 depended from claim 7, and claim 7 depended from claim 1. *Id.* at 10:27–44. Claims 7 and 1 were also cancelled via reexamination. *Id.* at IPRC 1:10–13. The remaining challenged claims depend from claim 21. *Id.* at EPRC 1:40–8:62. Therefore, we treat claim 21 as the sole independent claim. To reflect claim 21's full scope, we reproduce claims 1, 7, 8, and 21 below.

> 1.    A semiconductor light source for emitting light to illuminate a space used by humans, the semiconductor light source comprising:
>
> an enclosure, said enclosure being fabricated from a material substantially transparent to white light,
>
> an interior volume within said enclosure,
>
> a heat sink located in said interior volume,
>
> said heat sink being capable of drawing heat from one or more semiconductors devices,
>
> said heat sink having a plurality of panels on it suitable for mounting semiconductor devices thereon,
>
> said panels on said heat sink being oriented to facilitate emission of light from the semiconductor light source in desired directions around the semiconductor light source,
>
> at least one semiconductor chip capable of emitting light mounted on one of said panels,

8

IPR2022-00847
Patent 6,465,961 C2

said semiconductor chip being capable of emitting monochromatic light,

said semiconductor chip being selected from the group consisting of light emitting diodes, light emitting diode arrays, laser chips, LED modules, laser modules, and VCSEL chips, and

a coating for converting monochromatic light emitted by said chip to white light.

7.    A device as recited in claim 1 wherein said chip includes

a substrate on which epitaxial layers are grown,

a buffer layer located on said substrate, said buffer layer serving to mitigate differences in material properties between said substrate and other epitaxial layers,

a first cladding layer serving to confine electron movement within the chip, said first cladding layer being adjacent said buffer layer,

an active layer, said active layer emitting light when electrons jump to a valance state,

a second cladding layer, said second cladding layer positioned so that said active layer lies between cladding layers, and

a contact layer on which an electron may be mounted for powering said chip.

8.    A device as recited in claim 7 further comprising a first and a second reflective layers, each of said first and second reflective layers being located on opposite sides of said active layer, said reflective layers serving to reflect light emitted by said active layer.

21.    The semiconductor light source as recited in claim 8 wherein:

9

IPR2022-00847
Patent 6,465,961 C2

said at least one semiconductor chip is a light emitting diode (LED) chip configured to output light at greater than about 40 milliwatts, and

said LED chip is configured to emit monochromatic visible light.

Ex. 1001, 9:52–10:10, 10:28–43, 10:44–48, EPRC 1:32–48.

### D.    Asserted Grounds of Unpatentability

Petitioner, supported by the declaration of Michael S. Lebby, Ph.D. (Ex. 1006), asserts the following three grounds of unpatentability (Pet. 13):[2]

| Claim(s) Challenged | 35 U.S.C. § | Reference(s)/Basis |
|---|---|---|
| 21, 22, 25, 26, 28–30, 32–36, 40–44, 47–49, 52, 53, 56–59, 62, 63, 65–68, 71–73, 77, 78, 81, 82, 85, 86, 88–91 | 103(a) | Begemann,[3] Krames,[4] Allen[5] |
| 21, 22, 25, 26, 28–30, 32–36, 40–44, 47–49, 52, 53, 56–59, 62, 63, 65–68, 71–73, 77, 78, 81, 82, 85, 86, 88–91 | 103(a) | Begemann, Nakamura[6], Allen, Krames |

---

[2] The relevant sections of the Leahy-Smith America Invents Act ("AIA"), Pub. L. No. 112–29, took effect on March 16, 2013. The application that issued as the '961 patent was filed before this date. *See* Ex. 1001, code (22). For the purposes of this Decision, pre-AIA statutes apply.

[3] WO 00/17569, published March 30, 2000, Ex. 1007 ("Begemann").

[4] Krames et al., *High-brightness AlGaInN light-emitting diodes*, Proc. SPIE 3938, LIGHT-EMITTING DIODES: RESEARCH, MANUFACTURING, AND APPLICATIONS IV (2000), Ex. 1008 ("Krames"). The publication status of the Krames reference is disputed, and we address that dispute in Section III.E, *infra*.

[5] WO 99/57945, published November 11, 1999, Ex. 1011 ("Allen").

[6] US 5,777,350, issued July 7, 1998, Ex. 1009 ("Nakamura").

10

**Appx76**

IPR2022-00847
Patent 6,465,961 C2

| Claim(s) Challenged | 35 U.S.C. § | Reference(s)/Basis |
|---|---|---|
| 21, 22, 25, 26, 28–30, 32–36, 40–44, 47–49, 52, 53, 56–59, 62, 63, 65–68, 71–73, 77, 78, 81, 82, 85, 86, 88–91 | 103(a) | Begemann, Sugiura[7], Allen, Krames |

III.    ANALYSIS

*A.    Patent Owner's Motion to Exclude Exhibit 1028*

Patent Owner moves to exclude the Declaration of Michael R. Krames, Exhibit 1028 ("the Krames declaration"). Paper 57, *passim* ("PO Mot."); *see also* Paper 63 (Patent Owner Reply in Support of Motion to Exclude) ("PO Reply"). Petitioner opposes the motion. Paper 58 ("Pet. Opp."). Patent Owner argues that the Petition is based on the contention that the Krames reference teaches that its LED chip achieves "[a] power output of over 170 mW … at a drive current of 1.5 A dc." PO Mot. 3–4 (quoting Pet. 53–54) (alternation in original). Patent Owner responded to the Petition, in part, by showing, via expert declarations, that use of the Krames chip at 170 mW with a drive current of 1.5 A dc "would cause the LEDs and the Begemann device to burn up." *Id.* at 5 (citing Resp. 34–36).

Petitioner filed the Krames declaration in support of its Reply. *Id.* at 5; *see also* Ex. 1028. The Krames declaration states that a person of ordinary skill in the art would not have "entertained" a drive current of 1.5 amps in product development and would instead use lower amperage. PO Mot. 6 (citing Ex. 1028 ¶ 22).

Patent Owner argues that the Krames declaration does not properly address the Patent Owner Response in accordance with 37 C.F.R. §

---

[7] US 6,015,979, issued January 18, 2000, Ex. 1010 ("Sugiura").

11

**Appx77**

IPR2022-00847
Patent 6,465,961 C2

42.23(b). PO Mot. 9. Patent Owner argues that the declaration instead changes "the starting point from Cree's own Petition." *Id.* Patent Owner further argues that the Krames declaration is irrelevant because it does not relate to whether or not a person of ordinary skill in the art "would have been motivated to combine the 1.5/170 milliwatt LED chip from the Krames article with the LED light of Begemann" with "a reasonable expectation of success." *Id.* at 10–11. Patent Owner also seeks to exclude the declaration pursuant to Federal Rule of Evidence 403 because unfair prejudice outweighs probative value and under Federal Rule of Evidence 702(d) because Dr. Krames does not apply his principles and methods to the facts of the case. *Id.* at 11–12.

Patent Owner's argument is unpersuasive because the Krames declaration addresses the Patent Owner Response and is relevant to the issues at hand. We start with an important observation: claim 21 (the only independent claim at issue) is an apparatus claim; the claim is directed to a "semiconductor light source." Ex. 1001, 9:52. One requirement of this apparatus is that it comprise "at least one semiconductor chip" (*id.* at 10:1) where the "at least one semiconductor chip is a light emitting diode (LED) chip configured to output light at greater than about 40 milliwatts." *Id.* at EPRC, 1:34–36. As we explain when addressing claim construction, *infra*, we adopt Patent Owner's proposed construction of "a light emitting diode (LED) chip configured to output light at greater than about 40 milliwatts" as meaning "at least one LED chip is *capable of* emitting light greater than about 40 milliwatts." *See* Section III.D, *infra* (emphasis added).

Because of these recitations, Petitioner bears the burden of establishing that the prior art teaches or suggests a semiconductor chip

12

**Appx78**

IPR2022-00847
Patent 6,465,961 C2

"capable of emitting light greater than about 40 milliwatts." As explained herein, we determine that in the Petition, Petitioner met this burden by establishing by a preponderance of the evidence that the Krames reference teaches an LED chip that has this capability. Pet. 54 (quoting Ex. 1008, 10). Notably, claim 21 does *not* require actual operation of anything at greater than 40 milliwatts because claim 21 is not a method claim. Petitioner never had a burden of establishing a method of running the Krames reference's LED at this power output within a semiconductor light source.

Petitioner's unpatentability grounds are not based upon Krames alone. Pet. 13. Claim 21 is directed to a greater lightbulb structure and also a structure related to the semiconductor chip for the semiconductor light source. Ex. 1001, 9:52–10:10, 10:44–58, EPRC 1:32–39. Petitioner relies on Begemann as teaching semiconductor light source aspects aside from structure of the chip. *See, e.g.*, Pet. 32–39. Petitioner relies on Krames as teaching semiconductor chip structure. *See, e.g.*, Pet. 41–54.

Because Petitioner's unpatentability ground relies on both Krames and Begemann, Petitioner also bears the burden of establishing by a preponderance of the evidence that a person of ordinary skill in the art would have used Krames's semiconductor chip as the chip in Begemann's lightbulb structure. To meet this burden, Petitioner establishes that Begemann teaches use of an LED chip but does not teach a specific chip. Pet. 29 (citing, e.g., Ex. 1007, 2:3–5; 4:30–32). Petitioner also establishes that Krames teaches an appropriate chip that has the same goal as Begemann. *Id.* (citing, e.g., Ex. 1008, 6; Ex. 1007, 2:3–5). We determine that Petitioner's evidence, absent rebuttal evidence, is sufficient to establish that a person of ordinary skill in the art would have had a "high expectation of success" in mounting

13

**Appx79**

IPR2022-00847
Patent 6,465,961 C2

Krames's chips as LEDs 4 of Figure 3 of Begemann. *Id.* at 30 (citing Ex. 1006 ¶ 93).

Against this backdrop, Patent Owner argues that a person of ordinary skill in the art would *not* have combined Krames's LEDs with Begemann's device. Resp. 33–38. Of particular relevance here, Patent Owner argues that a person of ordinary skill in the art "would not have expected Begemann's heat dissipating structure to be able to handle the heat generated by Krames' higher-powered LEDs." *Id.* 34.

In the Reply, Petitioner uses the Krames declaration (Ex. 1028) to argue, for example, that a person of ordinary skill in the art would have used a lower amperage than the 1.5 A dc that Patent Owner's Response focuses on. Reply 8 (citing Ex. 1028 ¶ 22). This use of the Krames declaration is timely because it responds to an argument Patent Owner makes in the Patent Owner Response. 37 C.F.R. § 42.23(b) ("A reply may only respond to arguments raised in . . . patent owner response.").

As to relevancy and whether the Krames declaration is applicable to the facts of this case, the issues at hand are (1) whether or not a person having ordinary skill would have had reason to use the Krames LED with Begemann with a reasonable expectation of success and (2) whether or not the Krames LED is capable of outputting light at greater than about 40 milliwatts. Again, we emphasize that claim 21 does not recite a method where the LED within the recited semiconductor light source actually outputs greater than about 40 milliwatts.

The Krames declaration is relevant to the facts of this case because the declaration has bearing on whether or not a person of ordinary skill in the art would have combined the Krames reference's LED with Begemann's

14

**Appx80**

IPR2022-00847
Patent 6,465,961 C2

lightbulb design. *See, e.g.*, Ex. 1028 ¶ 22. Patent Owner argues that evidence must be relevant to motivation to combine "an LED chip from the Krames article (operating at 1.5 amps to produce 170 milliwatts of output)" but claim 21 has no "operating at 1.5 amps to produce 170 milliwatts of output" requirement. What is relevant is that Krames discloses a single chip that has the capability of outputting more or less light depending on operating conditions. Pet. Opp. 3; *see also* Ex. 1008, 8 (providing that Figure 12 of the Krames reference is described as illustrating "[l]ight output vs. current characteristic of a blue … 1x1 mm$^2$ AlGaInN LED in a power package, compared to a conventional AlGaInN LED in a 5 mm lamp a package"). Because claim 21 does not require actually running the recited LED at any particular wattage or amperage, it is appropriate for the Krames declaration to rebut Patent Owner's argument that a person of ordinary skill would not have considered using the Krames LED with Begemann at high amperage by explaining that a person of ordinary skill in the art would have considered using the exact same Krames LED with Begemann at a low amperage instead and that at this lower amperage the Krames LED would generate an amount of heat that would be easily dissipated by Begemann's lamp while still providing an optical output of "greater than about 40 milliwatts" as recited by claim 21. Ex. 1028 ¶¶ 23–24 (citing Ex. 1008, 8). The fact that the Krames LED is configured to run at the high amperage if desired for a different application does not negate the rationale for combining the Krames LED to run at a lower amperage.

With respect to prejudice outweighing probative value, the probative value is high because the Krames declaration directly bears on a key issue: reason to combine with reasonable expectation of success. Also, the

15

**Appx81**

IPR2022-00847
Patent 6,465,961 C2

prejudice is minimal because Patent Owner could have, in the Patent Owner Response, addressed the general issue of whether a person having ordinary skill in the art would have had reason to combine Begemann's teachings with the Krames reference LED under *any* operating conditions.

In the Reply Brief, Patent Owner argues that the statement of material facts in Patent Owner's motion should be considered admitted because Petitioner did not specifically deny them. PO Reply 2. As explained above, Petitioner refutes Patent Owner's framing of the motion to exclude in relevant respects. Also, 37 C.F.R. § 42.23(a) states, with our emphasis added, that "[a]ny material fact not specifically denied *may* be considered admitted." In the interest of justice, we decline to consider the statement of material facts admitted.[8]; *see also* 37. C.F.R. § 42.5(b) ("The Board may waive or suspend a requirement of parts 1, 41, and 42.").

Thus, for the reasons explained above, we deny Patent Owner's motion to exclude Exhibit 1028.

B.    *Petitioner's Motion to Exclude Exhibits 2017 and 2030*

Petitioner seeks to exclude Exhibit 2017 as hearsay. Paper 59, 1 ("Pet. Mot."); *see also* Paper 62 (Petitioner's Reply in support of Motion to Exclude). Exhibit 2017 is entitled "SOLID STATE LIGHTING CATALOG," and Patent Owner states that the catalog is from 2015. Resp. 62. Patent Owner argues that the catalog shows "expansion and breadth of its patented Dynasty LED lamp business." *Id.* Patent Owner argues that

---

[8] The parties also dispute whether or not Patent Owner's motion to exclude is procedurally proper. Pet. Opp. 9; PO Reply 4–5. We need not address this issue because we deny the motion to exclude for the reasons we explain here.

16

**Appx82**

IPR2022-00847
Patent 6,465,961 C2

Exhibit 2017 is an admissible business record. Paper 59, 2–6 ("PO Opp.").

Petitioner seeks to exclude Exhibit 2030 because the exhibit is an attorney-generated trial demonstrative and because it is hearsay. Pet. Mot. 3. Patent Owner argues that Exhibit 2030 is admissible because it was not properly objected to during deposition, because it is used to demonstrate Petitioner's positions, and to address an opposing party's statement. PO Opp. 4–7.

As explained herein, we ultimately determine that Petitioner meets its burden of establishing by a preponderance of the evidence that claims 21, 22, 25, 26, 28–30, 32–36, 40, 42–44, 47–49, 52, 53, 56–59, 62, 63, 65–68, 71–73, 77, 78, 81, 82, 85, 86, and 88–91 of the '961 patent are unpatentable even if we fully consider Exhibits 2017 and 2030. Moreover, we determine that Petitioner does not meet its burden of establishing that claim 41 of the '961 is unpatentable, and our determination would be the same even if we did not consider Exhibits 2017 and 2030. As such, we dismiss Petitioner's Motion to Exclude as moot.

<em>C.    Level of Ordinary Skill in the Art</em>

In order to determine whether an invention would have been obvious at the time the application was filed, we consider the level of ordinary skill in the pertinent art at the critical time. *Graham*, 383 U.S. at 17. The resolution of this question is important because it allows us to "maintain[] objectivity in the obviousness inquiry." *Ryko Mfg. Co. v. Nu–Star, Inc.*, 950 F.2d 714, 718 (Fed. Cir. 1991). In assessing the level of ordinary skill in the art, various factors may be considered, including the "type of problems encountered in the art; prior art solutions to those problems; rapidity with which innovations are made; sophistication of the technology; and

17

**Appx83**

IPR2022-00847
Patent 6,465,961 C2

educational level of active workers in the field." *In re GPAC, Inc.*, 57 F.3d 1573, 1579 (Fed. Cir. 1995) (quotation omitted). Generally, it is easier to establish obviousness under a higher level of ordinary skill in the art. *Innovention Toys, LLC v. MGA Entm't, Inc.*, 637 F.3d 1314, 1323 (Fed. Cir. 2011) ("A less sophisticated level of skill generally favors a determination of nonobviousness . . . while a higher level of skill favors the reverse.").

> Petitioner proposes a level of ordinary skill in the art as follows:

> As of the '961 Patent's claimed priority date (August 24, 2001), a POSITA would have had at least a bachelor's degree in an engineering discipline with coursework in semiconductors and/or optoelectronics, and three or more years of experience working in the semiconductor and/or optoelectronics fields. Less work experience may be compensated by a higher level of education with the foregoing coursework.

Pet. 20 (citing Ex. 1006 ¶ 34). Patent Owner provides a different description of the level of ordinary skill in the art:

> The POSITA for the '961 Patent would have at least a bachelor of science degree in electrical engineering, physics, materials science, or a similar area of study, so as to understand the basic principles of light and LED design and operation. Ex. 2018 at ¶ 19. The POSITA would also have experience related to LED lighting products, LED chip technology and applications, and/or LED packaging techniques for a period of at least one year. *Id.* In addition, the POSITA would understand, generally, how to implement LED chips and packages in the design and/or application of general-purpose lighting products for use in residential and commercial (or industrial) buildings and structures as well as outdoor spaces used by humans (such as roads, streets, parking lots, pathways, etc.). *Id.*

Resp. 18–19.

IPR2022-00847
Patent 6,465,961 C2

We agree with Patent Owner that the challenged claims relate to light fixtures, LED packaging, and LED chip layer structure and that the '961 patent claims reflect "a hybrid of the light bulb art and semiconductor art." Resp. 19. The prior art of record, for example, Begemann, likewise reflects "a hybrid of the light bulb art and semiconductor art." *Id.* (quoting Pet. 28). Petitioner's expert, Dr. Lebby, agreed that a person having ordinary skill in the art would need to be "familiar with thermal issues." Ex. 2015, 26:15–28:16.

While Petitioner's proposed description of a person having ordinary skill in the art could, in some instances, be sufficient to qualify a person as having ordinary skill, Patent Owner's proposal is a more complete and accurate description of the level of skill commensurate with the scope of the challenged '961 patent claims. Patent Owner's description appears consistent with the prior art and patent specification before us and is supported by witness testimony. *See Okajima v. Bourdeau*, 261 F.3d 1350, 1355 (Fed. Cir. 2001) (prior art itself may reflect an appropriate level of skill). For the purpose of this Decision, we adopt Patent Owner's description. We further note that the outcome of our decision would be the same under either party's asserted skill level.

### D.    *Claim Construction*

In an *inter partes* review proceeding based on a petition filed on or after November 13, 2018, a patent claim shall be construed using the same claim construction standard that would be used to construe the claim in a civil action under 35 U.S.C. § 282(b). 37 C.F.R. § 42.100(b) (as amended Oct. 11, 2018). This rule adopts the same claim construction standard used by Article III federal courts, which follow *Phillips v. AWH Corp.*, 415 F.3d

19

**Appx85**

IPR2022-00847
Patent 6,465,961 C2

1303 (Fed. Cir. 2005) (en banc), and its progeny. Under this standard, the words of a claim are generally given their "ordinary and customary meaning," which is the meaning the term would have to a person of ordinary skill at the time of the invention, in the context of the entire patent including the specification. *See Phillips*, 415 F.3d at 1312–13.

Petitioner contends that "[t]he terms in the Challenged Claims should receive their ordinary and customary meaning as understood by a POSITA in the context of the patent specification and prosecution history." Pet. 19 (citing Ex. 1006 ¶ 71). Petitioner states that "Patent Owner has taken a position as to the scope of certain claim terms through infringement contentions in the district court case." *Id.* Specifically, Petitioner avers that Patent Owner proposes claim constructions for the term "reflective layers" and contends that grounds 1 and 3 demonstrate unpatentability even under Patent Owner's interpretation of "reflective layers." *Id.* at 20 (citing Ex. 1017, 22–23; Ex. 1006 ¶ 72). In the Petition, however, Petitioner does not propose any particular construction for "reflective layers" beyond ordinary and customer meaning. *Id.* at 19–20.[9]

Patent Owner identifies claim construction for two terms as "particularly relevant." Resp. 14–15. First, Patent Owner argues that "a light emitting diode (LED) chip configured to output light at greater than about 40 milliwatts" means "at least one LED chip is capable of emitting light greater

---

[9] Petitioner states that "Patent Owner thus contends the recited 'reflective layers' can include transparent or semi-transparent layers that exhibit some reflectivity (e.g., $SiO_2$) or an interface between two layers (e.g., the buffer and substrate layers) that exhibit differing indices of refraction." Pet. 20. Patent Owner frames this as being Petitioner's "novel construction" (Resp. 16), but Petitioner does not expressly endorse this Patent Owner contention.

20

IPR2022-00847
Patent 6,465,961 C2

than about 40 milliwatts." Resp. 14–15. Patent Owner notes that a district court already adopted this construction and notes that the "LED chip" includes LEDs, LED modules, and LED arrays but excludes laser chips, laser modules, and VCSEL chips. *Id.* (citing Ex. 2003, 15–18). Petitioner argues that the phrase "needs no construction" and that Petitioner's grounds meet this construction.  Reply 1–2. We adopt Patent Owner's proposed construction because it is well supported by the record including the District Court's reasoning. Ex. 2003, 15–18.

Second, Patent Owner argues that we should adopt the claim construction for "a first and a second reflective layers . . . serving to reflect light emitted by said active layer" that was reached by California and Delaware district courts: "first and second reflective layers are distinct from each other and [] reflect more than negligible light." Resp. 15, 18.[10] Petitioner responds by again stating the phrase "needs no construction" and by also arguing that the grounds meet the construction. Reply 1–4.

Patent Owner's claim construction is well-supported by the record including the reasoning provided by the California and Delaware district courts. Ex. 2002, 19–21 (California district court explaining why the "reflective layers" must be distinct layers based on how claim 8 is structured and also explaining why the amount of reflection must be non-negligible); Ex. 2003, 2, 13 (Delaware district court explaining why reflection has to be more than negligible but need not reflect more light than the light absorbed or transmitted). We, thus, agree that "first and a second reflective layers . . .

---

[10] Patent Owner's proposed claim construction combines various statements made by the district courts into one statement. Resp. 15 (citing Ex. 2002, 19–21; Ex. 2003, 2, 13).

21

**Appx87**

IPR2022-00847
Patent 6,465,961 C2

serving to reflect light emitted by said active layer" means that the "first and second reflective layers are distinct from each other and reflect more than negligible light." We further note that the preponderance of the evidence supports that as little as one percent light reflectance is "non-negligible" in this context. Reply 4; *also* Ex. 1032, 188:7–14 (Patent Owner's witness, Dr. Shealy, testifying that reflection "on the order of one percent" would be more than negligible); *see also* Tr. 53 (counsel for Patent Owner agreeing that Dr. Shealy opined that "three percent reflection is enough to be non-negligible").

It is unnecessary to construe any other claim terms in this Decision because none of the parties' disputes turn on the meaning of other claim terms.  *See, e.g.*, *Nidec Motor Corp. v. Zhongshan Broad Ocean Motor Co.*, 868 F.3d 1013, 1017 (Fed. Cir. 2017).

### E.    Prior Art Status of the Krames Reference

Patent Owner argues that Petitioner fails to demonstrate that the Krames reference is prior art. Resp. 23–29. A reference may qualify as prior art if, for example, it is a printed publication. 35 U.S.C. § 102(a)(1); *see also* 35 U.S.C. § 103 (referring back to Section 102 when referencing prior art). Whether a reference qualifies as a "printed publication" is a legal conclusion based on underlying factual determinations. *Suffolk Techs., LLC v. AOL Inc.*, 752 F.3d 1358, 1364 (Fed. Cir. 2014). The determination of whether a document is a "printed publication" under 35 U.S.C. § 102(b) "involves a case-by-case inquiry into the facts and circumstances surrounding the reference's disclosure to members of the public." *In re Klopfenstein*, 380 F.3d 1345, 1350 (Fed. Cir. 2004). "Because there are many ways in which a reference may be disseminated to the interested public, 'public accessibility'

22

**Appx88**

IPR2022-00847
Patent 6,465,961 C2

has been called the touchstone in determining whether a reference constitutes a 'printed publication' bar under 35 U.S.C. § 102(b)." *Blue Calypso, LLC v. Groupon, Inc.*, 815 F.3d 1331, 1348 (*quoting In re Hall*, 781 F.2d 897, 898–99 (Fed. Cir. 1986)). "A reference will be considered publicly accessible if it was 'disseminated or otherwise made available to the extent that persons interested and ordinarily skilled in the subject matter or art exercising reasonable diligence, can locate it.'" *Id.* (*quoting Kyocera Wireless Corp. v. Int'l Trade Comm'n*, 545 F.3d 1340, 1350 (Fed. Cir. 2008)).

The '961 patent was filed on August 24, 2001, and does not claim any earlier priority date. Ex. 1001, code (22). We find that the record supports the following facts, and we determine that these facts, cumulatively, support that the Krames reference is prior art because it was a printed publication at least as of June 29, 2000:

1.      The Krames reference, on its face, indicates that it is an "Invited Paper." Ex. 1008, 2.

2.      The face of the Krames reference bears these indicia: "In *Light-Emitting Diodes: Research, Manufacturing, and Applications IV*, H. Walter Yao, Ian T. Ferguson, E. Fred Schubert, Editors, Proceedings of SPIE[11] Vol. 3938 (2000) • 0277-786X/00/$15.00." *Id.* These indicia suggest that the Krames reference was published in the SPIE Proceedings volume ("the Proceedings") and the Proceedings were available to the public for fifteen dollars.

---

[11] SPIE refers to "The International Society for Optical Engineering" or "The Society of Photo-Optical Instrumentation Engineers." Ex. 1020, Ex. A (pgs. 6, 8).

23

**Appx89**

IPR2022-00847
Patent 6,465,961 C2

3.      Rachel J. Watters is a librarian and "Head of Resource Sharing for the University of Wisconsin-Madison's General Library System" located in Madison, Wisconsin. Ex. 1020, 1. Ms. Watters worked as a librarian with the University of Wisconsin library system since 1998. *Id.* Ms. Watters has a master's degree in Library and Information Studies. *Id.*

4.      When the University of Wisconsin-Madison Libraries received a volume, it was checked in, added to library holdings records, and made available to readers as soon as possible and, at most, within two to three weeks. *Id.* at 2.

5.      The University of Wisconsin-Madison Libraries catalogued the Proceedings as of June 29, 2000. *Id.*; *see also id.* at Ex. B, 27[12] (library record indicating June 29, 2000 "Receiving date" for the Proceedings).

6.      The Kurt Wendt Library at the University of Wisconsin-Madison owns the Proceedings of SPIE, 3938 that the Krames reference appears in. *Id.* at 2; *see also id.* at Ex. A (copy of excerpt of the Kurt Wendt Library's copy of the Proceedings).

7.      The Proceedings, on their face, indicate that papers from the Proceedings were presented at "26-27 January 2000 San Jose, California." *Id.* at Ex. A, 6.

8.      Dr. Lebby attended this January 2000 conference. Ex. 1006 ¶ 78. Dr. Lebby also confirms that "proceedings from this conference were distributed to all members of SPIE as well as to libraries which had a subscription to the

---

[12] Reference is made to the page number of Exhibit 1020: page 27 of 28.

24

IPR2022-00847
Patent 6,465,961 C2

*Proceedings of SPIE*, so it was widely available to and accessible by those with skill in the art." *Id.*[13]

9.     The Proceedings indicate that papers included in the Proceedings volume "were selected by the conference program committee to be presented in oral or poster format." Ex. 1020, Ex. A, 7.

10.     The Proceedings indicate a 2000 copyright date and further indicate that the volume was publicly available from the Copyright Clearance Center for fifteen dollars per article. *Id.*

11.     The excerpt of the library's Proceedings volume has a sticker in the upper left corner: "TK 7871.89 L53 2000." *Id.* at 6. The sticker suggests the volume was catalogued by the library in 2000. The table of contents page also bears hand writing that repeats similar indicia including "2000." *Id.* at 8.

12.     The library catalog record of the University of Wisconsin-Madison indicates that the Proceedings volume "was properly catalogued and could be found by or requested by a person of skill in the art of the subject matter of the foregoing article exercising reasonable diligence." Ex. 1020, 3.

13.     Members of the interested public could locate the Proceedings volume on June 29, 2000, the date it was catalogued, "by searching the public library catalog or requesting a search through [Wisconsin TechSearch] WTS." *Id.*

The facts above are evidence of the Krames reference's publication as of June 29, 2000, because the facts tend to make the Krames reference's publication as of June 29, 2000, more probable than it would be without the facts. *See* Fed. R. Evid. 401(a) (defining evidence as relevant "if it has any tendency to make a fact more or less probable than it would be without the

---

[13] We note that Dr. Lebby does not directly state *when* the Proceedings were widely available. *See* Sur-Reply 14.

IPR2022-00847
Patent 6,465,961 C2

evidence"). The evidence is sufficient to support publication. Meanwhile, no evidence of record suggests that Krames was *not* a printed publication as of June 29, 2000. Thus, a preponderance of the evidence supports Krames's prior art status.

Patent Owner argues that Ms. Watters "never establishes a firm date when Krames was purportedly available to the relevant public." Resp. 25. Patent Owner bases this argument by taking a tortured reading of Ms. Watters's statement that "[m]embers of the interested public could locate a copy of [the Proceedings] on or after June 29, 2000, the date it was catalogued." *Id.* (quoting Ex. 1020, 3); *see also* Sur-Reply 13–14. The best understanding of Ms. Watters's statement, in view of the context of Ms. Watters explaining the library's cataloguing process, is that a member of the interested public had two options: the person could choose to locate the Proceedings on June 29, 2000, or the person could choose to locate the Proceedings after June 29, 2000. Thus, the statement supports public availability as of June 29, 2000.

Patent Owner also argues that Exhibits A and B to the Watters declaration also do not establish when the Proceedings were available. Resp. 25–26. The Exhibits, however, serve to corroborate Ms. Watters's credible testimony as to when the Proceedings were available.

Patent Owner also argues that a person of ordinary skill in the art would not have been able to find the Krames article and argues that a prior, non-precedential board decision, *Salesforce.com, Inc. v. WSOU Investments, LLC*, IPR2022-00357, Paper 12 (PTAB July 13, 2022), is analogous. Resp. 26–28. But the *Salesforce* decision is distinguishable. The *Salesforce* patent claims related to, for example, interfacing two network environments via a

26

**Appx92**

IPR2022-00847
Patent 6,465,961 C2

message gateway and content reformatted in a vectorized format. *Salesforce.com, Inc.*, IPR2022-00357, Paper 12 at 3. Given this context, the panel determined that Petitioner did not establish a reasonable likelihood the Fox article was publicly accessible before the critical date because the MARC record was only "keyed to the title of the entire conference proceedings." *Id.* at 14. Because the conference proceedings were entitled "Proceedings of the 2002 International Conference on International Computing," the panel reasonably determined that a person having ordinary skill in the art would not have, with reasonable diligence, known to look in these proceedings to find information relevant to the claimed subject matter. *Id.* In *Salesforce*, the topic of the proceedings was very broad compared to the subject matter of the claims at issue.

In contrast, a person of ordinary skill in the art could have reasonably located the Krames article based on the title of the Proceedings. As a starting point, there is no dispute that Begemann is prior art. Begemann teaches an LED lamp fixture that makes use of LED chips, but it does not give very many details about the design of those chips. Ex. 1007, 1:1–14, 2:22–23, 5:13–18, Figs. 2, 3A, 3B. A person having ordinary skill in the art at the relevant time (August 24, 2001) would have sought out more information about what different kinds of light emitting diodes could be manufactured for application with Begemann. *See* Section III.F.4.a, *infra*. As such, a person having ordinary skill in the art would have been very interested in a recent (2000) publication from a known technical society entitled "Light-Emitting Diodes: Research, Manufacturing, and Applications IV." Ex. 1008, 2; *see also* Ex. 1020, Ex. A, 6. The evidence supports that the Proceeding's title was indexed such that a person of ordinary skill could find it, and this

27

IPR2022-00847
Patent 6,465,961 C2

would have been sufficient to lead a person having ordinary skill in the art to the Krames article. Ex. 1020, 2–3; *see also* Reply 5–6.

Patent Owner also notes that the barcode on the back of Proceedings volume (Ex. 1020, Ex. A, 24) has a different number than the barcode number the ExLibris system states (Ex. 1020, Ex. B, 26). Resp. 27. Patent Owner does not provide evidence explaining the import of this distinction. It is possible, for example, that the book has different barcodes for different purposes (for example, one for the manufacturer and another assigned to the library). Given that other indicia do not indicate any conflict or controversy regarding publication date, the evidence supports Ms. Watters's testimony establishing June 29, 2000, library indexing. Ex. 1020, 2–3.

Patent Owner further argues that Exhibit B has some unexplained features related to page number and volume availability. Resp. 27. Again, Patent Owner lacks evidence regarding the import of these observations.

Patent Owner argues that Ms. Watters does not provide evidence that she personally knew about publication of the Krames article. *Id.* at 28; Sur-Reply 12. This does not undermine Ms. Watters's credible testimony regarding her library's systems and when, based on the library's records, Krames was publicly available (indexed by the library in a useful fashion).

To summarize, the record provides sufficient evidence supporting that Krames published by June 29, 2000. The record provides no evidence to the contrary. The weight of the evidence supports Krames's June 29, 2000, publication. As such, Petitioner has established by a preponderance of the evidence that Krames is a printed publication.

28

**Appx94**

IPR2022-00847
Patent 6,465,961 C2

### F.     *Obviousness Analysis*

#### 1.     Obviousness: Legal Standard

A patent claim is unpatentable under 35 U.S.C. § 103(a) if the differences between the claimed subject matter and "the prior art are such that the subject matter, as a whole, would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains." *KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 406 (2007). The question of obviousness is resolved on the basis of underlying factual determinations including: (1) the scope and content of the prior art; (2) any differences between the claimed subject matter and the prior art; (3) the level of ordinary skill in the art; and (4) when in evidence, objective evidence of nonobviousness. *Graham v. John Deere Co.*, 383 U.S. 1, 17–18 (1966).

#### 2.     Objective Indicia of Non-Obviousness

Patent Owner argues that commercial success and the combination of long-felt need, failure of others in the industry, and industry skepticism weigh in favor of patentability. Resp. 61–66. Petitioner argues that Patent Owner fails to show that commercial products embody and are coextensive with the challenged claims. Reply 26–29. For objective indicia of nonobviousness to be accorded substantial weight, its proponent must establish a nexus between the evidence and the merits of the claimed invention. *Lectrosonics, Inc. v. Zacom, Inc.*, IPR2018-01129, Paper 33 at 32 (PTAB Jan. 24, 2020) (precedential); *see also Fox Factory Inc. v. SRAM, LLC*, 944 F.3d 1366, 1373 (Fed. Cir. 2019) (to establish objective indicia of non-obviousness, Patent Owner bears the burden of tying the objective evidence that embodies the claimed features).

IPR2022-00847
Patent 6,465,961 C2

Here, as to commercial success and industry praise, Patent Owner argues that Cree's "Embodying Products" meet the limitations of claim 18 of the '961 patent. Resp. 61. Then, Patent Owner argues that "Cree's Lighting Products segment" has been commercially successful. *Id.* at 62. Patent Owner also argues that Cree received praise "for its LED light bulbs." *Id.* Patent Owner does not establish, however, that the "Embodying Products" are the same as "Cree's Lighting Products segment" or "its LED light bulbs."

Just to the contrary, Patent Owner provides, for example, sales figures for lighting products "including the embodying products" (and, presumably, including other products as well). Ex. 2019 ¶ 46 (emphasis omitted). Patent Owner's witness, Ms. Kindler, admits to assessing only revenues associated "with [Patent Owner's] Embodying Products as part of its Lighting Products segment." *Id.* Although Patent Owner provides evidence that Cree states that its "Lighting Products segment 'primarily consist[ed] of LED lighting systems and lamps,' which would include the Embodying Products," the record is unclear what other products the "Lighting Products segment" includes. *Id.* The evidence fails to persuasively connect patented features to commercial success or praise.

Patent Owner also argues that "there is a nexus between the industry's LED lighting products eventually introduced and the '961 Patent." Resp. 61–62. Patent Owner does not argue, however, that "the industry's LED lighting products" enjoyed commercial success, praise, or indicia supporting non-obviousness.

Patent Owner argues that its 2015 catalog shows "expansion and breadth" of its patented Dynasty LED lamp business. *Id.* at 62 (citing Ex.

30

**Appx96**

IPR2022-00847
Patent 6,465,961 C2

2017). The catalog establishes what Patent Owner offered for sale and how Patent Owner advertised Dynasty LED lamps. But the catalog does not persuasively establish commercial success or success relative to any competitors in the market.

Patent Owner further argues that Patent Owner's "Dynasty LED lamps" are covered by the '961 patent and had "notable examples of installation" at two stores. *Id.* (citing Ex. 2019 ¶¶ 30–31, 49). These examples, at best, provide very limited evidence of some commercial success.

With regard to long-felt but unmet need, Patent Owner argues that others in the industry failed to develop "a monochromatic general illumination light source that uses a semiconductor LED chip while also dissipating heat" and cites problems others in the industry had in developing such a light both before and after filing of the '961 patent. *Id.* at 62–66. The record, however, suggests that the '961 patent did not solve particular industry problems. Rather, Patent Owner's witness testified, for example, that he purchased an off-the-shelf LED as a prototype, that attaching heat sinks was well known, and that phosphor coatings for white light were well known. Reply 28–29 (citing Ex. 1030, 291:20–295:6 (testimony of '961 inventor)).[14]

---

[14] Petitioner also argues that attaching heat sinks and adding phosphor coatings was well known. Reply 28–29. Petitioner cites the Ex. 1030 trial transcript at 126:25–127:6 and 134:17–21 for testimony supporting this argument, but these pages appear to be omitted from the present record. Nonetheless, the prior art discussed herein (for example, Begemann, Krames, and Allen) establishes that heat sinks and phosphor coatings were known in the art.

31

**Appx97**

IPR2022-00847
Patent 6,465,961 C2

In sum, the evidence of objective indicia of non-obviousness is weak and, therefore, has little influence on our obviousness conclusions in either direction. All of our obviousness determinations, as we discuss *infra*, are made after considering all evidence in the record, including all evidence relating to objective indicia of non-obviousness.

### 3. Overview of the Asserted Art

a. *Begemann (Exhibit 1007)*

Begemann describes "a LED lamp comprising a gear column, a lamp cap which is connected to an end of the gear column and a substrate which is connected to the other end of the gear column and which is provided with a number of LEDs." Ex. 1007, 1:1–3.

We reproduce Begemann's Figure 2 below.



FIG. 2

32

IPR2022-00847
Patent 6,465,961 C2

Figure 2 depicts an embodiment of a LED lamp. *Id.* at 4:11. LED lamp includes gear column 1, metal lamp cap 2, metal substrate 3 having LEDs 4, envelope 5, and outlet holes 6 and inlet holes 7 for air flow. *Id.* at 5:13–16. Begemann describes substrate 6 as cube-shaped and states that each one of the faces has a number of LEDs 4. *Id.* at 5:17–18, 5:21–22. Begemann explains that multiple-chip LEDs are used in this embodiment, "which each have three light points (green, red and blue) per LED or four light points (green, red, yellow, blue) per LED" and "[t]hese colors are mixed so as to obtain white light in the secondary optical system of each of the LEDs." *Id.* at 5:22–25.

We reproduce Begemann's Figure 3A below.



FIG. 3A

Figure 3A shows a LED that includes single-chip LEDs, which each has only one light point 11 per LED. *Id.* at 6:3–5. Begemann explains that "[l]ight point (11) is provided with a primary optical system(13), by means of which the radiation characteristic of the LED can be influenced." *Id.* at 6:6–8.

33

IPR2022-00847
Patent 6,465,961 C2

b.      *Krames (Exhibit 1008)*

Krames is a paper titled "High-brightness AlGaInN light-emitting diodes." Ex. 1008, 2. Specifically, Krames describes AlGaInN LEDs grown via organometallic vapor phase epitaxy ("OMVPE"). *Id.* Krames describes a light output versus current characteristic for a blue (wavelength of about 470 nm) 1 x 1 mm2 AlGaInN LED. *Id.* at 10. Krames explains that a power output of over 170 mW is obtained at a drive current of 1.5 A DC. *Id.*

Krames's Figure 3 is reproduced below.



Fig. 3.  Typical AlGaInN LED structure.

Figure 3 depicts a typical AlGaInN LED structure. *Id.* at 4. Krames discloses that "[t]he two most common substrates used for OMVPE growth of AlGaInN are sapphire and SiC." *Id.* Krames explains that "[s]apphire is insulating and therefore both p and n Ohmic contacts must be formed on the top surface of the LED chip." *Id.* The n-type contact is formed by mesa etching the AlGaInN LED structure to expose n-type GaN layers beneath the active region and then applying an ohmic n-contact metallization (e.g.,

34

**Appx100**

IPR2022-00847
Patent 6,465,961 C2

Ti/Al) to the n-type GaN. *Id.* Krames states that the p-type contact is formed "by depositing a semi-transparent Ni/Au Ohmic contact metallization across the GaN:Mg surface." *Id.*

c.     *Allen (Exhibit 1011)*

Allen describes a lamp that includes one or more monolithic LED devices that each has an array of LED dies. Ex. 1011, code (57). Allen states that the "[t]he array of LED dies may comprise a mixture of RGB sub-dies or 'white dies' or a mixture of both types of dies" and that "[w]hite dies may be, for example, blue dies with phosphorescent coating to produce a wideband spectrum." *Id.* at 4:9–12.

We reproduce Allen Figures 6A and 6B below.



FIG. 6A                    FIG. 6B

Figure 6A depicts a top view of an "A-type" screw-in hemispherical lamp configuration. *Id.* at 3:17–18. Figure 6B shows a side view of the hemispherical lamp. *Id.* at 3:19–20. The lamp includes monolithic LED device 100, lamp housing 207, mounting brackets 212, voltage converter

35

**Appx101**

IPR2022-00847
Patent 6,465,961 C2

204, and base 210. *Id.* at 6:10–12. Allen states that voltage converter 204 "may be a transformer, such as step-down transformer, series resistor, or other type of voltage converter employed in the art to convert from a supply voltage such as an AC or DC supply followed by a bridge rectifier circuit." *Id.* at 6:16–18.

d.    *Nakamura (Ex. 1009)*

Nakamura describes "a semiconductor light-emitting device such as a light-emitting diode (LED) or a laser diode (LD)." Ex. 1009, 1:7–9. We reproduce Nakamura Figure 11.



Figure 11 is a cross-sectional view of a light-emitting device. *Id.* at 5:58–60. The light-emitting device includes substrate 151, buffer layer 152, n-type contact layer 153, second n-type clad layer 154, first n-type clad layer 155, active layer 156, second p-type clad layer 158, and p-type contact layer 159. *Id.* at 19:45–54. Nakamura further discloses that it is possible to dispose a light-reflecting film "consisting of at least two kinds of nitride semiconductor layers, each differing in composition," on an outer side of

36

IPR2022-00847
Patent 6,465,961 C2

first n-type clad layer 155 and/or a second multi-layer film "consisting of at least two kinds of nitride semiconductor layers, each differing in composition," on an outer side of second p-type clad layer 158. *Id.* at 21:47–55.

e.    *Sugiura (Ex. 1010)*

Sugiura describes "a nitride-based semiconductor element such as a semiconductor laser, a light-emitting diode, an electronic device, or the like." Ex. 1010, 1:6–8. Sugiura's Figure 7 is reproduced below.



F I G. 7

Figure 7 illustrates a sectional view of a nitride-based semiconductor laser. *Id.* at 9:1–3. The nitride-based semiconductor laser includes sapphire substrate 30, mask 31 having grooves 31a, low-temperature GaN buffer layer 32, undoped underlying GaN layer 33, n-type GaN contact layer 35, n-type AlGaN current injection layer 36, n-type GaN optical guide layer 37, InGaN active layer 38, p-side GaN optical guide layer 39, p-type AlGaN

37

IPR2022-00847
Patent 6,465,961 C2

current injection layer 40, and p-type GaN contact layer 41. *Id.* at 12:24–36. Sugiura states that "[a]lthough this embodiment has been described above with reference to the case it is applied to a laser, . . . the present invention can be applied not only to a nitride-based semiconductor laser but also to a light-emitting diode." *Id.* at 14:58–61.

4.      Ground One: Unpatentability over Begemann, Krames, and Allen

Petitioner asserts that claims 21, 22, 25, 26, 28–30, 32–36, 40–44, 47–49, 52, 53, 56–59, 62, 63, 65–68, 71–73, 77, 78, 81, 82, 85, 86, and 88–91 are unpatentable under 35 U.S.C. § 103(a) as obvious over Begemann, Krames, and Allen, citing the Declaration of Dr. Michael S. Lebby for support. Pet. 32–104 (citing Ex. 1006). Below, we first address Petitioner's argued reasons to combine the references' teachings. We then address independent claim 21. Next, we address disputed recitations of dependent claims. Finally, we address the remaining dependent claims collectively.

a.      *Combining the teachings of Begemann, Krames, and Allen*

We first address the combination of Begemenan and Krames. Pet. 29–30. Begemann teaches that "[c]ustomary incandescent lamps can only be replaced by LED lamps which are provided with LEDs having . . . a high luminous flux." Ex. 1007, 2:3–5. Begemann discloses LEDs mounted to surfaces within the interior of its bulb and as part of an LED package. *Id.* at Figs. 2, 3A. Begemann does not, however, disclose what specific LED chip should be used with its device. Pet. 29. A person having ordinary skill in the art would have naturally searched LED chip references to determine what existing chips could be combined with Begemann's disclosure.

38

IPR2022-00847
Patent 6,465,961 C2

Krames teaches an LED chip that a person of ordinary skill in the art would have recognized as useful in Begemann's LED package. Krames notes that "[b]y increasing the chip size and providing low-thermal-resistance power packages capable of dissipating several Watts, LEDs should be able to compete more favorably with conventional lighting technologies in many applications." Ex. 1008, 6. Krames thus has a goal similar to that of Begemann. Ex. 1007, 2:3–5. A person of ordinary skill in the art would have had a reasonable expectation of success in mounting the LED chips Krames teaches into the Figure 3 apparatus of Begemann. Ex. 1006 ¶ 93.

Patent Owner argues that a person of ordinary skill in the art would have recognized that Begemann's heat sink is inadequate to handle the heat of Begemann's suggested RGB LEDs. Resp. 34. This argument does not squarely respond to the ground of challenge. Petitioner's unpatentability grounds are based upon combining Begemann's teachings with Krames's LED and Allen's phosphor coating. Moreover, Begemann teaching a heat sink along with teaching its LEDs suggests, by a preponderance of the evidence, that Begemann's heat sinks are adequate for Begemann's LEDs. *See, e.g.*, Ex. 1007, Fig. 2, 2:17–19, 5:17–18.

Patent Owner argues that a person having ordinary skill in the art would not have combined the Krames LED with the Begemann device because Begemann's structure would not be able to handle the heat of the Krames "higher-powered LEDs." Resp. 34–36. Patent Owner's argument is unpersuasive because it is premised on the Krames LED chips being driven at 1.5 amperes and producing 390 lumens. Reply 8 (citing Ex. 2021 ¶¶ 48–64 (Patent Owner witness, Mr. McCreary, considering heat based on these

IPR2022-00847
Patent 6,465,961 C2

conditions)); Ex. 2022 ¶¶ 86–109 (Patent Owner witness, Mr. York, referring to Mr. McCreary's modeling). A preponderance of the evidence supports that a person of ordinary skill in the art would have utilized the Krames LED chip in conjunction with Begemann at a lower drive current and with lower lumens. *See, e.g.*, Ex. 1034, 107:6–25 (Patent Owner's witness, Mr. York, testifying that the practical drive current for the Krames chip was somewhere around 350 milliamps); Ex. 1028 ¶¶ 22, 28 (Petitioner's witness, Dr. Krames, testifying that an output of 136 lumens would be a reasonable output and a drive current near 350 mA would be reasonable).

Patent Owner argues that it focused on a drive current of 1.5 amps because Petitioner relied on this amperage in the Petition. Sur-Reply 16–17. This argument is unpersuasive because it reflects a misunderstanding of the scope of claim 21 and how the Petition addresses claim 21. Claim 21 recites "at least one semiconductor chip is a light emitting diode (LED) chip configured to output light at greater than about 40 milliwatts." Ex. 1001, EPRC 1:34–36. Patent Owner agrees that claim 21's "configured to" language requires that the chip be "capable of" outputting light at greater than about 40 milliwatts. Resp. 14–15. The claim does not require a chip that, when placed in the bulb, actually operates at more than about 40 milliwatts. Thus, to show that the Krames chip meets this claim language, Petitioner explained that "Krames teaches its LED chip achieves '[a] power output of over 170 mW . . . at a drive current of 1.5 A dc.'" Pet. 54 (quoting Ex. 1008, 10) (alteration in original). In other words, Petitioner proved the *capability* of the Krames chip.

40

**Appx106**

IPR2022-00847
Patent 6,465,961 C2

Petitioner never, however, insisted that a person of skill in the art would run the Krames chip within Begemann at such a high power output. Rather, Petitioner's reason to combine is that Begemann teaches use of LED chips with high luminous flux, and Krames teaches such a chip. Pet. 29–30. When Patent Owner attempted to refute this reason to combine by arguing that the Krames chip would overheat at 170 mW and 1.5 A dc, Petitioner appropriately responded by establishing that the Krames chip could operate at a variety of power and amperage conditions. Reply 9–10; *see also Rembrandt Diagnostics, LP, v. Alere, Inc.*, 76 F.4th 1376, 1382–84 (Fed. Cir. 2023) (holding that Board did not err by considering Petitioner arguments responsive to Patent Owner assertions regarding motivation to successfully combine). Figure 12 of Krames illustrates possible operating conditions for the Krames chip, and we reproduce that figure below.



Fig. 12. Light output vs. current characteristic of a blue ($\lambda_p$ ~470 nm), 1x1 mm$^2$ AlGaInN LED in a power package, compared to a conventional AlGaInN LED in a 5 mm lamp package.

41

IPR2022-00847
Patent 6,465,961 C2

Ex. 1008, 9. Krames Figure 12 depicts a graph comparing the light output versus current characteristics of the Krames LED chip versus a conventional LED. *Id.*

Krames Figure 12 illustrates that the Krames chip can operate at amperages much lower than 1.5 A. Indeed, Krames indicates "excellent reliability performance" at 350 mA. *Id.* at 10; *see also* Ex. 1028 ¶ 22. The preponderance of the evidence also establishes that, at lower amperage, a person of ordinary skill in the art would have recognized that any heat issues would have been manageable. *See* Reply 9–10 (citing Ex. 1028 ¶¶ 22–23; Ex. 1008, 9).

Patent Owner also argues that a person having ordinary skill in the art would not have utilized the Krames LED with Begemann because the Krames LED is less energy efficient than an incandescent light bulb and less efficient than the Begemann RGB LEDs. Resp. 36–37. Krames, however, teaches, at 350 mA, "the best performance in terms of power conversion efficiency" and "excellent reliability performance." Reply 8 (quoting Ex. 1008, 7); *see also* Ex. 1008, 9 (teaching excellent reliability performance at 350 mA). Petitioner persuasively argues that the combination of Begemann and Krames could output 136 lumens which exceeds the light output of many commercial bulbs (while dissipating resulting heat). Reply 11–12 (citing Ex. 1028 ¶¶ 27–29). Also, Krames teaches that its LEDs "should be able to compete more favorably with conventional lighting technologies in many applications." Ex. 1008, 6; *see also id.* at 10 (explaining that the Krames chip offers advantages where "high flux density is important" and may offer unique advantages in "traffic signaling"), 11 (noting "long-life of solid-state emitters").

42

**Appx108**

IPR2022-00847
Patent 6,465,961 C2

A person having ordinary skill in the art would have recognized potential advantages of using the Krames LED chip and would have been able to weigh the advantages against any disadvantages. The existence of advantages and disadvantages does not make the combination of Begemann and Krames less obvious in view of Begemann suggesting use of LED chips and Krames providing an appropriate LED chip that provides at least some advantages. *See Medichem, S.A. v. Rolabo, S.L.*, 437 F.3d 1157, 1165 (Fed. Cir. 2006) ("a given course of action often has simultaneous advantages and disadvantages, and this does not necessarily obviate motivation to combine"). In sum, the preponderance of the evidence, as explained above, supports that a person of ordinary skill in the art would have had reason to combine the teachings of Begemann and Krames with a reasonable expectation of success.

With respect to Allen, Begemann teaches a "white LED" for at least one embodiment. Pet. 31–32 (quoting Ex. 1007, 3:6–9). Krames teaches conversion of blue light into white "via phosphors" and Allen teaches that "blue dies with phosphorescent coating" may be used. Ex. 1008, 11; Ex. 1011, 4:11–12; Ex. 1006 ¶¶ 95–96. A preponderance of the evidence supports Petitioner's position that a person of skill in the art would have combined the teachings of Begemann, Allen, and Krames to reach claim 1's recited coating.

Patent Owner argues that Petitioner's proposed obviousness combination is inconsistent because it "argues for the purported obviousness of replacing Begemann's LEDs with Krames' LED chips" but "also argues for the purported obviousness of replacing Begemann's LEDs with Allen's chips." Resp. 30. Patent Owner further argues that neither the Krames chip

43

IPR2022-00847
Patent 6,465,961 C2

nor the Allen chip alone teach all recitations of claim 21. *Id.* at 30–31. This argument is unpersuasive because the Petition is reasonably clear that ground one asserts Begemann with the Krames chip and Allen's phosphor coating. *See* Pet. 29–30 (explaining why it would have been obvious to use the Krames chip with Begemann), 31–32 (explaining why it would have been obvious to modify the Krames chip by using a coating of phosphors). When Petitioner maps claim 21 (which depends from cancelled claims 1, 7, and 8) to the asserted art, Petitioner refers to Begemann for the greater lightbulb structure and Krames for the chip. *Id.* at 32–54. For claim 21, Petitioner refers to Allen *only* for the phosphor coating. *Id.* at 41.[15] Petitioner does not rely on only the chip of Krames or only the chip of Allen to meet claim 21, and, as we further address below, Petitioner accounts for each recitation of claim 21.

To summarize, the preponderance of the evidence establishes that a person of ordinary skill in the art would have had good reason to implement the Krames chip in the Begemann device while also making use of a phosphor coating as Allen teaches and that a person of ordinary skill in the art would have had a reasonable expectation of success in combining the references' teachings in this manner.

b.    *Independent Claim 21*

Claim 21 depends from cancelled claims 1, 7, and 8. The preamble of claim 1 recites, "A semiconductor light source for emitting light to illuminate a space used by humans, the semiconductor light source comprising." Petitioner argues that Begemann discloses a semiconductor

---

[15] When addressing dependent claims, Petitioner also refers to Allen for certain aspects of the bulb structure. *See, e.g.*, Pet. 62, 64, 66–75, 78–83.

IPR2022-00847
Patent 6,465,961 C2

light source. Pet. 32–33. The preponderance of the evidence supports that Begemann teaches or suggests this recitation. Ex. 1007, 6:23–24, Fig. 2; Ex. 1006 ¶ 98.

Claim 1 next recites "an enclosure, said enclosure being fabricated from a material substantially transparent to white light." Petitioner argues that Begemann teaches this recitation. Pet. 33–34. The preponderance of the evidence supports that Begemann teaches or suggests this recitation. Begemann states, for example, that "during operation of the LED lamp shown, white light is obtained" and that the Begemann device has an "envelope . . . made of glass [or] synthetic resin." Ex. 1007, 2:23–24, 5:26; *see also id.* at Fig. 2; Ex. 1006 ¶ 99.

Claim 1 next recites "an interior volume within said enclosure." As Petitioner asserts, the preponderance of the evidence supports that Begemann teaches or suggests this recitation. Pet. 34–35, Ex. 1007, Fig. 2; Ex. 1006 ¶ 100.

Claim 1 next recites "a heat sink located in said interior volume." Petitioner identifies such a sink by annotating Figure 2. Pet. 35–37. We reproduce that annotated figure below.



FIG. 2

45

IPR2022-00847
Patent 6,465,961 C2

Pet. 35–36 (reproducing Ex. 1006, Fig. 2). Begemann Figure 2 is a view of a second embodiment of Begemann's LED lamp. Ex. 1007, 4:11. Petitioner annotates the Figure to identify heat sink areas. The preponderance of the evidence supports that Begemann teaches or suggests this recitation. Begemann teaches, for example, that substrate 3 is made of a metal or metal alloy, thereby enabling a good heat conduction and that the outer surface of the gear column (1) of the LED lamp is made of a metal or a metal alloy enabling good heat conduction. *Id.* at 5:1–21; *see also* Ex. 1006 ¶ 101.

Claim 1 next recites "said heat sink being capable of drawing heat from one or more semiconductors devices." As Petitioner explains, the preponderance of the evidence supports that Begemann teaches or suggests this recitation. Pet. 37.

Claim 1 next recites "said heat sink having a plurality of panels on it suitable for mounting semiconductor devices thereon." Petitioner annotates Figure 2 to identify a plurality of panels. Pet. 37–38. The preponderance of the evidence supports that Begemann teaches or suggests this recitation. *See* Ex. 1007, Fig. 2; Ex. 1006 ¶ 103.

Claim 1 next recites "said panels on said heat sink being oriented to facilitate emission of light from the semiconductor light source in desired directions around the semiconductor light source." Petitioner again annotates Figure 2 to illustrate how Begemann teaches this recitation. Pet. 38–39. The preponderance of the evidence supports that Begemann teaches or suggests this recitation.  *See* Ex. 1007, Fig. 2; Ex. 1006 ¶ 104.

Claim 1 next recites "at least one semiconductor chip capable of emitting light mounted on one of said panels." Petitioner annotates Begemann Figures 2 and 3A to illustrate how Begemann teaches this

46

IPR2022-00847
Patent 6,465,961 C2

recitation. Pet. 39–40. The preponderance of the evidence supports that Begemann teaches or suggests this recitation.  Ex. 1007, Figs. 2, 3A; Ex. 1006 ¶ 105.

Claim 1 next recites "said semiconductor chip being capable of emitting monochromatic light." Petitioner argues that Begemann teaches this recitation. Pet. 40. The preponderance of the evidence supports that Begemann teaches or suggests this recitation.  Begemann teaches that its "single chip LEDs" have "only one light point per LED." Ex. 1007, 4:32–34.[16] Begemann explains, for example, that its green, red, yellow, blue light points may be mixed to obtain white light. *Id.* at 5:17–26. Petitioner's witness, Dr. Lebby, testifies that having only one light point means the light is monochromatic. Ex. 1006 ¶ 106.

Claim 1 next recites "said semiconductor chip being selected from the group consisting of light emitting diodes, light emitting diode arrays, laser chips, LED modules, laser modules, and VCSEL chips." The preponderance of the evidence supports that Begemann teaches or suggests this recitation. As Petitioner asserts, Begemann teaches that its chips are LEDs. Pet. 40–41; Ex. 1007, 6:4–5, Fig. 3A; Ex. 1006 ¶ 107.

Claim 1 next recites "a coating for converting monochromatic light emitted by said chip to white light." Petitioner asserts that Allen and Krames teach such a coating. Pet. 41. The preponderance of the evidence supports that Allen and Krames teach or suggest this recitation. *See* Ex. 1011, 4:11–12 (Allen stating that "[w]hite dies may be, for example, blue dies with phosphorescent coating to produce a wideband spectrum"); Ex. 1008, 11

---

[16] Petitioner mistakenly cites 3:32–34 (Pet. 40), but the quote is easily located on the next page.

47

IPR2022-00847
Patent 6,465,961 C2

(Krames explaining "conversion of blue light into white via phosphors");
Ex. 1006 ¶¶ 108–109. Also, as we explain above, the preponderance of the
evidence supports Petitioner's arguments regarding combining the teachings
of Begemann, Krames, and Allen.

We next address elements of claim 7, which depends from claim 1.
Claim 7 first recites "A device as recited in claim 1 wherein said chip
includes a substrate on which epitaxial layers are grown." Petitioner asserts
that Krames teaches such a substrate. Pet. 41. The preponderance of the
evidence supports that Krames teaches or suggests this recitation. Ex. 1008,
Fig. 3 (depicting "Sapphire Substrate"), 4 ("the two most common substrates
used for OMVPE growth of AlGa1nN are sapphire and SiC"); *see also* Ex.
1006 ¶¶ 110–111.

Claim 7 next recites "a buffer layer located on said substrate."
Petitioner asserts that Krames teaches a buffer layer located on its substrate.
Pet. 42–43. The preponderance of the evidence supports that Krames teaches
or suggests this recitation. Ex. 1008, Fig. 3 (depicting "Buffer Layer"); *see
also* Ex. 1006 ¶ 112.

Claim 7 next recites "said buffer layer serving to mitigate differences
in material properties between said substrate and other epitaxial layers."
Petitioner asserts that Krames's buffer layer serves this role. Pet. 43–45. The
preponderance of the evidence supports that Krames teaches or suggests this
recitation. Ex. 1008, Fig. 3; Ex. 1006 ¶¶ 113–114; Ex. 1014, 353 (reference
Krames cites explaining that mismatch between substrate and film makes
film difficult to grow).

Claim 7 next recites "a first cladding layer serving to confine electron
movement within the chip." Petitioner asserts that Krames discloses this

48

**Appx114**

IPR2022-00847
Patent 6,465,961 C2

layer. Pet. 45–46. The preponderance of the evidence supports that Krames teaches or suggests this recitation. Ex. 1008, 5 (referring to GaN confining layers), Fig. 3; Ex. 1006 ¶ 115.

Claim 7 next recites "said first cladding layer being adjacent said buffer layer." Petitioner asserts that Krames discloses this recitation. Pet. 46. The preponderance of the evidence supports that Krames teaches or suggests this recitation as illustrated, for example, by Krames Figure 3. Ex. 1008, Fig. 3; Ex. 1006 ¶ 116.

Claim 7 next recites "an active layer." Petitioner asserts that Krames discloses an active layer. Pet. 46–47. The preponderance of the evidence supports that Krames teaches or suggests this recitation. Ex. 1008, Fig. 3; Ex. 1006 ¶ 117.

Claim 7 next recites "said active layer emitting light when electrons jump to a valance state." Petitioner asserts that Krames's active layers perform this function. Pet. 47. The preponderance of the evidence supports that Krames teaches or suggests this recitation. Ex. 1006 ¶ 118.

Claim 7 next recites "a second cladding layer." Pet. 48. Petitioner asserts that Krames teaches this layer. *Id.* The preponderance of the evidence supports that Krames teaches or suggests this recitation. Ex. 1008, 5, Fig. 3; Ex. 1006 ¶ 119.

Claim 7 next recites "said second cladding layer positioned so that said active layer lies between cladding layers." Petitioner asserts that Krames teaches this layer and annotates Krames Figure 3 to illustrate this point. Pet. 48–49. The preponderance of the evidence supports that Krames teaches or suggests this recitation. Ex. 1008, Fig. 3; Ex. 1006 ¶ 120.

49

**Appx115**

IPR2022-00847
Patent 6,465,961 C2

Claim 7 next recites "a contact layer on which an electron may be mounted for powering said chip." Petitioner asserts that Krames teaches this layer. Pet. 49–50. The preponderance of the evidence supports that Krames teaches or suggests this recitation. Ex. 1008, Fig. 3; Ex. 1006 ¶ 122.

We next address elements of claim 8, which depends from claim 7. Claim 8 recites "[a] device as recited in claim 7 further comprising a first and a second reflective layers, each of said first and second reflective layers being located on opposite sides of said active layer, said reflective layers serving to reflect light emitted by said active layer." We address claim construction relating to this term in Section III.D, *supra*.

Petitioner contends that Krames's Gold-Nickel "AuNi Contact Layer" is a first reflective layer and Krames's "metal back-reflector" is a second reflective layer. Pet. 50–53. The preponderance of the evidence supports that Krames teaches or suggests these recitations. Ex. 1008, Fig. 3, 6; Ex. 1006 ¶¶ 123–126.

As to the first reflective layer, Patent Owner argues that Krames's Gold-Nickel (AuNi) contact layer is not a reflective layer because Petitioner lacks evidence that this layer would reflect more than a negligible amount of light. Resp. 39–40. Patent Owner argues that the surface of the Nickel facing the active layer would be rough and not polished and that the reflection, if any, would be negligible. *Id.* (citing Ex. 2020 ¶ 148). Patent Owner also argues that Dr. Krames did not consider the AuNi contacts to be reflectors. Sur-Reply 24–25 (citing Ex. 2030, DDX10-58; Ex. 2029, 807:22–809:9; Ex. 2033, 38:23–44:16).

Petitioner, however, provides persuasive evidence that the gold-nickel AuNi contact layer would provide non-negligible reflection. In particular,

50

**Appx116**

IPR2022-00847
Patent 6,465,961 C2

Petitioner shows that such a layer of typical thicknesses would have a reflectivity of 20.6% or, more conservatively with different thickness, 5.9%; either result is more than the 1% or 3% necessary for reflectance to be more than negligible. Reply 13–14 (citing Ex. 1027 ¶¶ 9–12); *see also* Ex. 1032, 188:7–14 (Patent Owner's witness, Dr. Shealy, testifying that reflection "on the order of one percent" would be more than negligible); Tr. 53 (counsel for Patent Owner agreeing that Dr. Shealy opined that "three percent reflection is enough to be non-negligible").[17] Also, whether or not Dr. Krames subjectively considered the contact to be a "reflective layer" does not persuasively bear on the technical issue of whether the contact would, nonetheless, provide the small amount of reflection necessary for reflection to be non-negligible.

Patent Owner disputes Petitioner's reflectivity evidence by arguing that the AuNi layer would have 60.8% absorbance and only 18.6% transmittance and would "block substantially all of the light from the LED." Sur-Reply 24. Patent Owner, however, does not offer evidence that undermines Petitioner's position that the reflection would be more than the one or three percent necessary to be non-negligible. Because non-negligible reflectance may be as little as one or three percent reflectance, it may be true that the reflectance is non-neglible and also true that the AuNi layer blocks "substantially all" (ninety-seven to ninety-nine percent of light). Patent Owner also argues that Petitioner's calculations (performed by Dr. Lebby)

---

[17] Patent Owner notes that Petitioner's argument is "advanced for the first time in Cree's Reply." Sur-Reply 23. Patent Owner does not, however, contend that Petitioner's argument is inappropriate for this reason. We determine the argument is appropriate because it is responsive to Patent Owner's Response.

51

**Appx117**

IPR2022-00847
Patent 6,465,961 C2

are flawed (Sur-Reply 25–26), but Dr. Lebby's testimony nonetheless provides sufficient evidence that the AuNi layer is non-negligibly reflective, and Patent Owner offers no persuasive evidence to the contrary. As such, the preponderance of the evidence supports Petitioner.

As to the second reflective layer, Patent Owner argues that the evidence does not support that the "metal back-reflector" can be a second reflector layer because Krames does not teach what the metal back-reflector is or how it is inserted. Resp. 40–41. This argument is unpersuasive. Krames describes "inserting a metal back-reflector on the sapphire substrate" and that, because of the insertion, "the light output was recovered to result in a reliable AlGaInN LED with no penalty to light output." Ex. 1008, 6. Dr. Lebby also provides testimony explaining this reflector. Ex. 1006 ¶¶ 124–125. This is adequate to support, by a preponderance of the evidence, that Krames teaches or suggests the recited second reflective layer especially given that one to three percent reflectance is adequate to meet the requirement of a "reflective layer" in this context. *See* Reply 14–15.

Petitioner contends, as an alternative, that the interface between the substrate and the buffer layer is a "second reflective layer." Pet. 52. Patent Owner argues that "[a]n interface is not a layer." Resp. 40. Because we determine that the "metal back-reflector" is a second reflective layer, we do not need to reach the issue of whether or not this interface might satisfy claim 8's second reflector layer.

We next address elements of claim 21 which depends from claim 8. Claim 21 first recites, "[t]he semiconductor light source as recited in claim 8 wherein: said at least one semiconductor chip is a light emitting diode (LED) chip configured to output light at greater than about 40 milliwatts."

52

**Appx118**

IPR2022-00847
Patent 6,465,961 C2

Petitioner contends that Krames teaches a LED chip with 170 milliwatt power output (i.e., more than 40 milliwatts). Pet. 53–54. The preponderance of the evidence supports that Krames teaches or suggests this recitation. Ex. 1008, 10; Ex. 1006 ¶ 128. Importantly, this claim language requires a semiconductor chip *capable* of the recited output, and Patent Owner does not persuasively dispute that the Krames chip is *capable* of meeting this recitation.

Claim 21 next recites "said LED chip is configured to emit monochromatic visible light." Petitioner contends that Krames teaches this recitation. Pet. 54. The preponderance of the evidence supports that Krames teaches or suggests this recitation. Ex. 1008, 5; Ex. 1006 ¶ 129.

To summarize, Petitioner has shown by a preponderance of the evidence that the combined teachings of Begemann, Krames, and Allen teach or reasonably suggest all of the elements of claim 21 in the manner claim 21 (and the claims that claim 21 depends from) recites. Thus, we are persuaded that Petitioner has established by a preponderance of the evidence that the combination of Begemann, Krames, and Allen renders claim 21 obvious.

c. *Dependent Claim 29*

Claim 29 recites, "[t]he semiconductor light source as recited in claim 28 wherein: said opening defined in said dome-shaped enclosure is large enough for said heat sink to pass through said opening." Ex. 1001, EPRC 2:17–21. The "opening" of claim 29 is defined in claim 28 which refers to "said enclosure [referring back to the enclosure of claim 1] is shaped as a dome that defines an opening." *Id.* at 2:9–16.

53

**Appx119**

IPR2022-00847
Patent 6,465,961 C2

Petitioner reproduces Figure 6B of Allen to illustrate that the opening of Allen is large enough for Allen's heat sink to pass through. Pet. 66–67. Petitioner further argues that a person having ordinary skill in the art would incorporate this aspect of Allen "to achieve an LED lamp with improved performance and manufacturability to replace conventional incandescent lamps." Pet. 32 (citing Ex. 1006 ¶ 96).

Patent Owner argues that Petitioner relies only on Begemann as providing a heat sink and that "Cree provides absolutely no explanation why a POSITA would have been motivated to use or combine Allen's enclosure with Begemann." Resp. 41–42. This argument is unpersuasive. Petitioner provides a rationale for combining the teachings of Allen and Begemann, and the rationale is supported by at sufficient evidence, namely the declaration of Dr. Lebby. Pet. 32 (citing Ex. 1006 ¶ 96); *see also* Reply 21–22. Patent Owner provides no evidence that would undermine or weigh against Petitioner's stated reasons to combine.

Patent Owner further argues that a person having ordinary skill in the art would understand that Allen's "dome-shaped enclosure" would not function for its intended purpose with Begemann's lightbulb because it "does not fit the geometry of Begemann's light bulb." Resp. 42 (citing Ex. 1007, Figs. 1–2 and Ex. 1011 Figs. 6A–6B). This argument is unpersuasive because it does not squarely address Petitioner's contentions; Petitioner's combination relies on using Allen's bulb shape having Allen's opening rather than relying on Begemann's lightbulb shape. *See* Reply 22.

Thus, Petitioner has shown by a preponderance of the evidence that the combined teachings of Begemann, Krames, and Allen teach or reasonably suggest all of the elements of claim 29 in the manner claim 29

54

**Appx120**

IPR2022-00847
Patent 6,465,961 C2

recites. Ex. 1006 ¶ 96; Ex. 1011, Fig. 6B. Thus, we are persuaded that Petitioner has established by a preponderance of the evidence that the combination of Begemann, Krames, and Allen renders claim 29 obvious.

      d.     *Dependent Claim 32*

Claim 32 recites, "[T]he semiconductor light source as recited in claim 21 wherein: the semiconductor light source further comprises an AC/DC converter, said AC/DC converter is configured to convert AC power into DC power that is usable by said LED chip, and said AC/DC converter is positioned outside said interior volume." Ex. 1001, EPRC 2:33–40.

Petitioner argues that Allen teaches the recited voltage converter. Pet. 68–69 (citing Ex. 1011, 6:15–18). Petitioner further argues that Allen teaches that voltage converter 204 is located outside of the interior volume. Pet. at 69–70 (citing Ex. 1011, 6:15–18, Fig. 6B). Petitioner also provides evidence, namely testimony from Dr. Lebby, supporting that a person of ordinary skill in the art would have been motivated to put circuitry outside of the interior volume to avoid obscuring emitted light. Pet. 70 (citing Ex. 1006 ¶ 148).

Patent Owner argues that Allen's voltage converter 204 is not "outside said interior volume" as claim 32 recites. Resp. 42–43. Patent Owner argues that Petitioner "incorrectly limits the interior volume within the enclosure to only the space to the left of the leftmost 'support 212.'" *Id.* at 43. This argument is unpersuasive because the preponderance of the evidence supports Petitioner.

As Petitioner argues, claim 1 (which claim 32 ultimately depends from) states that the recited "enclosure" must be "fabricated from a material substantially transparent to white light." Reply 23. Allen's structure to the

55

**Appx121**

IPR2022-00847
Patent 6,465,961 C2

right of the leftmost "support 212" (where the converter 204 is located) is opaque: "the mounting 212 supporting the five monolithic LED devices 100 is preferably transparent or translucent, whereas *the mounting 212 that supports the voltage converter 204 is preferably opaque*." Ex. 1011, 9:32–34 (emphasis added). Allen continues: "the parts of the bulb housing 207 forming the globular front face 206 and form the side up to the mounting support for the power supply is likely to be transparent or frosted, whereas the remaining parts of the housing 207 forming the base 210 are preferably opaque." *Id.* at 9:34–10:3.

Patent Owner argues that the entire enclosure need not be opaque. Sur-Reply 30–31. This argument does not squarely address Petitioner's position. The preponderance of the evidence supports that Allen's enclosure for the LEDs is the transparent portion to the left of support 212 while the opaque portion is an opaque base that is not part of that same enclosure. The opaque portion to the right of support 212 is separated from the transparent portion to the right of support 212 and, thus, does not enclose the same components and is not the same enclosure. Ex. 1011, Fig. 6B.

Patent Owner also argues that Petitioner's alleged reason to combine Allen with Begemann "to avoid the emitted light from being obscured by such circuitry or structures" would not be a concern. Resp. 44. Patent Owner argues that Begemann does not identify this problem and places components in its interior volume. *Id.* This argument is unpersuasive because Allen discloses a workable and advantage design; a person having ordinary skill in the art would have understood that Begemann would benefit from having electronic components outside the interior lighting volume for the same reason Allen benefits from this design. *KSR Int'l, Co.*, 550 U.S. at 417 ("if a

56

**Appx122**

IPR2022-00847
Patent 6,465,961 C2

technique has been used to improve one device, and a person of ordinary skill in the art would recognize that it would improve similar devices in the same way, using the technique is obvious unless its actual application is beyond his or her skill"); *see also* Ex. 1006 ¶ 148.

Petitioner has shown by a preponderance of the evidence that the combined teachings of Begemann, Krames, and Allen teach or reasonably suggest all of the elements of claim 32 in the manner claim 32 recites. Ex. 1006 ¶ 148; Ex. 1011, 9:32–10:3, Fig. 6B. We are persuaded Petitioner has established by a preponderance of the evidence that the combination of Begemann, Krames, and Allen renders claim 32 obvious.

     e.    *Dependent Claim 34*

Claim 34 recites:

> The semiconductor light source as recited in claim 33 wherein: the semiconductor light source further comprises a positive lead wire and a negative lead wire configured to provide power from said AC/DC converter to said LED chip, and said positive lead wire and said negative lead wire run from said AC/DC converter, through an interior of said base, into said interior volume, and over an exterior surface of said heat sink.

Ex. 1001, EPRC 2:46–55. Petitioner argues that Allen Figure 6B illustrates positive and negative lead wires. Pet. 72 (citing Ex. 1011, Figs. 6A, 6B; Ex. 1006 ¶ 151). Petitioner argues that it would have been obvious to include Allen's AC/DC converter in Begemann's base and to connect those wires as recited in order to power the LEDs. *Id.* at 72–73 (citing Ex. 1006 ¶ 152).

Patent Owner argues that the identified structures do not "run from said AC/DC converter, through an interior of said base." Resp. 45. We disagree. As we explain with regard to claim 32, Allen's structure to the

**Appx123**

IPR2022-00847
Patent 6,465,961 C2

right of leftmost "support 212" is the recited base. Reply 24. Figure 6B shows the wires running through this base.

Patent Owner also argues that Petitioner does not provide a reason why a person having ordinary skill in the art would combine Allen's voltage converter 204 and lead wires with Begemann's device or place Allen's voltage converter 204 within Begemann's base. Resp. 45. Petitioner, when addressing claim 33, provides a persuasive reason why a person of ordinary skill in the art would use Allen's voltage converter and position it in the base. Pet. 71 ("A POSITA would have been motivated and found it obvious to put circuitry or other electronic structures in Begemann's base to avoid the emitted light from being obscured by such circuitry or structures"). Patent Owner does not present evidence persuasively undermining this reasoning or evidence. A preponderance of the evidence supports Petitioner's position. Ex. 1011, Fig. 6B, 6:15–18; Ex. 1006 ¶ 150. We are persuaded Petitioner has established by a preponderance of the evidence that the combination of Begemann, Krames, and Allen renders claim 34 obvious.

f.    *Dependent Claim 36*

Claim 36 recites: "[t]he semiconductor light source as recited in claim 21 wherein: said coating is directly applied to a face of said LED chip." Ex. 1001, EPRC 2:61-63. Petitioner argues that Allen teaches "[w]hite dies may be, for example, blue dies with phosphorescent coating to produce a wideband spectrum." Pet. 74 (citing Ex. 1011, 4:11–12). Petitioner further provides evidence that a "die" is a way of referring to an LED chip. *Id.* (citing Ex. 1006 ¶ 155).

Patent Owner argues that this passage does not teach applying the coating directly to the face of an LED chip because the coating could instead

58

**Appx124**

IPR2022-00847
Patent 6,465,961 C2

encapsulate the LED chip as taught by U.S. Patent No. 5,959,316. Resp. 46 (citing Ex. 2024, Fig. 3, 3:6–11).

The preponderance of the evidence supports Petitioner's position. Allen suggests that it is its die that has a coating rather than suggesting that there is a spacer adjacent to the die that is coated. Reply 24–25 (citing Ex. 1011, 4:11–12). The die is the LED chip. Ex. 1006 ¶ 155. We are persuaded Petitioner has established by a preponderance of the evidence that the combination of Begemann, Krames, and Allen renders claim 36 obvious.

g.    *Dependent Claim 41*

Dependent claim 41 recites, "[T]he semiconductor light source as recited in claim 40 wherein: said enclosure includes a substantially flat side." Ex. 1001, EPRC 3:18–20. Petitioner annotates Figure 6B of Allen to argue that Allen's enclosure has a substantially flat side. Below, we reproduce Figure 6A alongside Figure 6B as Petitioner annotates that figure.



59

IPR2022-00847
Patent 6,465,961 C2

Pet. 76 (reproducing Ex. 1011, Figs. 6A, 6B). Allen Figure 6A shows a top view of an exemplary embodiment of Allen "employed in an 'A-type' screw-in hemispherical lamp configuration," and Figure 6B shows a side view of the same embodiment. Ex. 1011, 3:17–20. Petitioner annotates Figure 6B by pointing to the enclosure and top and bottom portions labeled as "[s]ubstantially [f]lat [s]ide." Pet. 76.

Patent Owner argues that Petitioner does not establish that Allen's Figure 6B enclosure has a "substantially flat side" because "the two purportedly 'flat sides' are actually part of a cylindrical—not flat—portion of Allen's enclosure." Resp. 47. The preponderance of the evidence supports Patent Owner's position.

The '961 patent addresses use of a "flat" enclosure in the context of Figure 10. We reproduce Figure 10 below for reference.



Fig. 10

Ex. 1001, Fig. 10. Figure 10 "depicts an LED or laser light source located in a light enclosure having a phosphor coating." *Id.* at 2:42–43. The '961 patent

60

**Appx126**

IPR2022-00847
Patent 6,465,961 C2

distinguishes Figure 10 from a flat shape by stating that "[t]he depicted shape is that of a bulb, but flat, arcuate, rounded or other shapes may be used depending on the application." *Id.* at 8:41–43.

Petitioner argues that Figure 6B depicts a disclosure with a "substantially flat side" because, even though the disclosure is cylindrical, it still "comprises a flat side which encircles the lamp." Reply 25. We disagree. The surface of the Figure 6B bulb is cylindrical. Given the context of the '961 patent, as explained above, "flat" describes a three-dimensional object being flat—in other words being flat in three dimensions. The '961 patent does not indicate that "flat" or "substantially flat" can be understood so broadly that it includes a curved three-dimensional surface that only *appears* flat based on viewing the surface from a particular direction.

We further emphasize that Petitioner's position is based upon combining Allen's teachings with Begemann (as opposed to, for example, modifying the art's teachings based on what is generally known in the art). Pet. 76 ("[a] POSITA would have found it obvious to use Allen's enclosure with two substantially flat sides as the enclosure of Begemann"); Reply 26 ("a POSITA would have found it obvious to use Allen's enclosure with two substantially flat sides as the enclosure of Begemann"). Because Allen does not teach a substantially flat surface, combining the teachings will also not result in a substantially flat surface.

Thus, for the reasons explained above, Petitioner has not adequately established by a preponderance of the evidence that claim 41 would have been obvious in view of the cited art.

61

**Appx127**

IPR2022-00847
Patent 6,465,961 C2

> h.    *Dependent Claims 22, 25, 26, 28, 30, 33, 35, 40, 42–44,*
> *47–49, 52, 53, 56–59, 62, 63, 65–68, 71–73, 77, 78, 81,*
> *82, 85, 86, and 88–91*

Petitioner accounts for the limitations recited in claims 22, 25, 26, 28, 30, 33, 35, 40, 42–44, 47–49, 52, 53, 56–59, 62, 63, 65–68, 71–73, 77, 78, 81, 82, 85, 86, and 88–91. Pet. 54–104. Petitioner provides detailed explanations as to how the combined teachings of Begemann, Krames, and Allen disclose, teach, or suggest the limitations of these claims and why it would have been obvious to combine those teachings with a reasonable expectation of success, citing Dr. Lebby's testimony for support. *Id.* (citing Ex. 1006).

We are persuaded that Petitioner has demonstrated that all of the limitations recited in claims 22, 25, 26, 28, 30, 33, 35, 40, 42–44, 47–49, 52, 53, 56–59, 62, 63, 65–68, 71–73, 77, 78, 81, 82, 85, 86, and 88–91 would have been obvious over Begemann, Krames, and Allen. Patent Owner provides no arguments regarding these claims outside of the arguments discussed above. *See generally* Resp. Having reviewed Petitioner's arguments and supporting evidence, we are persuaded that Petitioner has established by a preponderance of the evidence that claims 22, 25, 26, 28, 30, 33, 35, 40, 42–44, 47–49, 52, 53, 56–59, 62, 63, 65–68, 71–73, 77, 78, 81, 82, 85, 86, and 88–91 are unpatentable under § 103(a) over Begemann, Krames, and Allen.

> 5.    Ground Two: Unpatentability over Begemann,
> Nakamura, Allen, and Krames

Petitioner asserts that claims 21, 22, 25, 26, 28–30, 32–36, 40–44, 47–49, 52, 53, 56–59, 62, 63, 65–68, 71–73, 77, 78, 81, 82, 85, 86, and 88–91 are unpatentable under 35 U.S.C. § 103(a) as obvious over Begemann,

62

**Appx128**

IPR2022-00847
Patent 6,465,961 C2

Nakamura, Allen, and Krames, citing the Declaration of Dr. Michael S. Lebby for support. Pet. 104–116 (citing Ex. 1006). To the extent Petitioner's assertions and Patent Owner's counter arguments do not relate to Nakamura, we address those issues above when addressing Ground One and, for brevity, we do not repeat that analysis here.

Petitioner argues that Nakamura teaches an LED chip appropriate for combination with Begemann and that Nakamura's LED chip teaches claim 21's recited reflective layers. Pet. 30, 104–115. But, as we explain below, Patent Owner persuasively argues that the Nakamura chip embodiment having the required reflective layers is a chip for a laser rather than an LED. Resp. 51–53. Because the embodiment with reflective layers is a laser chip, Petitioner does not adequately establish that a person of ordinary skill in the art would have combined that chip with Begemann which seeks to use LED chips. Ex. 1007, 2:3–5, Figs. 2, 3A; *see also* Resp. 52–53.

Petitioner relies on the structure of Nakamura's Figure 11 to argue claim 21's recited chip layers would have been obvious. Pet. 104–115. Nakamura's Figure 11, most generally, depicts a "light emitting device according to the seventh embodiment of the present invention." Ex. 1009, 5:58–60, 19:43–45. Nakamura states that its invention "relates to a semiconductor light-emitting device such as a light-emitting diode (LED) or a laser diode (LD)." *Id.* at 1:7–11. Thus, the Figure 11 device, in general, could be either an LED or a laser diode.

Petitioner, however, also relies on Nakamura's text at 21:47–55 as disclosing a "light-reflecting film." Pet. 112–114. Here, the text indicates that it is "also possible" for the seventh embodiment "to dispose as a light-reflecting film a first multi-layered film 100." Ex. 1009, 21:47–50. Notably,

63

IPR2022-00847
Patent 6,465,961 C2

Figure 11 does not illustrate the reflective first multi-layered film 100. Rather, Nakamura is best understood as teaching that the light-reflecting film is an option that could be added to the seventh (Figure 11) embodiment.

Why would someone want to add the light-reflecting film option? Nakamura immediately answers the question. *Id.* at 21:56–22:27. In particular, Nakamura Figures 12 and 13 illustrate a "light-emitting device provided with such a light-reflecting film" and "these Figures illustrate a structure of a *laser device.*" *Id.* at 21:56–62 (emphasis added). Nakamura explains that the purpose of the light-reflecting multilayer film is to confine light "to easily allow the generation of laser oscillation." *Id.* at 22:1–11. In other words, while Figure 11 could be an LED chip of a laser diode chip, Nakamura strongly indicates that there would be no reason to add the light-reflecting multilayer film of Figures 12 and 13 unless you wished to generate laser oscillation. Resp. 51–53.

Petitioner argues that Nakamura teaches incorporating reflective layers into a "light-emitting device" and argues, based on testimony of Dr. Lebby, that reflective layers in a light-emitting device would be useful to create a "super-luminous LED." Reply 17–18 (emphasis omitted). Petitioner's argument is unpersuasive. Nakamura, for the reasons explained above, is best understood as teaching that its light-reflecting multilayer film is useful to generate laser oscillation for a laser. Nakamura does not mention super-luminous LEDs or suggest use of its light-reflecting multilayer film in an LED. Thus, even if super-luminous LEDs existed in the art, Petitioner's position fails to establish that a person having ordinary skill in the art would have understood that Nakamura suggests that its light-reflecting multilayer film would have been useful in an LED. Sur-Reply 26–27. Moreover, Patent

64

IPR2022-00847
Patent 6,465,961 C2

Owner provides credible evidence that adding the light-reflecting multilayer film into an LED would be inefficient. *Id.* at 26 (citing Ex. 2020 ¶¶ 158, 161; Ex. 2015, 34:7–23).

Thus, Petitioner has not met the burden of establishing by a preponderance of the evidence that a person having ordinary skill in the art would have had reason to incorporate Nakamura's light-reflecting multilayer film into an LED chip for Begemann. As such, Petitioner does not establish that Petitioner's stated theory of obviousness based on the combined teachings of Begemann, Nakamura, Allen, and Krames establishes the obviousness of claim 21 or any dependent claim.[18]

      6.     Ground Three: Unpatentability over Begemann, Sugiura, Allen, and Krames

Petitioner asserts that claims 21, 22, 25, 26, 28–30, 32–36, 40–44, 47–49, 52, 53, 56–59, 62, 63, 65–68, 71–73, 77, 78, 81, 82, 85, 86, and 88–91 are unpatentable under 35 U.S.C. § 103(a) as obvious over Begemann, Sugiura, Allen, and Krames, citing the Declaration of Dr. Michael S. Lebby for support. Pet. 116–130 (citing Ex. 1006). To the extent Petitioner's assertions and Patent Owner's counter arguments do not relate to Sugiura,

---

[18] We note that, above, we determine that Petitioner adequately established the obviousness of certain claims based on Begemann, Allen, and Krames (ground one). As a practical matter, a person having ordinary skill in the art would have also found the same claims obvious over Begemann, Nakamura, Allen, and Krames; the person having ordinary skill in the art could ignore Nakamura's laser teachings. The Petition's second ground nonetheless fails because the ground relies on Nakamura rather than Krames for its LED chip, and, as we explain, Petitioner has not adequately established that a person of ordinary skill in the art would have had reason to use the Nakamura chip with Begemann.

**Appx131**

IPR2022-00847
Patent 6,465,961 C2

we address those issues above when addressing Ground One and, for brevity, we do not repeat that analysis here.

Petitioner argues that Sugiura teaches an LED chip appropriate for combination with Begemann and that Sugiura's LED chip teaches claim 21's recited reflective layers. Pet. 30, 116–130. But Petitioner's argument is unpersuasive for reasons similar to why the argument regarding Nakamura failed. As we explain below, Patent Owner persuasively argues that the Sugiura chip embodiment having the required reflective layers is a chip for a laser rather than an LED. Resp. 58–59. Because the embodiment with reflective layers is a laser chip, Petitioner does not adequately establish that a person of ordinary skill in the art would have combined that chip with Begemann which seeks to use LED chips. Ex. 1007, 2:3–5, Figs. 2, 3A; *see also* Resp. 58–59.

Petitioner relies on the structure of Sugiura Figure 7 to argue claim 21's recited chip layers would have been obvious. Pet. 116–130. Petitioner alleges that $SiO_2$ film 43 is a first reflective layer and either a metal back reflector (as taught by Krames) or the interface between the substrate (layer 30) and the buffer layer (combination of layers 32 and 33) is a second reflective layer. Pet. 126–128.

Figure 7 of Sugiura, however, shows "the structure of the nitride-based semiconductor *laser* according to a second embodiment of the present invention." Ex. 1010, 12:21–23 (emphasis added). Sugiura teaches that "$SiO_2$ film 43 is selectively formed in order to narrow the current." *Id.* at 12:40–45. Dr. Shealy persuasively explains that "narrowing the current" is contrary to LED design which seeks to spread the current. Ex. 2020 ¶ 187.

66

IPR2022-00847
Patent 6,465,961 C2

Dr. Shealy states "[c]urrent narrowing can be an effective strategy in an edge-emitting laser, but it is destructive to efficiency in an LED." *Id.*

Petitioner argues that Sugiura expressly teaches that Figure 7 may be a laser or an LED device. Reply 19. Petitioner is correct in this regard. Ex. 1010, 14:58–67 ("Although this embodiment [Figure 7] has been described above with reference to the case it is applied to a laser, . . . the present invention can be applied not only to a nitride-based semiconductor laser but also to a light-emitting diode [LED]".). This teaching, however, does not mean that a person having ordinary skill in the art would have chosen to include $SiO_2$ film 43 when implementing Figure 7 as an LED. Rather, Sugiura suggests that $SiO_2$ film 43 is "selectively formed" only when it is desirable to narrow the current (Ex. 1010, 12:21–23), and the preponderance of the evidence supports that a person having ordinary skill in the art would have had no need to narrow the current of an LED (Ex. 2020 ¶ 187). As such, the preponderance of the evidence suggests that if a person having ordinary skill in the art were to implement Sugiura Figure 7 as an LED, $SiO_2$ film 43 would have been omitted.

Petitioner also argues that laser design is "intimately related to LEDs." Reply 20 (emphasis omitted). The evidence supports such a relationship. The argument, however, does not persuasively explain why structure for narrowing current such as Sugiura's $SiO_2$ film 43 would be appropriate for an LED.

Thus, Petitioner has not met the burden of establishing by a preponderance of the evidence that a person having ordinary skill in the art would have had reason to incorporate Sugiura's $SiO_2$ film 43 into an LED chip for Begemann. As such, Petitioner does not establish that Petitioner's

67

**Appx133**

IPR2022-00847
Patent 6,465,961 C2

stated theory of obviousness based on the combined teachings of Begemann, Sugiura, Allen, and Krames establishes the obviousness of claim 21 or any dependent claim.[19]

## IV.    CONCLUSION

Based on the evidence presented with the Petition, the evidence introduced during the trial, and the parties' respective arguments, Petitioner has shown by a preponderance of the evidence that claims 21, 22, 25, 26, 28–30, 32–36, 40, 42–44, 47–49, 52, 53, 56–59, 62, 63, 65–68, 71–73, 77, 78, 81, 82, 85, 86, and 88–91 of U.S. Patent No. 6,465,961 C2 are unpatentable.[20] Petitioner has not shown by a preponderance of the evidence that claim 41 of U.S. Patent No. 6,465,961 C2 is unpatentable.

In summary:

| Claim(s) | 35 U.S.C. § | Reference(s)/Basis | Claims Shown Unpatentable | Claims Not Shown Unpatentable |
|---|---|---|---|---|
| 21, 22, 25, 26, 28–30, | 103(a) | Begemann, Krames, Allen | 21, 22, 25, 26, 28–30, 32–36, | 41 |

---

[19] We note that, although claims would have been obvious based on Begemann, Allen, and Krames (ground one), the Petition's third ground fails because the ground relies on Sugiura rather than Krames for its LED chip, and, as we explain, there would not have been good reason to use a Sugiura chip having $SiO_2$ film 43 with Begemann.

[20] Should Patent Owner wish to pursue amendment of the challenged claims in a reissue or reexamination proceeding subsequent to the issuance of this decision, we draw Patent Owner's attention to the April 2019 *Notice Regarding Options for Amendments by Patent Owner Through Reissue or Reexamination During a Pending AIA Trial Proceeding. See* 84 Fed. Reg. 16,654 (Apr. 22, 2019). If Patent Owner chooses to file a reissue application or a request for reexamination of the challenged patent, we remind Patent Owner of its continuing obligation to notify the Board of any such related matters in updated mandatory notices. *See* 37 C.F.R. § 42.8(a)(3), (b)(2).

IPR2022-00847
Patent 6,465,961 C2

| Claim(s) | 35 U.S.C. § | Reference(s)/Basis | Claims Shown Unpatentable | Claims Not Shown Unpatentable |
|---|---|---|---|---|
| 32–36, 40–44, 47–49, 52, 53, 56–59, 62, 63, 65–68, 71–73, 77, 78, 81, 82, 85, 86, 88–91 | | | 40, 42–44, 47–49, 52, 53, 56–59, 62, 63, 65–68, 71–73, 77, 78, 81, 82, 85, 86, 88–91 | |
| 21, 22, 25, 26, 28–30, 32–36, 40–44, 47–49, 52, 53, 56–59, 62, 63, 65–68, 71–73, 77, 78, 81, 82, 85, 86, 88–91 | 103(a) | Begemann, Nakamura, Allen, Krames | | 21, 22, 25, 26, 28–30, 32–36, 40–44, 47–49, 52, 53, 56–59, 62, 63, 65–68, 71–73, 77, 78, 81, 82, 85, 86, 88–91 |
| 21, 22, 25, 26, 28–30, 32–36, 40–44, 47–49, 52, 53, 56–59, 62, 63, 65–68, 71–73, 77, 78, 81, 82, 85, 86, 88–91 | 103(a) | Begemann, Sugiura, Allen, Krames | | 21, 22, 25, 26, 28–30, 32–36, 40–44, 47–49, 52, 53, 56–59, 62, 63, 65–68, 71–73, 77, 78, 81, 82, 85, 86, 88–91 |
| **Overall Outcome** | | | 21, 22, 25, 26, 28–30, 32–36, 40, 42–44, 47–49, 52, 53, 56–59, 62, 63, 65–68, 71–73, 77, 78, 81, 82, 85, 86, 88–91 | 41 |

69

IPR2022-00847
Patent 6,465,961 C2

## V. ORDER

For the foregoing reasons, it is

ORDERED that Petitioner establishes by a preponderance of the evidence that claims 21, 22, 25, 26, 28–30, 32–36, 40, 42–44, 47–49, 52, 53, 56–59, 62, 63, 65–68, 71–73, 77, 78, 81, 82, 85, 86, and 88–91 of U.S. Patent No. 6,465,961 C2 are unpatentable;

FURTHER ORDERED that Petitioner does not establish by a preponderance of the evidence that claim 41 of U.S. Patent No. 6,465,961 C2 is unpatentable;

FURTHER ORDERED that Patent Owner's Motion to Exclude Exhibit 1028 is *denied*;

FURTHER ORDERED that Petitioner's Motion to Exclude Exhibits 2017 and 2030 is *dismissed as moot*; and

FURTHER ORDERED that, because this is a Final Written Decision, the parties to the proceeding seeking judicial review of the decision must comply with the notice and service requirements of 37 C.F.R. § 90.2.

70

IPR2022-00847
Patent 6,465,961 C2

PETITIONER:

John Alemanni
Matias Ferrario
Andrew Saul
KILPATRICK TOWNSEND & STOCKTON LLP
jalemanni@kilpatricktownsend.com
mferrario@kilpatricktownsend.com
asaul@kilpatricktownsend.com

Sanjeet Dutta
GOODWIN PROCTER LLP
sdutta@goodwinlaw.com

Ryan Dykal
Mark Schafer
SHOOK, HARDY & BACON, LLP
rdykal@shb.com
mschafer@shb.com

PATENT OWNER:

Joshua Larsen
Paul Hunt
Adam Kaufmann
BARNES & THORNBURG LLP
Joshua.larsen@btlaw.com
Paul.hunt@btlaw.com
Adam.kaufmann@btlaw.com

Ronald E. Cahill
BARNES & THORNBURG LLP
rcahill@nutter.com

Kevin B. Laurence
LAURENCE & PHILLIPS IP LAW
klaurence@lpiplaw.com

71

Trials@uspto.gov
571-272-7822

Paper 63
Entered: September 28, 2023

UNITED STATES PATENT AND TRADEMARK OFFICE

_____

BEFORE THE PATENT TRIAL AND APPEAL BOARD

_____

WOLFSPEED, INC. and IDEAL INDUSTRIES LIGHTING, LLC d/b/a
CREE LIGHTING
,
Petitioner,

v.

CAO LIGHTING, INC.,
Patent Owner.

_____

IPR2022-00848
Patent 6,634,770 C3

_____

Before GRACE KARAFFA OBERMANN, CHRISTOPHER M. KAISER,
and BRIAN D. RANGE, *Administrative Patent Judges*.

RANGE, *Administrative Patent Judge*.

JUDGMENT
Final Written Decision
Determining Some Challenged Claims Unpatentable
*35 U.S.C. § 318(a)*

IPR2022-00848
Patent 6,634,770 C3

## I.    INTRODUCTION

Wolfspeed, Inc. and IDEAL Industries Lighting, LLC d/b/a Cree Lighting ("Cree") (collectedly, "Petitioners") filed a Petition requesting *inter partes* review of claims 18, 22, 25, 26, 28–30, 32–36, 40–44, 47–49, 52, 53, 56–59, 62, 63, 65–68, 70–73, 77, 78, 81, 82, 85, 86, and 88–91 (the "Challenged Claims") of U.S. Patent No. 6,634,770 C3 (Ex. 1001, "the '770 patent"). Paper 1 ("Pet."). We instituted *inter partes* review of the challenged claims on all asserted grounds. Paper 10 ("Dec"). After institution, Patent Owner filed a Patent Owner Response (Paper 31, "Resp."), Petitioner filed a Reply (Paper 42, "Reply"), and Patent Owner filed a Sur-Reply (Paper 46, "Sur-Reply"). An oral hearing was held on July 18, 2023, and a transcript of the hearing is included in the record (Paper 59, "Tr.").

We have jurisdiction under 35 U.S.C. § 6. This decision is issued pursuant to 35 U.S.C. § 318(a). For the reasons that follow, we determine that Petitioner has shown, by a preponderance of the evidence, that claims 21, 22, 25, 26, 28–30, 32–36, 40, 42–44, 47–49, 52, 53, 56–59, 62, 63, 65–68, 71–73, 77, 78, 81, 82, 85, 86, and 88–91 of the '770 patent are unpatentable. We determine that Petitioner has not shown, by a preponderance of the evidence, that claim 41 is unpatentable.

## II.    BACKGROUND

### A.    *Related Matters*

The parties indicate that the '770 patent is the subject of the following district court proceedings: *CAO Lighting, Inc. v. Cree, Inc. et al.*,[1] No. 1:21-

---

[1] Petitioner states that "Cree, Inc., a named defendant in the Underlying Litigation, is now Wolfspeed, Inc." Pet. 115 n.3.

IPR2022-00848
Patent 6,634,770 C3

cv-00634 (M.D.N.C.) ("the parallel district court litigation"). Pet. 115; Paper 4, 1. Patent Owner also identifies the following proceedings as related matters: *CAO Group v. GE Lighting et al.*, 2-11-cv-00426 (District of Utah), *CAO Lighting, Inc. v. GE Lighting, Inc.*, No. 1:20-cv-00681 (D. Del.), I*nter Partes* Reexamination Control No. 95/000,678, *inter partes* Reexamination Control No. 95/002,242, and *Ex Parte* Reexamination Control No. 90/012,959. Paper 4, 1.

### B.    The '770 Patent

The '770 patent originally issued with claims 1–17. Ex. 1001, 9:52–12:20. Claims 1–6, 8, 10–15, and 17 were disclaimed during a first reexamination. *Id.* at Dec. 3, 2013, Inter Partes Reexamination Certificate ("IPRC") 1:12–13. Claims 7, 9, and 16 were cancelled in a third reexamination, and claims 18–96 were added. *Id.* at Sept. 8, 2014, Ex Parte Reexamination Certificate ("EPRC") 1:26–8:41.

The '770 patent is titled "Light Source Using Semiconductor Devices Mounted on a Heat Sink." *Id.* at code (54). According to the '770 patent, "[p]rior art semiconductor light sources have not been successfully and economically used to illuminate physical spaces." *Id.* at 1:19–21. The '770 patent states "[t]ypical prior art LED modules lack high light intensity due to the size of the LED chips used." *Id.* at 1:23–25. In view of this, the '770 patent states there is a need "in the prior art for a semiconductor light source for use in illuminating a space with single color light in the visible range and which can efficiently dissipate the heat that they produce." *Id.* at 1:46–49.

We reproduce Figure 1 of the '770 patent below.

3

IPR2022-00848
Patent 6,634,770 C3



**Fig. 1**

Figure 1 shows a semiconductor light source that uses a high power chip or array arrangement. *Id.* at 1:65–67. Semiconductor light source 100 includes enclosure 101 having interior volume 102. *Id.* at 2:49–52, 3:9. Enclosure 101 may be mounted to support 105. *Id.* at 3:15. Semiconductor light source 100 further includes base 103, which "may be configured as a fitting or connector for use in a desired light socket." *Id.* at 3:15–18. Heat sink 104 is further located within interior volume 102. *Id.* at 3:22–23. The '770 patent describes heat sink 104 as having "a generally flat or planar top 104a, and a plurality of generally flat or planar panels or compartment 104b, 104c, 104d, 104e, 104f, 104g, 104h, 104i, etc. each of which may host a single or an

4

**Appx141**

IPR2022-00848
Patent 6,634,770 C3

array of semiconductor devices capable of producing light." *Id.* at 3:24–29. In addition, at least one semiconductor device 106 is mounted on heat sink 104. *Id.* at 3:37–38. The '770 patent describes the use of "high power" LEDs by stating that "'[h]igh power' LED's means that the light output from each LED module is greater than 40 milliwatts." *Id.* at 4:6–7.

We reproduce Figure 3d of the '770 patent below.



**Fig. 3d**

Figure 3d illustrates an LED structure on a sapphire substrate. *Id.* at 2:9–10. The structure includes electrically conductive substrate 1212, buffer layer 1213, cladding layer 1214, active layer 1215 where energy is converted to light, cladding layer 1216, and contact layer 1217. *Id.* at 5:11–20.

C.    *Illustrative Claims*

Petitioner challenges claims 18, 22, 25, 26, 28–30, 32–36, 40–44, 47–49, 52, 53, 56–59, 62, 63, 65–68, 70–73, 77, 78, 81, 82, 85, 86, and 88–91. Pet. 11. Claim 18 depends from claim 9, which was cancelled during reexamination. Ex. 1001, EPRC 1:28. Claim 9 depended from claim 1,

5

IPR2022-00848
Patent 6,634,770 C3

which was also disclaimed. *Id.* at 10:52, EPRC 1:27. The remaining

challenged claims directly or indirectly depend from claim 18. EPRC 1:51–

8:22. Therefore, we treat claim 18 as the sole independent claim. To reflect

claim 18's full scope, we reproduce claims 1, 9, and 18 below.

> 1.    A semiconductor light source for emitting light to illuminate a space used by humans, the semiconductor light source comprising:
>
> an enclosure, said enclosure being fabricated from a material substantially transparent to white light,
>
> a base to which said enclosure is mounted,
>
> an interior volume within said enclosure,
>
> a secondary heat sink located in said interior volume, said secondary heat sink being capable of drawing heat from one or more semiconductors devices,
>
> a plurality of primary heat sinks mounted on said secondary heat sink, each of said primary heat sinks being smaller than said secondary heat sink,
>
> a semiconductor chip capable of emitting light mounted on one of said primary heat sinks, said semiconductor chip being capable of emitting monochromatic light, said semiconductor chip being selected from the group consisting of light emitting diodes, light emitting diode arrays, laser chips, and VCSEL chips,
>
> said chip including a substrate on which epitaxial layers are grown,
>
> a buffer layer located on said substrate, said buffer layer serving to mitigate differences in material properties between said substrate and other epitaxial layers,
>
> a first cladding layer serving to confine electron movement within the chip, said first cladding layer being adjacent said buffer layer,
>
> an active layer, said active layer emitting light when electrons jump to a valance state,

6

**Appx143**

IPR2022-00848
Patent 6,634,770 C3

a second cladding layer, said second cladding layer positioned so that said active layer lies between cladding layers, and

a contact layer on which an electron may be mounted for powering said chip, and

a coating for converting monochromatic light emitted by said chip to white light.

9.     A device as recited in claim 1 wherein said substrate is electrically conductive.

18.     The semiconductor light source as recited in claim 9 wherein:

said semiconductor chip is a light emitting diode (LED) chip configured to output light at greater than about 40 milliwatts,

said LED chip is surface mounted on said one of said primary heat sinks, and

said LED chip is configured to emit monochromatic visible light.

Ex. 1001, 9:52–10:21, 10:52–53, 32.

### D.     *Asserted Grounds of Unpatentability*

Petitioner, supported by the declaration of Michael S. Lebby, Ph.D. (Ex. 1006), asserts the following two grounds of unpatentability (Pet. 13):[2]

---

[2] The relevant sections of the Leahy-Smith America Invents Act ("AIA"), Pub. L. No. 112–29, took effect on March 16, 2013. The application that issued as the '770 patent was filed before this date. *See* Ex. 1001, code (22). For the purposes of this Decision, pre-AIA statutes apply.

7

**Appx144**

IPR2022-00848
Patent 6,634,770 C3

| Claims Challenged | 35 U.S.C. § | References/Basis |
|---|---|---|
| 18, 22, 25, 26, 28–30, 32–36, 40–44, 47–49, 52, 53, 56–59, 62, 63, 65–68, 70–73, 77, 78, 81, 82, 85, 86, 88–91 | 103(a) | Begemann,[3] Krames,[4] Allen[5] |
| 18, 22, 25, 26, 28–30, 32–36, 40–44, 47–49, 52, 53, 56–59, 62, 63, 65–68, 70–73, 77, 78, 81, 82, 85, 86, 88–91 | 103(a) | Begemann, Sugiura,[6] Allen, Krames |

## III.    ANALYSIS

### A.    Patent Owner's Motion to Exclude Exhibit 1028

Patent Owner moves to exclude the Declaration of Michael R. Krames, Exhibit 1028 ("the Krames declaration"). Paper 52, *passim* ("PO Mot."); *see also* Paper 57 ("Patent Owner Reply in Support of Motion to Exclude") ("PO Reply"). Petitioner opposes the motion. Paper 53 ("Pet. Opp."). Patent Owner argues that the Petition is based on the contention that the Krames reference teaches that its LED chip achieves "[a] power output of over 170 mW … at a drive current of 1.5 A dc." PO Mot. 3–4 (quoting Pet. 52–53). Patent Owner responded to the Petition, in part, by showing, via expert declarations, that use of the Krames chip at 170 mW with a drive

---

[3] WO 00/17569, published March 30, 2000, Ex. 1007 ("Begemann").

[4] Krames et al., *High-brightness AlGaInN light-emitting diodes*, Proc. SPIE 3938, LIGHT-EMITTING DIODES: RESEARCH, MANUFACTURING, AND APPLICATIONS IV (2000), Ex. 1008 ("Krames"). The publication status of the Krames reference is disputed, and we address that dispute in Section III.E, *infra*.

[5] WO 99/57945, published November 11, 1999, Ex. 1011 ("Allen").

[6] US 6,015,979, issued January 18, 2000, Ex. 1010 ("Sugiura").

8

**Appx145**

IPR2022-00848
Patent 6,634,770 C3

current of 1.5 A dc "would cause the LEDs and the Begemann device to burn up." PO Mot. 5 (citing Resp. 33).

Petitioner filed the Krames declaration in support of its Reply. PO Mot. 5; *see also* Reply; Ex. 1028. The Krames declaration states that a person of ordinary skill in the art ("POSITA") would not have "entertained" a drive current of 1.5 amps in product development, and would instead use lower amperage. PO Mot. 6 (citing Ex. 1028 ¶ 22).

Patent Owner argues that the Krames declaration does not properly address the Patent Owner Response in accordance with 37 C.F.R. § 42.23(b). PO Mot. 9–10. Patent Owner argues that the declaration instead changes "the starting point from Cree's own Petition." *Id.* Patent Owner further argues that the Krames declaration is irrelevant, because it does not relate to whether or not a person of ordinary skill in the art "would have been motivated to combine the 1.5/170 milliwatt LED chip from the Krames article with the LED light of Begemann" with "a reasonable expectation of success." *Id.* at 10–11. Patent Owner also seeks to exclude the declaration pursuant to Federal Rule of Evidence 403 because unfair prejudice outweighs probative value, and under Federal Rule of Evidence 702(d) because Dr. Krames does not apply his principles and methods to the facts of the case. *Id.* at 11–12.

Patent Owner's argument is unpersuasive because the Krames declaration addresses the Patent Owner Response and is relevant to the issues at hand. We start with an important observation: claim 18 (the only independent claim at issue) is an apparatus claim; the claim is directed to a "semiconductor light source." Ex. 1001, 9:52, EPRC 1:32. One requirement of this apparatus is that it comprise "a semiconductor chip" (*id.* at 9:66) where "said semiconductor chip is a light emitting diode (LED) chip

9

IPR2022-00848
Patent 6,634,770 C3

configured to output light at greater than about 40 milliwatts." Ex. 1001, EPRC, 1:34–36. As we explain when addressing claim construction, *infra*, we adopt Patent Owner's proposed construction (Resp. 14) of "said semiconductor chip is a light emitting diode (LED) chip configured to output light at greater than about 40 milliwatts" as referring to "a semiconductor LED chip *capable of* emitting light greater than about 40 milliwatts." *See* Section III.D, *infra* (emphasis added).

Because of these recitations, Petitioner bears the burden of establishing that the prior art teaches or suggests a semiconductor LED chip "capable of emitting light greater than about 40 milliwatts." As explained herein, we determine that in the Petition, Petitioner met this burden by establishing by a preponderance of the evidence that the Krames reference teaches an LED chip that has this capability. Pet. 53 (quoting Ex. 1008, 10). Notably, claim 18 does *not* require actual operation of anything at greater than 40 milliwatts because claim 21 is not a method claim. Petitioner never had a burden of establishing a method of running the Krames reference's LED at this power output within a semiconductor light source.

Petitioner's unpatentability grounds are not based upon Krames alone. Pet. 13. Claim 18 is directed to a greater lightbulb structure and also a structure related to the semiconductor chip for the semiconductor light source. Ex. 1001, 9:52–10:21, EPRC 1:32–40. Petitioner relies on Begemann as teaching semiconductor light source aspects aside from structure of the chip. *See, e.g.,* Pet. 31–42. Petitioner relies on Krames as teaching semiconductor chip structure. *See, e.g.,* Pet. 42–54.

Because Petitioner's unpatentability ground relies on both Krames and Begemann, Petitioner also bears the burden of establishing by a preponderance of the evidence that a person of ordinary skill in the art would

10

**Appx147**

IPR2022-00848
Patent 6,634,770 C3

have used Krames's semiconductor chip as the chip in Begemann's lightbulb structure. To meet this burden, Petitioner establishes that Begemann teaches use of an LED chip but does not teach a specific chip. Pet. 27–28 (citing, e.g., Ex. 1007, 2:3–5; 4:30–32). Petitioner also establishes that Krames teaches an appropriate chip that has the same goal as Begemann. *Id.* at 28 (citing, e.g., Ex. 1008, 6; Ex. 1007, 2:3–5). We determine that Petitioner's evidence, absent rebuttal evidence, is sufficient to establish that a person of ordinary skill in the art would have had a "high expectation of success" in mounting Krames's chips as LEDs 4 of Figure 3 of Begemann. *Id.* (citing Ex. 1006 ¶ 86).

Against this backdrop, Patent Owner argues that a person of ordinary skill in the art would *not* have combined Krames's LEDs with Begemann's device. Resp. 30–35. Of particular relevance here, Patent Owner argues that a person of ordinary skill in the art "would not have expected Begemann's heat dissipating structure to be able to handle the heat generated by Krames' higher-powered LEDs." *Id.* 31–32.

In Reply, Petitioner uses the Krames declaration (Ex. 1028) to argue, for example, that a person of ordinary skill in the art would have used a lower amperage than the 1.5 A dc that Patent Owner's Response focuses on. Reply 6 (citing Ex. 1028 ¶ 22). This use of the Krames declaration is timely because it responds to an argument Patent Owner makes in the Patent Owner Response. 37 C.F.R. § 42.23(b) ("A reply may only respond to arguments raised in … patent owner response.").

As to relevancy and whether the Krames declaration is applicable to the facts of this case, the issues at hand are (1) whether or not a person having ordinary skill would have had reason to use the Krames LED with Begemann with a reasonable expectation of success and (2) whether or not

11

IPR2022-00848
Patent 6,634,770 C3

the Krames LED is capable of outputting light at greater than about 40 milliwatts. Again, we emphasize that claim 18 does not recite a method where the LED within the recited semiconductor light source actually outputs greater than about 40 milliwatts.

The Krames declaration is relevant to the facts of this case because the declaration has bearing on whether or not a person of ordinary skill in the art would have combined the Krames reference's LED with Begemann's lightbulb design. *See, e.g.*, Ex. 1028 ¶ 22. Patent Owner argues that evidence must be relevant to motivation to combine "an LED chip from the Krames article (operating at 1.5 amps to produce 170 milliwatts of output)" but claim 21 has no "operating at 1.5 amps to produce 170 milliwatts of output" requirement. What is relevant is that Krames discloses a single chip that has the capability of outputting more or less light depending on operating conditions. Pet. Opp. 3; *see also* Ex. 1008, 8 (providing that Figure 12 of the Krames reference is described as illustrating "[l]ight output vs. current characteristic of a blue … 1x1 $mm^2$ AlGaInN LED in a power package, compared to a conventional AlGaInN LED in a 5 mm lamp a package"). Because claim 18 does not require actually running the recited LED at any particular wattage or amperage, it is appropriate for the Krames declaration to rebut Patent Owner's argument that a person of ordinary skill would not have considered using the Krames LED with Begemann at high amperage by explaining that a person of ordinary skill in the art would have considered using the exact same Krames LED with Begemann at a low amperage instead and that this lower amperage would not generate excessive heat. The fact that the Krames LED is configured to run at the high amperage if desired for a different application does not negate the rationale for combining the Krames LED to run at a lower amperage.

12

**Appx149**

IPR2022-00848
Patent 6,634,770 C3

With respect to prejudice outweighing probative value, the probative value is high because the Krames declaration directly bears on a key issue: reason to combine with reasonable expectation of success. Also, the prejudice is minimal because Patent Owner could have, in the Patent Owner Response, addressed the general issue of whether a person having ordinary skill in the art would have had reason to combine Begemann's teachings with the Krames reference LED under *any* operating conditions.

In the Reply Brief, Patent Owner argues that the statement of material facts in Patent Owner's motion should be considered admitted because Petitioner did not specifically deny them. PO Reply 2. As explained above, Petitioner refutes Patent Owner's framing of the motion to exclude in relevant respects. Also, 37 C.F.R. § 42.23(a) states, with our emphasis added, that "[a]ny material fact not specifically denied *may* be considered admitted." In the interest of justice, we decline to consider the statement of material facts admitted; *see also* 37. C.F.R. § 42.5(b) ("The Board may waive or suspend a requirement of parts 1, 41, and 42.").[7]

Thus, for the reasons explained above, we deny Patent Owner's motion to exclude Exhibit 1028.

B.     *Petitioner's Motion to Exclude Exhibits 2017 and 2030*

Petitioner seeks to exclude Exhibit 2017 as hearsay. Paper 51, 1 ("Pet. Mot."); *see also* Paper 56 (Petitioner's Reply in support of Motion to Exclude). Exhibit 2017 is entitled "SOLID STATE LIGHTING CATALOG," and Patent Owner states that the catalog is from 2015. Resp.

---

[7] The parties also dispute whether or not Patent Owner's motion to exclude is procedurally proper. Pet. Opp. 9; PO Reply 4–5. We need not address this issue because we deny the motion to exclude for the reasons we explain here.

13

**Appx150**

IPR2022-00848
Patent 6,634,770 C3

48. Patent Owner argues that the catalog shows "expansion and breadth of its patented Dynasty LED lamp business." *Id.* Patent Owner argues that Exhibit 2017 is an admissible business record. Paper 54, 2–4 ("PO Opp.").

As explained herein, we ultimately determine that Petitioner meets its burden of establishing by a preponderance of the evidence that claims 18, 22, 25, 26, 28–30, 32–36, 40–44, 47–49, 52, 53, 56–59, 62, 63, 65–68, 70–73, 77, 78, 81, 82, 85, 86, and 88–91 of the '770 patent are unpatentable even if we fully consider Exhibit 2017. Moreover, we determine that Petitioner does not meet its burden of establishing that claim 41 of the '770 is unpatentable, and our determination would be the same even if we do not consider Exhibits 2017. As such, we dismiss Petitioner's Motion to Exclude as moot.

## C.    Level of Ordinary Skill in the Art

In order to determine whether an invention would have been obvious at the time the application was filed, we consider the level of ordinary skill in the pertinent art at the critical time. *Graham v. John Deere Co.*, 383 U.S. 1, 17 (1966). The resolution of this question is important because it allows us to "maintain[] objectivity in the obviousness inquiry." *Ryko Mfg. Co. v. Nu–Star, Inc.*, 950 F.2d 714, 718 (Fed. Cir. 1991). In assessing the level of ordinary skill in the art, various factors may be considered, including the "type of problems encountered in the art; prior art solutions to those problems; rapidity with which innovations are made; sophistication of the technology; and educational level of active workers in the field." *In re GPAC, Inc.*, 57 F.3d 1573, 1579 (Fed. Cir. 1995) (quotation omitted). Generally, it is easier to establish obviousness under a higher level of ordinary skill in the art. *Innovention Toys, LLC v. MGA Entm't, Inc.*, 637 F.3d 1314, 1323 (Fed. Cir. 2011) ("A less sophisticated level of skill

14

**Appx151**

IPR2022-00848
Patent 6,634,770 C3

generally favors a determination of nonobviousness . . . while a higher level
of skill favors the reverse.”).

> Petitioner proposes a level of ordinary skill in the art as follows:

> As of the '770 Patent's claimed priority date (August 24, 2001),
> a POSITA would have had at least a bachelor's degree in an
> engineering discipline with coursework in semiconductors
> and/or optoelectronics, and three or more years of experience
> working in the semiconductor and/or optoelectronics fields. Less
> work experience may be compensated by a higher level of
> education with the foregoing coursework.

Pet. 19–20 (citing Ex. 1006 ¶ 34). Patent Owner provides a different
description of the level of ordinary skill in the art:

> The POSITA for the '770 Patent would have at least a bachelor of
> science degree in electrical engineering, physics, materials science, or
> a similar area of study, so as to understand the basic principles of light
> and LED design and operation. Ex. 2018 at ¶19. The POSITA would
> also have experience related to LED lighting products, LED chip
> technology and applications, and/or LED packaging techniques for a
> period of at least one year. *Id.* In addition, the POSITA would
> understand, generally, how to implement LED chips and packages in
> the design and/or application of general-purpose lighting products for
> use in residential and commercial (or industrial) buildings and
> structures as well as outdoor spaces used by humans (such as roads,
> streets, parking lots, pathways, etc.). *Id.*

Resp. 15–16.

We agree with Patent Owner that the challenged claims relate to light
fixtures, LED packaging, and LED chip layer structure and that the '770
patent claims reflect "a hybrid of the light bulb art and semiconductor art."
Resp. 16. The prior art of record, for example, Begemann, likewise reflects
"a hybrid of the light bulb art and semiconductor art." *Id.* (quoting Pet. 28).
Petitioner's expert, Dr. Lebby, agreed that a person having ordinary skill in

15

IPR2022-00848
Patent 6,634,770 C3

the art would need to be "familiar with thermal issues." Ex. 2015, 26:15–28:16.

While Petitioner's proposed description of a person having ordinary skill in the art could, in some instances, be sufficient to qualify a person as having ordinary skill, Patent Owner's proposal is a more complete and accurate description of the level of skill commensurate with the scope of the challenged '770 patent claims. Patent Owner's description appears consistent with the prior art and patent specification before us and is supported by witness testimony. *See Okajima v. Bourdeau*, 261 F.3d 1350, 1355 (Fed. Cir. 2001) (prior art itself may reflect an appropriate level of skill). For the purpose of this Decision, we adopt Patent Owner's description. We further note that the outcome of our decision would be the same under either party's asserted skill level.

### D.    *Claim Construction*

In an *inter partes* review proceeding based on a petition filed on or after November 13, 2018, a patent claim shall be construed using the same claim construction standard that would be used to construe the claim in a civil action under 35 U.S.C. § 282(b). 37 C.F.R. § 42.100(b) (as amended Oct. 11, 2018). This rule adopts the same claim construction standard used by Article III federal courts, which follow *Phillips v. AWH Corp.*, 415 F.3d 1303 (Fed. Cir. 2005) (en banc), and its progeny. Under this standard, the words of a claim are generally given their "ordinary and customary meaning," which is the meaning the term would have to a person of ordinary skill at the time of the invention, in the context of the entire patent including the specification. *See Phillips*, 415 F.3d at 1312–13.

Petitioner contends that "[t]he terms in the Challenged Claims should receive their ordinary and customary meaning as understood by a POSITA

16

IPR2022-00848
Patent 6,634,770 C3

in the context of the patent specification and prosecution history." Pet. 19 (citing Ex. 1006 ¶ 69).

Patent Owner argues the U.S. District Court for the District of Delaware held, with respect to related U.S. Patent 6,465,961, construed "a light emitting diode (LED) chip configured to output light at greater than about 40 milliwatts" as "at least one LED chip is capable of emitting light greater than about 40 milliwatts." Resp. 14 (citing Ex. 1024, 15–18). Petitioner responds that the phrase "needs no construction" and that Petitioner's grounds meet this construction.  Reply 1.

We note that the language of claim 18 does not precisely match the language the District Court considered, it is substantively the same. The record supports a construction very similar to the construction the District Court adopts, and we reference the District Court's reasoning. Ex. 1024, 15–18. We, thus, construe claim 18's recitation that "said semiconductor chip is a light emitting diode (LED) chip configured to output light at greater than about 40 milliwatts" as referring to "a semiconductor LED chip that is capable of emitting light greater than about 40 milliwatts."

It is unnecessary to construe any other claim terms in this Decision because none of the parties' disputes turn on the meaning of other terms. *See, e.g.*, *Nidec Motor Corp. v. Zhongshan Broad Ocean Motor Co.*, 868 F.3d 1013, 1017 (Fed. Cir. 2017).

### E.     *Prior Art Status of the Krames Reference*

Patent Owner argues that Petitioner fails to demonstrate that the Krames reference is prior art. Resp. 18–25. A reference may qualify as prior art if, for example, it is a printed publication. 35 U.S.C. § 102(a)(1); *see also* 35 U.S.C. § 103 (referring back to Section 102 when referencing prior art). Whether a reference qualifies as a "printed publication" is a legal conclusion

17

IPR2022-00848
Patent 6,634,770 C3

based on underlying factual determinations. *Suffolk Techs., LLC v. AOL Inc.*, 752 F.3d 1358, 1364 (Fed. Cir. 2014) (citation omitted). The determination of whether a document is a "printed publication" under 35 U.S.C. § 102(b) "involves a case-by-case inquiry into the facts and circumstances surrounding the reference's disclosure to members of the public." *In re Klopfenstein*, 380 F.3d 1345, 1350 (Fed. Cir. 2004). "Because there are many ways in which a reference may be disseminated to the interested public, 'public accessibility' has been called the touchstone in determining whether a reference constitutes a 'printed publication' bar under 35 U.S.C. § 102(b)." *Blue Calypso, LLC v. Groupon, Inc.*, 815 F.3d 1331, 1348 (Fed. Cir. 2016) (quoting *In re Hall*, 781 F.2d 897, 898–99 (Fed. Cir. 1986)). "A reference will be considered publicly accessible if it was 'disseminated or otherwise made available to the extent that persons interested and ordinarily skilled in the subject matter or art exercising reasonable diligence, can locate it.'" *Id.* (quoting *Kyocera Wireless Corp. v. Int'l Trade Comm'n*, 545 F.3d 1340, 1350 (Fed. Cir. 2008)).

The '770 patent was filed on August 24, 2001, and does not claim any earlier priority date. Ex. 1001, (22). We find that the record supports the following facts, and we determine that these facts, cumulatively, support that the Krames reference is prior art because it was a printed publication at least as of June 29, 2000:

1.    The Krames reference, on its face, indicates that it is an "Invited Paper." Ex. 1008, 1.

2.    The face of the Krames reference bears these indicia: "In *Light-Emitting Diodes: Research, Manufacturing, and Applications IV*, H. Walter

18

IPR2022-00848
Patent 6,634,770 C3

Yao, Ian T. Ferguson, E. Fred Schubert, Editors, Proceedings of SPIE[8] Vol. 3938 (2000) • 0277-786X/00/$15.00." *Id.* These indicia suggests that the Krames reference was published in the SPIE Proceedings volume ("the Proceedings") and the Proceedings were available to the public for fifteen dollars.

3.      Rachel J. Watters is a librarian and "Head of Resource Sharing for the University of Wisconsin-Madison's General Library System" located in Madison, Wisconsin. Ex. 1020, 1. Ms. Watters worked as a librarian with the University of Wisconsin library system since 1998. *Id.* Ms. Watters has a master's degree in Library and Information Studies. *Id.*

4.      When the University of Wisconsin-Madison Libraries received a volume, it was checked in, added to library holdings records, and made available to readers as soon as possible and, at most, within 2 to 3 weeks. *Id.* at 1–2.

5.      The University of Wisconsin-Madison Libraries catalogued the Proceedings as of June 29, 2000. *Id.* at 2; *see also id.* at Exhibit B, 27[9] (library record indicating June 29, 2000 "Receiving date" for the Proceedings).

6.      The Kurt Wendt Library at the University of Wisconsin-Madison owns the Proceedings of SPIE, 3938 that the Krames reference appears in. *Id.* at 2; *see also id.* at Ex. A (copy of excerpt of the Kurt Wendt Library's copy of the Proceedings).

---

[8] SPIE refers to "The International Society for Optical Engineering" or "The Society of Photo-Optical Instrumentation Engineers." Ex. 1020, Ex. A, 6, 8.

[9] Reference is made to the page number of Exhibit 1020: page 27 of 28.

IPR2022-00848
Patent 6,634,770 C3

7.    The Proceedings, on their face, indicate that papers from the Proceedings were presented at "26-27 January 2000 San Jose, California." Ex. 1020, Exhibit A, 6.

8.    Dr. Lebby attended this January 2000 conference. Ex. 1006 ¶ 75. Dr. Lebby also confirms that "proceedings from this conference were distributed to all members of SPIE as well as to libraries which had a subscription to the *Proceedings of SPIE*, so it was widely available to and accessible by those with skill in the art." *Id.*[10]

9.    The Proceedings indicate that papers included in the Proceedings volume "were selected by the conference program committee to be presented in oral or poster format." Ex. 1020, Exhibit A, 7.

10.    The Proceedings indicate a 2000 copyright date and further indicate that the volume was publicly available from the Copyright Clearance Center for fifteen dollars per article. *Id.*

11.    The excerpt of the library's Proceedings volume has a sticker in the upper left corner: "TK 7871.89 L53 2000." *Id.* at 6. The sticker suggests the volume was catalogued by the library in 2000. The table of contents page also bears hand writing that repeats similar indicia including "2000." *Id.* at 8–9.

12.    The library catalog record of the University of Wisconsin-Madison indicates that the Proceedings volume "was properly catalogued and could be found by or requested by a person of skill in the art of the subject matter of the foregoing article exercising reasonable diligence." Ex. 1020, 3.

---

[10] We note that Dr. Lebby does not directly state *when* the Proceedings were widely available. *See* Sur-Reply 14.

20

IPR2022-00848
Patent 6,634,770 C3

13.     Members of the interested public could locate the Proceedings volume on June 29, 2000, the date it was catalogued, "by searching the public library catalog or requesting a search through [Wisconsin TechSearch] WTS." *Id.*

The facts above are evidence of the Krames reference's publication as of June 29, 2000, because the facts tend to make the Krames reference's publication as of June 29, 2000, more probable than it would be without the evidence. *See* Fed. R. Evid. 401(a) (defining evidence as relevant "if it has any tendency to make a fact more or less probable than it would be without the evidence"). The evidence is sufficient to support publication. Meanwhile, no evidence of record suggests that Krames was *not* a printed publication as of June 29, 2000. Thus, a preponderance of the evidence supports Krames's prior art status.

Patent Owner argues that Ms. Watters "never establishes a firm date when Krames was purportedly available to the relevant public." Resp. 21. Patent Owner bases this argument by taking a tortured reading of Ms. Watters's statement that "[m]embers of the interested public could locate a copy of [the Proceedings] on or after June 29, 2000, the date it was catalogued." *Id.* (quoting Ex. 1020, 3); *see also* Sur-Reply 12–13. The best understanding of Ms. Watters's statement, in view of the context of Ms. Watters explaining the library's cataloguing process, is that a member of the interested public had two options: the person could choose to locate the Proceedings on June 29, 2000, or the person could choose to locate the Proceedings after June 29, 2000. Thus, the statement supports public availability as of June 29, 2000.

Patent Owner also argues that Exhibits A and B to the Watters declaration also do not establish when the Proceedings were available. Resp.

21

IPR2022-00848
Patent 6,634,770 C3

21–22. The Exhibits, however, serve to corroborate Ms. Watters's credible testimony as to when the Proceedings were available.

Patent Owner also argues that a person of ordinary skill in the art would not have been able to find the Krames article and argues that a prior, non-precedential board decision, *Salesforce.com, Inc. v. WSOU Investments, LLC*, IPR2022-00357, Paper 12 (PTAB July 13, 2022), is analogous. Resp. 20–21. But the *Salesforce* decision is distinguishable. The *Salesforce* patent claims related to, for example, interfacing two network environments via a message gateway and content reformatted in a vectorized format. *Salesforce.com, Inc.*, IPR2022-00357 at 3. Given this context, the panel determined that Petitioner did not establish a reasonable likelihood the Fox article was publicly accessible before the critical date because the MARC record was only "keyed to the title of the entire conference proceedings." *Id.* at 14. Because the conference proceedings were entitled "Proceedings of the 2002 International Conference on International Computing," the panel reasonably determined that a person having ordinary skill in the art would not have, with reasonable diligence, known to look in these proceedings to find information relevant to the claimed subject matter. *Id.* In *Salesforce*, the topic of the proceedings was very broad compared to the subject matter of the claims at issue.

In contrast, a person of ordinary skill in the art could have reasonably located the Krames article based on the title of the Proceedings. As a starting point, there is no dispute that Begemann is prior art. Begemann teaches an LED lamp fixture that makes use of LED chips, but it does not give very many details about the design of those chips. Ex. 1007, 1:1–14, 2:22–23, 5:13-18, Figs. 2, 3A, 3B. A person having ordinary skill in the art at the relevant time (August 24, 2001) would have sought out more information

22

IPR2022-00848
Patent 6,634,770 C3

about what different kinds of light emitting diodes could be manufactured for application with Begemann. *See* Section III.F.4.a, *infra*. As such, a person having ordinary skill in the art would have been very interested in a recent (2000) publication from a known technical society entitled "Light-Emitting Diodes: Research, Manufacturing, and Applications IV." Ex. 1008, 1; *see also* Ex. 1020, Exhibit A, 6. The evidence supports that the Proceeding's title was indexed such that a person of ordinary skill could find it, and this would have been sufficient to lead a person having ordinary skill in the art to the Krames article. Ex. 1020, 2–3; *see also* Reply 2–3.

Patent Owner also notes that the barcode on the back of Proceedings volume (Ex. 1020, Exhibit A, 24) has a different number than the barcode the ExLibris system states (Ex. 1020, Exhibit B, 26). Resp. 27. Patent Owner does not provide evidence explaining the import of this distinction. It is possible, for example, that the book has different barcodes for different purposes (for example, one for the manufacturer and another assigned to the library). Given that other indicia do not indicate any conflict or controversy regarding publication date, the evidence supports Ms. Watters's testimony establishing June 29, 2000, library indexing. Ex. 1020, 2–3.

Patent Owner further argues that Exhibit B has some unexplained features related to page number and volume availability. Resp. 23. Again, Patent Owner lacks evidence regarding the import of these observations.

Patent Owner argues that Ms. Watters does not provide evidence that she personally knew about publication of the Krames article. Resp. 24–25; Sur-Reply 11. This does not undermine Ms. Watters's credible testimony regarding her library's systems and when, based on the library's records, Krames was publicly available (indexed by the library in a useful fashion).

23

**Appx160**

IPR2022-00848
Patent 6,634,770 C3

To summarize, the record provides sufficient evidence supporting that Krames published by June 29, 2000. The record provides no evidence to the contrary. The weight of the evidence supports Krames's June 29, 2000, publication. As such, Petitioner has established by a preponderance of the evidence that Krames is a printed publication.

### F. Obviousness Analysis

#### 1. Obviousness: Legal Standard

A patent claim is unpatentable under 35 U.S.C. § 103(a) if the differences between the claimed subject matter and "the prior art are such that the subject matter, as a whole, would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains." *KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 406 (2007). The question of obviousness is resolved on the basis of underlying factual determinations including: (1) the scope and content of the prior art; (2) any differences between the claimed subject matter and the prior art; (3) the level of ordinary skill in the art; and (4) when in evidence, objective evidence of nonobviousness.. *Graham*, 383 U.S. at 17–18.

#### 2. Objective Indicia of Non-Obviousness

Patent Owner argues that commercial success and the combination of long-felt need, failure of others in the industry, and industry skepticism weigh in favor of patentability. Resp. 46–52. Petitioner argues that Patent Owner fails to show that commercial products embody and are coextensive with the challenged claims. Reply 19–21. For objective indicia of nonobviousness to be accorded substantial weight, its proponent must establish a nexus between the evidence and the merits of the claimed invention. *Lectrosonics, Inc. v. Zacom, Inc.*, IPR2018–01129, Paper 33 at 32 (PTAB Jan. 24, 2020) (precedential); *see also Fox Factory Inc. v. SRAM,*

24

IPR2022-00848
Patent 6,634,770 C3

*LLC*, 944 F.3d 1366, 1373 (Fed. Cir. 2019) (to establish objective indicia of non-obviousness, Patent Owner bears the burden of tying the objective evidence that embodies the claimed features).

Here, as to commercial success and industry praise, Patent Owner argues that Cree's "Embodying Products" meet the limitations of claim 18 of the '770 patent. Resp. 47. Then, Patent Owner argues that "Cree's Lighting Products segment" has been commercially successful. *Id.* at 48. Patent Owner also argues that Cree received praise "for its LED light bulbs." *Id.* Patent Owner does not establish, however, that the "Embodying Products" are the same as "Cree's Lighting Products segment" or "its LED light bulbs."

Just to the contrary, Patent Owner provides, for example, sales figures for lighting products "including the embodying products" (and, presumably, including other products as well). Ex. 2019 ¶ 46. Patent Owner's witness, Ms. Kindler, admits to assessing only revenues associated "with [Patent Owner's] Embodying Products as part of its Lighting Products segment." *Id.* Although Patent Owner provides evidence that Cree states that its "Lighting Products segment 'primarily consist[ed] of LED lighting systems and lamps,' which would include the Embodying Products," the record is unclear what other products the "Lighting Products segment" includes. *Id.* In sum, the evidence fails to persuasively connect patented features to commercial success or praise.

Patent Owner also argues that "there is a nexus between the industry's LED lighting products eventually introduced and the ['770 patent]." Resp. 47. Patent Owner does not argue, however, that "the industry's LED lighting products" enjoyed commercial success, praise, or indicia supporting non-obviousness.

25

**Appx162**

IPR2022-00848
Patent 6,634,770 C3

Patent Owner argues that its 2015 catalog shows "expansion and breadth" of its patented Dynasty LED lamp business. Resp. 48 (citing Ex. 2017). The catalog establishes what Patent Owner offered for sale and how Patent Owner advertised Dynasty LED lamps. But the catalog does not persuasively establish commercial success or success relative to any competitors in the market.

Patent Owner further argues that Patent Owner's "Dynasty LED lamps" are covered by the '770 patent and had "notable examples of installation" at two stores. Resp. 48 (citing Ex. 2019 ¶¶ 30–31, 48). These examples, at best, provide very limited evidence of some commercial success.

With regard to long-felt but unmet need, Patent Owner argues that others in the industry failed to develop "a monochromatic general illumination light source that uses a semiconductor LED chip while also dissipating heat" and cites problems others in the industry had in developing such a light both before and after filing of the '770 patent. Resp. 48–52. The record, however, suggests that the '770 patent did not solve particular industry problems. Rather, Patent Owner's witness testified, for example, that he purchased an off-the-shelf LED as a prototype, that attaching heat sinks was well known, and that phosphor coatings for white light were well known. Reply 21 (citing Ex. 1030, 291:20–295:6 (testimony of '770 inventor)).[11]

---

[11] Petitioner also argues that attaching heat sinks and adding phosphor coatings was well known. Reply 21. Petitioner cites the Ex. 1030 trial transcript at 126:25–127:6 and 134:17–21 for testimony supporting this argument, but these pages appear to be omitted from the present record. Nonetheless, the prior art discussed herein (for example, Begemann,

26

IPR2022-00848
Patent 6,634,770 C3

In sum, the evidence of objective indicia of non-obviousness is weak and, therefore, has little influence on our obviousness conclusions in either direction. All of our obviousness determinations, as we discuss *infra*, are made after considering all evidence in the record, including all evidence relating to objective indicia of non-obviousness.

### 3. Overview of the Asserted Art

a. *Begemann (Exhibit 1007)*

Begemann describes "a LED lamp comprising a gear column, a lamp cap which is connected to an end of the gear column and a substrate which is connected to the other end of the gear column and which is provided with a number of LEDs." Ex. 1007, 1:1–3.

We reproduce Begemann's Figure 2 below.

---

Krames, and Allen) establishes that heat sinks and phosphor coatings were known in the art.

27

IPR2022-00848
Patent 6,634,770 C3



FIG. 2

Figure 2 depicts an embodiment of a LED lamp. *Id.* at 4:11. LED lamp includes gear column 1, metal lamp cap 2, metal substrate 3 having LEDs 4, envelope 5, and outlet holes 6 and inlet holes 7 for air flow. *Id.* at 5:13–16. Begemann describes substrate 6 as cube-shaped and states that each one of the faces has a number of LEDs 4. *Id.* at 5:17–18, 21–22. Begemann explains that multiple-chip LEDs are used in this embodiment, "which each have three light points (green, red and blue) per LED or four light points (green, red, yellow, blue) per LED" and "[t]hese colors are mixed so as to obtain white light in the secondary optical system of each of the LEDs." *Id.* at 5:22–25.

We reproduce Begemann's Figure 3A below.

28

IPR2022-00848
Patent 6,634,770 C3



FIG. 3A

Figure 3A shows an LED that includes single-chip LEDs, which each has only one light point 11 per LED. *Id.* at 6:3–5. Begemann explains that "[l]ight point (11) is provided with a primary optical system(13), by means of which the radiation characteristic of the LED can be influenced." *Id.* at 6:6–8.

b.    *Krames (Exhibit 1008)*

Krames is a paper titled "High-brightness AlGaInN light-emitting diodes." Ex. 1008, 1. Specifically, Krames describes AlGaInN LEDs grown via organometallic vapor phase epitaxy ("OMVPE"). *Id.* Krames describes a light output versus current characteristic for a blue (wavelength of about 470 nm) 1 x 1 mm2 AlGaInN LED. *Id.* at 10. Krames explains that a power output over 170 mW is obtained at a drive current of 1.5 A DC. *Id.*

Krames's Figure 3 is reproduced below.

29

IPR2022-00848
Patent 6,634,770 C3



Fig. 3. Typical AlGaInN LED structure.

Figure 3 depicts a typical AlGaInN LED structure. *Id.* at 4. Krames discloses that "[t]he two most common substrates used for OMVPE growth of AlGaInN are sapphire and SiC." *Id.* Krames explains that "[s]apphire is insulating and therefore both p and n Ohmic contacts must be formed on the top surface of the LED chip." *Id.* The n-type contact is formed by mesa etching the AlGaInN LED structure to expose n-type GaN layers beneath the active region and then applying an ohmic n-contact metallization (e.g., Ti/Al) to the n-type GaN. *Id.* Krames states that the p-type contact is formed "by depositing a semi-transparent Ni/Au Ohmic contact metallization across the GaN:Mg surface." *Id.*

c.    *Allen (Exhibit 1011)*

Allen describes a lamp that includes one or more monolithic LED devices that each has an array of LED dies. Ex. 1011 code (57). Allen states that the "[t]he array of LED dies may comprise a mixture of RGB sub-dies or 'white dies' or a mixture of both types of dies" and that "[w]hite dies may

30

IPR2022-00848
Patent 6,634,770 C3

be, for example, blue dies with phosphorescent coating to produce a wideband spectrum." *Id.* at 4:9–12.

We reproduce Allen Figures 6A and 6B below.



FIG. 6A          FIG. 6B

Figure 6A depicts a top view of an "A-type" screw-in hemispherical lamp configuration. *Id.* at 3:17–18. Figure 6B shows a side view of the hemispherical lamp. *Id.* at 3:19–20. The lamp includes monolithic LED device 100, lamp housing 207, mounting brackets 212, voltage converter 204, and base 210. *Id.* at 6:10–12. Allen states that voltage converter 204 "may be a transformer, such as step-down transformer, series resistor, or other type of voltage converter employed in the art to convert from a supply voltage such as an AC or DC supply followed by a bridge rectifier circuit." *Id.* at 6:16–18.

d.    *Sugiura (Ex. 1010)*

Sugiura describes "a nitride-based semiconductor element such as a semiconductor laser, a light-emitting diode, an electronic device, or the like." Ex. 1010, 1:6–8. Sugiura's Figure 7 is reproduced below.

31
**Appx168**

IPR2022-00848
Patent 6,634,770 C3



**F I G. 7**

Figure 7 illustrates a sectional view of a nitride-based semiconductor laser. *Id.* at 9:1–3. The nitride-based semiconductor laser includes sapphire substrate 30, mask 31 having grooves 31a, low-temperature GaN buffer layer 32, undoped underlying GaN layer 33, n-type GaN contact layer 35, n-type AlGaN current injection layer 36, n-type GaN optical guide layer 37, InGaN active layer 38, p-side GaN optical guide layer 39, p-type AlGaN current injection layer 40, and p-type GaN contact layer 41. *Id.* at 12:24–36. Sugiura states that "[a]lthough this embodiment has been described above with reference to the case it is applied to a laser, . . . the present invention can be applied not only to a nitride-based semiconductor laser but also to a light-emitting diode." *Id.* at 14:58–61.

    4.    Ground One: Unpatentability over Begemann, Krames, and Allen

Petitioner asserts that claims 18, 22, 25, 26, 28–30, 32–36, 40–44, 47–49, 52, 53, 56–59, 62, 63, 65–68, 70–73, 77, 78, 81, 82, 85, 86, and 88–91

32

IPR2022-00848
Patent 6,634,770 C3

are unpatentable under 35 U.S.C. § 103(a) as obvious over Begemann, Krames, and Allen, citing the Declaration of Dr. Michael S. Lebby for support. Pet. 31–98 (citing Ex. 1006). Below, we first address Petitioner's argued reasons to combine the references' teachings. We then address independent claim 18. Next, we address disputed recitations of dependent claims. Finally, we address the remaining dependent claims collectively.

a.    *Combining the teachings of Begemann, Krames, and Allen*

We first address the combination of Begemenan and Krames. Pet. 27–28. Begemann teaches that "[c]ustomary incandescent lamps can only be replaced by LED lamps which are provided with LEDs having … a high luminous flux." Ex. 1007, 2:3–5. Begemann discloses LEDs mounted to surfaces within the interior of its bulb and as part of an LED package. *Id.* at Figs. 2, 3A. Begemann does not, however, disclose what specific LED chip should be used with its device. Pet. 28. A person having ordinary skill in the art would have naturally searched LED chip references to determine what existing chips could be combined with Begemann's disclosure.

Krames teaches an LED chip that a person of ordinary skill in the art would have recognized as useful in Begemann's LED package. Krames notes that "by increasing the chip size and providing low-thermal-resistance power packages capable of dissipating several Watts, LEDs should be able to compete more favorably with conventional lighting technologies in many applications." Ex. 1008, 6. Krames thus has a goal similar to that of Begemann. Ex. 1007, 2:3–5. A person of ordinary skill in the art would have had a reasonable expectation of success in mounting the LED chips Krames teaches into the Figure 3 apparatus of Begemann. Ex. 1006 ¶ 93.

Patent Owner argues that a person of ordinary skill in the art would have recognized that Begemann's heat sink is inadequate to handle the heat

33

**Appx170**

IPR2022-00848
Patent 6,634,770 C3

of Begemann's suggested RGB LEDs. Resp. 31–32. This argument does not squarely respond to the ground of challenge. Petitioner's unpatentability grounds are based upon combining Begemann's teachings with Krames's LED and Allen's phosphor coating. Moreover, Begemann teaching a heat sink along with teaching its LEDs suggests, by a preponderance of the evidence, that Begemann's heat sinks are adequate for Begemann's LEDs. *See, e.g.,* Ex. 1007, Fig. 2, 2:17–19, 5:17–18.

Patent Owner argues that a person having ordinary skill in the art would not have combined the Krames LED with the Begemann device because Begemann's structure would not be able to handle the heat of the Krames "higher-powered LEDs." Resp. 31–33. This argument does not persuasively undermine Petitioner's evidence because it is premised on the Krames LED chips being driven at 1.5 amperes and producing 390 lumens. Reply 5 (citing Ex. 2021 ¶¶ 48–64 (Patent Owner witness, Mr. McCreary, considering heat based on these conditions); Ex. 2022 ¶¶ 86–109 (Patent Owner witness, Mr. York, referring to Mr. McCreary's modeling)). A preponderance of the evidence supports that a person of ordinary skill in the art would have utilized the Krames LED chip in conjunction with Begemann at a lower drive current and with lower lumens. *See*, e.g., Ex. 1034, 107:6-25 (Patent Owner's witness, Mr. York, testifying that the practical drive current for the Krames chip was somewhere around 350 milliamps); Ex. 1028 ¶¶ 22, 28 (Petitioner's witness, Dr. Krames, testifying that an output of 136 lumens would be a reasonable output and a drive current near 350 mA would be reasonable).

Patent Owner argues that it focused on a drive current of 1.5 amps because Petitioner relied on this amperage in the Petition. Sur-Reply 15–16. This argument is unpersuasive because it reflects a misunderstanding of the

34

**Appx171**

IPR2022-00848
Patent 6,634,770 C3

scope of claim 18 and how the Petition addresses claim 18. Claim 18 recites "said semiconductor chip … configured to output light at greater than about 40 milliwatts." Ex. 1001, EPRC 1:34–36. Patent Owner agrees that claim 18's "configured to" language requires that the chip be "capable of" outputting light at greater than about 40 milliwatts. Resp. 14–15. The claim does not require a chip that, when placed in the bulb, actually operates at more than about 40 milliwatts. Thus, to show that the Krames chip meets this claim language, Petitioner explained that "Krames teaches its LED chip achieves '[a] power output of over 170 mW … at a drive current of 1.5 A dc.'" Pet. 53 (quoting Ex. 1008, 10). In other words, Petitioner proved the *capability* of the Krames chip.

Petitioner never, however, insisted that a person of skill in the art would run the Krames chip within Begemann at such a high power output. Rather, Petitioner's reason to combine is that Begemann teaches use of LED chips with high luminous flux, and Krames teaches such a chip. Pet. 27–28. When Patent Owner attempted to refute this reason to combine by arguing that the Krames chip would overheat at 170 mW and 1.5 A dc, Petitioner appropriately responded by establishing that the Krames chip could operate at a variety of power and amperage conditions. Reply 4–7; *see also Rembrandt Diagnostics, LP, v. Alere, Inc.*, 76 F.4th 1376, 1382–84 (Fed. Cir. 2023) (holding that Board did not err by considering Petitioner arguments responsive to Patent Owner assertions regarding motivation to successfully combine). Figure 12 of Krames illustrates possible operating conditions for the Krames chip, and we reproduce that figure below.

35

IPR2022-00848
Patent 6,634,770 C3



Fig. 12. Light output vs. current characteristic of a blue ($\lambda_p$ ~470 nm), 1x1 mm² AlGaInN LED in a power package, compared to a conventional AlGaInN LED in a 5 mm lamp package.

Ex. 1008, 9. Krames Figure 12 depicts a graph comparing the light output versus current characteristics of the Krames LED chip versus a conventional LED. *Id.*

Krames Figure 12 illustrates that the Krames chip can operate at amperages much lower than 1.5 A. Indeed, Krames indicates "excellent reliability performance" at 350 mA. *Id.* at 10; *see also* Ex. 1028 ¶ 22. The preponderance of the evidence also establishes that, at lower amperage, a person of ordinary skill in the art would have recognized that any heat issues would have been manageable. *See* Reply 6–7 (citing Ex. 1028 ¶¶ 22–23; Ex. 1008, 9).

Patent Owner also argues that a person having ordinary skill in the art would not have utilized the Krames LED with Begemann because the Krames LED is less energy efficient than an incandescent light bulb and less efficient than the Begemann RGB LEDs. Resp. 33–35. Krames, however, teaches, at 350 mA, "the best performance in terms of power conversion

36

IPR2022-00848
Patent 6,634,770 C3

efficiency" and "excellent reliability performance." Reply 6 (quoting Ex. 1008, 7); *see also* Ex. 1008, 9 (teaching excellent reliability performance at 350 mA). Petitioner persuasively argues that the combination of Begemann and Krames could output 136 lumens which exceeds the light output of many commercial bulbs (while dissipating resulting heat). Reply 9–10 (citing Ex. 1028 ¶¶ 27–29). Also, Krames teaches that its LEDs "should be able to compete more favorably with conventional lighting technologies in many applications." Ex. 1008, 6; *see also id.* at 10 (explaining that the Krames chip offers advantages where "high flux density is important" and may offer unique advantages in "traffic signaling"), 11 (noting "long-life of solid-state emitters").

A person having ordinary skill in the art would have recognized potential advantages of using the Krames LED chip and would have been able to weigh the advantages against any disadvantages. The existence of advantages and disadvantages does not make the combination of Begemann and Krames less obvious in view of Begemann suggesting use of LED chips and Krames providing an appropriate LED chip that provides at least some advantages. *See Medichem, S.A. v. Rolabo, S.L.*, 437 F.3d 1157, 1165 (Fed. Cir. 2006) ("a given course of action often has simultaneous advantages and disadvantages, and this does not necessarily obviate motivation to combine"). In sum, the preponderance of the evidence, as explained above, supports that a person of ordinary skill in the art would have had reason to combine the teachings of Begemann and Krames with a reasonable expectation of success.

With respect to Allen, Begemann teaches a "white LED" for at least one embodiment. Pet. 29 (quoting Ex. 1007, 3:6–9). Krames teaches conversion of blue light into white "via phosphors" and Allen teaches that

37

**Appx174**

IPR2022-00848
Patent 6,634,770 C3

"blue dies with phosphorescent coating" may be used. Ex. 1008, 11; Ex. 1011, 4:11–12; Ex. 1006 ¶¶ 88–90. A preponderance of the evidence supports Petitioner's position that a person of skill in the art would have combined the teachings of Begemann, Allen, and Krames to reach claim 1's recited coating.

Patent Owner argues that Petitioner's proposed obviousness combination is inconsistent because it "argues for the purported obviousness of replacing Begemann's LEDs with Krames' LED chips" but "also argues for the purported obviousness of replacing Begemann's LEDS with Allen's chips." Resp. 26. Patent Owner further argues that neither the Krames chip nor the Allen chip alone teach all recitations of claim 18. *Id.* at 26–28. This argument is unpersuasive because the Petition is reasonably clear that ground one asserts the Begemann with the Krames chip and Allen's phosphor coating. *See* Pet. 26–28 (explaining why it would be obvious to use the Krames chip with Begemann), 29–31 (explaining why it would have been obvious to modify the Krames chip by using a coating of phosphors). When Petitioner maps claim 18 to the asserted art, Petitioner refers to Begemann for the greater lightbulb structure and Krames for the chip. *Id.* at 31–54. For claim 18, Petitioner refers to Allen *only* for the phosphor coating. *Id.* at 51.[12] Petitioner does not rely on only the chip of Krames or only the chip of Allen to meet claim 18, and, as we further address below, Petitioner accounts for each recitation of claim 18.

To summarize, the preponderance of the evidence establishes that a person of ordinary skill in the art would have had good reason to combine

---

[12] When addressing dependent claims, Petitioner also refers to Allen for certain aspects of the bulb structure. *See, e.g.,* Pet. 61–74, 76–77.

IPR2022-00848
Patent 6,634,770 C3

implement the Krames chip in the Begemann device while also making use of a phosphor coating as Allen teaches and that a person of ordinary skill in the art would have had a reasonable expectation of success in combining the references' teachings in this manner.

  b.  *Independent Claim 18*

Claim 18 depends from cancelled claims 1 and 9. The preamble of claim 1 recites, "A semiconductor light source for emitting light to illuminate a space used by humans, the semiconductor light source comprising." Petitioner argues that Begemann discloses this recitation. Pet. 31–32. The preponderance of the evidence supports that Begemann teaches or suggests this recitation. Ex. 1007, 1:1, 6:23–24, Fig. 2; Ex. 1006 ¶ 91.

Claim 1 next recites "an enclosure, said enclosure being fabricated from a material substantially transparent to white light." Petitioner argues that Begemann teaches this recitation. Pet. 32–33. The preponderance of the evidence supports that Begemann teaches or suggests this recitation. Begemann states, for example, that "during operation of the LED lamp shown, white light is obtained" and that the Begemann device has an "envelope … made of glass [or] synthetic resin." Ex. 1007, 2:23–24, 5:26; *see also id.* at Fig. 2; Ex. 1006 ¶ 92.

Claim 1 next recites "a base to which said enclosure is mounted." Petitioner asserts that Begemann lamp cap 2 and the structure surrounding adjusting ring 8 of Begemann Figure 2 is such a base. Pet. 33–34. The preponderance of the evidence supports that Begemann teaches or suggests this recitation. Ex. 1007, Fig. 2; Ex. 1006 ¶ 93.

Claim 1 next recites "an interior volume within said enclosure." As Petitioner asserts, the preponderance of the evidence supports that

39

**Appx176**

IPR2022-00848
Patent 6,634,770 C3

Begemann teaches or suggests this recitation. Pet. 34–35, Ex. 1007, Fig. 2; Ex. 1006 ¶ 94.

Claim 1 next recites "a secondary heat sink located in said interior volume." Petitioner identifies such a sink by annotating Figure 2. Pet. 35–36. We reproduce that annotated figure below.



Pet. 35–36 (reproducing Ex. 1007, Fig. 2). Begemann Figure 2 is a view of a second embodiment of Begemann's LED lamp. Ex. 1007, 4:11. Petitioner annotates the Figure to "Secondary Heat Sink" areas. The preponderance of the evidence supports that Begemann teaches or suggests this recitation. Begemann teaches, for example, that substrate 3 is "made of a metal or metal alloy, thereby enabling a god heat conduction" and that "[t]he outer surface of the gear column (1) of the LED lamp is made of a metal or a metal alloy … enable[ing] good heat conduction." *Id.* at 4:28–29, 5:1–3; *see also* Ex. 1006 ¶ 95.

Claim 1 recites "said secondary heat sink being capable of drawing heat from one or more semiconductors devices." For the reasons we address

40

IPR2022-00848
Patent 6,634,770 C3

above, the preponderance of the evidence supports that Begemann teaches or suggests this recitation. Pet. 37.

Claim 1 recites "a plurality of primary heat sinks mounted on said secondary heat sink." Petitioner asserts that the MC-PCP elements 12 of Begemann Figure 3A are primary heat sinks. Pet. 37–39. The preponderance of the evidence supports that Begemann teaches or suggests this recitation. Begemann teaches, for example, that the MC-PCB elements are "responsible for good heat transfer." Ex. 1007, 6:5–6, Fig. 3A; *see also* Ex. 1006 ¶¶ 97–98.

Claim 1 recites "each of said primary heat sinks being smaller than said secondary heat sink." Petitioner asserts that Begemann teaches this recitation as illustrated, for example by Begemann Figure 2. Pet. 39–40. The preponderance of the evidence supports that Begemann teaches or suggests this recitation. Ex. 1007, Figs. 2, 3A; Ex. 1006 ¶ 99.

Claim 1 recites "a semiconductor chip capable of emitting light mounted on one of said primary heat sinks." Petitioner asserts that Begemann Figure 3A depicts such a chip. Pet. 40–41. The preponderance of the evidence supports that Begemann teaches or suggests this recitation. Ex. 1007, 6:3–5, Fig. 3A; Ex. 1006 ¶ 100.

Claim 1 recites "said semiconductor chip being capable of emitting monochromatic light." Petitioner argues that Begemann teaches this recitation. Pet. 41–42. The preponderance of the evidence supports that Begemann teaches or suggests this recitation. Begemann teaches that its "single chip LEDs" have "only one light point per LED." Ex. 1007, 4:32–

41

IPR2022-00848
Patent 6,634,770 C3

34.[13] Begemann explains, for example, that its green, red, yellow, blue light points may be mixed to obtain white light. *Id.* at 5:17–26. Petitioner's witness, Dr. Lebby, testifies that these statements indicate the LED is monochromatic. Ex. 1006 ¶ 101. Moreover, as we explain herein, Petitioner persuasively explains why it would have been obvious to use a phosphor coating in conjunction with Begemann to achieve monochromatic white light.

Claim 1 recites "said semiconductor chip being selected from the group consisting of light emitting diodes, light emitting diode arrays, laser chips, and VCSEL chips." The preponderance of the evidence supports that Begemann teaches or suggests this recitation. As Petitioner asserts, Begemann teaches that its chips are LEDs. Pet. 42; Ex. 1007, 6:4–5, Fig. 3A; Ex. 1006 ¶ 102.

Claim 1 recites "said chip including a substrate on which epitaxial layers are grown." Petitioner asserts that Krames discloses this limitation by showing a "sapphire substrate" on which epitaxial layers have grown. Pet. 42–43. The preponderance of the evidence supports that Begemann teaches or suggests this recitation. Ex. 1008, 4 ("the two most common substrates used for OMVPE growth of AlGa1nN are sapphire and SiC"), Fig. 3; Ex. 1006 ¶¶ 103–104.

Claim 1 recites "a buffer layer located on said substrate." Petitioner asserts that Krames discloses this limitation. Pet. 43–44. The preponderance of the evidence supports that Krames teaches or suggests this recitation. Krames Figure 3 shows a "buffer layer" located on a "sapphire substrate."

---

[13] Petitioner mistakenly cites 3:32–35 (Pet. 40), but the quote is easily located on the next page.

42

IPR2022-00848
Patent 6,634,770 C3

Ex. 1008, Fig. 3; Ex. 1006 ¶ 105. Also, as we explain *supra*, Petitioner adequately establishes that it would have been obvious to combine Krames' LED chip with Begemann.

Claim 1 recites "said buffer layer serving to mitigate differences in material properties between said substrate and other epitaxial layers." Petitioner argues that Krames's buffer layers would serve this function. Pet. 44–46. The preponderance of the evidence supports that Krames teaches or suggests this recitation. Ex. 1008, Fig. 3; Ex. 1006 ¶¶ 106–107; Ex. 1014, 353 (reference Krames cites explaining that mismatch between substrate and film makes film difficult to grow).

Claim 1 recites "a first cladding layer serving to confine electron movement within the chip." Petitioner asserts that Krames discloses a cladding layer that serves to perform the recited function. Pet. 46. The preponderance of the evidence supports that Krames teaches or suggests this recitation. Ex. 1008, 5, Fig. 3; Ex. 1006 ¶ 108.

Claim 1 recites "said first cladding layer being adjacent said buffer layer." Petitioner asserts that Krames Figure 3 discloses this recitation. Pet. 47. The preponderance of the evidence supports that Krames teaches or suggests this recitation. Ex. 1008, Fig. 3; Ex. 1006 ¶ 109.

Claim 1 recites "an active layer." Petitioner asserts that Krames teaches this layer as "either the single InGaN QW active layer or the multiple stacked QW active layers" of Krames Figure 3. Pet. 47–48. The preponderance of the evidence supports that Krames teaches or suggests this recitation. Ex. 1008, Fig. 3; Ex. 1006 ¶ 110.

Claim 1 recites "said active layer emitting light when electrons jump to a valance state." Petitioner asserts that Krames's active layer will meet

43

**Appx180**

IPR2022-00848
Patent 6,634,770 C3

this function. Pet. 48–49. The preponderance of the evidence supports that Krames teaches or suggests this recitation. Ex. 1006 ¶ 111.

Claim 1 recites "a second cladding layer." Petitioner asserts that Krames discloses this limitation. Pet. 49–50. The preponderance of the evidence supports that Krames teaches or suggests this recitation. Ex. 1008, 5, Fig. 3; Ex. 1006 ¶ 112.

Claim 1 recites "said second cladding layer positioned so that said active layer lies between cladding layers." Petitioner asserts that Krames Figure 3 discloses this recitation. Pet. 50. The preponderance of the evidence supports that Krames teaches or suggests this recitation. Ex. 1008, Fig. 3; Ex. 1006 ¶ 113.

Claim 1 recites "a contact layer on which an electron [sic, electrode] may be mounted for powering said chip." Petitioner asserts that Krames Figure 3 discloses this recitation. Pet. 50–51.The preponderance of the evidence supports that Krames teaches or suggests this recitation. Ex. 1008, Fig. 3; Ex. 1006 ¶¶ 114–115.

Claim 1 recites "a coating for converting monochromatic light emitted by said chip to white light." Petitioner asserts that Allen teaches this recitation and that, additionally, Krames teaches conversion of blue light "into white via phosphors." Pet. 51–52. The preponderance of the evidence supports that Allen and Krames teaches or suggests this recitation. *See* Ex. 1011, 4:11–12 (Allen stating that "[w]hite dies may be, for example, blue dies with phosphorescent coating to produce a wideband spectrum"); Ex. 1008, 11 (Krames explaining "conversion of blue light into white via phosphors"); Ex. 1006 ¶¶ 116–117. Also, as we explain *supra*, the preponderance evidence supports that a person having ordinary skill in the

44

**Appx181**

IPR2022-00848
Patent 6,634,770 C3

art would have had reason to combine the teachings of Allen with Krames and Begemann.

We next address elements of claim 9 which depend from claim 1. Claim 9 recites "[a] device as recited in claim 1 wherein said substrate is electrically conductive." Petitioner asserts that Krames teaches an electrically conductive SiC substrate. Pet. 52.

Patent Owner argues that Petitioner relies on Figure 3 of Krames as teaching a sapphire substrate but never establishes that a sapphire substrate is a conductive substrate. Resp. 28; *see also* Surreply 21. Patent Owner's argument is unpersuasive because it does not squarely address the Petition. While Petitioner relies on Krames Figure 3 for some elements, Petitioner also relies on Krames teaching that the substrate can be "sapphire (as depicted) or SiC." Pet. 23 (*citing* Ex. 1008, 4); Reply 10–11. Petitioner further explains that Krames teaches OMVPE growth for "the two most common substrates … sapphire and SiC." Pet 43; *see also* Ex. 1006 ¶¶ 103–104. In other words, Krames reasonably suggests that the Figure 3 substrate, instead of being sapphire, could be SiC. Petitioner explains that sapphire or SiC could be used for growing an epitaxial layer (Pet. 42) and explains that, between these two choices that Krames offers, Krames teaches that the SiC option is conductive (*id.* at 52).

Krames further teaches that sapphire is less expensive but is "insulating" which poses "design challenges." *Id.* Krames, thus, provides evidences that SiC substrate is conductive. Dr. Lebby's testimony further supports this position. *Id.* at 52 (citing Ex. 1006 ¶ 118). As such, the preponderance of the evidence supports that Krames teaches it would have been obvious to use a SiC layer and that such a layer would have both been conductive and would have permitted growing an epitaxial layer.

45

**Appx182**

IPR2022-00848
Patent 6,634,770 C3

We next address elements of claim 18. Claim 18 depends from claim 9. Claim 18 recites "[t]he semiconductor light source as recited in claim 9 wherein: said semiconductor chip is a light emitting diode (LED) chip configured to output light at greater than about 40 milliwatts." The preponderance of the evidence supports that Krames teaches or suggests this recitation. Ex. 1008, 10; Ex. 1006 ¶ 119. Importantly, this claim language requires a semiconductor chip *capable* of the recited output, and Patent Owner does not persuasively dispute that the Krames chip is *capable* of meeting this recitation.

Claim 18 recites "said LED chip is surface mounted on said one of said primary heat sinks." Petitioner asserts that Begemann Figure 3A depicts LED chips (elements 11) surface mounted on the primary heat sink. Pet. 53–54. The preponderance of the evidence supports that Begemann teaches or suggests this recitation. Ex. 1007, Fig. 3A; Ex. 1006 ¶ 120.

Claim 18 also recites "said LED chip is configured to emit monochromatic visible light." Petitioner asserts that Krames discloses the limitation. Pet. 54. The preponderance of the evidence supports that Krames teaches or suggests this recitation. Ex. 1008, 5; Ex. 1006 ¶ 121.

To summarize, Petitioner has shown by a preponderance of the evidence that the combined teachings of Begemann, Krames, and Allen teach or reasonably suggest all of the elements of claim 18 in the manner claim 18 (and the claims that claim 18 depends from) recites. Thus, we are persuaded that Petitioner has established by a preponderance of the evidence that the combination of Begemann, Krames, and Allen renders claim 18 obvious.

46

IPR2022-00848
Patent 6,634,770 C3

     c.    *Dependent Claim 29*

Claim 29 recites, "[t]he semiconductor light source as recited in claim 28 wherein: said opening defined in said dome-shaped enclosure is large enough for said heat sink to pass through said opening." Ex. 1001, EPRC 2:21–25. The "opening" of claim 29 is defined in claim 28 which refers to "said enclosure [referring back to the enclosure of claim 1] is shaped as a dome that defines an opening." *Id.* at 2:18–20.

Petitioner reproduces Figure 6B of Allen to illustrate that the opening of Allen is large enough for Allen's heat sink to pass through. Pet. 62–63. Petitioner further argues that a person having ordinary skill in the art would incorporate this aspect of Allen "to achieve an LED lamp with improved performance and manufacturability that could replace conventional incandescent lamps. Pet. 30–31 (citing Ex. 1006 ¶ 90).

Patent Owner argues that Petitioner relies only on Begemann as providing a heat sink and that "Cree provides absolutely no explanation why a POSITA would have been motivated to use or combine Allen's enclosure with Begemann." Resp. 35–36. This argument does not persuasively undermine Petitioner's position. Petitioner provides a rationale for combining the teachings of Allen and Begemann, and the rationale is supported by sufficient evidence, namely the declaration of Dr. Lebby. Pet. 30–31 (citing Ex. 1006 ¶ 90); *see also* Reply 13–15. Patent Owner provides no evidence that would undermine or weigh against Petitioner's stated reasons to combine.

Patent Owner further argues that a person having ordinary skill in the art would understand that Allen's "dome-shaped enclosure" would not function for its intended purpose with Begemann's lightbulb because it "does not fit the geometry of Begemann's light bulb." Resp. 36 (citing

47

IPR2022-00848
Patent 6,634,770 C3

Ex. 1007, Figs. 1–2; Ex. 1011, Figs. 6A–6B). This argument is unpersuasive because it does not squarely address Petitioner's contentions; Petitioner's combination relies on using Allen's bulb shape having Allen's opening rather than relying on Begemann's lightbulb shape. *See* Reply 13–15.

Thus, Petitioner has shown by a preponderance of the evidence that the combined teachings of Begemann, Krames, and Allen teach or reasonably suggest all of the elements of claim 29 in the manner claim 29 recites. Ex. 1006 ¶ 90; Ex. 1011, Fig. 6B. Thus, we are persuaded that Petitioner has established by a preponderance of the evidence that the combination of Begemann, Krames, and Allen renders claim 29 obvious.

> d.    *Dependent Claim 32*

Claim 32 recites, "[T]he semiconductor light source as recited in claim 18 wherein: the semiconductor light source further comprises an AC/DC converter, said AC/DC converter is configured to convert AC power into DC power that is usable by said LED chip, and said AC/DC converter is positioned outside said interior volume." Ex. 1001, EPRC 2:37–44.

Petitioner argues that Allen teaches the recited voltage converter. Pet. 65 (citing Ex. 1011, 6:15-18). Petitioner further argues that Allen teaches that voltage converter 204 is located outside of the interior volume. *Id.* at 65–67 (citing Ex. 1011, 6:15–18, Fig. 6B). Petitioner also provides evidence, namely testimony from Dr. Lebby, supporting that a person of ordinary skill in the art would have been motivated to put circuitry outside of the interior volume to avoid obscuring emitted light. *Id.* at 66–67 (citing Ex. 1006 ¶ 139).

Patent Owner argues that Allen's voltage converter 204 is not "outside said interior volume" as claim 32 recites. Resp. 37–38. Patent Owner argues that Petitioner "incorrectly limits the interior volume within the enclosure to

48

IPR2022-00848
Patent 6,634,770 C3

only the space to the left of the leftmost "support 212." *Id.* at 37. This argument is unpersuasive because the preponderance of the evidence supports Petitioner.

As Petitioner argues, claim 1 (which claim 32 ultimately depends from) states that the recited "enclosure" is "fabricated from a material substantially transparent to white light." Reply 16. Allen's structure to the right of the leftmost "support 212" (where the converter 204 is located) is opaque: "[t]he mounting 212 supporting the five monolithic LED devices 100 is preferably transparent or translucent, whereas *the mounting 212 that supports the voltage converter 204 is preferably opaque*." Ex. 1011, 9:32–34 (emphasis added). Allen continues: "the parts of the bulb housing 207 forming the globular front face 206 and form the side up to the mounting support for the power supply is likely to be transparent or frosted, whereas the remaining parts of the housing 207 forming the base 210 are preferably opaque." *Id.* at 9:34–10:2.

Patent Owner argues that the entire enclosure need not be opaque. Sur-Reply 24–25. This argument does not squarely address Petitioner's position. The preponderance of the evidence supports that Allen's enclosure for the LEDs is the transparent portion to the left of support 212 while the opaque portion is a base rather than being part of that same enclosure. The opaque portion to the right of support 212 is separated from the transparent portion to the right of support 212 and, thus, does not enclose the same components and is not the same enclosure. Ex. 1011, Fig. 6B.

Patent Owner also argues that Petitioner's alleged reason to combine Allen with Begemann "to avoid the emitted light from being obscured by such circuitry or structures" would not be a concern. Resp. 38. Patent Owner argues that Begemann does not identify this problem and places components

IPR2022-00848
Patent 6,634,770 C3

in its interior volume. *Id.* This argument is unpersuasive because Allen discloses a workable and advantage design; a person having ordinary skill in the art would have understood that Begemann would benefit from having electronic components outside the interior lighting volume for the same reason Allen benefits from this design. *KSR Int'l. Co.*, 550 U.S. at 417 ("if a technique has been used to improve one device, and a person of ordinary skill in the art would recognize that it would improve similar devices in the same way, using the technique is obvious unless its actual application is beyond his or her skill"); *see also* Ex. 1006 ¶ 148.

Petitioner has shown by a preponderance of the evidence that the combined teachings of Begemann, Krames, and Allen teach or reasonably suggest all of the elements of claim 32 in the manner claim 32 recites. Ex. 1006 ¶ 148; Ex. 1011, 9:32–10:2, Fig. 6B. We are persuaded Petitioner has established by a preponderance of the evidence that the combination of Begemann, Krames, and Allen renders claim 32 obvious.

  e.  *Dependent Claim 34*

Claim 34 recites:

> The semiconductor light source as recited in claim 32 wherein:
> the semiconductor light source further comprises a positive lead wire and a negative lead wire configured to provide power from said AC/DC converter to said LED chip, and
> said positive lead wire and said negative lead wire run from said AC/DC converter, through an interior of said base, into said interior volume, and over an exterior surface of said secondary heat sink.

Ex. 1001, EPRC 2:48–57. Petitioner argues that Allen Figure 6B illustrates positive and negative lead wires. Pet. 68 (citing Ex. 1011, Figs. 6A, 6B; Ex. 1006 ¶ 141). Petitioner argues that it would have been obvious to include

50

**Appx187**

IPR2022-00848
Patent 6,634,770 C3

Allen's AC/DC converter in Begemann's base and to connect those wires as recited in order to power the LEDs. *Id.* at 68–70 (citing Ex. 1006 ¶ 142).

Patent Owner argues that the identified structures do not "run from said AC/DC converter, through an interior of said base." Resp. 39. We disagree. As we explain with regard to claim 32, Allen's structure to the right of leftmost "support 212" is the recited base. Reply 16–17. Figure 6B shows the wires running through this base.

Patent Owner also argues that Petitioner does not provide a reason why a person having ordinary skill in the art would combine Allen's voltage converter 204 and lead wires with Begemann's device or place Allen's voltage converter 204 within Begemann's base. Resp. 39–40. Petitioner, when addressing claim 33, provides a persuasive reason why a person of ordinary skill in the art would use Allen's voltage converter and position it in the base. Pet. 67 ("A POSITA would have been motivated and found it obvious to put circuitry or other electronic structures in Begemann's base to avoid the emitted light from being obscured by such circuitry or structures"). Patent Owner does not present evidence persuasively undermining this reasoning or evidence. A preponderance of the evidence supports Petitioner's position. Ex. 1011, Fig. 6B, 6:15–18; Ex. 1006 ¶ 140. We are persuaded Petitioner has established by a preponderance of the evidence that the combination of Begemann, Krames, and Allen renders claim 34 obvious.

f.    *Dependent Claim 36*

Claim 36 recites: "[t]he semiconductor light source as recited in claim 18 wherein: said coating is directly applied to a face of said LED chip." Ex. 1001, EPRC 2:63-65. Petitioner argues that Allen teaches "[w]hite dies may be, for example, blue dies with phosphorescent coating to produce a wideband spectrum." Pet. 70 (citing Ex. 1011, 4:11–12). Petitioner also

51

**Appx188**

IPR2022-00848
Patent 6,634,770 C3

provides evidence that a "die" is a way of referring to an LED chip. *Id.* (citing Ex. 1006 ¶ 144).

Patent Owner argues that this passage does not teach applying the coating directly to the face of an LED chip because the coating could instead encapsulate the LED chip as taught by U.S. Patent No. 5,959,316. Resp. 40–41 (citing Ex. 2024, Fig. 3, 3:6–11).

The preponderance of the evidence supports Petitioner's position. Allen suggests that it is its die that has a coating rather than suggesting that there is a spacer adjacent to the die that is coated. Reply 17 (citing Ex. 1011, 4:11–12). The die is the LED chip. Ex. 1006 ¶ 144. We are persuaded Petitioner has established by a preponderance of the evidence that the combination of Begemann, Krames, and Allen renders claim 36 obvious.

g.    *Dependent Claim 41*

Dependent claim 41 recites, "[T]he semiconductor light source as recited in claim 40 wherein: said enclosure includes a substantially flat side." Ex. 1001, EPRC 3:21–23. Petitioner annotates Figure 6B of Allen to argue that Allen's enclosure has a substantially flat side. Below, we reproduce Figure 6A alongside Figure 6B as Petitioner annotates that figure.

52

IPR2022-00848
Patent 6,634,770 C3



Pet. 71–72 (reproducing Ex. 1011, Figs. 6A, 6B). Allen Figure 6A shows a top view of an exemplary embodiment of Allen "employed in an 'A-type' screw-in hemispherical lamp configuration," and Figure 6B shows a side view of the same embodiment. Ex. 1011, 3:17–20. Petitioner annotates Figure 6B by pointing to the enclosure and top and bottom portions labeled as "[s]ubstantially flat side." Pet. 72.

Patent Owner argues that Petitioner does not establish that Allen's Figure 6B enclosure has a "substantially flat side" because "the two purportedly 'flat sides' are actually part of a cylindrical—not flat—portion of Allen's enclosure." Resp. 41–42. The preponderance of the evidence supports Patent Owner's position.

The '770 patent addresses use of a "flat" enclosure in the context of Figure 10. We reproduce Figure 10 below for reference.

53

IPR2022-00848
Patent 6,634,770 C3



**Fig. 10**

Ex. 1001, Fig. 10. Figure 10 "depicts an LED or laser light source located in a light enclosure having a phosphor coating." *Id.* at 2:42–43. The '770 patent distinguishes Figure 10 from a flat shape by stating that "[t]he depicted shape is that of a bulb, but flat, arcuate, rounded or other shapes may be used depending on the application." *Id.* at 8:41–43.

Petitioner argues that Figure 6B depicts a disclosure with a "substantially flat side" because, even though the disclosure is cylindrical, it still "comprises a flat side which encircles the lamp." Reply 18–19. We disagree. The surface of the Figure 6B bulb is cylindrical. Given the context of the '847 patent, "flat" describes a three-dimensional object being flat—in other words being flat in three dimensions. The '770 patent does not indicate

54

**Appx191**

IPR2022-00848
Patent 6,634,770 C3

that "flat" or "substantially flat" can be understood so broadly that it includes a curved three-dimensional surface that only *appears* flat based on viewing the surface from a particular direction.

We further emphasize that Petitioner's position is based upon combining Allen's teachings with Begemann (as opposed to, for example, modifying the art's teachings based on what is generally known in the art). Pet. 72 ("[a] POSITA would have found it obvious to use Allen's enclosure with two substantially flat sides as the enclosure of Begemann"); Reply 19 ("a POSITA would have found it obvious to use Allen's enclosure with two substantially flat sides as the enclosure of Begemann"). Because Allen does not teach a substantially flat surface, combining the teachings will also not result in a substantially flat surface.

Thus, for the reasons explained above, Petitioner has not adequately established by a preponderance of the evidence that claim 41 would have been obvious in view of the cited art.

> h.  *Dependent Claims 22, 25, 26, 28, 30, 33, 35, 40, 42–44, 47–49, 52, 53, 56–59, 62, 63, 65–68, 70–73, 77, 78, 81, 82, 85, 86, and 88–91*

Petitioner accounts for the limitations recited in claims 22, 25, 26, 28, 30, 33, 35, 40, 42–44, 47–49, 52, 53, 56–59, 62, 63, 65–68, 70–73, 77, 78, 81, 82, 85, 86, and 88–91. Pet. 54–98. Petitioner provides detailed explanations as to how the combined teachings of Begemann, Krames, and Allen disclose, teach, or suggest the limitations of these claims and why it would have been obvious to combine those teachings with a reasonable expectation of success, citing Dr. Lebby's testimony for support. *Id.* (citing Ex. 1006).

IPR2022-00848
Patent 6,634,770 C3

We are persuaded that Petitioner has demonstrated that all of the limitations recited in claims 22, 25, 26, 28, 30, 33, 35, 40, 42–44, 47–49, 52, 53, 56–59, 62, 63, 65–68, 70–73, 77, 78, 81, 82, 85, 86, and 88–91 would have been obvious over Begemann, Krames, and Allen. Patent Owner provides no arguments regarding these claims outside of the arguments discussed above. *See generally* Resp. Having reviewed Petitioner's arguments and supporting evidence, we are persuaded that Petitioner has established by a preponderance of the evidence that claims 22, 25, 26, 28, 30, 33, 35, 40, 42–44, 47–49, 52, 53, 56–59, 62, 63, 65–68, 70–73, 77, 78, 81, 82, 85, 86, and 88–91 are unpatentable under § 103(a) over Begemann, Krames, and Allen.

> 5. Ground Two: Unpatentability over Begemann, Sugiura, Allen, and Krames

Petitioner asserts that claims 18, 22, 25, 26, 28–30, 32–36, 40–44, 47–49, 52, 53, 56–59, 62, 63, 65–68, 70–73, 77, 78, 81, 82, 85, 86, and 88–91 are unpatentable under 35 U.S.C. § 103(a) as obvious over Begemann, Sugiura, Allen, and Krames, citing the Declaration of Dr. Michael S. Lebby for support. Pet. 98–112 (citing Ex. 1006). To the extent Petitioner's assertions and Patent Owner's counter arguments do not relate to SuguiraSugiura, we address those issues above when addressing Ground One and, for brevity, we do not repeat that analysis here. Below, we first address Petitioner's argued reasons to combine the references' teachings. We then address independent claim 18. Next, we address disputed recitations of dependent claims. Finally, we address the remaining dependent claims collectively.

56

IPR2022-00848
Patent 6,634,770 C3

a. *Combining the teachings of Begemann, Sugiura, Krames, and Allen*

Petitioner argues that it would have been obvious to combine Sugiura's chip with Begemann's bulb structure while increasing the area and operating current of Sugiura's LED chips, as taught by Krames. Pet. 28–29. Begemann teaches that "[c]ustomary incandescent lamps can only be replaced by LED lamps which are provided with LEDs having … a high luminous flux." Ex. 1007, 2:3–5. Begemann discloses LEDs mounted to surfaces within the interior of its bulb and as part of an LED package. *Id.* at Figs. 2, 3A. Begemann does not, however, disclose what specific LED chip should be used with its device. Pet. 28. A person having ordinary skill in the art would have naturally searched LED chip references to determine what existing chips could be combined with Begemann's disclosure.

Sugiura teaches LED chip structures meant to achieve improved luminous output. Ex. 1006 ¶ 87; *see also, e.g.,* Ex. 1010, 14:58–67 (explaining that the Sugiura LED provides various advantages). Petitioner provides evidence that a person having ordinary skill in the art would have had reason to increase the area and operating current of the Sugiura chips to achieve the goal of Begemann. Pet. 29; Ex. 1006 ¶ 87.

Patent Owner argues that Petitioner fails to consider how increasing size or drive current could impact output or efficiency of the Sugiura chips. Resp. 43. This argument does not persuasively undermine Petitioner's position. The details of how to increase size or drive current are not relevant to claim recitations, and Patent Owner lacks persuasive no evidence that a person having ordinary skill in the art would have had difficulty or lack or reason to modify Sugiura to an appropriate size and drive current. Reply 12–13. Also, Krames teaches increasing chip size to, in line with Begemann's

57

IPR2022-00848
Patent 6,634,770 C3

goals, "compete more favorably with conventional lighting technologies in many applications." Ex. 1008, 1 (abstract), 6.

Patent Owner also argues that driving the Sugiura chip at 1.5 amps and 40 milliwatts would create too much heat. Resp. 45. This argument does not persuasively undermine Petitioner's rationale and evidence regarding reason to combine because, as we explain in ground one, the claims only require a chip capable of a 40 milliwatt output.

To summarize, the preponderance of the evidence establishes that a person of ordinary skill in the art would have had good reason to combine implement the Sugiura chip (as modified as Krames suggests) in the Begemann device while also making use of a phosphor coating as Allen teaches, and that a person of ordinary skill in the art would have had a reasonable expectation of success in combining the references' teachings in this manner.

b.    *Independent Claim 18*

For brevity, we address only claim recitations that relate to Sugiura. For other recitations, we refer to our assessment of Ground One.

Claim 18 depends from cancelled claims 1 and 9. Claim 1 recites "said chip including a substrate on which epitaxial layers are grown." Petitioner asserts that Sugiura discloses this limitation by showing an n-type silicon substrate 60 on which epitaxial layers have been grown. Pet. 100. The preponderance of the evidence supports that Begemann teaches or suggests this recitation. Ex. 1010, Fig. 10, 17:12; Ex. 1006 ¶¶ 222.

Claim 1 recites "a buffer layer located on said substrate." Petitioner asserts that Sugiura discloses this limitation. Pet. 101–102. The preponderance of the evidence supports that Sugiura teaches or suggests this

58

IPR2022-00848
Patent 6,634,770 C3

recitation. Sugiura Figure 10 shows the buffer layer as n-type contact layer 63. Ex. 1010, Fig. 10, 17:28, 17:30–33; Ex. 1006 ¶¶ 223–225; *See also* Ex. 1005, 1/24/2014 Action, 22 (reexamination examiner recognizing this layer).

Claim 1 recites "said buffer layer serving to mitigate differences in material properties between said substrate and other epitaxial layers." Petitioner argues that Sugiura's buffer layers would serve this function. Pet. 102. The preponderance of the evidence supports that Sugiura teaches or suggests this recitation. Ex. 1010, Fig. 10, 17:28, 17:30–33; Ex. 1006 ¶¶ 223–225.

Claim 1 recites "a first cladding layer serving to confine electron movement within the chip." Petitioner asserts that Sugiura discloses a cladding layer that serves to perform the recited function. Pet. 103. The preponderance of the evidence supports that Sugiura teaches or suggests this recitation. Ex. 1010, Fig. 3, 17:34; Ex. 1006 ¶¶ 227–229; *see also* Ex. 1005, 1/24/2014 Action, 23.

Claim 1 recites "said first cladding layer being adjacent said buffer layer." Petitioner asserts that Sugiura Figure 10 discloses this recitation. Pet. 105. The preponderance of the evidence supports that Sugiura teaches or suggests this recitation. Ex. 1010, Fig. 10; Ex. 1006 ¶ 230.

Claim 1 recites "an active layer." Petitioner asserts that Sugiura teaches this layer as active layer 65. Pet. 105–106. The preponderance of the evidence supports that Krames teaches or suggests this recitation. Ex. 1010, Fig. 10, 17:34; Ex. 1006 ¶ 231

Claim 1 recites "said active layer emitting light when electrons jump to a valance state." Petitioner asserts that Sugiura's active layer will meet this function. Pet. 106. The preponderance of the evidence supports that Sugiura teaches or suggests this recitation. Ex. 1006 ¶ 232.

59

IPR2022-00848
Patent 6,634,770 C3

Claim 1 recites "a second cladding layer." Petitioner asserts that Sugiura discloses this limitation as current injection layer 66. Pet. 106–107. The preponderance of the evidence supports that Sugiura teaches or suggests this recitation. Ex. 1010, Fig. 10, 17:36–37; Ex. 1006 ¶¶ 233–235; *see also* Ex. 1005, 1/24/2014 Action, 18–19, 23.

Claim 1 recites "said second cladding layer positioned so that said active layer lies between cladding layers." Petitioner asserts that Sugiura Figure 10 discloses this recitation. Pet. 109. The preponderance of the evidence supports that Sugiura teaches or suggests this recitation. Ex. 1010, Fig. 10; Ex. 1006 ¶ 236.

Claim 1 recites "a contact layer on which an electron [sic, electrode] may be mounted for powering said chip." Petitioner asserts that Sugiura teaches contact layer 67. The preponderance of the evidence supports that Sugiura teaches or suggests this recitation. Ex. 1010, Fig. 10, 17:37–38, 44; Ex. 1006 ¶ 237.

We next address elements of claim 9 which depends from claim 1. Claim 9 recites "[a] device as recited in claim 1 wherein said substrate is electrically conductive." Petitioner asserts that Sugiura teaches N-type silicon substrate 60 and that silicon is electrically conductive. Pet. 111. The preponderance of the evidence supports that Suguira teaches or suggests this recitation. Ex. 1010, 17:12; Ex. 1006 ¶ 239.

We next address elements of claim 18. Claim 18 depends from claim 9. Claim 18 recites "[t]he semiconductor light source as recited in claim 9 wherein: said semiconductor chip is a light emitting diode (LED) chip configured to output light at greater than about 40 milliwatts." This claim language requires a semiconductor chip *capable* of the recited output.

60

IPR2022-00848
Patent 6,634,770 C3

Petitioner argues that the combination of Suguira and Krames discloses this claim recitation.

Patent Owner argues that Petitioner never establishes that the modified Suguira chip "would output light at greater than 40 milliwatts." Resp. 44. Patent Owner's argument misses the mark because claim 18 is not a method claim and does not require a particular light output. A preponderance of the evidence, as Petitioner cites, supports that a person of ordinary skill in the art would have been motivated to modify Suguira to increase area and operating current. Pet. 28–29; Ex. 1007, 2:3–5; Ex. 1006 ¶ 87. The preponderance of the evidence supports that the modified Suguira chip would, like Krames, be capable of outputting light at greater than 40 milliwatts. Ex. 1008, Abstract, Fig. 12, 5 (Table I, Fig. 12), 10; Ex. 1006 ¶¶ 87, 119.

Claim 18 recites "said LED chip is configured to emit monochromatic visible light." Petitioner asserts that Suguira in combination with Krames discloses the limitation. Pet. 111. The preponderance of the evidence supports that Petitioner's assertion for the reasons we explain when addressing this element with regard to ground 1 and when addressing reasons to combine the references' teachings.

To summarize, Petitioner has shown by a preponderance of the evidence that the combined teachings of Begemann, Suguira, Krames, and Allen teach or reasonably suggest all of the elements of claim 18 in the manner claim 18 (and the claims that claim 18 depends from) recites. Thus, we are persuaded that Petitioner has established by a preponderance of the evidence that the combination of Begemann, Suguira, Krames, and Allen renders claim 18 obvious.

61

**Appx198**

IPR2022-00848
Patent 6,634,770 C3

      c.     *Dependent Claims 22, 25, 26, 28–30, 32–36, 40–44, 47–49, 52, 53, 56–59, 62, 63, 65–68, 70–73, 77, 78, 81, 82, 85, 86, and 88–91*

Petitioner adequately accounts for the limitations recited in claims 22, 25, 26, 28–30, 32–36, 40, 42–44, 47–49, 52, 53, 56–59, 62, 63, 65–68, 70–73, 77, 78, 81, 82, 85, 86, and 88–91. Pet. 54–98, 111. Petitioner's position with respect to these claims is essentially the same as for Ground One except that claim elements relating to LED chip emission characteristics rely on the combination of Suguira and Krames. Patent Owner does not separately dispute these dependent claims except to the extent Patent Owner's arguments with respect to Ground One still apply. Resp. 46. For the reasons we explain when addressing ground one, Patent Owner's arguments do not persuasively undermine Petitioner's showing of unpatentability except with regard to claim 41. As to claim 41, Petitioner does not adequately establish unpatentability for the reason we explain when addressing ground one.

We are persuaded that Petitioner has demonstrated that all of the limitations recited in claims 22, 25, 26, 28–30, 32–36, 40, 42–44, 47–49, 52, 53, 56–59, 62, 63, 65–68, 70–73, 77, 78, 81, 82, 85, 86, and 88–91 would have been obvious over Begemann, Suguira, Krames, and Allen. Having reviewed Petitioner's arguments and supporting evidence, we are persuaded that Petitioner has established by a preponderance of the evidence that claims 22, 25, 26, 28–30, 32–36, 40, 42–44, 47–49, 52, 53, 56–59, 62, 63, 65–68, 70–73, 77, 78, 81, 82, 85, 86, and 88–91 are unpatentable under § 103(a) over Begemann, Suguira, Krames, and Allen. Petitioner has not established by a preponderance of the evidence that claim 41 is unpatentable under § 103(a) over Begemann, Suguira, Krames, and Allen.

62

IPR2022-00848
Patent 6,634,770 C3

## IV.    CONCLUSION

Based on the evidence presented with the Petition, the evidence introduced during the trial, and the parties' respective arguments, Petitioner has shown by a preponderance of the evidence that claims 21, 22, 25, 26, 28–30, 32–36, 40, 42–44, 47–49, 52, 53, 56–59, 62, 63, 65–68, 71–73, 77, 78, 81, 82, 85, 86, and 88–91 of U.S. Patent No. 6,634,770 C3 are unpatentable.[14] Petitioner has not shown by a preponderance of the evidence that claim 41 of U.S. Patent No. 6,634,770 C3 is unpatentable.

In summary:

| Claims | 35 U.S.C. § | References/Basis | Claims Shown Unpatentable | Claims Not Shown Unpatentable |
|---|---|---|---|---|
| 21, 22, 25, 26, 28–30, 32–36, 40–44, 47–49, 52, 53, 56–59, 62, 63, 65–68, 71–73, 77, 78, 81, 82, 85, 86, 88–91 | 103(a) | Begemann, Krames, Allen | 21, 22, 25, 26, 28–30, 32–36, 40, 42–44, 47–49, 52, 53, 56–59, 62, 63, 65–68, 71–73, 77, 78, 81, 82, 85, 86, 88–91 | 41 |
| 21, 22, 25, 26, 28–30, 32–36, 40– | 103(a) | Begemann, Sugiura, Allen, Krames | 21, 22, 25, 26, 28–30, 32–36, 40, 42–44, | 41 |

---

[14] Should Patent Owner wish to pursue amendment of the challenged claims in a reissue or reexamination proceeding subsequent to the issuance of this decision, we draw Patent Owner's attention to the April 2019 *Notice Regarding Options for Amendments by Patent Owner Through Reissue or Reexamination During a Pending AIA Trial Proceeding. See* 84 Fed. Reg. 16,654 (Apr. 22, 2019). If Patent Owner chooses to file a reissue application or a request for reexamination of the challenged patent, we remind Patent Owner of its continuing obligation to notify the Board of any such related matters in updated mandatory notices. *See* 37 C.F.R. § 42.8(a)(3), (b)(2).

IPR2022-00848
Patent 6,634,770 C3

| Claims | 35 U.S.C. § | References/Basis | Claims Shown Unpatentable | Claims Not Shown Unpatentable |
|---|---|---|---|---|
| 44, 47–49, 52, 53, 56–59, 62, 63, 65–68, 71–73, 77, 78, 81, 82, 85, 86, 88–91 | | | 47–49, 52, 53, 56–59, 62, 63, 65–68, 71–73, 77, 78, 81, 82, 85, 86, 88–91 | |

## V.   ORDER

For the foregoing reasons, it is

ORDERED that Petitioner establishes by a preponderance of the evidence that claims 21, 22, 25, 26, 28–30, 32–36, 40, 42–44, 47–49, 52, 53, 56–59, 62, 63, 65–68, 71–73, 77, 78, 81, 82, 85, 86, and 88–91 of U.S. Patent No. 6,634,770 C3 are unpatentable;

FURTHER ORDERED that Petitioner does not establish by a preponderance of the evidence that claim 41 of U.S. Patent No. 6,634,770 C3 is unpatentable;

FURTHER ORDERED that Patent Owner's Motion to Exclude Exhibit 1028 is *denied*;

FURTHER ORDERED that Petitioner's Motion to Exclude Exhibits 2017 and 2030 is *dismissed as moot*; and

FURTHER ORDERED that, because this is a Final Written Decision, the parties to the proceeding seeking judicial review of the decision must comply with the notice and service requirements of 37 C.F.R. § 90.2.

64

IPR2022-00848
Patent 6,634,770 C3

PETITIONER:

John Alemanni
Matias Ferrario
Andrew Saul
KILPATRICK TOWNSEND & STOCKTON LLP
jalemanni@kilpatricktownsend.com
mferrario@kilpatricktownsend.com
asaul@kilpatricktownsend.com


PATENT OWNER:

Joshua Larsen
Paul Hunt
Adam Kaufmann
BARNES & THORNBURG LLP
Joshua.larsen@btlaw.com
Paul.hunt@btlaw.com
Adam.kaufmann@btlaw.com

Ronald E. Cahill
BARNES & THORNBURG LLP
rcahill@nutter.com

Kevin B. Laurence
LAURENCE & PHILLIPS IP LAW
klaurence@lpiplaw.com

**Appx202**

FORM 19. Certificate of Compliance with Type-Volume Limitations

Form 19
July 2020

# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

### CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATIONS

**Case Number:**  2024-1194, 2024-1221, 2024-1222, 2024-1223

**Short Case Caption:**  CAO Lighting, Inc. v. Wolfspeed, Inc. et al.

**Instructions:** When computing a word, line, or page count, you may exclude any items listed as exempted under Fed. R. App. P. 5(c), Fed. R. App. P. 21(d), Fed. R. App. P. 27(d)(2), Fed. R. App. P. 32(f), or Fed. Cir. R. 32(b)(2).

The foregoing filing complies with the relevant type-volume limitation of the Federal Rules of Appellate Procedure and Federal Circuit Rules because it meets one of the following:

☑ the filing has been prepared using a proportionally-spaced typeface and includes __13,811__ words.

☐ the filing has been prepared using a monospaced typeface and includes _____ lines of text.

☐ the filing contains _____ pages / _____ words / _____ lines of text, which does not exceed the maximum authorized by this court's order (ECF No. _____).

Date: __03/25/2024__

Signature: /s/ Ronald E. Cahill

Name: Ronald E. Cahill